# EXHIBIT
# A

# NOTICE OF ARBITRATION
# UNDER THE ARBITRATION RULES OF THE
# UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW
# AND
# THE NORTH AMERICAN FREE TRADE AGREEMENT

**MESA POWER GROUP, LLC**

Investor

**v.**

**GOVERNMENT OF CANADA**

Party

October 4, 2011

Pursuant to Article 3 of the United Nations Commission on International Trade Law ("UNCITRAL") Rules of Arbitration and Articles 1116 and 1120 of the North American Free Trade Agreement ("NAFTA"), the Investor, **MESA POWER GROUP, LLC**, initiate recourse to arbitration under the UNCITRAL Rules of Arbitration (Resolution 31/98 Adopted by the General Assembly on December 15, 1976).

## A. DEMAND THAT THE DISPUTE BE REFERRED TO ARBITRATION

1. Pursuant to Article 1120(1)(c) of the NAFTA, the Investor hereby demands that the dispute between it and the Government of Canada ("Canada") be referred to arbitration under the UNCITRAL Arbitration Rules.

2. Pursuant to Article 1119 of the NAFTA, the Investor delivered a Notice of Intent to Submit a Claim to Arbitration to Canada on July 6, 2011, more than ninety days prior to the submission of this claim.

3. Pursuant to Article 1121 of the NAFTA, the Investor consents to arbitration in accordance with the procedures set out in the NAFTA. The Investor hereby waives its right to initiate or continue before any administrative tribunal or any court, or any other dispute settlement procedures, any proceedings with respect to the measures outlined herein, except for proceedings for injunctive, declaratory or other extraordinary relief, not involving payment of damages, before an administrative tribunal or court under the laws of Canada. The Investor's executed consent and waiver, and the Investments' waivers, are attached to this Notice of Arbitration.[1]

## B. NAMES AND ADDRESSES OF THE PARTIES

The Investor is:

Mesa Power Group, LLC
8117 Preston Road Suite 260 West
Dallas, TX 75225
United States

This arbitration is with respect to four Alberta unlimited liability companies owned by the Investor. The four Investments are: Arran Wind Project ULC, TTD Wind Project ULC, North Bruce Project, ULC, and Summerhill Project, ULC.

The Investments maintain their registered office at:

3700, 400 – 3rd Avenue SW
Calgary, AB T2P 4H2
Canada

[1] The duly executed consent and waiver of Mesa Power Group, LLC is attached at Exhibit 1. The duly executed waivers of the four Investments are attached at Exhibit 2.

The Government of Canada is a Party to this arbitration. It is represented by:

Office of the Deputy Attorney General of Canada
284 Wellington Street
Ottawa, ON K1A 0H8
Canada

## C. ARBITRATION CLAUSE OR SEPARATE ARBITRATION AGREEMENT INVOKED

4. The Investor invokes Section B of Chapter 11 of the NAFTA, and specifically Articles 1116, 1120 and 1122 of the NAFTA, as authority for this arbitration. Section B of Chapter 11 of the NAFTA sets out the provisions concerning the settlement of disputes between a Party and an investor of another Party.

## D. CONTRACT OUT OF OR IN RELATION TO WHICH THE DISPUTE ARISES

5. The dispute is in relation to the Investor's investment in Canada and the damages that have arisen out of Canada's breach of its obligations under Section A of Chapter 11 of the NAFTA.

## E. THE GENERAL NATURE OF THE CLAIM

6. This claim arises out of the arbitrary and unfair application of various government measures related to the regulation and production of renewable energy in Ontario. Canada, through its sub-national organs imposed sudden and discriminatory changes to the established scheme for renewable energy, namely the Feed-In-Tariff Program (the "FIT Program").

**Mesa Power is an Investor of the United States**

7. The Investor, Mesa Power Group, LLC ("Mesa Power"), is a Delaware limited liability corporation. It owns Mesa Wind, LLC ("Mesa Wind"), which in turn owns and controls Mesa AWA, LLC ("Mesa AWA").

**Mesa Power Owns Investments in Canada**

8. Mesa Power wholly owns and controls (through Mesa AWA) the following four wind farm investments in southwestern Ontario:

    a. TTD Wind Project ULC ("TTD") is an unlimited liability corporation incorporated in the Province of Alberta. The TTD Wind Project is designed to produce generation of 150 MW of wind power.

b. Arran Project ULC ("Arran") is an unlimited liability corporation incorporated in the Province of Alberta. The Arran Project is designed to produce generation of 115 MW of wind power.

c. North Bruce Project, ULC ("North Bruce") is an unlimited liability corporation incorporated in the province of Alberta. The North Bruce Project is designed to produce generation of 200 MW of wind power.

d. Summerhill Project, ULC ("Summerhill") is an unlimited liability corporation incorporated in the Province of Alberta. The Summerhill Project is designed to produce generation of 100 MW of wind power.

9. The Province of Ontario is a subnational government of Canada. Canada is responsible for Ontario's observance of the NAFTA pursuant to NAFTA Article 105. The Ontario Power Authority ("OPA") is a state enterprise that is wholly owned and controlled by the Province of Ontario. As directed by the Ministry of Energy pursuant to powers conferred by Ontario law, the OPA is responsible to implement the FIT Program, including the setting of prices and the administration of contracts. The defined power purchase rates are paid for pursuant to the contracts between the OPA and electricity generators.[2]

**The FIT Program**

10. Ontario's government launched the Feed-In Tariff Program ("FIT Program") in 2009.[3] The renewable energy obtained through the FIT Program is sold into the Ontario electrical grid for resale to individual customers across Ontario. The OPA sets the prices of the energy and administers the contracts with its customers.

11. The Bruce to Milton Transmission project was a key element to enable power production in the Bruce Region under the FIT Program. This project was designed to allow the OPA to offer contracts under the FIT Program in the region from Bruce County to Milton, Ontario. The process was to offer 1,200 MW of renewable energy contracts with this region of the province of Ontario.

---

[2] Feed-In Tariff Program, *FIT Rules Version 1.5*, June 3, 2011. Ontario Power Authority at para. 1.2. ***(Investor's Schedule of Documents at Tab 1)***

[3] The Ontario legislature enacted the *Green Energy Act* on May 14, 2009. *Green Energy Act, 2009,* SO 2009, c.12, Sched. A ***(Investor's Schedule of Documents at Tab 2)***

12. Through long-term fixed price contracts with the OPA, the Ontario FIT Program guaranteed electrical grid access to renewable energy producers. The renewable energy producers in the FIT Program would receive a set price for renewable energy, and a guaranteed contract for the energy they produce. As a green energy supplier, Mesa Power needed to enter into contractual relations with the OPA to have the opportunity to conduct business with the local distribution companies and the transmission asset owners with whom electricity generators benefiting from the FIT Program need to work with in order to connect to the network.

13. To participate in the FIT Program, applicants must comply with all of the rules established by the OPA regarding the FIT Program (the "FIT Rules").[4] A successful applicant under the FIT Program would receive a Power Purchase Agreement (PPA) from the OPA, that guaranteed a set purchase price over a twenty year period (the "FIT Contract").[5] This guaranteed purchase price was based on 13.5 cents per kilowatt hour plus escalators.

14. All wind power projects interested in long-term contracts for renewable energy in Ontario and that are over 10kW are required to be evaluated under the FIT Program. Projects are evaluated against other projects in their geographic electricity transmission zone, as defined by the OPA. The evaluation considers four characteristics:

    a. Expertise of wind power development;

    b. Financial capacity;

    c. Guaranteed access for wind turbine supply; and

    d. Permitting.

    Thus, those projects that are ahead of others in the FIT Program are intended to be those that are shovel ready. They are favored because of the financial depth, relevant experience, and available turbine supply.

15. In accordance with FIT Program Rules, the OPA assessed all completed applications, by order of time stamp. The OPA ranked applicants in priority based on the four criteria. This priority ranking determined which proponents were to be awarded contracts within each geographic zone.

---

[4] Feed-In Tariff Program, *FIT Rules Version 1.5*, June 3, 2011, Ontario Power Authority at para. 1.2 ***(Investor's Schedule of Documents at Tab 1)***

[5] Feed-In Tariff Program, *Program Overview*, August 2010 at para. 6.4. ***(Investor's Schedule of Documents at Tab 3)***

16. A proponent would only be offered a FIT Contract if there is sufficient transmission capacity available to connect the project. To determine whether the necessary connection resources were available to the applicant, the OPA provided tools designed to identify connection availability. Provided that the project was not exempt from the OPA's project capacity allocation, then all proposed projects were to be assessed within sixty days of a complete application:

    a. The transmission availability test, as performed by the OPA to determine whether the transmission system had the connection availability to connect the project to the grid. If the proponent passed the test, then the OPA offered a FIT Contract to the proponent.[6]

    b. If the proponent failed the test, then the project was assessed under the Economic Connection Test, which was designed to assess whether there was a justification for ratepayer investment to upgrade the grid and expand system capacity.[7]

17. A successful applicant under the FIT Program receives a twenty year Power Purchase Agreement from the OPA. The FIT Contract guarantees the purchase price over the twenty-year contract period.[8]

18. On December 21, 2010, the OPA issued its first-round priority ranking, and indicated that priority ranking was based on the acceleration – shovel readiness criteria.[9]

---

[6] Feed-in Tariff Program, *FIT Rules Version 1.5,* June 3, 2011, Ontario Power Authority, at para. 5.2(a) ***(Investor's Schedule of Documents at Tab 1)***

[7] Feed-in Tariff Program, *FIT Rules Version 1.5,* June 3, 2011, Ontario Power Authority, at para. 5.2(b) ***(Investor's Schedule of Documents at Tab 1)***

[8] Feed-in Tariff Program, *Program Overview*, August 2010, at para 6.4 ***(Investor's Schedule of Documents at Tab 3)***

[9] Feed-in Tariff Program, Program Update, Priority ranking for First Round FIT Contracts, December 21, 2010 ***(Investor's Schedule of Documents at Tab 4)***

**The Domestic Content Requirements**

19. On September 24, 2009, the Ontario Minister of Energy directed the OPA to create a FIT Program that contained a defined percentage of domestic content.[10] To meet this direction, the OPA incorporated provisions that provided that each wind power project applicant was required to achieve specific thresholds for the level of local inputs to be incorporated in the FIT Contract. An interested applicant must meet the minimum required domestic content level.[11]

20. To be considered for the FIT Program, wind power projects were initially required to achieve a minimum of 25% of domestic content.[12] This level was increased to 50% for power projects that became operational after January 1, 2012.[13] All of the Investor's projects would be affected by the 50% domestic content rule. In addition to creating rules whereby the levels of domestic content gradually increased over time, the OPA distinguished the domestic content requirements depending on the level of local inputs, as according to the source of energy, and the size of the renewable energy project at issue.

21. A FIT Contract would not be eligible to receive the benefits of the FIT Program unless it complied with the requirements set forth in the FIT Rules, and as provided in the FIT Contract. To verify this requirement, an interested applicant must complete the Domestic Content Report package within 60 days of reaching Commercial Operation pursuant to the requirements of the FIT Contract.[14] Notwithstanding the FIT Program Rules, the OPA has the discretion to request additional information or documentation relating to any Designated Activity set out in the Domestic Content Report as having been performed.

---

[10] Directive from Minister of Energy and Infrastructure, the Honourable George Smitherman to Colin Andersen, CEO, Ontario Power Authority, September 24, 2009, directing the OPA to develop a FIT Program and include a requirement that the applicant submit a plan for meeting the domestic content goals in the FIT rules. ***(Investor's Schedule of Documents at Tab 5)***

[11] Feed-in Tariff Program, *FIT Contract Version 1.5*, June 3, 2011, Ontario Power Authority, at paras. 2.2(f), 2.4(b)(iii) (An energy Supplier shall not receive a Notice to proceed unless the supplier identifies a plan setting out how it intends to meet the Minimum Required Domestic Content Level) ***(Investor's Schedule of Documents at Tab 6)***

[12] Feed-In Tariff Program, *FIT Rules Version 1.5*, June 3, 2011, Ontario Power Authority at para. 6.4(a)(i) ***(Investor's Schedule of Documents at Tab 1)***

[13] Feed-In Tariff Program, *FIT Rules Version 1.5*, June 3, 2011, Ontario Power Authority at para. 6.4(a)(i) ***(Investor's Schedule of Documents at Tab 1)***

[14] Feed-in Tariff Program, *FIT Contract Version 1.5*, June 3, 2011, Ontario Power Authority, at paras. 2.11(c). All of the prescribed forms necessary for the submission of a complete Domestic Content Report are available online. ***(Investor's Schedule of Documents at Tab 6)***

**The Korean Consortium's Green Energy Investment Agreement**

22. On January 21, 2010, two Korean-controlled companies, Samsung C&T Corporation and Korea Electric Power Corporation, signed a $7 billion green energy investment agreement with Ontario's Premier and with Ontario's Minister of Energy (The Agreement is known as the *Green Energy Investment Agreement*).[15] The existence of the agreement was public, but its terms and conditions were kept secret. The hidden agreement granted Samsung C&T and Korea Electric Power Corporation significantly better access to renewable energy transmission and generation than to other energy providers in the province of Ontario including other companies participating in the FIT Program.

23. On April 1, 2010, the Minister of Energy issued a Ministerial Direction to the OPA related to the *Green Energy Investment Agreement*.[16] The Ministerial Directive revealed some of the details of the terms of the *Green Energy Investment Agreement*, and that the Consortium had agreed to develop 2,500 MW of wind and solar renewable generation projects in Ontario in five Phases.[17] The Consortium committed to bringing manufacturing plants to Ontario to manufacture wind and solar generation components. Phase 1 of the Green Energy Investment Agreement was to provide for Targeted Generation Capacity of 400 MW of wind power and 100 MW of solar power with the targeted commercial operation date as of March 31, 2013.[18]

24. To satisfy Phase 1 of the *Green Energy Investment Agreement*, the Ontario Ministry of Energy directed the OPA on September 30, 2009 to hold in reserve 240 MW of transmission capacity in Haldimand County, Ontario and a total 260 MW of transmission capacity in Essex County and the Municipality of Chatham-Kent jointly for renewable energy generating facilities with respect to proponents that signed province-wide framework agreements.[19] As a result of the *Green Energy Investment Agreement*, the Korean Consortium received a guaranteed right of first refusal on transmission access in these transmission zones in the Province of Ontario.

---

[15] Samsung C&T Press Release, January 21, 2010. The Press release also indicates that Samsung C&T is currently engaged in renewable energy projects in Korea, Italy, Greece, Turkey, Costa Rica and the United States. ***(Investor's Schedule of Documents at Tab 7)***

[16] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, April 1, 2010 ***(Investor's Schedule of Documents at Tab 8)***

[17] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, April 1, 2010 ***(Investor's Schedule of Documents at Tab 8)***

[18] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, April 1, 2010 ***(Investor's Schedule of Documents at Tab 8)***

[19] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, April 1, 2010 ***(Investor's Schedule of Documents at Tab 8)***

25. Pattern Energy Group LLC ("Pattern Energy") is an independent, fully integrated energy company that develops, constructs, owns and operates renewable energy and transmissions assets in the United States, Canada and Latin America.[20] On April 18, 2011, Pattern Energy joined the Korean Consortium to acquire wind projects in Ontario. Pattern Energy joined into the benefits of the *Green Energy Investment Agreement*, by jointly acquiring land from two wind development projects in the Regional Municipality of Chatham-Kent.[21]

26. A few days later, on April 26, 2011, Pattern Energy partnered with Samsung Renewable Energy to acquire wind power projects in Ontario.[22] Samsung noted that this successfully "secured dedicated transmission capacity for these initial projects".[23]

27. Initial rankings for projects were issued in December 21, 2010.[24]

28. On Friday, June 3, 2011, the OPA issued, without any prior notice, a new set of rules for awarding FIT Program contracts based on a directive it received from the Ontario Minister of Energy.[25] The new rules made four fundamental changes:

    a. The Ontario Power Authority was directed to award 750 MW of FIT Program contracts in the Bruce Region transmission zone, and 300 MW in the West of London Region transmission zone;[26]

    b. Each project was now to be provided the opportunity to change its interconnect point during a five day period commencing Monday, June 6, 2011;[27]

---

[20] Pattern Energy has a head office in San Francisco, California, and offices in Houston, New York and Toronto. Pattern Energy Press Release, April 18, 2011 ***(Investor's Schedule of Documents at Tab 9)***

[21] Pattern Energy Press Release, April 18, 2011 ***(Investor's Schedule of Documents at Tab 9)***

[22] Pattern Energy Press Release, April 26, 2011 ***(Investor's Schedule of Documents at Tab 16)***

[23] Pattern Energy Press Release, April 26, 2011 ***(Investor's Schedule of Documents at Tab 16)***

[24] Feed-In Tariff Program, Priority Ranking List, December 21, 2010 ***(Investor's Schedule of Documents at Tab 10)***

[25] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, June 3, 2011 ***(Investor's Schedule of Documents at Tab 13)***

[26] Feed-In Tariff Program, *FIT Rules Version 1.5*, June 3, 2011, Ontario Power Authority at para. 5.4.1(c)(iv). ***(Investor's Schedule of Documents at Tab 1)***

[27] Public News Release, *Allocating Capacity and Offering FIT Contracts for Bruce to Milton Enabled Projects*, June 3, 2011, Ontario Power Generation. ***(Investor's Schedule of Documents at Tab 14)***

c. Projects in the Bruce or West of London Regions could change and select an interconnect point outside their own region, and could build long transmission lines outside of their own regions and into neighbouring regions; and

d. Instead of evaluating projects on the previously published priority rankings for the region, the projects were now to be evaluated on a provincial wide ranking.

29. As a result of the new rules, several wind projects in the Bruce Region transmission zone lost available transmission capacity in their designated interconnects.

30. Projects in the West of London region, that had a higher provincial-wide priority ranking, could now build long transmission lines to interconnect in the Bruce Region and thereby jump ahead in the priority ranking.

31. For example, a domestic competitor to the Claimants, Boulevard Associates Canada, Inc., was able to bring four of its West of London region projects, that were previously not eligible to receive contracts because of the 300 MW limit in that region, over to the Bruce Region. This allowed Boulevard Associates Canada, Inc. to jump to the front of the priority line, bumping ahead of the projects that had been in the Bruce Region since the beginning of the FIT Program, including the Investor's projects.

32. Other Canadian competitors, such as Suncor, also benefited from the last-minute unfair rule changes.

33. On July 4, 2011 the Investor consequently lost their priority ranking and were not offered FIT Program contracts, because of the 750 MW limit on awards in the Bruce Region, even though there was still available transmission capacity at each of their respective interconnects.

34. Rather than allow the FIT Program to be impartially assessed through the ordinary approval process, Ministers and other government officials used extraordinary unilateral Ministerial directives to interfere with the Investor's rights and the conduct and operations of its investments. These measures were taken without any consultation or notice to the four companies or their investments.

35. The arbitrary and discriminatory use of these extraordinary powers resulted in a direct and immediate benefit to the better treated companies.

36. On August 2, 2011, the OPA announced that it would modify the termination provisions of the FIT Program to ensure that any contract awarded could not be terminated under the existing four month termination provisions in the FIT Program.[28]

---

[28] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, August 2, 2011 ***(Investor's Schedule of Documents at Tab 12)***

37. On August 3, 2011, the Ontario Ministry of Energy announced changes to the generous terms granted to Samsung C&T and its Consortium Partners.[29] The Minister gave a one-year extension to the Consortium.

**Renewable Energy Approval Changes**

38. In August 2011, various Ontario ministries published revised guidelines as related to the Renewable Energy Approvals ("REA") process. These recent changes make the REA process significantly easier for proponents that will ensure their ability to move quickly and demanded less stringent development requirements on potential projects.

39. These changes allowed proponents with FIT Contracts to avoid certain development work. However, at the same time Mesa Power aggressively developed its projects believing that when Ontario would award FIT Contracts, they would need to be operational by 2013. In contrast, the proponents awarded with FIT Contracts faced a short timeline to develop their projects and have asked for a relaxation of the original rules for permitting.

**Waiver of OPA Termination Rights**

40. On August 2, 2011, the Ministry of Energy directed the OPA to offer FIT Contract holders (the "Supplier") the opportunity to have the OPA's termination rights under section 2.4(a) of the FIT Contract waived.[30] Under the pre-existing section 2.4(a) of the FIT Contract, either the OPA or the Supplier could terminate the FIT Contract until time that the OPA issued a Notice to Proceed (NTP) and the Supplier had paid the Incremental NTP Security.[31]

41. The Ministerial Directive in August 2011 directed that developers demonstrated a completed Domestic Content Plan and a manufacturing equipment agreement by December 21, 2011, were now able to request a waiver of the OPA's termination rights.

42. On August 5, 2011, the OPA further notified proponents that if a Supplier were to submit an accurate and complete waiver on or before August 15, 2011, then the OPA would use commercially reasonable efforts to review and execute the waiver before the Ontario general election by a September 30, 2011 deadline.

[29] Public News Release from Ontario Minister of Energy, the Honourable Brad Duguid, August 3, 2011 ***(Investor's Schedule of Documents at Tab 15)***

[30] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, August 2, 2011 ***(Investor's Schedule of Documents at Tab 12)***

[31] Feed-in Tariff Program, *FIT Contract Version 1.5*, June 3, 2011, Ontario Power Authority, at para. 2.4(a). The FIT Contract s. 2.4(b) specified that certain NTP Prerequisites were required, including: (i) regulatory approvals, (ii) financing plan, (iii) domestic content plan, and (iv) electricity connection approvals. ***(Investor's Schedule of Documents at Tab 6)***

**The Investor's Concerns as to Ranking Were Ignored Without Due Process**

43. The ranking results raised some concerns about the criteria applied by the OPA. The Investors were able to meet or exceed the terms of the others who were ranked higher on the listing but there was no transparent way to review the rankings provided by the OPA.

44. Around May 20, 2011, Mesa Power wrote to the OPA asking for more information about the method used for ranking because of concerns that proper ranking methodology had not been applied.

45. About one month later, the OPA responded, and refused to provide any substantive explanation or to disclose the ranking methodology. The OPA merely stated that the rankings for two of the wind projects, Arran and TTD Projects, were correct.[32] The Investor had no way to know how to evaluate the accuracy of the statements made by the OPA in the absence of more information.

**Arbitrary Changes to the FIT Program**

46. On June 3, 2011, the Ontario Minister of Energy directed the OPA to issue, without any prior notice, a new set of rules for awarding FIT Program contracts.[33]

47. As a result of these changes, projects in the West of London area were artificially provided with a higher provincial-wide priority ranking, and could now build long transmission lines to interconnect in the Bruce Region, thereby jumping ahead in the priority ranking.

48. On July 4, 2011 all four of the Investments consequently lost their priority ranking and were not offered FIT Program contracts, because of the 750 MW limit on awards in the Bruce Region, even though there was still available transmission capacity at each of their respective interconnects.

49. Rather than allow the FIT Program to be impartially assessed through the ordinary approval process, Ministers and other government officials used extraordinary unilateral Ministerial directives to interfere with Mesa Power's property rights and the conduct and operations of its investments. These measures were taken without any consultation or notice to Mesa Power or its investments.

50. The arbitrary and non-transparent use of these extraordinary powers resulted in a direct and immediate benefit to the better treated companies, and were taken in the context of an Ontario provincial general election to be held on October 6, 2011.

---

[32] Letter from Shawn Cronkwright, Ontario Power Authority to Mark Ward, Mesa Power Group, LLC, June 17, 2011 ***(Investor's Schedule of Documents at Tab 17)***

[33] Directive from Minister of Energy, the Honourable Brad Duguid to Colin Andersen, CEO, Ontario Power Authority, June 3, 2011 ***(Investor's Schedule of Documents at Tab 13)***

## F. BREACH OF OBLIGATIONS

51. The Investor claims that Canada has violated at least the following provisions of Section A of NAFTA Chapter 11:

    Article 1102 – National Treatment

    Article 1103 – Most Favored Nation Treatment

    Article 1104 – Standard of Treatment

    Article 1105 – International Law Standards of Treatment

    Article 1106 – Performance Requirements

    Article 1503(2) – State Enterprises

    These breaches have resulted in damage to the Investor.

52. The applicable measures relating to the FIT Program includes, but is not limited to, the following:

    a. the *Electricity Act, 1998*, as amended, including in particular Part II.1 (Ontario Power Authority), and Part II.2, (Management of Electricity Supply, Capacity and Demand) thereof, including, in particular, Section 25.35 (Feed-in tariff Program);[34]

    b. the *Green Energy Act, 2009,* as enacted on May 14, 2009;[35]

    c. the *Electricity Restructuring Act, 2004*, including in particular Section A, Section 28, enacting Part II.1 of the *Electricity Act, 1998*;

    d. FIT Directive dated September 24, 2009, from George Smitherman, Deputy Premier and Minister of Energy and Infrastructure, to Colin Anderson, Chief Executive Officer, Ontario Power Authority, directing OPA to develop a FIT Program and include a requirement that the applicant submit a plan for meeting the domestic content goals in the FIT Rules (Ministerial Direction (September));

---

[34] *Electricity Act, 1998*, S.O. 1998, c.15 Sched. A, last amended 2010, c.8 ***(Investor's Schedule of Documents at Tab 11)***

[35] *Green Energy Act, 2009*, S.O. 2009, c.12, Sched. A. ***(Investor's Schedule of Documents at Tab 2)***

e. FIT Directive dated April 1, 2011 from the Minister of Energy to Colin Anderson, Chief Executive Officer, Ontario Power Authority, (the Ministerial Direction (April 2011));

f. FIT Directive dated June 3, 2011 from the Minister of Energy to Colin Anderson, Chief Executive Officer, Ontario Power Authority, (the Ministerial Direction (June 2011));

g. FIT Directive dated August 2, 2011 from the Ontario Minister of Energy to Colin Anderson, Chief Executive Officer, Ontario Power Authority, (the Ministerial Direction (August 2, 2011));

h. FIT Rules, Version 1.5 issued on June, 3 2011 and amended on July 15, 2011by the OPA;

i. FIT Contract, Version 1.5 (June 3,2011), including General Terms and Conditions, Exhibits, and Standard Definitions, issued by the OPA;

j. FIT Application Form (December 1, 2009);

k. FIT Price Schedule (June 3, 2011), issued by the OPA;

l. Public Press Release from Minister of Energy, the Honourable Brad Duguid, August 3, 2011;

m. FIT Program Interpretations of the Domestic Content Requirements (December 14, 2009), issued by the OPA; and

n. Any amendments or extensions of the foregoing, any replacement measures, any renewal measures, any implementing measures, and any related measures.

53. Each of these governmental measures was taken by the Government of Ontario or by its state enterprise, the Ontario Power Authority.

**National Treatment**

54. NAFTA Article 1102 obliges the NAFTA Parties to treat investors from other NAFTA Parties and their investments as favorably as it treats domestic investors and their investments operating in like circumstances.

55. Canada treated the Investor and its Investment less favorably than domestic investors operating in like circumstances. Other investors or Investments in like circumstances, were treated more favorably.

56. Each of the ways in which Canada and Ontario treated the Investor and its Investments less favorably than other Canadian investors and investments in like circumstances constitutes a violation of NAFTA Article 1102.

57. For example, a domestic competitor to Mesa Power, Boulevard Associates Canada, Inc., was able to bring four of its West of London region projects, that were not eligible to receive contracts because of the 300 MW limit in that region, over to the Bruce Region. This allowed Boulevard Associates Canada, Inc. to jump to the front of the priority line, bumping ahead of the projects that had been in the Bruce Region since the beginning of the FIT Program.

58. Canada failed to meet its obligations to provide National Treatment by providing more favorable transmission treatment to a Canadian company in like circumstances, Boulevard Associates Canada, Inc., and to local subsidiaries of members of the Consortium, which was also in like circumstances.

**Most Favored Nation Treatment**

59. NAFTA Article 1103 requires Canada to provide Mesa Power with treatment no less favorable than that provided to foreign investors or investments under other international agreements to which Canada is a party. Canada has failed to meet this obligation. Article 1103 entitles Mesa Power and its investment to receive the best level of treatment available to any foreign investors or investments in Ontario.

60. Canada also violated its Most Favored Nation Treatment obligation (NAFTA Article 1103), when it provided more favorable transmission treatment to the local subsidiary of a company owned by a non-NAFTA party which was in like circumstances, namely the members of the Consortium, than that provided to the Investor and its Investments.

**International Law Standard of Treatment**

61. NAFTA Article 1105 sets out the international law standard of treatment that a NAFTA Party is obliged to accord investments of another NAFTA Party. Canada must ensure that the Investment receives treatment in accordance with the international law standard of treatment, including fair and equitable treatment, freedom from discrimination and full protection and security.

62. The rejection of the Investor's four wind power projects constituted a continuing course of arbitrariness, discrimination, procedural unfairness. These measures constituted a failure to provide fair and equitable treatment to the Investment. Canada has violated its Article 1105 obligation through the Government of Ontario's unfair, arbitrary and discriminatory actions. These measures include, but are not necessarily limited to, the following:

   a. Unannounced last-minute arbitrary changes, failing to fulfill the reasonable and legitimate expectations of the Investment;

   b. Failure to provide reasons for the ranking methodology applied by the Ontario Power Authority;

c. Undue political interference and discriminatory treatment to the Investment and blatant favoritism to other investments;

d. Failure to provide transparent administration of the FIT Program;

e. Imposition of irrelevant political considerations when assessing the Investment; and

f. Failure to apply relevant considerations such as the technical merits of the Investor's wind farm.

63. Each of the ways in which the governments treated the Investment in an unfair, arbitrary and discriminatory way constitutes a violation of NAFTA Article 1105.

64. NAFTA Article 1104 states that the Investor is entitled to the better treatment required under NAFTA Articles 1102 and 1103.

**Performance Requirements**

65. NAFTA Article 1106 restricts the imposition of performance requirements on investments or investors. The prohibited practices are specifically enumerated in NAFTA Article 1106(1) and Article 1106(3). These prohibitions apply to all investments or investors including those from non-NAFTA parties.

66. Article 1106(1) sets out a general prohibition on performance requirements. It states:

> No Party may impose or enforce any of the following requirements, or enforce any commitment or undertaking, in connection with the establishment, acquisition, expansion, management, conduct or operation of an investment of an investor of a Party or of a non-Party in its territory.
>
> (a) to export a given level or percentage of goods or services;
>
> (b) to achieve a given level or percentage of domestic content;
>
> (c) to purchase, use or accord a preference to goods produced or services provided in its territory, or to purchase goods or services from persons in its territory;
>
> (d) to relate in any way the volume or value of imports to the volume or value of exports or to the amount of foreign inflows associated with such investment;
>
> (e) to restrict sales of goods or services in its territory that such an investment produces or provides by relating such sales in any way to the volume or value of its exports or foreign exchange earnings;

> (f) to transfer technology, a production process or other proprietary knowledge to a person in its territory, except when the requirement is imposed or the commitment or undertaking is enforced by a court, administrative tribunal or competition authority to remedy an alleged violation of competition laws or to act in a manner not inconsistent with other provisions of this Agreement; or
>
> (g) to act as the exclusive supplier of the goods it produces or services it provides to a specific region or world market.

67. Article 1106(3) lists a sub-set of performance requirements that cannot be imposed in connection with the provision of an advantage:

> No Party may condition the receipt or continued receipt of an advantage, in connection with an investment in its territory of an investor of a Party or of a non-Party, on compliance with any of the following requirements:
>
> (a) to achieve a given level or percentage of domestic content;
>
> (b) to purchase, use or accord a preference to goods produced or services provided in its territory, or to purchase goods or services from persons in its territory;
>
> (c) to relate in any way the volume or value of imports to the volume or value of exports or to the amount of foreign inflows associated with such investment;
>
> (d) to restrict sales of goods or services in its territory that such an investment produces or provides by relating such sales in any way to the volume or value of its exports or foreign exchange earning.

68. Canada imposed prohibited local content requirements on the Investor and its Investments, as a precondition to obtain approval of contracts under the FIT Program in violation of NAFTA Article 1106.

**State Enterprises**

69. The OPA is a state enterprise. At times, the OPA also acted on the direction of, and as agent for, the Province of Ontario. Canada did not comply with its obligations under NAFTA Article 1503(2), by failing to ensure through regulatory control, administrative supervision or the application of other measures, that the OPA acted in a manner consistent with Canada's obligations under NAFTA Chapter Eleven, wherever the OPA exercised regulatory, administrative or other governmental authority.

## G. ISSUES RAISED

70. Has Canada taken measures inconsistent with its obligations under Section A of the NAFTA, including Articles 1102, 1103, 1104, 1105, 1106 of Chapter 11 of the NAFTA or Article 1503(2)? If so, then what amount of compensation is to be paid to the Investment as a result of Canada's failure to comply with its obligations under the NAFTA?

---

## H. RELIEF SOUGHT AND APPROXIMATE AMOUNT OF DAMAGES CLAIMED

71. The effect of the various measures has caused loss and damage to Mesa Power and to the Investor's related business operations.

72. These losses are not less than 775 million dollars. The Investor and Investment have suffered loss arising from governmental unfair and arbitrary actions as well as from the lack of the most basic procedural fairness protections to follow the rule of law. In addition, the Investment has suffered loss and damage arising from Canada's failure to comply with its NAFTA Chapter 11 obligations.

73. The Investor respectfully claims:

   a. Damages of not less than CDN$775 million in compensation for the loss, harm, injury, moral damage, loss of reputation and damage caused by or resulting from Canada's breach of its obligations under Part A of Chapter 11 of the NAFTA;

   b. Costs of these proceedings, including all professional fees and disbursements;

   c. Fees and expenses incurred to mitigate the effect of the unlawful governmental measures taken by Canada;

   d. Pre-award and post-award interest at a rate to be fixed by the Tribunal; and

   e. Such further relief as counsel may advise and the Tribunal may deem appropriate.

---

**DATE OF ISSUE:** October 4, 2011

**Appleton & Associates International Lawyers**
77 Bloor Street West, Suite 1800
Toronto, ON M5S 1M2
Telephone: (416) 966 8800
Fax: (416) 966 8801

BARRY APPLETON
Counsel for the Investor

SERVED TO: Office of the Deputy Attorney General of Canada
284 Wellington Street
Ottawa, ON K1A 0H8, Canada