# EXHIBIT B

**PCA Case No. 2012-17**                                              **24 March 2016**

## AN ARBITRATION UNDER CHAPTER 11 OF THE NAFTA
## AND THE UNCITRAL ARBITRATION RULES, 1976

between

**MESA POWER GROUP, LLC**

Claimant

and

**GOVERNMENT OF CANADA**

Respondent

---

## AWARD

---

## ARBITRAL TRIBUNAL

Professor Gabrielle Kaufmann-Kohler (Presiding Arbitrator)

The Honorable Charles N. Brower

Toby Landau, QC

## Secretary of the Tribunal

Rahul Donde

TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ................................................................................................ V

I.      THE PARTIES ..................................................................................................... 1

A.      The Claimant ...................................................................................................... 1

B.      The Respondent ................................................................................................. 2

II.     MAIN FACTS ...................................................................................................... 3

A.      Background of Ontario's Electricity Sector ........................................................ 3

B.      The FIT Program ................................................................................................ 4

C.      Applications to the FIT Program ........................................................................ 5

        1. Launch Period Applications ........................................................................... 5

        2. Other Applications ......................................................................................... 6

D.      Mesa's Applications to the FIT Program ............................................................ 7

E.      Awarding FIT Contracts ..................................................................................... 7

        1. First Round of FIT Contract Offers ................................................................ 7

        2. Second Round of FIT Contract Offers ........................................................... 7

        3. Third Round of FIT Contract Offers ............................................................... 8

F.      The Green Energy Investment Agreement ........................................................ 9

III.    PROCEDURAL HISTORY ................................................................................ 10

A.      Initial Phase ..................................................................................................... 10

B.      Written Phase ................................................................................................... 11

C.      Hearing on Merits, Liability and Quantum and Subsequent Submissions ....... 29

IV.     POSITIONS OF THE PARTIES AND RELIEF REQUESTED ........................... 33

A.      Summary of the Claimant's Position ................................................................ 33

B.      The Claimant's Request for Relief .................................................................... 34

C.      Summary of the Respondent's Position ............................................................ 34

**D.**      **The Respondent's Request for Relief**..................................................................**35**

**V.**      **ANALYSIS**..................................................................**36**

**A.**      **Preliminary Matters**..................................................................**36**

     1. Relevance of Previous Decisions and Awards .................................................36

     2. Applicable Legal Framework ..................................................................37

     a. Law Governing the Procedure..................................................................37

     b. Law Governing Jurisdiction .................................................................37

     c. Law Governing the Merits ..................................................................38

     d. Principles of Interpretation ................................................................38

     3. Burden of Proof..................................................................40

**B.**      **Submission of a Claim to Arbitration** ...........................................................**41**

     1. Requirements for Submission of a Claim to Arbitration ....................................42

     a. Article 1121 ..................................................................42

     b. Article 1116..................................................................43

     c. Article 1118..................................................................48

     d. Article 1119..................................................................49

     2. Article 1120 Objection ..................................................................50

     a. The Respondent's Position ..................................................................50

     b. The Claimant's Position ..................................................................53

     c. The Non-Disputing Parties' Position..................................................................55

     d. Analysis ..................................................................56

     3. *Ratione temporis* Objection ..................................................................64

     a. The Respondent's Position ..................................................................64

     b. The Claimant's Position ..................................................................65

     c. The Non-Disputing Parties' Submissions .....................................................65

     d. Analysis ..................................................................65

4. Attribution Objection.................................................................................71

a. Article 4 of the ILC Articles...............................................................73

b. Article 5 of the ILC Articles...............................................................75

**C.    Procurement Exception**..............................................................................**84**

1. The Respondent's Position ...............................................................84

2. The Claimant's Position ....................................................................86

3. The Non-Disputing Parties' Position.................................................88

4. Analysis ............................................................................................89

a. Whether Article 1103 precludes the application of Article 1108........90

b. The FIT Program constitutes "procurement"......................................91

c. The FIT Program is a procurement program "by a Party or a state enterprise"..............107

**D.    Article 1105(1)** ............................................................................................**108**

1. Interpretation of Article 1105 ..........................................................108

a. The Claimant's Position ...................................................................108

b. The Respondent's Position ..............................................................109

c. Non-Disputing Parties' Position........................................................110

d. Analysis ...........................................................................................110

2. Scope and Content of Article 1105.................................................113

a. The Claimant's Position ...................................................................113

b. The Respondent's Position ..............................................................114

c. The Non-Disputing Parties' Position.................................................115

d. Analysis ...........................................................................................116

3. Canada's Alleged Breaches of Article 1105 ...................................121

a. Implementation of the FIT Program by the OPA...............................122

b. The GEIA ........................................................................................130

c. Allocation of capacity in the Bruce Region .....................................155

**VI.    COSTS** ...................................................................................................................**175**

**A.    Background** ..........................................................................................................**175**

**B.    Positions of the Parties** ....................................................................................**175**

   1. The Claimant's Position .......................................................................................175

   2. The Respondent's Position ..................................................................................176

**C.    Analysis** ...............................................................................................................**176**

   1. Costs ....................................................................................................................177

   2. Applicable Legal Framework ...............................................................................178

   3. Allocation of Costs ..............................................................................................178

**VII.   DECISION** ...........................................................................................................**180**

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Arran | Arran Wind Project, ULC |
| AWA | American Wind Alliance, LLC |
| BIT | Bilateral Investment Treaty |
| Canada's Notes | General notes to Appendix 1 of the GPA |
| Canada-Czech Republic FIPA | Canada-Czech Republic Foreign Investor Promotion and Protection Agreement, 2009 |
| CanWEA | Canadian Wind Energy Association |
| C-Mem. | Canada's Counter-Memorial and Reply on Jurisdiction dated 28 February 2014 |
| DAT | Distribution Availability Test |
| ECT | Economic Connection Test |
| EDA | Economic Development Adder |
| Exh. C- | Claimant's Exhibit (Documentary exhibits) |
| Exh. CL- | Claimant's Exhibit (Legal exhibits) |
| Exh. R- | Respondent's Exhibit (Documentary exhibits) |
| Exh. RL- | Respondent's Exhibit (Legal exhibits) |
| FET | Fair and Equitable Treatment |
| FIT Program | Feed-in Tariff Program |
| FTC | NAFTA Free Trade Commission |
| FTC Note | FTC "Notes of Interpretation of Certain Chapter Eleven Provisions", 2001 |
| GATT | General Agreement on Tariffs and Trade, 1994 |
| GE | General Electric |
| GEA | Green Energy Act, 2009 |
| GEGEA | Green Energy and Green Economy Act, 2009 |
| GEIA | Green Energy Investment Agreement, 2010 |
| Government | Government of Ontario |

| | |
|---|---|
| GPA | Government Procurement Agreement |
| Hydro One | Hydro One, Inc. |
| ICJ | International Court of Justice |
| ICSID | International Centre for Settlement of Investment Disputes |
| IESO | Independent Electricity System Operator |
| ILC | International Law Commission |
| ILC Articles | ILC Articles on Responsibility of States for Internationally Wrongful Acts, 2001 |
| IPA | Individual Project Assessment |
| Korean Consortium | Samsung and the Korea Electric Power Corporation |
| kV | Kilovolts |
| LEI | London Economics International, LLC |
| LTEP | Long-Term Energy Plan, 2010 |
| Mem. | Memorial of the Investor dated 20 November 2013 |
| Mesa | Mesa Power Group, LLC |
| MFN | Most-Favored-Nation |
| Minister of Energy or Minister | Minister of Energy of the Government of Ontario |
| MOU | Memorandum of Understanding |
| MW | Megawatts |
| NAFTA | North American Free Trade Agreement |
| NoA or Notice of Arbitration | Investor's Notice of Arbitration dated 4 October 2011 |
| North Bruce | North Bruce Project, ULC |
| NT | National Treatment under NAFTA |
| OPA | Ontario Power Authority |
| PCA | Permanent Court of Arbitration |
| PIA | Postal Imports Agreement |
| PPA | Power Purchase Agreement |
| REA | Renewable Energy Approval |
| Rejoinder | Canada's Rejoinder on the Merits dated 2 July 2014 |

| | |
|---|---|
| Reply | Investor's Reply Memorial and Rejoinder on Jurisdiction dated 30 April 2014 |
| RESOP | Renewable Energy Standard Offer Program, 2006 |
| Samsung | Samsung C&T Corporation |
| SCM Agreement | Agreement on Subsidies and Countervailing Measures |
| Slovak Treaty | Canada-Slovak Republic Agreement for the Promotion and Protection of Investments, 2010 |
| Summerhill | Summerhill Project, ULC |
| TAT | Transmission Availability Test |
| TTD | TTD Wind Project, ULC |
| UNCITRAL Rules | UNCITRAL Arbitration Rules, 1976 |
| US-Ecuador BIT | Treaty Between the United States of America and the Republic of Ecuador Concerning The Encouragement and Reciprocal Protection of Investment, 1993 |
| VCLT or Vienna Convention | Vienna Convention on the Law of Treaties |
| WTO | World Trade Organization |

# I.   THE PARTIES

## A. THE CLAIMANT

1.   Mesa Power Group, LLC ("**Mesa**" or "**the Claimant**") is a Delaware limited liability corporation created in July 2008 with its head office at 8117, Preston Road, Suite 260, West Dallas, TIC 75225, United States. Mesa is part of the Mesa group of companies, which oversee and develop renewable energy projects, notably in the wind sector.[1]

2.   Mesa owns Mesa Wind, LLC, a Delaware corporation, which in turn owns Mesa AWA, LLC, another Delaware corporation.[2] Mesa AWA owns American Wind Alliance, LLC, also a Delaware corporation ("**AWA**"). Through four Delaware incorporated "development corporations",[3] AWA and, therefore, its indirect parent Mesa owns four unlimited liability corporations incorporated in the Canadian province of Alberta, each of which owns a specific wind project: 22 Degrees Holdings, ULC owns TTD Wind Project, ULC ("**TTD**"); Arran Holdings, ULC owns Arran Wind Project, ULC ("**Arran**"); North Bruce Holdings, ULC owns North Bruce Project, ULC ("**North Bruce**"); and Summerhill Holdings, ULC owns Summerhill Project, ULC ("**Summerhill**").[4] This corporate organisation has been depicted by the Claimant as follows:[5]

---

[1]   Witness Statement of Cole Robertson dated 19 November 2013 ("**Robertson WS I**") §7.

[2]   GE Energy, LLC initially held an interest in American Wind Alliance, LLC. On 7 July 2010, Mesa Power purchased the interests of GE Energy LLC, and became the sole owner of American Wind Alliance, LLC (Reply §§93-96; Reply Witness Statement of Cole Robertson dated 28 April 2014 ("**Robertson WS II**") §10).

[3]   AWA TTD Development, LLC; AWA Arran Development, LLC; AWA North Bruce Development, LLC; AWA Summerhill Development, LLC.

[4]   Reply §§852-856.

[5]   Exh. C-0055; Mem. §35.



3. The Claimant has been represented in this arbitration by:

> Appleton & Associates International Lawyers
> 77 Bloor Street West, Suite 1800
> Toronto, ON M5S 1M2
> Canada
> Tel.: + 416 966 8800
> Fax: + 416 966 8801
> E-mail:  bappleton@appletonlaw.com;
> aa40@appletonlaw.com.

**B. THE RESPONDENT**

4. The Respondent is the Government of Canada (the "**Respondent**" or "**Canada**"), having its address at the Office of the Deputy Attorney General of Canada, 284 Wellington Street, Ottawa, ON KIA OH 8, Canada.

5. The Respondent has been represented in this arbitration by:

> Ms. Sylvie Tabet, General Counsel and Director
> Mr. Shane Spelliscy, Counsel
> Mr. Michael Owen, Deputy Director and Counsel
> Mr. Ian Philp, Counsel
> Ms. Heather Squires, Counsel
> Ms. Jennifer Hopkins, Counsel

Trade Law Bureau (JLT)
Foreign Affairs and International Trade, Canada
125 Sussex Drive
Ottawa, Ontario
Canada K1A 0G2
E-mail:  shane.spelliscy@international.gc.ca;
             melissa.perrault@international.gc.ca.

## II.    MAIN FACTS

6.    The following summary is meant to give a general overview of the present dispute. It does not include all facts which may be of relevance, particularly as they emerged from the extensive evidence gathered at the hearing. To the extent relevant and useful, additional facts will be discussed in the Tribunal's analysis of the disputed issues.

### A.  BACKGROUND OF ONTARIO'S ELECTRICITY SECTOR

7.    The origins of Ontario's electricity system can be traced back to 1906, when the Government of Ontario (the "**Government**") established the Hydro-Electric Power Commission of Ontario, which was later renamed Ontario Hydro. As a vertically integrated monopoly, Ontario Hydro coordinated generation and transmission together.

8.    In 1998, following the general trend to introduce competition into regulated monopoly sectors, the Government sought to modify the regulation and management of the electricity system in the province through the Energy Competition Act, the Electricity Act and the Ontario Energy Board Act. Ontario Hydro was restructured and its assets were distributed among separate corporate entities. These successor entities included (i) the Independent Market Operator, later renamed Independent Electricity System Operator, ("**IESO**"), which was charged with administering the electricity market as well as directing the flow of electricity from generators to consumers through the transmission system; and (ii) Hydro One, Inc. ("**Hydro One**"), which assumed the transmission and rural distribution business of Ontario Hydro.

9.    The Government again restructured the electricity system in 2002 and in 2004. In 2004, through the Electricity Restructuring Act, the Government created the Ontario Power Authority ("**OPA**"), which was to be responsible for long-term system planning, procurement of new generation through long term power purchase agreements, and the promotion of the diversification of Ontario's electricity supply with a particular emphasis on renewable energy.

10. In keeping with its intention to eliminate Ontario's reliance on coal-fired generation facilities, the Government launched several initiatives for the promotion of renewable sources of energy. Among these was the 2006 Renewable Energy Standard Offer Program ("**RESOP**"), which by 2008 had resulted in 3145 20-year fixed-price contracts for the procurement of approximately 1,300 MW of renewably generated electricity.

11. In 2009, in the wake of the global financial crisis, the Government enacted the Green Energy and Green Economy Act, 2009 (the "**GEGEA**") to "build a green economy."[6] The GEGEA amended 15 existing statutes and constituted a new standalone legislation known as the Green Energy Act, 2009 (the "**GEA**"). Notably, the GEGEA added section 25.35 to the Electricity Act authorizing the Minister of Energy of the Government (the "**Minister of Energy**") to direct the OPA to develop a feed-in tariff program (the "**FIT Program**") to promote the generation and consumption of renewable energy in the province. The OPA was to be responsible for implementing the FIT Program, including setting prices and administering contracts entered into under that program.

### B. THE FIT PROGRAM

12. Work on designing the FIT Program began in early 2009. On 24 September 2009, after several stakeholder consultations, the Minister of Energy formally directed the OPA to create the FIT Program.[7] The FIT Program was to achieve specified goals. One of these goals was that participants in the program satisfy prescribed domestic content requirements: developers who had a milestone date for commercial operation on or before 31 December 2011 would have to meet a domestic content requirement of 25%, and those with a later milestone date would have to meet a domestic content requirement of 50%. As will be seen below, the latter requirement applied to the Claimant's projects.

13. The FIT Program was formally launched by the OPA on 1 October 2009. It was accompanied by the FIT Rules, which set the eligibility criteria for the program as well as the criteria for evaluating applications to the FIT Program. These Rules were amended on several occasions.

---

[6]  Exh. R-057.
[7]  Exh. R-001.

14.   Under the FIT Program, interested parties were to apply for a 20 or 40-year power purchase agreement (a "**FIT Contract**") with the OPA. Under a FIT Contract, generators would be paid a guaranteed price per kWh for electricity delivered into the Ontario electricity system. Participation in the FIT Program was open to projects located in Ontario that generated electricity exclusively from one or more sources of renewable energy. Applicants had to be connected to the electricity grid (either to a distribution system, a transmission system or through a customer).

15.   The FIT Program itself was divided into two streams: the FIT stream for projects with a production capacity exceeding 10 kW and the microFIT stream for projects with a lower capacity. All of the Claimant's projects fell within the FIT stream.

16.   When launching the FIT Program, the Government was concerned that the number of applications would not be sufficient to meet Ontario's energy needs. In reality, a high number of applications were filed and the Government employed an "independent fairness monitor", London Economics International, LLC ("**LEI**"), inter alia to design a system to process the large number of applications.

### C.   APPLICATIONS TO THE FIT PROGRAM

17.   The FIT Rules set out a process for scoring and ranking applications to determine which projects would receive FIT Contracts. Projects with the highest rankings would be awarded contracts based on available transmission capacity.

18.   The process involved two phases: a special process for ranking applications received during the first 60 days of the program ("**the Launch Period**") and a standard process for ranking applications received later. Applications received during the Launch Period would be ranked based on criteria identifying the most development-ready (or "shovel-ready") projects, whereas all other applications would be ranked based on the time when they were received by the OPA.

### 1.   Launch Period Applications

19.   Applications received between 1 October and 30 November 2009 ("**Launch Period Applications**") were deemed to have been received at the same time. Applicants during this period could advance their ranking by demonstrating that their projects were "shovel-ready." In order to assess shovel-readiness, the OPA looked at four criteria: (i) whether

the project was exempt from the Renewable Energy Approval ("REA") Process ("**REA Exemption Point**"); (ii) whether the applicant owned or had a firm order for a major component ("**Major Equipment Control Point**"); (iii) whether the applicant had successfully developed a similar facility ("**Prior Experience Point**"); and (iv) whether the applicant had financial backing ("**Financial Capacity Point**").

20.   If an applicant satisfied all of these criteria, it would be awarded four points. For each point awarded, the applicant committed to operate its project 90 days earlier than otherwise required under the standard FIT Contract ("**COD Acceleration Days**"). Accordingly, if an applicant bid for all four criteria points, it committed to bring its project into commercial operation 360 days earlier than otherwise required by the FIT Contract.

21.   In addition, Launch Period applicants could commit to be ready for commercial operations up to 365 days earlier than otherwise required by the FIT Contract. Thus, in total, a Launch Period applicant could bid up to a maximum of 725 COD Acceleration Days.

###   2.   Other Applications

22.   Applications received after the Launch Period received a time stamp based on the actual date and time when the OPA received the application. The ranking of these applications was based solely on their time stamps; these applicants could not advance their rankings by demonstrating that their projects were shovel-ready.

23.   In order to consolidate launch and post-launch period rankings, the OPA developed a procedure to translate COD Acceleration Days back into a "time stamp." As a result, the top-ranked Launch Period Application, based on the number of COD Acceleration Days that it had been awarded, would be accorded the "earliest" time stamp. The second ranked application would be accorded the next earliest, and so on until all the Launch Period Applications had been ranked. All other applications would then be ranked in accordance with their actual time stamp.

24.   Any applicant would only be offered a FIT Contract if there was sufficient transmission capacity available to connect its project to the grid. To determine if there was sufficient transmission capacity, the OPA would conduct a Transmission Availability Test ("TAT"). If no capacity was available for the project, the OPA would conduct an Economic

Connection Test ("**ECT**") to determine whether it was economically and technically feasible to upgrade the transmission system to accommodate the project.

25.   Other requirements had to be satisfied before a project could proceed to development. These included regulatory approvals, impact assessments, permits and licenses.[8]

### D.   MESA'S APPLICATIONS TO THE FIT PROGRAM

26.   Mesa filed six applications under the FIT Program.[9] On 25 November 2009, TTD and Arran submitted one application each. Each application bid for three criteria points: Major Equipment Control, Prior Experience and Financial Capacity. Subsequently, on 29 May 2010, North Bruce and Summerhill submitted two applications each. All of Mesa's projects were located in the Bruce Region of Ontario.

### E.   AWARDING FIT CONTRACTS

#### 1.   First Round of FIT Contract Offers

27.   A vast majority of the FIT applications submitted during the Launch Period were inadequately completed. Rather than rejecting the applications on this basis, the OPA communicated with the applicants, creating an online tool that would allow them to supplement or correct the information that they had submitted. Ultimately, the OPA reviewed a total of 447 Launch Period Applications on their merits.

28.   On 8 April 2010, after the TATs were run to determine whether transmission capacity was available for the relevant projects, the OPA offered a first round of 184 contracts to Launch Period Applicants. This represented a total of approximately 2,500 MW of available capacity. Due to transmission constraints, no contracts were awarded to projects located in the Bruce region, such as the Claimant's TTD and Arran projects.

#### 2.   Second Round of FIT Contract Offers

29.   On 21 December 2010, the OPA published the priority rankings for the 242 applications that had not received a FIT Contract in April of the same year. The OPA divided the

---

[8]   C-Mem. §114.
[9]   Mem. §26.

ranking into "transmission areas" (i.e. regions) and provided an "area ranking." The Respondent explains that applicants were placed into these areas on the basis of the location of the point at which they would connect to the electricity grid (connection point), not on the basis of the geographic location of the generation facility. According to the Respondent, dividing the rankings by transmission area was important, in particular because only a certain amount of power could be put on the transmission lines coming out of any specific area. Mesa's TTD and Arran projects were ranked 8th and 9th in the Bruce Region and 91st and 96th in the province of Ontario. Subsequently, Mesa's two Summerhill applications were ranked 318th and 319th, and the two North Bruce applications were ranked 320th and 321st.

30.   On 24 February 2011, after running the necessary TATs, the OPA offered 40 FIT Contracts for a total of 872 MW. Once again, because of transmission constraints, no contracts were awarded in the Bruce Region.

### 3.   Third Round of FIT Contract Offers

31.   Applications which did not receive a FIT Contract because of the lack of transmission capacity were added to a priority ranking list and were scheduled for an ECT. Before the ECT, the OPA released a new priority ranking reflecting all applications received up to and including 4 June 2010.

32.   As noted above, no FIT Contracts had been awarded to projects in the Bruce region due to transmission constraints. These constraints could only be resolved by the construction of a new high-voltage transmission line out of the Bruce region (the "**Bruce to Milton Line**"). It was estimated that this new line would result in approximately 1,200 MW of transmission capacity being made available in the Bruce region for all of Ontario's renewable energy projects. However, the development of this line was subject to regulatory approvals, which were only obtained in the summer of 2011.

33.   By this time, much had changed in the Ontario electricity market. For instance, in 2010, the Government had released its Long Term Energy Plan (the "**LTEP**") under which it established a target of a total of 10,700 MW of renewable energy capacity in Ontario by 2018. Further, the 2011 Supply Mix Directive had directed the OPA to plan to reach this target with renewables making up 10-15% of the supply mix. The Respondent explains that, due to the success of the FIT Program, Ontario was rapidly approaching these

targets and it thus became necessary to slow down the pace of its procurement of renewable energy.

34.   In this context, it was not practical, so argues the Respondent, to run a province-wide ECT. The Ministry of Energy, in consultation with the OPA, thus drew up a more "discrete" process specific to the Bruce to Milton Line, "[to] meet developer expectations by including the relevant components of an ECT, without actually being a province-wide ECT"[10] (the "**Bruce to Milton Allocation Process**").

35.   The Bruce to Milton Allocation Process was put into effect by a direction of the Minister of Energy on 3 June 2011. The OPA was directed to award FIT Contracts for 750 MW in the Bruce Region. Further, each project was to be given an opportunity to change its connection point during a five business-day period starting on 6 June 2011 (the "**Connection Point Amendment Window**"). This meant that projects located within the Bruce Region could select a connection point outside this region and build transmission lines from their generation facility to the connection point.

36.   After the close of the Connection Point Amendment Window, on 6 July 2011 the OPA offered 14 FIT Contracts, totalling 749.5 MW. None of the Claimant's projects received a FIT Contract.

37.   The Claimant contends that the "arbitrary and unfair" design and implementation of the FIT Program, as well as the directives of the Minister of Energy, ultimately led to it not being awarded any FIT Contracts.

F.   THE GREEN ENERGY INVESTMENT AGREEMENT

38.   As mentioned above, one of the measures taken by the Government in the wake of the financial crisis was the enactment of the GEGEA. At the same time, the Government entered into discussions with two Korean companies, Samsung C&T Corporation ("**Samsung**") and Korea Electric Power Corporation (together, the "**Korean Consortium**") regarding a proposal for a major investment in Ontario's renewable energy sector. These discussions culminated in the signing of a Memorandum of Understanding (the "**MOU**") in December 2008.

---

[10]  Witness Statement of Susan Lo dated 28 February 2014 ("**Sue Lo WS I**") §46.

39.    On 21 January 2010, the Government and the Korean Consortium entered into the Green Energy Investment Agreement ("**GEIA**"). Valued at CAD 7 billion, the GEIA was, according to Canada, the single largest investment in renewable electricity generation in the Province's history.

40.    The GEIA required the Korean Consortium to establish and operate manufacturing facilities for wind and solar generation equipment in Ontario. In exchange, the Korean Consortium was *inter alia* guaranteed priority access to 2,500 MW of transmission capacity in Ontario. The capacity was to be allocated in five phases over five years, with each phase targeting approximately 500 MW.

41.    In the first phase, on 30 September 2009, the Minister of Energy directed the OPA to hold 240 MW of transmission capacity in Haldimand County in reserve for the Korean Consortium, and 260 MW in Essex County and the Municipality of Chatham-Kent jointly. In the second phase, on 17 September 2010, the Minister of Energy directed the OPA to hold in reserve 500 MW of transmission capacity in the Bruce Region.

42.    The Claimant contends that the GEIA granted the Korean Consortium "significantly" better access to Ontario's energy grid and ultimately led to the Claimant not receiving any FIT Contracts.

## III.    PROCEDURAL HISTORY

### A.   INITIAL PHASE

43.    On 6 July 2011, Mesa served Canada with a Notice of Intent to Submit a Claim to Arbitration under Chapter 11 of the North American Free Trade Agreement ("**NAFTA**").

44.    On 4 October 2011, the Claimant filed a Notice of Arbitration (the "**Notice of Arbitration**" or "**NoA**") accompanied by Exhibits 1 to 2 and Tabs 1 to 17. In the Notice of Arbitration, the Claimant sought the following relief:

> "a. Damages of not less than CDN$775 million in compensation for loss, harm, injury, moral damage, loss of reputation, and damage caused by or resulting from Canada's breach of its obligations under Part A of Chapter 11 of the NAFTA;
>
> b. Costs of these proceedings, including all professional fees and disbursements;

c. Fees and expenses incurred to mitigate the effect of the unlawful governmental measures taken by Canada;

d. Pre-award and post-award interest at a rate to be fixed by the Tribunal; and

e. Such further relief as counsel may advise and the Tribunal may deem appropriate."

45.   On 3 January 2012, the Claimant appointed Judge Charles N. Brower, a national of the United States, as arbitrator in this case.

46.   On 31 May 2012, the Respondent appointed Mr. Toby T. Landau, QC, a national of the United Kingdom, as arbitrator in this case.

47.   On 29 June 2012, the International Centre for Settlement of Investment Disputes ("**ICSID**"), acting as appointing authority, appointed Professor Gabrielle Kaufmann-Kohler, a national of Switzerland, as Presiding Arbitrator.

48.   Each of the members of the Tribunal subsequently signed a Declaration of Acceptance and Statement of Independence and Impartiality regarding his or her appointment. In the further course of the arbitration, on 4 May 2015, the Presiding Arbitrator disclosed that she was chairing an ICSID arbitration in which Mr. Toby Landau appeared as counsel.

49.   On 16 July 2012, the Presiding Arbitrator informed the Parties that the Tribunal had been duly constituted and invited the Respondent to submit an Answer to the Notice of Arbitration by 31 July 2012.

   **B.  WRITTEN PHASE**

50.   On 16 July 2012, the Claimant wrote to the Tribunal, informing it that some evidentiary issues may arise in the arbitration "from a Judicial Subpoena issued in the Northern District of California and a related Non-disclosure Court Order." The Claimant submitted the Non-disclosure Order, advising the Tribunal that the Order required it to be "aware of the need to protect confidentiality of evidence obtained from the US Courts in the arbitration", whilst also informing the Tribunal that a "similar type of subpoena was confirmed by the Courts of the State of Florida earlier this month."

51.   On 30 July 2012, the Tribunal informed the Parties that the Permanent Court of Arbitration ("**PCA**") would act as the administering institution and that a preliminary hearing would be held on 12 October 2012 in Toronto, Canada.

52.   On 31 July 2012, in response to the Tribunal's invitation of 16 July 2012, the Respondent submitted an Outline of Potential Issues.

53.   On 16 August 2012, the Tribunal circulated draft Terms of Appointment and Procedural Rules to the Parties for their comments and proposed to appoint Mr. Rahul Donde, an associate with the Presiding Arbitrator's law firm in Geneva, as Secretary of the Tribunal. On 31 August 2012, the Parties confirmed that they had no objection to Mr. Donde's appointment.

54.   On 30 August 2012, the Claimant informed the Respondent that, further to a court order issued in the Northern District of California, it had received documents from Pattern Energy Group LP, on which it intended to rely in this arbitration. The Claimant further informed the Respondent that the Federal Court for the Northern District of California had issued a Protective Order with respect to the relevant documents that the Respondent would be required to accept if it wished to see the documents. The Claimant also advised that if the Respondent did not agree to those terms, the Protective Order provided for the resolution of that issue by the Tribunal. On 7 September 2012, the Respondent refused to sign the Protective Order and "reserve[d] all [its] rights to comment on the admissibility and confidentiality of [those] materials, should the Claimant seek to introduce them in this arbitration."

55.   On 10 September 2012, the Parties submitted to the Tribunal their comments on the draft Terms of Appointment and Procedural Rules. In addition, the Respondent submitted a draft Confidentiality Order.

56.   In its comments of 10 September 2012, Canada proposed that the Tribunal select either Toronto or Calgary as the legal seat of the arbitration. On 14 September 2012, the Tribunal invited the Claimant to respond to such comments by 21 September 2012. On 21 September 2012, the Claimant proposed that the Tribunal select either New York or Washington D.C. as the legal seat of the arbitration.

57.   In its communication of 21 September 2012, the Claimant referred to proceedings which it had initiated in the United States pursuant to 28 USC § 1782 (Assistance to foreign

and international tribunals and to litigants before such tribunals) ("**Section 1782**"), and informed the Tribunal that it intended to offer as evidence "documents demonstrating Canada's breaches pursuant to court proceedings in the United States." It also requested the Tribunal to order Canada to "maintain and adhere to the confidentiality agreements that are annexed to the US court orders." The Claimant submitted to the Tribunal orders from the United States District Court for the Northern District of California and the United States District Court for the Southern District of Florida requiring the Claimant "to seek agreement from Canada to maintain disclosed documents confidential" and proposed certain modifications to the Respondent's draft Confidentiality Order. On 28 September 2012, the Tribunal invited the Respondent to comment on the Claimant's communication of 21 September 2012.

58.   On 5 October 2012, the Respondent rejected the Claimant's suggested modifications to the draft Confidentiality Order and submitted that it "should not be ordered to adhere to the Protective Orders entered by the US district courts."

59.   On 12 October 2012, the Tribunal held a first procedural hearing in Toronto. The hearing was attended by Mr. Barry Appleton, Dr. Alan Alexandroff, and Ms. Kyle Dickson-Smith for the Claimant, and Ms. Sylvie Tabet, Mr. Shane Spelliscy, Mr. Michael Owen, Mr. Ian Philp, Ms. Heather Squires, and Ms. Jennifer Hopkins for the Respondent. During the hearing both Parties made submissions in particular with regard to the legal seat of the arbitration. The Claimant submitted that it may be necessary to subpoena witnesses and to seek the assistance of local courts to secure documents in the hands of third parties in the US, and therefore the Tribunal should select a US seat. By contrast, the Respondent argued in favor of a seat in Canada.

60.   On 16 October 2012, the Tribunal directed the Parties to make further submissions with regard to the legal seat of the arbitration by 26 October 2012, with the option of filing responses by 2 November 2012. The Parties filed submissions on the legal seat of the arbitration on 26 October 2012 and on 2 November 2012.

61.   On 1 November 2012, the Claimant requested that the Tribunal "provide a supporting letter that can be filed before the District Court for the Southern District of Florida, confirming the Tribunal's ability to use the documents received under the Section 1782 process." On the same day, the Tribunal confirmed that it had the authority to rule on the admission and use in the arbitration of documents that the Claimant had obtained pursuant to the order of the United States District Court for the Northern District of

California. The Tribunal also invited the Claimant "to apply to the United States District Court for the Southern District of Florida to confirm that…[the] Tribunal [had] the authority to govern the use of the…documents" obtained pursuant to the order of that court. The Tribunal also circulated a draft Procedural Order No. 1 ("**PO 1**") and a revised draft of the Confidentiality Order for the Parties' comments.

62. On 9 November 2012, the Respondent provided its comments on the draft PO 1 and the draft Confidentiality Order. It also presented three requests seeking (i) confirmation that the Tribunal had not ruled on the Respondent's objection raised on 5 October 2012; (ii) if the Section 1782 documents were admissible, confirmation that the determination would not apply to any transcripts of witness testimony; and (iii) confirmation that further efforts by the Claimant to obtain evidence using Section 1782 should be pursued only under the supervision of the Tribunal.

63. On 13 November 2012, the Tribunal invited the Claimant to provide its comments on such requests, which Mesa did on 19 November 2012.

64. On 21 November 2012, the Tribunal issued the final version of PO 1, which, *inter alia*, confirmed the composition of the Tribunal, the appointment of Mr. Rahul Donde as Secretary of the Tribunal, and the appointment of the PCA as administering institution. Annex B to PO 1 established the procedural calendar for the further proceedings.

65. On the same day, the Tribunal also issued the final version of the Confidentiality Order. The Order allowed the Parties to designate information in written submissions as "Confidential" or "Restricted Access", in which case they would be required to file a "Confidential" or "Restricted Access" version of the relevant submissions within certain deadlines. The Order further specified that, if a Party did not agree with the other's designation of information as "Confidential" or "Restricted Access", it could submit the issue for resolution to the Tribunal.

66. On 22 November 2012, responding to the Tribunal's invitation of 1 November 2012, the Claimant submitted to the Tribunal a draft letter to the United States District Court for the Southern District of Florida.

67. On 26 November 2012, the Claimant informed the Tribunal that it had received an order from the United States District Court for the District of New Jersey granting its Section 1782 application to obtain certain documents and information from Samsung C&T

America, Inc. and that it would bring the Tribunal's Confidentiality Order to the attention of the New Jersey District Court.

68.    On 27 November 2012, the Respondent reiterated its requests of 9 November 2012 and also informed the Tribunal that it had no objection to the content of the draft letter to the United States District Court for the Southern District of Florida proposed by the Claimant.

69.    On the same day, the Parties sent the Tribunal a copy of the Confidentiality Order signed by the Parties.

70.    On 3 December 2012, in accordance with the procedural calendar set forth in Annex B to PO 1, the Respondent submitted a Request for Bifurcation accompanied by legal authorities (RL-1 to RL-14) and an Objection to Jurisdiction accompanied by Exhibits R-1 to R-20 and legal authorities (RL-15 to RL-38).

71.    On 24 December 2012, the Claimant submitted a Response on Bifurcation.

72.    On 18 January 2013, the Tribunal issued Procedural Order No. 2 ("**PO 2**"), containing its decision to bifurcate the proceedings into two phases, concerning "(i) the jurisdictional objection based on the alleged failure of the Claimant to comply with Article 1120(1) of the NAFTA, and (ii) the merits of the case and any and all other jurisdictional objections that may arise." The Tribunal reserved its power to re-join the Respondent's jurisdictional objection to the merits of the case following review of the Parties' further submissions.

73.    On 19 February 2013, the Claimant submitted an Answer to Canada's Preliminary Objections on Jurisdiction ("**Answer on Jurisdiction**").

74.    On 23 February 2013, the Claimant informed the Tribunal that it had received an Amended Protective Order from the United States District Court for the Southern District of Florida in respect of documents produced by NextEra Energy Resources, LLC in response to the Claimant's Section 1782 application before that court, and sought leave to file additional documents supporting the arguments set out in its Answer on Jurisdiction.

75.    On 26 February 2013, the Respondent reiterated its previous requests with regard to its challenges to the admissibility of documents that Mesa had obtained under Section

1782, and also requested the Tribunal to direct the Claimant to identify any Section 1782 documents already in the record and to strike those documents from the record.

76. Still on 26 February 2013, the Claimant filed a public version of its Answer on Jurisdiction. On 27 February 2013, Canada objected that the Claimant's designation of information as "Confidential" in its Answer on Jurisdiction failed to comply with the provisions of the Tribunal's Confidentiality Order. On the same day, the Claimant submitted a new version of its Answer on Jurisdiction seeking to address the issues raised by the Respondent.

77. On 27 February 2013, the Claimant submitted comments on the Respondent's requests regarding Section 1782 documents.

78. On 28 February 2013, a telephone conference took place, during which the Tribunal heard the Parties' views on the continuation of the bifurcation.

79. On the same day, the Claimant submitted a copy of the order issued by the United States District Court for the District of New Jersey in respect of documents produced by Samsung C&T America, Inc. in response to the Claimant's Section 1782 application before that court.

80. On 28 March 2013, the Tribunal issued Procedural Order No. 3 ("**PO 3**") in which it dismissed the Respondent's challenge to the admissibility of all Section 1782 documents and selected Miami, Florida, as the legal seat of the arbitration. It chose Miami over other alternatives proposed by the Parties because of the possibility to issue subpoenas and seek the assistance of the courts in procuring evidence of third parties located in the US. This was on the basis that that Claimant had represented that key evidence was located within the State of Florida and wanted the option to call upon the Tribunal and local courts to exercise powers to secure the same. Finally, having had the benefit of the Claimant's Answer on Jurisdiction, the Tribunal concluded that it would not be possible to rule on the application of Article 1120(1) in the abstract without substantially engaging in the facts of the dispute. It thus discontinued the bifurcation ordered in PO 2, and set forth an amended procedural calendar.

81. On 17 April 2013, the Parties exchanged their requests for document production.

82.  On 23 April 2013, Mesa informed the Tribunal that the United States District Court for the District of New Jersey had granted part of its Section 1782 application seeking documents from the Korea Electric Power Corporation.

83.  On 21 May 2013, the Parties exchanged their reasoned objections to each other's document production requests.

84.  On 10 June 2013, the Claimant submitted a Request for Particulars, asking the Tribunal to direct the Respondent to provide "factual particulars" (along with documents, communications and files) relating to the Respondent's submissions on jurisdiction and on the merits. On the same day, Canada requested that the Tribunal grant it until 19 June 2013 to respond, which the Tribunal did on 13 June 2013.

85.  On 11 June 2013, each of the Parties submitted a Redfern Schedule containing its document production requests, the other side's objections, and its replies.

86.  On the same day, the Respondent submitted two further requests. One concerned the Claimant's designation of certain information as "Restricted Access" or "Confidential." The other sought a modification of PO 1 to allow it to produce documents to the Claimant only in electronic format. On 13 June 2013, the Tribunal invited the Claimant to comment on these requests by 19 June 2013.

87.  On 19 June 2013, Canada submitted its comments on the Claimant's Request for Particulars, arguing that it should be rejected. On the same day, the Claimant submitted its comments on the Respondent's requests in connection with the designation of information and electronic production.

88.  On 27 June 2013, the Tribunal, on the Claimant's request and with the Respondent's consent, modified the schedule for the subsequent pleadings of the Parties.

89.  On 12 July 2013, the Tribunal issued Procedural Order No. 4 ("**PO 4**"), denying Mesa's Request for Particulars; deciding the Parties' document production requests; denying the Respondent's request to produce documents to the Claimant only electronically; and deciding the Respondent's request concerning the Claimant's designation of certain information.

90. On 2 August 2013, the Respondent wrote to the Tribunal to request an extension of the time limit for the production of documents with respect to "IESO", Hydro One and the OPA set by PO 4. On the same day, the Tribunal invited the Claimant's comments on the Respondent's request. The Claimant provided its comments on 6 August 2013, objecting to the Respondent's request, but agreeing to a 30-day extension for the Respondent's document production. Additionally, the Claimant submitted two requests of its own, asking the Tribunal (i) to order that the Respondent disclose "all of its correspondence with the [OPA], Hydro One, and the IESO, relating to document disclosure and production, and correspondence with Ontario on the same issue", and (ii) to "draw an adverse inference against [the Respondent] from any non-production of relevant documents." On 7 August 2013, the Tribunal informed the Parties that it would soon issue a ruling and suspended the document production time limit until then.

91. On 23 August 2013, the Tribunal issued Procedural Order No. 5 ("**PO 5**"), granting the Respondent's request for an extension of the time limit with regard to document production and denying the Claimant's requests.

92. On 28 August 2013, the Claimant wrote to the Tribunal to request leave to proceed with its Section 1782 applications before the United States District Court for the Southern District of Florida and the United States District Court for the District of New Jersey.

93. On the same day, the Tribunal asked the Claimant for the court applications which it intended to file in the Section 1782 proceedings. On 2 November 2013, the Claimant submitted that the Tribunal should order that the applications be treated as "Restricted Access" information and that Canada undertake not to communicate with any non-disputing party regarding "any issues related to the completed applications" until after they had been filed. In its response of 8 November 2013, the Respondent objected to this submission.

94. On 20 November 2013, the Claimant submitted its Memorial accompanied by Exhibits C-1 to C-421, legal authorities (Exhibits CL-1 to CL-202), one witness statement and one expert report.

95. On 25 November 2013, the Respondent submitted that the designation of certain information by the Claimant in its Memorial as "Restricted Access" was inappropriate. It requested, *inter alia*, that the Tribunal order the Claimant to correct all the inappropriate

designations in the Memorial and to provide a brief justification for those designations that it wished to maintain.

96. On 4 December 2013, the Tribunal denied the Claimant's request of 2 November 2013 to designate the Claimant's Section 1782 applications as "Restricted Access" information.

97. On 9 December 2013, Canada requested the Tribunal to (i) strike certain portions of the Claimant's Memorial and certain supporting documents on the basis that "they refer to and rely upon witness testimony obtained and submitted by the Claimant contrary to the established procedures in this arbitration and to Canada's due process rights"; (ii) "strike Part V, Jurisdiction, of the Claimant's Memorial as it contains new and unauthorized submissions by the Claimant relating to Canada's jurisdictional objection regarding the Claimant's failure to respect the 'cooling-off' period under NAFTA"; (iii) order the production of certain documents responsive to the Respondent's original document production requests of 17 April 2013; and (iv) order the Claimant to provide the Respondent with the Excel model used by the Claimant's damages experts.

98. On 10 December 2013, the Claimant submitted its Section 1782 applications.

99. On 16 December 2013, the Claimant submitted a response to the Respondent's requests of 9 December 2013.

100. On the same day, the Tribunal wrote to the Parties, deciding the issues raised in the Respondent's 25 November 2013 submission and providing certain directions with regard to future designations of the Parties.

101. On 20 December 2013, the Respondent commented on the Claimant's Section 1782 applications, and requested the Tribunal to (i) "[r]efuse to authorize the Claimant to proceed with further evidence gathering in the United States from Nextera and Samsung"; (ii) make certain determinations in relation to designations; and (iii) grant the Respondent an extension of the time limit for its Counter-Memorial. The Respondent also objected to some of the Claimant's designations in its Memorial.

102. On 23 December 2013, the Claimant wrote to the Tribunal in relation to its "Confidential" and "Restricted Access" designations.

103. On 24 December 2013, Mesa requested the Tribunal to strike certain confidentiality designations by the Respondent and to direct the latter to produce certain documents which it had withheld for lack of consent from third parties.

104. On 30 December 2013, the Tribunal conveyed its decisions on a number of outstanding requests made by the Parties and advised the Parties that the reasons for its decisions would follow. Specifically, the Tribunal (i) denied the Respondent's request to strike portions of the Claimant's Memorial; (ii) denied the Respondent's request to strike arguments relating to the Respondent's jurisdictional objections in the Claimant's Memorial; (iii) ordered the Claimant to produce certain documents requested by the Respondent, whilst denying other document production requests; (iv) directed the Claimant to produce the Excel model used by the Claimant's damages experts; and (v) denied the Claimant's request to approve its proposed Section 1782 applications in the United States District Court for the District of New Jersey and the United States District Court for the Southern District of Florida, noting that the Claimant "[might] revive its request at a later stage."

105. On 3 January 2014, Canada wrote to the Tribunal, (i) making certain requests with regard to confidentiality designations; (ii) requesting the Tribunal to deny the Claimant's requests regarding the production of certain documents by the Respondent made in the Claimant's letter of 24 December 2013; and (iii) requesting the Tribunal to order the Claimant to submit into the record the entire transcript of the deposition of Mr. Colin Edwards, which evidence the Claimant had obtained through its Section 1782 applications.

106. On 8 January 2014, Mesa "declassified" 60% of the designations challenged on 20 December 2013, but maintained its position on the remaining designations.

107. On 15 January 2014, the Claimant responded to the Respondent's letter of 3 January 2014 and specified its requested relief with regard to the issues raised in that letter.

108. On 16 January 2014, the Respondent objected to the Claimant's submission of 15 January 2014 as being unauthorized and requested the Tribunal to strike it from the record.

109.  On 20 January 2014, the Respondent commented on the Claimant's letter of 8 January 2014 and challenged the Claimant's confidentiality designations with regard to evidence derived from the Section 1782 applications.

110.  On 24 January 2014, the Respondent provided comments on the Claimant's letter of 15 January 2014.

111.  On the dame day, the Claimant objected to the Respondent's challenges of 20 January 2014.

112.  On 18 February 2014, the Claimant wrote to the Tribunal, requesting it to order the Respondent to produce certain documents and to demonstrate claims of privilege on a document-by-document basis.

113.  On 27 February 2014, the Respondent requested the Tribunal to suspend paragraphs 2 and 3 of the Confidentiality Order in respect of the Respondent's Counter-Memorial and supporting documents pending the resolution by the Tribunal of the outstanding disputes between the Parties in relation to designations. On the same day, the Claimant objected to the Respondent's request. The Tribunal granted the suspension sought "for the time being", whilst inviting the Claimant to provide its comments by 6 March 2014.

114.  On 28 February 2014, the Respondent submitted its Counter-Memorial and Reply on Jurisdiction ("**Counter-Memorial**") accompanied by Exhibits R-21 to R-173, legal authorities (RL-39 to RL-76), six witness statements and two expert reports.

115.  On 3 March 2014, the Claimant commented on the Respondent's request of 27 February 2014.

116.  On 5 March 2014, the Tribunal issued Procedural Order No. 6 ("**PO 6**"), providing reasons for the Tribunal's decision of 30 December 2013. The Tribunal also rendered decisions on the requests of the Claimant dated 28 August 2013, 24 December 2013, and 8 and 15 January 2014, as well as on the Respondent's requests dated 9 December 2013. In addition, the Tribunal requested Mesa to submit a revised version of its Memorial, complying with the Tribunal's decisions.

117. On 10 March 2014, the Claimant submitted a Motion for Summary Determination, by which it requested a preliminary determination with regard to the Respondent's reliance on Article 1108 of the NAFTA.

118. On 11 March 2014, the Respondent suggested that the Tribunal postpone the date of notifications for *amici curiae* and non-disputing party submissions under the procedural calendar from 28 March 2014 to 4 May 2014, a suggestion that Mesa opposed on 17 March 2014.

119. On 18 March 2014, the Respondent objected to the Claimant's Motion of 10 March 2014.

120. On 19 March 2014, the Tribunal denied the Claimant's requests filed on 18 February 2014.

121. On 20 March 2014, the Claimant commented on the Respondent's objection to its Motion for Summary Determination. On 21 March 2014, the Respondent provided comments on the Claimant's communication of 20 March 2014.

122. On the same day, the Respondent objected to the Claimant's requests filed on 13 and 14 March 2014.

123. On 25 March 2014, the Claimant requested a variation of the Confidentiality Order "to permit a disputing party to not produce a public version of confidential exhibits or testimonial evidence that supports its written submission."

124. On 27 March 2014, the Tribunal suspended the time limits set in PO 6 until the resolution of the various pending requests from the Parties.

125. On 2 April 2014, the Respondent objected to the Claimant's requests of 25 March 2014.

126. On 10 April 2014, the Tribunal issued Procedural Order No. 7 ("**PO 7**"), denying the Claimant's Motion for Summary Determination and its application for further document production and giving the Parties an option to make document requests after the completion of the second round of submissions in accordance with the proposed calendar.

127. On 28 April 2014, Canada raised several complaints in respect of the Claimant's compliance with the Tribunal's rulings on confidentiality.

128. On the same day, the Respondent submitted a revised Counter-Memorial with corrected designations.

129. On 30 April 2014, the Claimant submitted its Reply Memorial and Rejoinder on Jurisdiction ("**Reply Memorial**"). The Claimant's Reply Memorial was accompanied by Exhibits C-422 to C-658, legal authorities (CL-208 to CL-343), three witness statements and three expert reports.

130. On 5 May 2014, the Claimant commented on the Respondent's 28 April 2014 complaints related to the Claimant's compliance with the Tribunal's rulings on confidentiality.

131. On 8 May 2014, the Claimant wrote to the Tribunal to indicate additional "Confidential" and "Restricted Access" designations in the Respondent's Counter-Memorial and supporting documents.

132. On 9 May 2014, the Tribunal issued Procedural Order No. 8 ("**PO 8**"), deciding the Respondent's requests in connection with the Claimant's designation of information in its Memorial, exhibits and expert report, as well as amending the procedural calendar.

133. On 12 May 2014, the Respondent wrote to the Tribunal to challenge some of the "Confidential" and "Restricted Access" designations in the Claimant's Reply Memorial.

134. On 13 May 2014, Mesa wrote to the Tribunal to modify the designations indicated on 8 May 2014.

135. On 15 May 2014, the Claimant submitted a public version as well as an amended "Restricted Access" and "Confidential" version of its Memorial.

136. On 16 May 2014, Canada challenged some of the designations made by the Claimant on 8 May 2014. It also requested the Tribunal to order the Claimant to file a revised version of its expert report complying with the Tribunal's decision on the designations in this report. On 20 May 2014, the Claimant commented on the Respondent's request. On 22 May 2014, the Tribunal ordered the Claimant to file a revised version of its expert report.

137. On 22 May 2014, the Respondent designated certain additional information in the Claimant's Reply Memorial as well as the supporting documents as "Confidential."

138. On 23 May 2014, the Claimant responded to the challenges filed by the Respondent on 16 May 2014; filed a revised version of its expert report; and designated additional information in the Respondent's expert report as "Confidential." On 26 May 2014, the Tribunal invited the Respondent to provide comments on these additional designations. The next day, the Respondent informed the Tribunal that it had no objections to such designations.

139. Still on 27 May 2014, the Respondent requested the production of certain excel models supporting the expert report submitted with the Claimant's Reply Memorial. On the same day, the Claimant informed the Tribunal that these models were not in its possession.

140. On 28 May 2014, the Tribunal issued Procedural Order No. 9 ("**PO 9**"), deciding the Claimant's requests in connection with the Respondent's designation of information in the Counter-Memorial and supporting documents, as well as adjusting the procedural calendar. On the same day, the Tribunal requested the Parties to confer to resolve the issue of the excel models.

141. On 30 May 2014, Mesa responded to the challenges filed by the Respondent on 12 May 2014, whilst also challenging the additional confidentiality designations proposed by the Respondent with regard to the Claimant's Reply Memorial and supporting documents.

142. On 2 June 2014, the Respondent submitted "Confidential" and public versions of its Counter-Memorial and Reply on Jurisdiction. On the same day, the Claimant submitted a public version of its expert report.

143. On 6 June 2014, the Tribunal set the time limit for *amici curiae* and non-disputing party submissions ("**Article 1128 Submissions**") as 25 July 2014 and the time limit for the Parties' observations on these submissions as 27 August 2014.

144. On 11 June 2014, Canada responded to the challenges filed by the Claimant on 30 May 2014. The Claimant commented on this response the following day.

145. On 16 June 2014, upon invitation by the Tribunal, the Claimant responded to Canada's communication of 11 June 2014. On 23 June 2014, the Respondent submitted its views on the Claimant's response.

146. On 24 June 2014, the Tribunal issued Procedural Order No. 10 ("**PO 10**") by which it decided the Respondent's challenges in connection with the designation of certain information in the Claimant's Reply and its supporting documents.

147. On 2 July 2014, the Respondent submitted its Rejoinder on the Merits (the "**Rejoinder**"). The Rejoinder was accompanied by Exhibits R-174 to R-196, legal authorities (RL-77 to RL-113), five witness statements and one expert report.

148. On 4 July 2014, the Tribunal issued Procedural Order No. 11 ("**PO 11**") in which it ruled on Mesa's challenges to additional confidentiality designations proposed by the Respondent with regard to the Reply Memorial and directed the Claimant to produce a re-designated Reply Memorial and supporting documents by 11 July 2014, as well as a public version of these documents by 18 July 2014.

149. On 11 July 2014, the Claimant submitted a re-designated public version as well as an amended "Restricted Access" and "Confidential" version of its Reply Memorial.

150. On 22 July 2014, the Respondent requested the Tribunal to determine that the information contained in certain exhibits provided by the Claimant was public.

151. On 23 July 2014, the Claimant submitted a Request to Produce Documents to the Respondent pursuant to the possibility contemplated in PO 7.

152. On 26 July 2014, the United States and Mexico each filed their Article 1128 Submissions.

153. On 28 July 2014, the Claimant designated certain additional information in the Respondent's Rejoinder and supporting documents as "Confidential."

154. On 29 July 2014, Mesa advised the Tribunal that there was no further information to provide with respect to the Section 1782 proceedings.

155. On 30 July 2014, the Tribunal granted the Respondent's request of 22 July 2014 in respect of public access to information contained in certain exhibits provided by the Claimant.

156. On 1 August 2014, the Respondent provided an update about the production of documents in the possession of IESO, the OPA and Hydro One. It noted that IESO and the OPA had received consent from NextEra to the disclosure of certain information in the arbitration. Since NextEra's consent was conditional on the designation of the relevant documents as "Restricted Access", the Respondent requested the express agreement of the Tribunal and the Claimant to such designation.

157. On 2 August 2014, the Respondent wrote to the Tribunal to request an extension of the time limit to produce documents pursuant to PO 4.

158. On 5 August 2014, the Claimant consented to the Respondent's request of 1 August 2014 to designate certain documents as "Restricted Access." On 6 August 2014, the Tribunal also consented to the Respondent's request.

159. On the same day, Canada objected to all the document production requests submitted by the Claimant on 23 July 2014.

160. On 7 August 2014, the Respondent challenged designations made on 28 July 2014 by the Claimant regarding the Rejoinder and supporting documents. On 12 August 2014, the Claimant replied to such challenges.

161. On the same day, Mesa submitted a "Motion to Strike." It pointed out that in its Rejoinder, the Respondent had raised a new argument that if the Tribunal accepted the Claimant's position that the FIT Program was a form of government assistance, then the Program would constitute a subsidy, with the result that Articles 1108(7)(a) and 1108(8)(b) would preclude the application of Articles 1102, 1103 and 1106 of the NAFTA (the "**Subsidy Defense**"). The Claimant requested the Tribunal (i) to strike the Respondent's Subsidy Defense because it was raised late or (ii) in the alternative, to grant the Claimant the right to a sur-reply and additional information requests.

162. On 18 August 2014, the Tribunal issued Procedural Order No. 12 ("**PO 12**"), ruling on the Respondent's challenges to designations proposed by the Claimant in relation to the

Rejoinder and supporting documents. PO 12 also directed the Claimant to produce a public version of the Rejoinder and supporting documents by 25 August 2014.

163. On the next day, the Respondent submitted its response to the Claimant's Motion to Strike and asked the Tribunal to deny the motion.

164. On 20 August 2014, the Claimant submitted its response to Canada's objections to its document production request of 23 July 2014.

165. On 25 August 2014, the Claimant submitted a public version of the Rejoinder and supporting documents.

166. On 27 August 2014, Canada reiterated its request that the Tribunal dismiss the Claimant's Motion to Strike.

167. On the same day, the Claimant submitted a Response to the Article 1128 Submissions of the non-disputing parties accompanied by Exhibits C-659 to C-691 and legal authorities (CL-344 to CL-392).

168. On 2 September 2014, Canada wrote with respect to the Claimant's Response to the Article 1128 Submissions of the non-disputing parties. It requested that the exhibits accompanying the Claimant's submission be struck from the record and that the time for the Respondent to designate information in these exhibits as "Confidential" or to object to the Claimant's confidentiality designations be suspended until the Tribunal ruled on its request.

169. On 4 September 2014, the Tribunal issued Procedural Order No. 13 ("**PO 13**") on Mesa's document production requests. The Tribunal confirmed that, in accordance with PO 7, the Respondent should produce all the relevant documents on or before 17 September 2014.

170. On the same day, the Tribunal denied Mesa's Motion to Strike and set out a procedure for the Parties to address the Respondent's Subsidy Defense.

171. On 5 September 2014, Mesa objected to the procedure on the Subsidy Defense and requested certain clarifications from the Tribunal. On 8 September 2014, the Tribunal replied with regard to these clarifications and authorized the Parties to further comment

on the procedure to deal with the Subsidy Defense. By communications dated 11 and 15 September, respectively, the Claimant and the Respondent offered such further comments.

172. On 16 September 2014, a pre-hearing conference call took place between the Parties and the Presiding Arbitrator to discuss outstanding procedural and organizational matters for the forthcoming hearing. A second procedural call involving the full Tribunal took place on 22 September 2014.

173. On 22 September 2014, the Claimant submitted its Observations on Canada's Subsidy Exception Defense accompanied by Exhibit C-692 and legal authorities (CL-393 to CL-420).

174. On 26 September 2014, the Tribunal provided for a procedure and time limits for the admission of new documents into the record. On 1 October 2014, the Claimant filed supplemental Exhibits C-693 to C-714. On the same day, the Respondent filed additional Exhibits R-197 to R-206 and designated certain "Confidential" and "Restricted Access" information.

175. On 3 October 2014, the Tribunal issued Procedural Order No. 14 ("**PO 14**") dealing with organizational and procedural matters with regard to the hearing. PO 14 also gave the Respondent an opportunity to address the exhibits filed by the Claimant together with its comments on the Article 1128 Submissions.

176. On 6 October 2014, the Respondent requested the Tribunal to clarify the procedures for designating "Confidential" and "Restricted Access" information contained in the exhibits submitted by the Parties on 1 October 2014 and in exhibits that Mesa had submitted with its responses to the Article 1128 Submissions of the United States and Mexico.

177. On the same day, Canada submitted its response to the arguments raised by the Claimant in its Observations on Canada's Subsidy Defense.

178. On 10 October 2014, the Respondent submitted designations with regard to the Claimant's additional exhibits filed on 1 October 2014 and the exhibits attached to the Claimant's Response to the Article 1128 Submissions.

179. In letters to the Parties of 9 and 14 October 2014, the Tribunal established timelines with regard to the challenges to the Parties' designations relating to the exhibits filed by the Claimant on 1 October 2014 and the exhibits attached to the Claimant's Response to the Article 1128 Submissions. Also on 14 October 2014, the Tribunal informed the Parties that the United States and Mexico had expressed an intention to attend the forthcoming hearing and requested the Parties' views in this regard.

180. On 20 October 2014, the Tribunal issued Procedural Order No. 15 ("**PO 15**") in which it determined the Parties' challenges regarding designations in the exhibits filed by the Claimant on 1 October 2014 and the exhibits attached to the Claimant's comments on the Article 1128 Submissions.

### C. Hearing on Merits, Liability and Quantum and Subsequent Submissions

181. From 26 October to 31 October 2014, a hearing on merits, liability and quantum was held at the Arbitration Place in Toronto. The hearing was broadcast live into a conference room accessible to the public in a hotel close to the hearing venue. The Parties were represented by the following individuals:

- For the Claimant

Mr. Lee Allison Robertson, Mesa Power Group, LLC, Vice President of Finance

Mr. Barry Appleton, Appleton & Associates
Dr. Alan Alexandroff, Appleton & Associates
Mr. Kyle Dickson-Smith, Appleton & Associates
Ms. Celeste Mowatt, Appleton & Associates
Mr. Sean Stephenson, Appleton & Associates
Mr. Edward Mullins, Astigarraga Davis Mullins & Grossman
Ms. Sujey Herrera, Appleton & Associates

- For the Respondent

Ms. Sylvie Tabet, Trade Law Bureau
Mr. Shane Spelliscy, Trade Law Bureau
Ms. Heather Squires, Trade Law Bureau
Mr. Raahool Watchmaker, Trade Law Bureau
Ms. Laurence Marquis, Trade Law Bureau
Ms. Susanna Kam, Trade Law Bureau
Mr. Rodney Neufeld, Trade Law Bureau
Ms. Melissa Perrault, Trade Law Bureau
Ms. Darian Parsons, Trade Law Bureau

Mr. Lucas McCall, Department of Foreign Affairs, Trade and Development
Ms. Jennifer Kacaba, Ontario Ministry of Energy

Ms. Saroja Kuruganty, Ontario Ministry of Economic Development, Employment and Infrastructure
Ms. Harkamal Multani, Ontario Ministry of Energy
Ms. Sejal Shah, Ontario Power Authority
Mr. Michael Solursh, Ontario Ministry of Economic Development, Employment and Infrastructure
Ms. Mirrun Zaveri, Ontario Ministry of Energy

Mr. Chris Reynolds, Core Legal, Canada's Trial Graphics
Mr. Alex Miller, Core Legal, Canada's Trial Graphics

- Ms. Alicia Cate attended for the Government of the United States and Ms. Adriana Pérez-Gil Ochoa attended for the Government of Mexico.

182. The following witnesses and experts were presented by the Claimant: Mr. Seabron Adamson, Mr. Thomas Boone Pickens, Mr. Lee Allison Robertson, Mr. Robert Low and Mr. Gary Timm. The Respondent presented the following witnesses and experts: Mr. Bob Chow, Mr. Shawn Cronkwright, Mr. Christopher Goncalves, Mr. Richard Jennings, Ms. Susan Lo and Mr. Jim MacDougall.

183. On 10 November 2014, the Tribunal issued Procedural Order No. 16 ("**PO 16**"), reproducing the directions given by the Tribunal at the hearing with regard to post-hearing matters.

184. On 17 November 2014, Canada submitted corrections to the transcript references in its closing slides.

185. On 24 November 2014, the Claimant submitted certain confidentiality designations and corrections to the hearing transcript.

186. On 18 December 2014, the Parties filed Post-Hearing Submissions.

187. On 9 January 2015, the Tribunal requested the Parties to provide their comments with respect to confidentiality designations in the transcript and video recording of the hearing prior to their public release. On 19 January 2015, the Parties provided their comments.

188. On 28 January 2015, the Respondent requested an extension of the time limit for filing cost submissions to 3 March 2015, with reply submissions due on 26 March 2015. On 2 February 2015, the Tribunal granted the extension sought by the Respondent.

189. On 3 March 2015, the Parties filed their Statements of Costs.

190. On 26 March 2015, the Claimant and the Respondent submitted their Replies to each other's Statement of Costs.

191. On 31 March 2015, the Respondent wrote to the Tribunal with regard to the Claimant's Reply Statement of Costs. On the same day, the Claimant responded to the Respondent's letter.

192. On 6 April 2015, the Claimant informed the Tribunal that on 17 March 2015 the award in *Bilcon v. Government of Canada* had been released. The Claimant enclosed a copy of the award and dissenting opinion and requested that it be admitted as a supplemental authority. On 15 April 2015, Canada opposed such request and, in the event that the award were to be accepted into the record stated that "under Article 1128, the United States and Mexico must also be afforded the opportunity to offer any comments they have on the interpretation of NAFTA contained in the Bilcon award." On 16 April 2015, Mesa commented and requested that Canada's request not to admit the *Bilcon* award be denied. On the next day, the Respondent objected to such letter as an unauthorized submission.

193. On 29 April 2015, the Parties agreed to the publication of redacted versions of the video footage and transcripts from the hearing on the PCA's website.

194. On 4 May 2015, the Tribunal invited the Parties' observations on the relevance and impact of the *Bilcon* award and dissenting opinion for purposes of this arbitration as well as on the Respondent's submission of 15 April 2015 that the United States and Mexico be given the opportunity to offer their comments on the award.

195. On 14 May 2015, the United States and Mexico separately notified the Tribunal that they would present Article 1128 Submissions to the Tribunal on issues of NAFTA interpretation raised in *Bilcon*.

196. On the same day, the Parties submitted their observations on the *Bilcon* award.

197. On the next day, the Claimant sought leave to comment on the requests of the non-disputing parties regarding Article 1128 submissions. By letter to the Parties dated 18 May 2015, the Tribunal granted the Claimant the opportunity to comment on the admissibility of further Article 1128 submissions.

198. On 19 May 2015, the Claimant wrote a letter to the Tribunal addressing the admissibility of the proposed Article 1128 submissions accompanied by legal authorities (CL-344 to CL-357). In its letter, the Claimant opposed further submissions by the non-disputing parties.

199. On 26 May 2015, the Tribunal informed the Parties that it accepted additional submissions of the United States and Mexico on *Bilcon* and that the Parties were authorized to provide their comments on those submissions by 26 June 2015.

200. On 12 June 2015, the United States and Mexico filed Article 1128 Submissions related to the interpretation of the NAFTA in the *Bilcon* award.

201. On 16 June 2015, the Claimant informed the Tribunal that a document pertaining to the 12 June 2015 Article 1128 Submission of the United States, namely the Article 1128 Submission filed by the Government of Mexico on 8 May 2015 in *Mercer International Inc. v. Government of Canada*, "[did] not appear to be available to the public." The Claimant requested "that the Government of the United States either immediately produce this document upon which it relies or alternatively that the reference to this secret document be struck in its entirety from the US Second Article 1128 Submission."

202. On the following day, the Tribunal invited the Parties to comment on the Article 1128 Submissions by 26 June 2015. The Tribunal also invited Canada to comment on the Claimant's 16 June 2015 requests by the same date.

203. Still on 17 June 2015, the United States submitted the Article 1128 Submission filed by Mexico in *Mercer International Inc. v. Government of Canada*. On 18 June 2015, the Tribunal wrote to the Parties, indicating its understanding that this communication satisfied the concerns which Mesa had expressed two days earlier.

204. On 26 June 2015, the Claimant and the Respondent provided their comments on the Article 1128 Submissions, the Claimant's comments being accompanied by legal authorities (CL-421 to CL-432).

205. The Tribunal closed the proceedings on 24 March 2016.

206. In accordance with paragraph 22.1 of PO 1 and following the redaction of confidential information, the PCA has published or will publish on its website the Parties' memorials

and other written submissions, the hearing transcripts and video recording, the procedural orders, and this Award.

## IV.   POSITIONS OF THE PARTIES AND RELIEF REQUESTED

### A.   SUMMARY OF THE CLAIMANT'S POSITION

207. As mentioned above, the dispute arises out of the alleged arbitrary and unfair application of various government measures related to the regulation and production of renewable energy in Ontario.[11] According to the Claimant, the "manipulation" of the FIT Program prevented it from obtaining FIT Contracts, and caused loss and damage to Mesa and its related business operations.

208. In essence, the Claimant contends that Ontario and thereby Canada:

     i.   In violation of Article 1106 of the NAFTA, imposed minimum domestic content requirements on the Claimant;

     ii.   In violation of Articles 1102 and 1103 of the NAFTA, treated the Claimant and its investments less favourably than other investors in like circumstances;

     iii.   In violation of Article 1104 of the NAFTA, failed to provide to the Claimant and/or its investments the better treatment required under Articles 1102 and 1103; and,

     iv.   In violation of Article 1105 of the NAFTA, failed to treat the Claimant's investments in accordance with the international law standard of treatment.

209. While the Claimant initially made claims in respect of Article 1503(2) of the NAFTA, these claims were later withdrawn.[12]

---

[11]  NoA §6.

[12]  Reply §§870-871 ("In its Memorial the Investor pleaded that Canada was responsible for the acts of the Ontario Power Authority, IESO, and Hydro One under Article 1503(2), concerning state enterprises. The Investor no longer maintains these claims under NAFTA Article 1503(2). Instead it maintains its claims on the same measures under Chapter Eleven.").

210. The Claimant's detailed arguments in so far as they are relevant and necessary to resolve the issues in dispute are summarized prior to the Tribunal's analysis of each disputed issue below. For the sake of clarity, the Tribunal emphasizes that, while it has reproduced only the most relevant allegations and arguments for its decision, it has considered all of the Claimant's submissions and evidence.

### B. THE CLAIMANT'S REQUEST FOR RELIEF

211. In its post-hearing brief, the Claimant sought the following relief:

> "In view of the facts and law set out in the written submissions and during the oral hearing, the Investor respectfully requests that the Tribunal grant the following relief:
>
> i.    To dismiss Canada's admissibility and jurisdictional objections in their entirety;
> ii.   A Declaration that Canada has acted in a breached [sic] its obligations under NAFTA Articles 1102, 1103,1104, 1105 and 1106;
> iii.  An award of damages for the losses that were caused by those breaches of the NAFTA, for moral damages and for pre and post-award interest compounded at a rate to be determined by the Tribunal; and
> iv.   An award in favour of the Investor for its costs, disbursements and expenses incurred in the arbitration for legal representation and assistance, plus interest, and for the costs of the Tribunal."[13]

212. This request for relief was substantially similar to the Claimant's earlier requests for relief.[14]

### C. SUMMARY OF THE RESPONDENT'S POSITION

213. The Respondent first submits that the Tribunal lacks jurisdiction over the present dispute because the Claimant failed to comply with the mandatory pre-requisites for the submission of a dispute to arbitration under Chapter 11 of the NAFTA. Even if the Tribunal disagreed on this point, the Respondent contends that it would still lack jurisdiction over the claims arising out of measures in existence prior to the Claimant's investment in Canada. It would also lack jurisdiction over claims relating to the impugned acts of state enterprises like the OPA.

---

[13]  C-PHB §530.
[14]  Mem. §962; Reply §917.

34

214. The Respondent next submits that even if the Tribunal found that it has jurisdiction over the present dispute; the Claimant has failed to establish that Canada has breached its NAFTA obligations. According to the Respondent, the FIT Program constitutes "government procurement" under Articles 1108(7)(a) and 1108(8)(b). Consequently, Canada has no obligations under Articles 1102, 1103 or 1106 of the NAFTA. In any event, even if the Tribunal were to find that the FIT Program did not constitute procurement, the claims would fail as Mesa has "fundamentally misconstrued" these provisions.

215. The Respondent also denies that it has violated any of its obligations under Article 1105. It submits that the Claimant's applications to the FIT Program were fairly and reasonably assessed. Further, the FIT Program was adapted over the years to meet changing market conditions and policy objectives, and "there is nothing manifestly arbitrary, unfair or unjust" about this. In respect of the GEIA, the Respondent submits that "[t]here is nothing manifestly arbitrary, grossly unjust, egregious or shocking about a government entering into an investment agreement in which it accords certain advantages to a particular investor in exchange for certain investment commitments by that investor."[15]

216. In the event that the Tribunal were to find that Canada has breached the NAFTA, the Respondent contends that the damages claimed are significantly inflated. Most of the alleged losses claimed by Mesa were not caused by the Respondent, but by the Claimant's own business failures.

217. Canada's detailed arguments in so far as they are relevant and necessary to resolve the issues in dispute are summarised below prior to the Tribunal's analysis of each disputed issue. For the sake of clarity, the Tribunal emphasizes that, while it has only referred to the most important submissions for its decision, it has considered all of the Respondent's submissions and evidence.

**D. THE RESPONDENT'S REQUEST FOR RELIEF**

218. In the Rejoinder, the Respondent sought the following relief:

---

[15] C-Mem. §406.

"Canada respectfully requests that the Tribunal dismiss the Claimant's claims in their entirety and with prejudice, order that the Claimant bear the costs of this arbitration, including Canada's costs for legal representation and assistance, and grant any further relief it deems just and proper."[16]

219. This request for relief was substantially similar to the Respondent's earlier request for relief.[17]

## V.   ANALYSIS

### A. PRELIMINARY MATTERS

220. Prior to addressing the merits of the Parties' positions, the Tribunal will address certain preliminary matters: the relevance of previous decisions or awards (1); the applicable legal framework (2); and the burden of proof (3).

#### 1.  Relevance of Previous Decisions and Awards

221. In support of their positions, both Parties have relied on previous decisions or awards, either to conclude that the same solutions should be adopted in the present case or in an effort to explain why this Tribunal should depart from a solution reached by another tribunal.

222. The Tribunal is not bound by the decisions of other arbitral tribunals. At the same time however, the Tribunal does believe that it should pay due respect to such decisions. Unless there are reasons to the contrary, the Tribunal will adopt the approaches established in a series of consistent cases comparable to the case at hand, subject, of course, to the specifics of the NAFTA and to the circumstances of the actual case. By doing so, the Tribunal believes it will meet its duty to contribute to the harmonious development of investment law and thereby to meet the legitimate expectations of the community of States and investors towards legal certainty and the rule of law.

---

[16] Rej. §277.
[17] C-Mem. §512.

## 2. Applicable Legal Framework

### a. Law Governing the Procedure

223. Article 1120(2) of the NAFTA and paragraph 8 of PO 1 deal with the applicable procedural framework in the following terms:

> "[T]he applicable arbitration rules shall govern the arbitration except to the extent modified by this Section" (Art. 1120(2)).

> "8.1 The procedure in this arbitration shall be governed by the 1976 UNCITRAL Arbitration Rules except as modified by the provisions of Section B of Chapter 11 of the NAFTA (per Article 1120(2) of the NAFTA).

> 8.2 If these provisions and rules do not address a specific procedural issue, the Tribunal shall, after consultation with the Parties, determine the applicable procedure. In addition, the Tribunal may seek guidance from, but shall not be bound by, the 2010 IBA Rules on the Taking of Evidence in International Commercial Arbitration" (Paragraph 8 PO 1).

224. The applicable procedural rules are thus the 1976 UNCITRAL Arbitration Rules ("**UNCITRAL Rules**"), except to the extent that they are modified by the provisions of Section B of NAFTA Chapter 11.

225. In addition, the Tribunal recalls that the legal seat of the arbitration is Miami, Florida, which may trigger the application of certain mandatory rules of international arbitration law applicable at the seat.

### b. Law Governing Jurisdiction

226. The jurisdiction of this Tribunal must primarily be governed by the NAFTA as this is the instrument by which Canada has expressed its offer to arbitrate, which the Claimant has accepted, thereby achieving consent.

227. Chapter 11 contains a choice of law which is quoted below and according to which the issues in dispute must be resolved in accordance with the NAFTA and "applicable rules of international law."

### c. Law Governing the Merits

228. Article 33(1) of the UNCITRAL Rules provides that an arbitral tribunal must "apply the law designated by the parties as applicable to the substance of the dispute."

229. Article 1131 of the NAFTA contains a choice of law clause as follows, which is also reproduced in paragraph 7.1 of PO 1:

> "Article 1131: Governing Law
>
> 1. A Tribunal established under this Section shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law.
>
> 2. An interpretation by the Commission of a provision of this Agreement shall be binding on a Tribunal established under this Section."

230. Accordingly, the Tribunal will resolve the merits of this dispute by application of the NAFTA and relevant rules of international law. As will be further discussed in the context of Article 1105, the Tribunal will also follow interpretations issued by the NAFTA Free Trade Commission (the "FTC"), specifically the 31 July 2001 "Notes of Interpretation of Certain Chapter Eleven Provisions" (the "FTC Note").

### d. Principles of Interpretation

231. Article 102 of the NAFTA sets out the objectives of the treaty and provides that the latter must be interpreted with these objectives in mind:

> "Article 102: Objectives
>
> 1. The objectives of this Agreement, as elaborated more specifically through its principles and rules, including national treatment, most-favored-nation treatment and transparency, are to:
>
> a) eliminate barriers to trade in, and facilitate the cross-border movement of, goods and services between the territories of the Parties;
> b) promote conditions of fair competition in the free trade area;
> c) increase substantially investment opportunities in the territories of the Parties;
> d) provide adequate and effective protection and enforcement of intellectual property rights in each Party's territory;
> e) create effective procedures for the implementation and application of this Agreement, for its joint administration and for the resolution of disputes; and
> f) establish a framework for further trilateral, regional and multilateral cooperation to expand and enhance the benefits of this Agreement.

2. The Parties shall interpret and apply the provisions of this Agreement in the light of its objectives set out in paragraph 1 and in accordance with applicable rules of international law."

232. Among the "applicable rules of international law" referred to in paragraph 2 of the provision just quoted, one counts Articles 31 and 32 of the Vienna Convention on the Law of Treaties (the "**VCLT**" or "**Vienna Convention**"),[18] which codify customary international law in the following terms:

"Article 31. General Rule of Interpretation

1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:
(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;
(b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:
(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;
(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;
(c) Any relevant rules of international law applicable in the relations between the parties.

4. A special meaning shall be given to a term if it is established that the parties so intended."

And:

"Article 32. Supplementary Means of Interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:
(a) Leaves the meaning ambiguous or obscure; or
(b) Leads to a result which is manifestly absurd or unreasonable."

---

[18] Exh. CL-11.

233. On this basis, the Tribunal will interpret the provisions of the NAFTA in accordance with the rules on treaty interpretation of the VCLT, taking into account the objectives of the NAFTA as they are set forth in Article 102(1).

### 3.  Burden of Proof

234. Both Parties have made submissions on the allocation of the burden of proof in respect of jurisdiction and merits. Mesa submits that the Respondent bears the burden of proof for the jurisdictional defenses it raises.[19] On its part, the Respondent submits that the Claimant bears the burden of establishing that this Tribunal has jurisdiction over the present dispute. It also points out that where there is any ambiguity about whether it has jurisdiction or not, a tribunal should decline to act.

235. The Tribunal recalls that Article 24(1) of the UNCITRAL Rules contains the rules applicable with respect to which Party bears the burden of proof. It provides:

> "Each party shall have the burden of proving the facts relied on to support his claim or defence."

236. Thus, each Party must establish the facts on which it relies in support of its claims and defenses. It is for the Claimant to establish the factual elements necessary to sustain the Tribunal's jurisdiction over the challenged measures.[20] The Claimant appears to agree with this position.[21]

237. On the merits, the Claimant must establish the facts showing that the challenged measures are contrary to the substantive protections of the NAFTA – a position which the Claimant accepts.[22] For instance, it is for the Claimant to demonstrate the facts that constitute a breach of Article 1105(1).[23] Similarly, where the Respondent raises a

---

[19] Reply §§806-808.

[20] Exh. RL-042, *Apotex Inc. v. United States* (UNCITRAL), Award on Jurisdiction and Admissibility, 14 June 2013 ("Apotex"), §150.

[21] Reply §804 ("[Mesa] must demonstrate that this Tribunal has jurisdiction to hear its claims"); §805 ("The Investor bears the burden to establish the Tribunal's jurisdiction under NAFTA Chapter 11").

[22] Reply §804 ("Mesa must prove its allegations that Canada breached its Article 1102, 1103 1105 and 1106 NAFTA obligations [...]").

[23] Exh. CL-072, *ADF Group Inc. v. United States* (ICSID Case No. ARB (AF)/00/1), Award, 9 January 2003 ("ADF"), §185: ("The Investor, of course, in the end has the burden of sustaining its charge of inconsistency with Article 1105(1). That burden has not been discharged here and hence, as a strict technical matter, the Respondent does not have to prove that the current customary international law concerning standards of treatment consists only of discrete, specific rules applicable to limited contexts."); See also, RL-073, *United Parcel Service of America, Inc. v. Government of Canada* (UNCITRAL), Award on Jurisdiction, 22 November 2002, §84.

defense – for instance, that the FIT Program involves procurement under Article 1108(7)(a) and 1108(8)(b) – it must establish the facts necessary to sustain the defense.[24]

### B. SUBMISSION OF A CLAIM TO ARBITRATION

238. The Claimant has initiated the present arbitration under Chapter 11 of the NAFTA and alleges breaches of the substantive guarantees contained in that Chapter. It cites Articles 1116, 1120 and 1122 of the NAFTA as bases for this arbitration.[25]

239. On its part, the Respondent has raised a number of preliminary objections. First, it contends that this Tribunal is without jurisdiction over the present dispute (or, at least part of the dispute), as the Claimant has failed to comply with the three-month "cooling off" period specified in Article 1120(1) of the NAFTA ((2) below). Second and in the alternative, it contends that even if the necessary conditions have been fulfilled, the Claimant has raised numerous arguments which are beyond the scope of the Tribunal's jurisdiction. Specifically, according to the Respondent, this Tribunal lacks jurisdiction over alleged breaches that occurred before the Claimant made its investments in Ontario ((3) below). Third, the Respondent objects that the acts of the OPA are not attributable to it ((4) below). Finally, relying on Article 1116, it argues that the Tribunal lacks jurisdiction to consider any alleged breaches which could not have caused loss to the Claimant (an objection discussed in the context of the first jurisdictional defense in connection with Article 1120(1) in section (2) below).

240. Before entering into the merits of the Respondent's objections, the Tribunal will first examine the Claimant's compliance with the requirements for the submission of a claim to arbitration ((1) below).

---

[24] Exh. CL-204, *Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v. Republic of Ecuador* (UNCITRAL), Interim Award, 1 December 2008, §138 ("As a general rule, the holder of a right raising a claim on the basis of that right in legal proceedings bears the burden of proof for all elements required for the claim. However, an exception to this rule occurs when a respondent raises a defense to the effect that the claim is precluded despite the normal conditions being met. In that case, the respondent must assume the burden of proof for the elements necessary for the exception to be allowed.").

[25] NoA §4. See also PO 1 §5.1; Tr. (31 October 2014) 91:8-10 ("There is another provision in NAFTA, Article 1117. But it is not in issue in this case. *We brought this under Article 1116.* (emphasis supplied)").

1.  **Requirements for Submission of a Claim to Arbitration**

241. Section B of Chapter 11 of the NAFTA contains various requirements for the submission of a claim to arbitration under the provisions of that Chapter. The Claimant recognises that (at least some of) these requirements must be fulfilled.[26] The Tribunal now turns to review the Claimant's satisfaction of these requirements.

   a.  **Article 1121**

242. As mentioned above, the Claimant has submitted its claims to arbitration under Article 1116. The conditions to submit a claim to arbitration under Article 1116 are provided in Article 1121, which reads as follows:

   "Article 1121: Conditions Precedent to Submission of a Claim to Arbitration

   1. A disputing investor may submit a claim under Article 1116 to arbitration only if:

   (a) the investor consents to arbitration in accordance with the procedures set out in this Agreement; and

   (b) the investor and, where the claim is for loss or damage to an interest in an enterprise of another Party that is a juridical person that the investor owns or controls directly or indirectly, the enterprise, waive their right to initiate or continue before any administrative tribunal or court under the law of any Party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing Party that is alleged to be a breach referred to in Article 1116, except for proceedings for injunctive, declaratory or other extraordinary relief, not involving the payment of damages, before an administrative tribunal or court under the law of the disputing Party."

243. Thus, Article 1121 requires a "disputing investor"[27] to consent to arbitration in accordance with the procedures set out in the NAFTA. Further, the disputing investor must waive its right to initiate or continue other proceedings concerning the measures that are the subject of the Chapter 11 arbitration.

--------

[26]  Mem. §§838-855.

[27]  Article 1139 of the NAFTA defines "disputing investor" as "an investor that makes a claim under Section B."

244. Mesa has consented to arbitrate in accordance with the procedures of the NAFTA and it has submitted the necessary waiver.[28] It has therefore complied with the requirements of Article 1121, which the Respondent does not appear to contest.

### b. Article 1116

245. Article 1116 sets out the circumstances under which an investor may bring a claim against a NAFTA Party in the following terms:

> "Article 1116: Claim by an Investor of a Party on Its Own Behalf
>
> 1. An investor of a Party may submit to arbitration under this Section a claim that another Party has breached an obligation under:
>
> (a) Section A or Article 1503(2) (State Enterprises), or
>
> (b) Article 1502(3)(a) (Monopolies and State Enterprises) where the monopoly has acted in a manner inconsistent with the Party's obligations under Section A,
>
> and that the investor has incurred loss or damage by reason of, or arising out of, that breach.
>
> [...]"

246. Consequently, under Article 1116, this Tribunal's jurisdiction is limited to claims of an "investor" of one NAFTA Party ((i) below) that another NAFTA Party has breached Section A (i.e. Articles 1101-1114) of Chapter 11 of the NAFTA ((ii) below).[29]

(i)   Is the Claimant an "investor"?

247. The term "investor" is defined in Article 1139 as an enterprise that makes an investment:

> "Article 1139: Definitions
>
> For purposes of this Chapter:
>
> investor of a Party means a Party or state enterprise thereof, or a national or an enterprise of such Party, that seeks to make, is making or has made an investment

---

[28]  NoA §3; Exhs. C-001, C-002.

[29]  The Tribunal would also have jurisdiction to decide claims concerning breaches of Article 1503, which is not relevant here.

[...]"

248. "Enterprise of a Party" is in turn defined as follows:

> "enterprise of a Party means an enterprise constituted or organized under the law of a Party, and a branch located in the territory of a Party and carrying out business activities there."[30]

249. "Investment" is defined broadly to include many different types of investments including (in a somewhat circular manner) an enterprise, equity, debt, real estate or other property whether tangible or intangible.

250. As mentioned above (§1), Mesa is a U.S. corporation. Through a chain of companies registered in the U.S. and in Alberta, Canada, Mesa owns TTD, Arran, North Bruce and Summerhill, which are all unlimited liability companies incorporated in Canada (§2). In addition, Mesa holds other interests and assets related to its renewable energy business in Canada.[31]

251. In other words, Mesa is an investor under Article 1139(a). It is an enterprise of a NAFTA Party which has made an investment in the form of four "enterprises" and other property in another NAFTA Party. While Canada does not challenge the Claimant's status as an investor, it objects to jurisdiction in respect of alleged breaches that are said to have occurred before Mesa made its investment in Canada, an objection to which the Tribunal will return in the continuation of its analysis (§§319 et. seq.).

(ii) Are the claims within the ambit of Section A of Chapter 11?

252. The second requirement for a submission to arbitration under Article 1116 is that the claims arise out of Section A of Chapter 11, i.e. Articles 1101 to 1114. In this respect, the Tribunal refers to Article 1101, which addresses the "scope and coverage" of Chapter 11. Article 1101(1) establishes both the scope and coverage of the substantive protections accorded to investors and investments (Section A of Chapter 11) as well as

---

[30] Article 1139 of the NAFTA.

[31] Mem. §33 ("In addition to the interests in the [wind projects], Mesa's interests include: (a) Real estate and other property, both tangible and intangible, including interests in lands and leases in Ontario on which wind turbines were to be built; and (b) Tangible and intangible property 'acquired in the expectation or used for the purpose of economic benefit or other business purposes' and (c) 'Interests arising from the commitment of capital or other resources in the territory of a Party to economic activity in such territory', including rights to receive a FIT contract from the Ontario Power Authority (OPA) based upon their priority ranking.").

the scope of the rights to submit disputes to arbitration under Chapter Eleven (Section B of Chapter 11) as follows:

"Article 1101: Scope and Coverage

1. This Chapter applies to measures adopted or maintained by a Party relating to:

(a) investors of another Party;

(b) investments of investors of another Party in the territory of the Party; and

(c) with respect to Articles 1106 and 1114, all investments in the territory of the Party.
[...]"

253. Thus, in order for the claims to fall within the scope of Section A of Chapter 11, they must target "measures adopted or maintained by a Party" ((a) below) affecting investors or the investments of investors of another Party ((b) below).

(a) "Measures"

254. The Claimant contends that the following measures of the Government and of the OPA, either jointly or taken together breached Articles 1102, 1103, 1105 and 1106:

- Measures of the Government of Ontario:

    ➢ In respect of the FIT Program:

    i.   The Electricity Act, 1998 as amended, in particular, Parts II.1 (Ontario Power Authority) and II.2 (Management of Electricity Supply, Capacity and Demand), including Section 25.35 (Feed-in tariff Program);

    ii.  The GEGEA and the GEA;

    iii. The Ministerial direction of 24 September 2009, directing the OPA to establish the FIT Program and setting out the domestic content requirements to be included in the FIT Program;

    iv.  The LTEP of 23 November 2010;

v.    The ranking of the FIT Program applicants on 21 December 2010;

vi.   The Ministerial direction of 17 February 2011, which directed the OPA to plan for 10,700 MW of renewable energy generating capacity, excluding hydroelectric, by 2018;

vii.  The Ministerial direction of 3 June 2011, which directed the OPA to offer FIT Contracts for up to 750 MW in the Bruce Region and to set up the Connection Point Amendment Window;

➢   In respect of the GEIA:

i.    The conclusion of the MOU between the Ontario Ministry of Energy and the Korean Consortium on 12 December 2008;

ii.   The alleged conclusion of a Framework Agreement between the Government of Ontario and the Korean Consortium on 25 September 2009 (signed on 29 October 2009);

iii.  The Ministerial direction of 30 September 2009, which directed the OPA to set aside transmission capacity for the Korean Consortium;

iv.   The conclusion of the GEIA on 21 January 2010; and

v.    The direction of 17 September 2010, which directed the OPA to hold in reserve 500 MW of transmission capacity in the Bruce Region;

• Measures of the OPA:

i.    All versions of the FIT Rules in particular Rule 6.4(a)(i) of Version 1.1, which required projects that became operational after 1 January 2012 to achieve 50% domestic content;

ii.   The FIT Contract. In particular, Section 2.4(b)(iii) and Annex D;

iii.  The alleged failure to follow the FIT Rules with respect to the ranking and evaluation of applications;

46

iv.   The decision taken in August 2010 not to run the ECT;

v.    The allegedly better treatment offered by the OPA to other FIT applicants, and the OPA's meetings with other FIT applicants which led to benefits not available to the Claimants being granted to these applicants;[32]

vi.   The release of the FIT Program rankings on 21 December 2010;

vii.  The OPA's alleged misadministration of the FIT Program;

viii. The OPA's decision on the information to be included in the TAT tables;

ix.   The OPA's decision to offer NextEra a FIT Contract with connection points on the 500 kV Bruce to Longwood Line; and

x.    The award of the FIT Contracts on 4 July 2011.

255. The Tribunal recalls that Article 201 of the NAFTA provides that the term "measure includes any law, regulation, procedure, requirement or practice."

256. The Respondent has not disputed — and rightly so — that the acts identified by the Claimant qualify as "measures" under the definition of Article 201 of the NAFTA. As other tribunals have observed,[33] the term "measures" in Article 201 must be understood broadly. While not all governmental acts necessarily constitute "measures",[34] the Tribunal is satisfied that the acts listed above fall within the ambit of Article 201.

257. The Tribunal notes that, in its Memorial, the Claimant listed some acts of Hydro One and IESO, which it claims to be attributable to the Government of Ontario and, therefore, to Canada. The Claimant noted in particular that IESO was part of the "Korean Consortium

---

[32]  Reply §878(b)(iv).

[33]  See, for instance, Exh. RL-010, *Loewen Group, Inc. and Raymond L. Loewen v. United States of America* (ICSID Case No. ARB(AF)/98/3), Decision on Hearing of Respondent's Objection to Competence and Jurisdiction, 5 January 2001, §53.

[34]  Exh. CL-104, *Robert Azinian, Kenneth Davitian, & Ellen Baca v. The United Mexican States* (ICSID Case No. ARB (AF)/97/2), Award, 1 November 1999 ("**Azinian**"), §87.

Working Group" and that, in 2010 and 2011, IESO and Hydro One met with the Claimant's competitors to discuss a connection to a 500 kV transmission line.[35] For the reasons set forth below (§376), the Tribunal has not listed them among the measures referred to above.

258. For the sake of clarity, the Tribunal further notes that not all of the measures identified in (§254) above are relevant for the Tribunal's analysis of the merits of the dispute. Indeed, for reasons that it will express later, it considers that it lacks jurisdiction over the measures that were already in existence at the time when Mesa invested in Canada.

    (b) Measures "relating to" investors or the investments of investors

259. As mentioned above, to fall within the ambit of Section A of Chapter 11, the impugned measures must "relate to" an investor of another NAFTA Party or to investments of such an investor. In the context of the present dispute, this means that all of the measures identified in (§254) above must have a causal nexus with the Claimant or its investment.[36] Having reviewed each of the measures identified in §254 above, the Tribunal considers that all of them have a causal link with the Claimant and its investments, a position which the Respondent does not appear to dispute.

260. Thus, the acts identified by the Respondent are "measures" under Article 1101(1) of the NAFTA. Further, they relate to the Claimant and its investments. Thus, the requirements of Article 1101(1) of the NAFTA are met.

261. In conclusion, the Tribunal holds that the Claimant is an investor and that its claims fall within the scope of Section A of Chapter 11. As a result, the Tribunal holds that the requirements of Article 1116(1) have been met.

    **c.  Article 1118**

262. Another condition to submit a claim to arbitration is set out in Article 1118, which provides that the Parties must attempt to settle their dispute amicably:

---

[35]  Mem. §§234, 578, 633, 671.

[36]  Exh. RL-045, *Cargill Incorporated v. United Mexican States* (ICSID Case No. ARB(AF)/05/2), Award, 18 September 2009 ("*Cargill*"), §174 ("Article 1101 has a causal connection requirement as well: the measures adopted or maintained by Respondent must be those 'relating to' investors of another Party or investments of investors of another Party.").

"Article 1118: Settlement of a Claim through Consultation and Negotiation

The disputing parties should first attempt to settle a claim through consultation or negotiation."

263. The Respondent initially argued that the Parties had not entered into consultations under Article 1118. It contended that, although it had offered to hold consultations with the Claimant through its letters of 13 July, 21 September, 30 September, 28 October, and 30 December 2011, "[t]he Claimant accepted none of these offers and no consultations have occurred."[37]

264. In reality, the record shows that the Claimant had sought consultations on 6 July 2011, prior to the Respondent's purported invitation of 13 July 2011.[38] This fact is also evidenced by two documents to which the Claimant referred in rebutting Canada's allegations.[39] Mesa also supplied its responses to the Respondent's invitations[40] and noted that there has been "a series of privileged exchanges of correspondence under the terms of NAFTA Article 1118", but that no consultations materialized because of "a disagreement between the Investor and Canada over the lack of confirmation that Canada's delegation would include those persons responsible for the measures in dispute from the Government of Ontario to ensure that consultations between the parties were meaningful."[41]

265. In the Tribunal's opinion, these facts are sufficient to meet the condition of Article 1118. In any event, the Tribunal notes that after the Claimant's additional submissions, the Respondent appears to have dropped this argument.

### d. Article 1119

266. Article 1119 provides that 90 days before submission of a claim to arbitration, an investor must send a Notice of Intent to the disputing Party:

"Article 1119: Notice of Intent to Submit a Claim to Arbitration

---

[37] Canada's Objection to Jurisdiction dated 3 December 2012 ("**Objection to Jurisdiction**") §16.
[38] Exhs. C-005, 099, 100.
[39] Mem. §819.
[40] Exhs. C-103, 104, 114.
[41] Answer on Jurisdiction §33.

> The disputing investor shall deliver to the disputing Party written notice of its intention to submit a claim to arbitration at least 90 days before the claim is submitted
> [...]"

267. It is not disputed that the Claimant delivered its Notice of Intent on 6 July 2011, and filed its Notice of Arbitration 90 days later on 4 October 2011. This requirement is, therefore, satisfied.

268. The Tribunal is aware of the Respondent's objection to the Claimant's inclusion into its Notice of Arbitration of events occurring after its Notice of Intent.[42] This objection is addressed in the context of the Respondent's Article 1120 objection below.

## 2. Article 1120 Objection

269. As mentioned above, the Respondent submits that the Claimant's failure to comply with the requirements of Article 1120 deprives this Tribunal of jurisdiction over the present dispute or a part of it. The Tribunal first reproduces the Parties' positions ((a) and (b) below) and the Non-Disputing Parties' submissions ((c) below) and then discusses its reasons ((d) below).

### a. The Respondent's Position

270. The Respondent submits that the NAFTA Parties have conditioned their consent to arbitration on a potential claimant following the procedures set out in Articles 1118 to 1121 of the NAFTA. In this case, the Claimant filed its Notice of Arbitration on 4 October 2011, only three months after it was not awarded a FIT Contract, which is the event that precipitated its claim. By doing so, it disregarded Article 1120(1) of the NAFTA that required it to wait six months after the events in question to submit a claim to arbitration. Since the Claimant did not comply with Article 1120(1), Canada has not consented to arbitrate the claims before this Tribunal. As a result, the Tribunal lacks jurisdiction.

271. The Respondent opposes the Claimant's argument that Article 1120(1) does not require that *all* the events giving rise to a claim occurred six months before the notice of arbitration. It submits that the ordinary meaning of the phrase "events giving rise to a claim" in Article 1120(1) designates *each and every* event which led to the claim. If the

---

[42] Objection to Jurisdiction §40.

intent had been to refer only to some of the events or to the first event in the chain, the singular term "event" or language such as "any of the events" would have been used.

272. According to the Respondent, the Claimant's interpretation of Article 1120(1) of the NAFTA destroys the very purpose of that provision. Article 1120(1) provides a respondent with six months to acquire knowledge of the facts of a possible claim. This time period is especially important when the source of the claim is a measure taken by a sub-national government. Further, Article 1120 is entitled "Submission of a Claim to Arbitration." The words "a claim" do not refer to any claim, but to the claim that is being submitted to arbitration. If the claims cover multiple breaches or numerous events, then Article 1120(1) requires that six months have passed since all of the events giving rise to any aspect of the claim have occurred.

273. The Respondent further argues that Articles 1118-1120 must be read and interpreted together. The consultation provisions of Article 1118 and the notice of potential claims in Article 1119 are embodied in the purpose of Article 1120. There is nothing inconsistent about these provisions being understood as notice provisions. Articles 1119 and 1120 combined, pursue the same objective as Article VI(3)(a) of the Treaty Between the United States of America and the Republic of Ecuador Concerning The Encouragement and Reciprocal Protection of Investment ("**US-Ecuador BIT**"). Therefore, the Claimant's efforts to distinguish *Burlington* and *Murphy* (both of which considered this **BIT**) are ill-placed. The fact that notice and consultation requirements are included in a single provision in the US-Ecuador BIT (because the periods are the same) rather than in separate provisions like in the NAFTA (because the periods are different) is irrelevant.

274. The Respondent also contends that the Claimant is wrong to argue that the phrase "events giving rise to a claim" in Article 1120(1) of the NAFTA can include knowledge of future events. It notes that Article 1120(1) requires time to have "elapsed" in the past tense. Moreover, the Claimant's reliance on *Ethyl* is misguided. In that case, the tribunal took a "future event" into account because its occurrence was a certainty. By contrast, here the earlier events, i.e. the rankings and the treatment of the Korean Consortium, did not entail that the June 3 Direction would be issued or the FIT Contracts awarded as they were on 4 July 2011. For the Respondent, "[t]he earlier events may be relevant to what happened later in time, but they are not the sort of events that could lead one to

say that the Claimant knew at that point that the future events which actually gave rise to its claims were going to occur."[43]

275. The Claimant is also wrong, so says the Respondent, in its argument that the 3 June 2011 Direction and the award of the FIT Contracts on 4 July 2011 "are part of a composite act which commenced long before" those dates, with the result that the requirements of Article 1120(1) would be met. The Respondent points to the Commentary on Article 15 of the Articles on State Responsibility for Internationally Wrongful Acts of the International Law Commission ("**ILC Articles**"), pursuant to which what is relevant is the time when the alleged wrongful act occurred. In the case of a composite act, a "claim" only arises when "sufficient" events taken together have occurred to constitute the allegedly wrongful act. It is only when six months have elapsed since this date that a claim can be submitted to arbitration. By filing its claim merely three months after the disputed award of the FIT Contracts, the Claimant failed to fulfil the requirements of Article 1120(1), even if the measures complained of were considered as a composite act.

276. In any event, even if the Claimant's interpretation of Article 1120(1) were correct, no claim exists under NAFTA Article 1116(1) until a challenged measure allegedly causes harm. The events before 4 July 2011 were not susceptible of causing harm and thus could not "give rise to a claim." Indeed, no claim could have arisen before 4 July 2011, when the Claimant was refused a FIT Contract. As a consequence, even under its own interpretation, the Claimant should have waited for six months after 4 July 2011 to submit its claim to arbitration.

277. Finally, the Respondent contends that it is irrelevant whether attempts to resolve the dispute would have been successful or not. It adds that Mesa has in any event not shown that negotiations would have been futile. It is equally irrelevant for Canada that six months have elapsed since the filing of the Notice of Arbitration. The contrary "would render waiting period clauses such as Article 1120 superfluous and without consequence."[44]

278. On this basis, and in reliance on *Burlington*, *Murphy* and other authorities, the Respondent requests the Tribunal to dismiss the claim in its entirety. At the very least,

---

[43] C-Mem. §251.
[44] Objection to Jurisdiction §35.

the Respondent contends that the Tribunal should dismiss the claims arising from events which occurred within the six-month period preceding the Notice of Arbitration. Since the latter was filed on 4 October 2011, this means that the Tribunal should dismiss claims arising out of events which occurred after 4 April 2011.

### b. The Claimant's Position

279. The Claimant argues that Canada has "clearly" consented to this arbitration. It contends that there are no irregularities in the submission of its claim to arbitration and that, even if there were any, it would not deprive the Tribunal of jurisdiction. Indeed, relying on authorities such as *Ethyl*, *Lauder* and *Biwater*, the Claimant argues that objections based on Article 1120(1) are procedural and not jurisdictional in nature.

280. The Claimant also refutes Canada's argument that Article 1120(1) requires an investor to wait six months after all of its possible claims have materialized, rather than waiting for six months after "a claim" has arisen. For the Claimant, Canada's interpretation is contrary to Article 102 of the NAFTA and Article 31 of the Vienna Convention. It would be "absurd" to require an investor to wait six months from every subsequent breach to bring a claim in respect of a prior breach. If that were the case, continuous and on-going breaches would in effect bar a tribunal from ever deciding a claim. As long as a NAFTA Party kept committing wrongful acts, the investor would be unable to launch a claim.

281. The Claimant also disputes that Articles 1118 and 1119 are duplicated by implication into Article 1120, which would "serve no practical, logical or conceptual purpose."[45] It finds Canada's proposition directly contrary to the plain text of the NAFTA and to the deliberate drafting of Articles 1118, 1119 and 1120 as distinct requirements, each providing separately for consultation (Article 1118), notice of dispute (Article 1119) and a cooling-off period (Article 1120). Article 1120(1) does not impose an additional notice requirement as Canada contends. Only Article 1119 requires "written notice of [an Investor's] intention to submit a claim to arbitration."

282. Mesa disagrees with Canada's reliance on *Burlington* and *Murphy* because of the differences in the notice provisions of the US-Ecuador BIT and the NAFTA. Instead of one notice provision, into which time for consultation was implied, the NAFTA contains three separate and distinct requirements in Articles 1118, 1119 and 1120. The essential

---

[45] Mem. §837.

purpose of Article VI (3)(a) of the US-Ecuador BIT is reflected in Article 1119, which provides for the state to be informed of a dispute, so it can collect information and engage in consultations as provided in Article 1118. In other words, the NAFTA Parties rejected the single provision approach in favor of three separate requirements contained in Articles 1118, 1119, 1120 which cannot be ignored.

283. The Claimant also argues that the 3 June Direction and the 4 July award of FIT Contracts "are part of a composite act which commenced long before." The ILC Articles consider that it is the earliest date in a series of events which gives rise to a composite breach. As both events in question are related to earlier events (the domestic content requirements in the FIT Program; the failure to follow the FIT Rules with respect to the ranking and evaluation of the Claimant's applications; the preferential treatment given to the Korean Consortium and other FIT applicants), the requirement of Article 1120(1) is met.

284. In rebuttal of the argument that, for a composite act, "sufficient" events must exist to satisfy Article 1120(1), the Claimant submits that a tribunal should look to the investor's good faith understanding of its claim to determine at what point in time "sufficient" events do exist. It must consider the wrongful conduct which is the basis of the claim and "ask, based upon the investor's theory of law, are there 'sufficient' acts and omissions six months prior to filing the Notice that, if proven, would establish internationally wrongful conduct of a sort that would allow the investor to succeed with the claim as filed?" If the investor came to the conclusion in good faith that it had a claim at a particular point in time and waited six months from that time, the waiting period should not bar the claims.

285. In respect of Canada's argument that Article 1116(1) requires a showing of harm, the Claimant responds that Article 1120(1) speaks of "events" that give rise to a claim, nothing more. In particular, Article 1120(1) does not require an investor to demonstrate that each "event" caused harm. For the Claimant, "[a]n event is not the same as a 'breach'; rather an event, or series of events, can give rise to a breach, which in turn give rise to a claim [...] 'Events giving rise to a claim' cannot mean an investor needs to demonstrate each and every event caused loss or damage."[46]

286. To counter the Respondent's submission that a notice under Article 1120(1) is required for the state to consult with its regional entities, the Claimant notes that a meaningful

---

[46] Reply §840.

consultation would in any event not have been possible. There was no indication that the Federal Government was prepared to offer monetary compensation and it was reasonable to assume that any consultation without the engagement of the Government of Ontario would have been futile.

287. Furthermore, the Claimant also argues that Canada has failed to establish any unfair surprise or bad faith on the Claimant's part. It has not shown that the lack of a six month cooling-off period with respect to some events compromised the possibility of settlement or turned out to be detrimental to Canada in these proceedings.

288. Finally, Mesa submits that "[p]ractical and efficient approaches should be preferred by NAFTA Tribunals to best serve the NAFTA's objectives to enhance the resolution of disputes in the NAFTA region", and that Canada's interpretation of Article 1120(1) "is entirely contrary to the effective settlement of disputes." If Canada's interpretation is adopted, later events could only be addressed by filing a new claim and constituting a new tribunal, which would be costly and wasteful as two different tribunals would consider events which occurred at different times, but are part of the same composite or continuing breach.

### c. The Non-Disputing Parties' Position

289. Mexico submits that the NAFTA Parties consented to arbitration upon compliance with the procedural requirements stipulated in Articles 1116-1121 of the NAFTA. Thus, tribunals must ensure that a claimant complies with all of the requirements set out in these provisions.

290. It further insists that Article 1120(1) of the NAFTA requires six months to have elapsed from the time when the allegedly wrongful act occurred. The claim must be ripe at the time it is filed. The waiting period provided in Article 1120(1) plays an important role in the overall operation of Chapter 11, "which is to provide a respondent Party with six months to learn of the events that may give rise to a claim, to meet with any potential claimants and to attempt to remedy the problem if appropriate." If a claim is submitted before the end of the six-month waiting period, a tribunal would lack jurisdiction even if such period elapsed by the time the tribunal was constituted.

291. The U.S. equally submits that no claim can be brought to arbitration unless the requirements of Chapter 11 are met. For the U.S., "[t]ogether with the notice requirement

in Article 1119, the 'cooling-off' requirement in Article 1120(1) affords a NAFTA Party time to identify and assess potential disputes, coordinate among relevant national and sub-national officials, and consider amicable settlement or other courses of action prior to arbitration." Consequently, any claim for which a claimant has not waited six months from the relevant events is not submitted in accordance with Article 1120(1). Hence, the submission does not satisfy the requirements of consent contained in Articles 1121 and 1122 of the NAFTA.

292. The U.S. further submits that there can be no claim under Article 1116(1) of the NAFTA until an investor has suffered harm from an alleged breach. Read together, Articles 1116(1) and 1120(1) of the NAFTA provide that a disputing investor may submit a claim to arbitration under Chapter 11 "only for a breach that already has occurred and for which damage or loss has already been incurred, provided that six months has elapsed from the events giving rise to the claim. No claim based solely on speculation as to future breaches or future loss may be submitted."

### d. Analysis

293. Article 1120(1) provides for a six-month waiting period before the submission of a claim to arbitration. It reads as follows:

> "Article 1120: Submission of a Claim to Arbitration
>
> 1. Except as provided in Annex 1120.1, and provided that six months have elapsed since the events giving rise to a claim, a disputing investor may submit the claim to arbitration [...]"

294. As set out above, the Respondent contends that this Tribunal does not have jurisdiction because the Claimant has failed to comply with this six-month waiting period. Alternatively, it submits that the Tribunal does not have jurisdiction over claims arising out of the two events that occurred within the six-month period preceding the Notice of Arbitration. The Claimant opposes these submissions on numerous grounds.

295. To resolve the issue, the Tribunal must interpret Article 1120(1). It will do so in application of the principles of interpretation identified above (§§231 et. seq.) and bearing in mind the objectives stated in Article 102(1) of the NAFTA.

296. At the outset, it bears recalling the reason why States provide for cooling off or waiting periods in investment treaties. The object and purpose of these periods is to appraise the State of a possible dispute and to provide it with an opportunity to remedy the

situation before the investor initiates an arbitration.[47] In most bilateral investment treaties, notice and consultation period requirements are included in a single provision.[48] By contrast, the NAFTA deals with this matter in three distinct provisions. Article 1118 of the NAFTA provides that disputing parties should attempt to settle a claim through consultation or negotiation. Article 1119 requires a disputing Party to send a written notice of its intent to submit a claim to arbitration at least 90 days before the submission. The notice must specify the provisions of the Agreement alleged to have been breached as well as the issues and the factual basis for the claim. A different provision – Article 1120 – addresses the submission of a claim to arbitration and specifies that six months must have elapsed since the events giving rise to a claim.

297.  Typically, consultations between the disputing parties take place after a notice of intent has been submitted.[49] Thus, through the notice of intent – in which an investor must articulate its claims with a reasonable degree of specificity – a disputing NAFTA Party is informed of the claims against it. It then has at least 90 days to consider and possibly settle the claims. The six-month period in Article 1120(1) of the NAFTA provides an additional opportunity to resolve the dispute amicably.[50] The six-month period is an additional requirement. While it may partially overlap with the 90 days of Article 1119, it is a distinct condition deriving from a separate provision.

298.  Having thus explained the object and purpose of Article 1120(1) in the context of the other provisions of the NAFTA, the Tribunal will now turn to the Parties' arguments. They diverge in particular on the significance of the words "events giving rise to a claim" in

---

[47] Exh. RL-002, *Burlington Resources Inc. v. Republic of Ecuador* (ICSID Case No. ARB/08/5), Decision on Jurisdiction, 2 June 2010, §312. See also *Western NIS Enterprise Fund v. Ukraine* (ICSID Case No. ARB/04/2), Order, 16 March 2006, §5 ("[the six-month waiting period requirement] allows the State, acting through its competent organs, to examine and possibly resolve the dispute by negotiations.").

[48] For instance, Article VI of the US-Ecuador Bilateral Investment Treaty (on which the Respondent has relied in its submissions) provides: "(2) In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation [...] (3)(a) Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2(a) or (b) and that six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration."

[49] Exh. CL-6, Re Notices of Intent to Submit a Claim to Arbitration (2003) (FTC) ("Efforts to settle NAFTA investment claims through consultation or negotiation have generally taken place only after the delivery of the notice of intent. The notice of intent naturally serves as the basis for consultation or negotiations between the disputing investor and the competent authorities of a Party"). See also Meg Kinnear et. al. (eds.), Investment Disputes under NAFTA (2006, Kluwer Law International) 1119-13. The Parties agree (Mem. §844-845, C-Mem. §244).

[50] Exh. RL-031, Canadian Statement of Implementation, p. 154.

Article 1120(1). According to the Respondent, the ordinary meaning of this phrase entails that *every* event which gives rise to a claim must have occurred at least six months prior to the submission of that claim to arbitration.[51] By contrast, the Claimant contends that the requirement of Article 1120(1) is satisfied, provided *some* of the events giving rise to the claim have occurred more than six months before the start of the arbitration.

299. The Tribunal agrees with the Claimant on this issue. If the Respondent's argument were followed, every new event related to a claim would require a claimant to wait for a new six months period before starting arbitration. This would apply however secondary or ancillary the new event may be. If events relating to the same claim kept occurring, a claimant would effectively be precluded from ever initiating an arbitration. This interpretation would effectively deprive Article 1116(1) (that entitles investors to submit a claim to arbitration) of *effet utile*, an outcome that is contrary to treaty interpretation rules.

300. Moreover, Article 102(1)(e) of the NAFTA, which this Tribunal must take into consideration when interpreting Article 1120(1), sets out the object and purpose of the Agreement as "creat[ing] effective procedures [...] for the resolution of disputes." It could hardly be said that this objective is satisfied by an interpretation of Article 1120(1) requiring the Claimant to initiate a new arbitration in respect of two out of a series of events that give rise to the claims before this Tribunal. This would clearly be counterproductive in terms of effective dispute settlement and would trigger the usual drawbacks of multiple proceedings, including a waste of resources and risks of conflicting decisions.[52] This is particularly true here where sufficient events giving rise to the claim had already occurred before the six-month cooling-off period – and all the more so considering that the Respondent was fully notified of the claims in accordance with Article 1119 of the NAFTA. Indeed, in its Notice of Intent of 6 July 2011, the Claimant had identified the 3 June Direction and the refusal to award the FIT Contracts of 4 July as events giving rise to its claim.[53] By the time the Notice of Arbitration was filed on 4

---

[51]  C-Mem. §240 ("Article 1120 requires that six months have passed since all of the events giving rise to any aspect of the claim have occurred before submitting it to arbitration.").

[52]  Other tribunals have adopted a similar approach. See for instance, Exh. CL-2, *Ethyl Corporation v. The Government of Canada* (UNCITRAL), Award on Jurisdiction, 24 June 1998, §85; and Exh. CL-3, *Pope & Talbot Inc. v. The Government of Canada* (UNCITRAL), Award Concerning the Motion by Government of Canada Respecting the Claim based upon Imposition of the "Super Fee", 7 August 2000, §27.

[53]  Notice of Intent §34 ("The Measures at issue raised in this dispute include, but are not limited to [...]: FIT direction dated June 3,2011"); §19 ("On July 4,2011 the Wind Farm Investments consequently lost

October 2011, the Respondent was well aware of all the events giving rise to the Claimant's claim. It was not somehow taken by surprise by the claims mentioned in the Notice of Arbitration.[54]

301. For these reasons, the Tribunal considers that the six-month requirement in Article 1120(1) must be deemed met if sufficient events giving rise to a claim exist six months prior to the submission of the dispute to arbitration. If additional events occur within the six-month period which are part of the claim brought to arbitration, they can be regarded as not affecting the Tribunal's jurisdiction over that claim. This is all the more the case where the additional events are foreseeable, as was the case in *Ethyl*.[55] The Respondent appears to agree with this position, albeit in a different context.[56]

302. Having reached this understanding, the Tribunal must now review what the "claim" is and whether sufficient events giving rise to the claim existed prior to the six-month period.[57] On the facts of this case, the latter review essentially involves determining whether the 3 June Direction and 4 July award of FIT Contracts are part of the same subject-matter as the prior events.[58]

---

their priority ranking and were not offered FIT Program contracts, because of the 750 MW limit on awards in the Bruce Region [...]").

[54] Two events were listed in the Notice of Arbitration although were not in the Notice of Intent because they occurred after the filing of the Notice of Intent: (i) that the Government of Ontario withdrew its ability to terminate FIT Contracts for cause; (ii) that the Government of Ontario extended the duration of the special preferences given to the Korean Consortium by a year (Submission on Jurisdiction, §18). The Claimant submits that "[n]either of these two events constituted a specific new breach of the NAFTA, but each fact was relevant to the evaluation of the breaches by the Tribunal" (Submission on Jurisdiction, §18). In the circumstances, these events are irrelevant to the present analysis. The Tribunal has considered them in the context of its analysis of the Claimant's Article 1105 claim below.

[55] In *Ethyl*, the event falling within the cooling-off period was legislation that had not come into effect at the time the arbitration was initiated. See CL-2, §§87-88.

[56] C-Mem. §255 ("[F]or the purposes of Article 1120, what is relevant is the time that the alleged wrongful act resulting in damage to the Claimant occurred, and by consequence a claim, arose. In the case of a composite act, a 'claim' arises only when, taken together, there are enough acts or omissions sufficient to constitute the allegedly wrongful act. It is only once six months have elapsed from this date that a claim can be validly submitted to arbitration under Article 1120 of the NAFTA.").

[57] This was the approach of the tribunal in *Pope & Talbot* albeit in a different context. There, the Tribunal first determined what the precise claim was in that proceeding, before proceeding to determine whether a later occurring fact could be included within that claim (Exh. CL-3).

[58] See generally Exh. CL-321, *CMS v. Argentina* (ICSID Case No. ARB/01/8), Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003, §109 (The tribunal noted that "as long as [multiple different actions] [allegedly] affect the investor in violation of its rights and cover the same subject matter, the fact that they may originate from different sources or emerge at different times does not necessarily mean that the disputes are separate and distinct."); Exh. CL-282, *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. The Argentine Republic* (ICSID Case No. ARB/09/1), Decision on Jurisdiction, 21 December 2012, §123 ("[i]nternational jurisprudence suggests that the *subject matter* of the negotiations should be the same as the dispute that is brought before the court or tribunal.").

303. In its Notice of Intent the Claimant described its claim as being about:

> "[...] unfairness, the abuse of power and process and undue political interference in the regulation of renewable energy in Ontario through the unannounced last-minute imposition of arbitrary measures and through opaque and secret administration and 'buy local' contract requirements. The government changed the regulatory framework without notice and without due process, so as directly to curtail and impair market access rights under the established scheme for renewable energy in Ontario."

304. It then identified most of the numerous measures listed above (§254) as the "Measures at issue raised in this dispute."[59]

305. In its Notice of Arbitration, the Claimant then stated as follows:

> "THE GENERAL NATURE OF THE CLAIM
> 6. This claim arises out of the arbitrary and unfair application of various government measures related to the regulation and production of renewable energy in Ontario. Canada, through its sub-national organs imposed sudden and discriminatory changes to the established scheme for renewable energy, namely the Feed-In-Tariff Program (the "FIT Program")."

306. In this context as well, it referred to most of the same measures enumerated above (§254) as the measures in dispute.

307. Thus, the claim submitted to this Tribunal principally involves the acts of the Government and the OPA in relation to the FIT Program and the GEIA. These acts allegedly breach various provisions of the NAFTA: Article 1102 (national treatment); Article 1103 (most-favored-nation treatment), Article 1105 (minimum standard of treatment); and Article 1106 (performance requirements). It is clear from the Notice of Intent and the Notice of Arbitration that the Tribunal was called to consider not only the acts of the governmental authorities, but also the effects of those acts on the Claimant.

308. The claim having being identified, the Tribunal must now examine whether sufficient events giving rise to such claim existed prior to the six-month period of Article 1120(1) of the NAFTA.

309. The Claimant alleges that the Respondent has breached Articles 1102, 1103, 1105 and Article 1106. It is not disputed that the events giving rise to the Article 1106 claim arose before 4 April 2011 i.e. before the six-month cooling-off period. The events giving rise to

---

[59] Notice of Intent §34.

the claims under Articles 1102, 1103, and 1105 also appear to have occurred before the commencement of the cooling-off period. Indeed, by 4 April 2011, most of the events listed above (§254) had already occurred: the OPA had (allegedly incorrectly) ranked the Claimant's FIT projects (on 21 December 2010); available transmission capacity had been reduced (because of reservation of capacity for the Korean Consortium from 12 December 2008, and because of the LTEP of 23 November 2010); and capacity had been reserved for the Korean Consortium (through the GEIA of 21 January 2010 and its predecessor agreements), particularly in the Bruce Region (on 17 September 2010). These events were sufficient to give rise to the claims based on Articles 1102, 1103, and 1105.

310.  These observations are corroborated by the fact that the two events within the six-month period, the 3 June Direction and 4 July award of FIT Contracts, were merely developments of events that had taken place earlier before the six-month period, i.e. before 4 April 2011. The impugned events were – to borrow the Claimant's expression – "interrelated" with earlier events[60]:

- The 3 June Direction limited the available transmission capacity in the Bruce Region to 750 MW. It further established the Connection Point Amendment Window. Both of these measures largely resulted from earlier events which had reduced the available transmission capacity. In December 2010, the OPA estimated that 1200 MW transmission capacity would be available to projects in the Bruce Region. However, through the LTEP of 23 November 2010 and the Ministerial direction of 17 February 2011, the Government directed the OPA to plan for 10,700 MW of renewable energy generating capacity by 2018. Further, through the GEIA (and its predecessor agreements), the Government reserved available transmission capacity for the Korean Consortium. It was because of the limitations on available transmission capacity[61] that, on 3 June 2011, the Government directed the OPA to award contracts up to 750 MW and establish the Connection Point Amendment Window.

- The 4 July award of FIT Contracts was equally the result of events that had taken place prior to 4 April 2011. By that date the OPA had already ranked

---

[60]  Submission on Jurisdiction §56.
[61]  See Sue Lo WS I §§37 et. seq.; Tr. (28 October 2014) 132:6-133:13.

the Claimant's projects.[62] By then, the Government had also limited the transmission capacity to be awarded to renewable energy projects. This capacity was further limited by the reservation for the Korean Consortium. As the Respondent's expert testified, had capacity not been reserved for the Korean Consortium in the Bruce Region, the Claimant would have been awarded a FIT Contract for its Arran and TTD projects.[63] These events, which are all "events giving rise to a claim", eventually led to the Claimant not being awarded a FIT Contract on 4 July 2011.

311. The Respondent next argues that, pursuant to Article 1116, no claim exists until an investor has allegedly suffered harm arising from a measure allegedly in breach of the NAFTA.[64] According to it, Mesa could not have suffered damage before 4 July 2011, when it was not awarded a FIT Contract. As this date falls within the six-month period prescribed by Article 1120(1), the Tribunal does not have jurisdiction over the present dispute.

312. Article 1116(1) stipulates that a party may initiate an arbitration claiming that (i) a NAFTA Party has breached Section A of Chapter 11 and that (ii) it incurred loss or damage as a result of that breach. It is undisputed that the first element – a claim for breach of Section A of Chapter 11 – is complied with. Indeed, in its Notices of Intent and of Arbitration, the Claimant alleged violations of Articles 1102, 1103, 1104, 1105 and 1106, all of which fall within Section A of Chapter 11 of the NAFTA.

313. For the second component – loss or damage caused by the breach – the Respondent appears to suggest that the Claimant must have actually suffered a loss or damage six months before the start of the arbitration. However, this is not what Article 1116(1) states. It merely requires the investor to "claim" that it has incurred harm due to the breach. It is not for the investor to prove at this early stage that it has actually suffered a loss or damage. Proof of actual damage is a matter for the merits, as opposed to the jurisdiction phase of the arbitration.

---

[62] In its letter of 20 May 2011, the Claimant also sought clarifications of the ranking process (Exh. C-10).

[63] Tr. (30 October 2014) 159:4-12 ("Turning to the GEIA counter factual, we then take away the breach, which is the 500-megawatt allocation of transmission capacity to the Korean Consortium. So you now have, at that dotted brown bar, a 1,250-megawatt available transmission capacity. And as you can see, TTD and Arran make the cut and get FIT contracts in that scenario, but Summerhill and North Bruce did not.").

[64] C-Mem. §§247-248.

314. Neither is there a requirement under Article 1120(1) that an investor wait six months after incurring loss or damage before submitting its claim to arbitration. As noted above, Article 1120(1) simply requires that six-months elapse between the "events giving rise to a claim", and the submission of the claim to arbitration. Hence, it is the "events giving rise" to the claim of loss or damage (under Article 1116(1)) that must occur six months previously, not the actual incurring of the loss or damage itself.

315. A similar question arose in *Methanex*. There, a Canadian investor claimed that its investment would be adversely affected by a ban on a gasoline additive. At the time of the submission of the claim, the ban had been proposed, but had not come into effect. The respondent challenged jurisdiction on the basis that the investor had not suffered and could not suffer any loss because the ban was not in effect yet. In rejecting this challenge, the tribunal observed that it was "an indisputable fact that Methanex has made 'a claim...that [Methanex] has incurred loss and damage'." It added that "the plain meaning of this provision [i.e. Article 1116(1)] does not require, as a jurisdictional matter, the claimant to prove loss and damage."

316. The NAFTA tribunal in *Mobil* also considered the question whether a breach giving rise to future and prospective damage fell within the ambit of Article 1116(1). There, the tribunal was asked to determine, *inter alia*, whether Canada had imposed impermissible performance requirements within the meaning of Article 1106(1)(c) on the foreign investor, subject to the exceptions of Article 1108. The claimants sought compensation for the incremental expenditures that they would incur as a result of the application of the performance requirements from the time that they came into force until 2036. Relying on Article 1116(1), Canada argued that the Tribunal could not award damages for prospective losses that were incurred after the filing of the claim. The majority of the tribunal, however, took a broader view accepting that future damages were covered by Article 1116:

> "A breach giving rise to future and prospective damage may, in general terms, fall within Article 1116. There is nothing in the language of Article 1116 (1) that convinces us that the provision is directed only to damages that occurred in the past and does not extend, in principle, to damages that are the result of a breach which began in the past [...] and continues

> [...] resulting in the incurring of losses which crystallise (i.e. become quantifiable) and must be paid sometime in the future [...]."[65]

317. Thus, the *Mobil* tribunal recognised that its jurisdiction was not limited to losses that had occurred in the past, but extended to future damages resulting from a breach that had begun in the past. This is precisely the case here. The limitation of capacity because of the LTEP and the reservation of capacity for the Korean Consortium through the GEIA of January 2010 and its predecessor agreements – both of which occurred outside the cooling-off period – resulted in the non-award of FIT Contracts to the Claimant on 4 July 2011. The loss may have accrued on 4 July 2011, but it merely resulted from the earlier governmental acts. As a result, this Tribunal is not barred from hearing the present dispute even though damages (if any) were actually incurred by the Claimant within the six-month waiting period of Article 1120(1) of the NAFTA.

318. Thus, for the reasons just discussed, the Tribunal denies the Respondent's objections concerning Article 1120(1) of the NAFTA. It holds that the requirements of Article 1120(1) have been complied with. As a consequence, it can dispense with determining whether these requirements go to consent and are thus jurisdictional or whether they are procedural and could accordingly be satisfied by the passage of time.

### 3. *Ratione temporis* Objection

319. The Respondent also submits that the Tribunal lacks jurisdiction over claims for breaches that occurred prior to the time when the Claimant invested in Canada. The Parties' positions are summarised in (a) and (b) below, and the Tribunal's analysis is set out in (d).

#### a. The Respondent's Position

320. Invoking Articles 1101(1) and 1116(1), the Respondent submits that for Chapter 11 to apply, an investment "of an investor of another party" must already have existed at the time of the disputed measure. An investor cannot challenge measures that were already in existence when it made its investment. Put differently, the Tribunal has no jurisdiction to rule on a challenged measure, unless an investor can establish that it had made its

---

[65] Exh. CL-18, *Mobil Investments Inc. & Murphy Oil Corporation v. Government of Canada* (ICSID Case No ARB(AF)/07/4), Decision on Liability and on Principles of Quantum, 22 May 2012 ("*Mobil*"), §427.

investment before the measure was adopted. Following this reasoning, as the Claimant's project companies TTD and Arran were incorporated on 17 November 2009, the Tribunal has no jurisdiction over the measures which occurred prior to this date with respect to these projects. Similarly, the Tribunal lacks jurisdiction over measures affecting North Bruce and Summerhill which were taken before 6 April 2010, which is the date when the respective project companies were incorporated.[66]

### b. The Claimant's Position

321. The Claimant opposes the Respondent's submissions. Article 1139 defines an "investor of a Party" as someone "that seeks to make, is making or has made an investment", a definition that Mesa meets. It specifies that "[Mesa] made its initial investments in Canada by August 14, 2009 [...] Mesa actually began looking to invest in Ontario in March 2009, and began due diligence and transaction work in July 2009." According to it "NAFTA's protection extends to Mesa in August 2009."[67]

322. If the Respondent's argument that Mesa's investments were made only in November 2009 were accepted, the Claimant contends that it would make no difference. The NAFTA provisions would still apply to the Claimant as of August 2009, because Article 1139 "extends to a situation in which an investor has purchased a good or service in the country of another state party but has yet to formally incorporate such investment."

### c. The Non-Disputing Parties' Submissions

323. Neither the U.S. nor Mexico have made any particular submissions on this issue.

### d. Analysis

324. Article 1101 circumscribes the scope of application of the treaty, and Article 1116(1) gives indications about the relevant breaches, in the following terms:

> "Article 1101: Scope and Coverage
>
> 1. This Chapter applies to measures adopted or maintained by a Party relating to:
>
> (a) investors of another Party;
> (b) investments of investors of another Party in the territory of the Party. [...]"

---

[66] C-Mem. §§263-269.
[67] C-PHB §§356-357.

And:

"Article 1116: Claim by an Investor of a Party on Its Own Behalf

1. An investor of a Party may submit to arbitration under this Section a claim that another Party has breached an obligation under:

(a) Section A or Article 1503(2) (State Enterprises)
[...]

and that the investor has incurred loss or damage by reason of, or arising out of, that breach.

[...]"

325. The scope of application so defined limits the Tribunal's jurisdiction for the obvious reason that the latter derives from the dispute settlement provisions embodied in Chapter 11. Consequently, there is no jurisdiction if disputed measures are not "relating to investors" or to "investments of an investor."[68] In addition to these express provisions of Chapter 11, the same conclusion arises as a general matter from the principle of non-retroactivity of treaties.[69] State conduct cannot be governed by rules that are not applicable when the conduct occurs.

326. As a consequence, investment arbitration tribunals have repeatedly found that they do not have jurisdiction *ratione temporis* unless the claimant can establish that it had an investment at the time the challenged measure was adopted. In the NAFTA context, the Tribunal in *Vito Gallo* observed:

"[F]or Chapter 11 of the NAFTA to apply to a measure relating to an investment, that investment must be owned or controlled by an investor of another party, and ownership or control must exist at the time the measure which allegedly violates the Treaty is adopted or maintained. In a claim under Art. 1117 the investor must prove that he owned or controlled

---

[68]  See Exh. RL-046, *Cementownia "Nowa Huta" S.A. v. Republic of Turkey* (ICSID Case No. ARB(AF)/06/2), Award, 17 September 2009, §§112-114 ("It is undisputed that an investor seeking access to international jurisdiction pursuant to an investment treaty must prove that it was an investor at the relevant time, i.e., at the moment when the events on which its claim is based occurred"); See also *Libananco Holdings Co. Limited v. Republic of Turkey* (ICSID Case No. ARB/06/8), Award, 2 September 2011, §§ 121-128 ("It is common ground between the Parties that the Tribunal's jurisdiction over the merits depends on whether Libananco owned ÇEAŞ and Kepez shares at the time of the alleged expropriation...In order to establish jurisdiction, the Claimant must prove that it owned ÇEAŞ and Kepez shares during the time at which it claims the acts constituting a violation of the ECT were committed by the Respondent.").

[69]  See Article 28 of the VCLT. See also Article 13 of the ILC Articles.

directly or indirectly the 'juridical person' holding the investment, at the critical time.

As the Tribunal in *Phoenix* declared, it does not need extended explanation to assert that a tribunal has no jurisdiction *ratione temporis* to consider claims arising prior to the date of the alleged investment, because the treaty cannot be applied to acts committed by a State before the claimant invested in the host country. In the present case, the Claimant must have owned or controlled the Enterprise at the time when the AMLA was enacted. And since the Tribunal has already found that the Claimant has failed to marshal the evidence necessary to prove such ownership and control at the relevant time, the necessary consequence is that his claim must fail for lack of jurisdiction *ratione temporis*."[70]

327. Accordingly, this Tribunal's jurisdiction *ratione temporis* is limited to measures that occurred after the Claimant became an "investor" holding an "investment." These terms are defined in Article 1139 as follows:

"Investment of an investor of a Party means an investment owned or controlled directly or indirectly by an investor of such Party;

Investor of a Party means a Party or state enterprise thereof, or a national or an enterprise of such Party, that seeks to make, is making or has made an investment;

[...]"

328. Under this definition, an investor is not only someone who has made an investment; it is also someone who "seeks to make" an investment. On this basis, the Claimant contends that Chapter 11 extended to Mesa before the actual incorporation of its investments in Canada in November 2009 (for TTD and Arran) and April 2010 (for North Bruce and Summerhill).[71]

329. Before it addresses the merits of this argument, the Tribunal notes that the Claimant's allegations as to the precise time at which it sought to make its investments in Canada lack clarity. For instance, in its submissions prior to the hearing, the Claimant contended that it sought to make and actually made its investments at the same time (i.e. at the time of incorporation of its project companies in November 2009 and May 2010), without

---

[70] Exh. RL-052, *Vito G. Gallo v. Government of Canada* (UNCITRAL), Award, 15 September 2011, §§325-326, citing *Phoenix Action Limited v. Czech Republic* (ICSID Case No. ARB/06/5), Award, 15 April 2009, §68. See also *Renée Rose Levy and Gremcitel S.A. v. Republic of Peru* (ICSID Case No. ARB/11/17), Award, 9 January 2015, §182 ("If a claimant acquires an investment after the date on which the challenged act occurred, the tribunal will normally lack jurisdiction *ratione temporis*.").
[71] C-PHB §355.

distinguishing between the two.[72] In the same brief, it also submitted that it was first affected by the Respondent's wrongful acts in September 2009 when it was seeking to make its investments in Ontario.[73] Still in the same brief, it also referred to June 2009, when AWA LLC was formed.[74] By contrast, in its post-hearing submission, the Claimant contended that Mesa made its initial investment in Canada by 14 August 2009, which is when the substantive protections of the NAFTA applied to it.[75] For the present purposes, the Tribunal will assume that the Claimant was seeking to make its investment in the TTD project as of 14 August 2009, and in the Arran project as of 14 September 2009. It chooses these dates because they appear in the latest submission of the Claimant and, more importantly, because they are the only dates for which the Claimant has submitted some evidence.[76] No cogent evidence has been submitted by the Claimant for the North Bruce and Summerhill projects. Therefore, for these projects, the relevant date is deemed to be the date of incorporation, i.e. 6 April 2010.

330. It is obviously implied in the definition quoted above that there must be a link between the investor that seeks to make an investment, and the investment that the investor seeks to make. Put differently, the investor must establish that it was seeking to make the very investment in respect of which it makes its claims. The Claimant's "investments" in Canada consist of the four wind farm projects: TTD, Arran, North Bruce, and Summerhill. Therefore, to establish that it was an investor in August or September 2009, the Claimant must show that it was seeking to make these four wind farm investment projects in Canada.

---

[72] Reply §826(a) ("The Investor had been seeking to invest in Canada, and made an investment in Canada by incorporating its investments TTD Wind Project ULC and Arran Wind Project ULC in the Province of Alberta on November 17, 2009."); see also Reply §831 ("[T]here are two dates that are relevant for events that first give rise to the claim – November 25, 2009 and May 29, 2010.").

[73] Reply §333(f)(i).

[74] Reply §859 ("Mesa's first investment in November 2009 was not a one-off investment. Mesa always intended to achieve several hundred megawatts of wind turbine projects in Canada from the time AWA LLC was formed with a view to establishing wind projects in June 2009.").

[75] C-PHB §355 ("Mesa made its initial investments in Canada by August 14, 2009. As testified by Cole Robertson, Mesa actually began looking to invest in Ontario in March 2009, and began due diligence and transaction work in July 2009. NAFTA's protection extends to Mesa in August 2009.").

[76] Exh. C-457 and Exh. C-461. By contrast, no evidence was submitted for the other dates supplied by the Claimant. For instance, in respect of the North Bruce and Summerhill projects, the Claimant submitted that it was seeking to make an investment before the FIT applications were made for these projects in May 2010 without providing any evidence in support. It also submitted that "[t]he North Bruce and Summerhill projects w[e]re simply an expansion of the original Investment" (Reply §859), also without furnishing any evidence in support.

331. In support of its allegation in respect of the TTD Project, the Claimant offers two documents – a "Certificate of Correction"[77] and a "Limited Liability Company Operating Agreement"[78], both of AWA TTD Development LLC and both dated 14 August 2009. According to the Claimant, under the latter Agreement, AWA TTD Development LLC was authorized to purchase "the assets of [Twenty Two Degree Energy Corp]"[79]. This is indeed so. However, AWA TTD Development LLC is a Delaware corporation (§2) and the Tribunal is unable to establish the link between this asset purchase and the Claimant's TTD project which was incorporated in November 2009. The position is the same for the Arran project. Here too, the Claimant has not established how the evidence on which it relies shows that Mesa was "seeking to make" its investment in the Arran project in September 2009.

332. As a result, and in the absence of other evidence, the Tribunal cannot but conclude that Mesa has failed to establish that it was seeking to make its investments in Canada starting in August and September 2009. Accordingly, the Tribunal considers that the relevant date for the present analysis is the one on which each of the wind farm vehicles was incorporated. The Claimant also appears to recognise that the date of incorporation may be considered as the relevant date for the Tribunal's analysis.[80]

333. TTD and Arran were incorporated on 17 November 2009.[81] North Bruce and Summerhill were incorporated on 6 April 2010.[82] Hence, for the reasons set forth above, the Tribunal concludes that its jurisdiction is limited to claims based on measures which occurred after 17 November 2009 for TTD and Arran and after 6 April 2010 for North Bruce and Summerhill.

---

[77] Exh. C-457.

[78] Exh. C-461.

[79] C-PHB §41.

[80] C-PHB §356 ("Should the Tribunal nonetheless determine that Mesa's investments were made only in November 2009, when Mesa's project companies were incorporated in Canada"). See also Reply §878(a)(iv)(a) and (b) ("[Measures contrary to Article 1106(1)(b) and (c) of the NAFTA] first affected the Investor on November 25, 2009 when TTD Wind Project ULC and Arran Project ULC submitted their FIT applications which required Mesa to commit to an undertaking to adhere to all the FIT Rules, including the domestic content requirements [...] Mesa was again affected by this same measure when on May 29, 2010 North Bruce Project ULC and Summerhill Project ULC submitted their FIT applications").

[81] Exhs. C-0087, C-0049.

[82] Exhs. C-0050, C-0041.

334. It follows that, for TTD and Arran, the Tribunal cannot entertain claims based on the following measures:

    a.  Measures of the Government in respect of the FIT Program:

        i.  The Electricity Act, 1998 as amended, in particular, Part II.1 (Ontario Power Authority) and Part II.2, (Management of Electricity Supply, Capacity and Demand), including Section 25.35 (Feed-in Tariff Program);

        ii.  The GEGEA and the GEA;

        iii.  The Ministerial direction of 24 September 2009 directing the OPA to establish the FIT Program and setting out the domestic content requirements to be included in the FIT Program;

    b.  Measures of the Government in respect of the GEIA:

        iv.  The conclusion of the MOU between the Ministry of Energy and the Korean Consortium on 12 December 2008;

        v.  The alleged conclusion of a Framework Agreement between the Government and the Korean Consortium on 25 September 2009 (signed on 29 October 2009);

        vi.  The Ministerial direction of 30 September 2009, which directed the OPA to set aside transmission capacity for members of the Korean Consortium;

    c.  Measures of the OPA:

        vii.  All version of the FIT Rules, in particular Rule 6.4(a)(i) of Version 1.1 of the FIT Rules, which required projects that became operational after 1 January 2012 to achieve 50% domestic content;

        viii.  The FIT Contract, in particular, Section 2.4(b)(iii) and Annex D.

335. In particular, the Tribunal lacks jurisdiction over the claims concerning the GEGEA, GEA and the Ministerial direction of 24 September 2009 in which the Minister of Energy directed the OPA to include domestic content requirements in the FIT Program (i.e. the Claimant's Article 1106 claim).[83] For completeness, however, the Tribunal notes that even if it had jurisdiction over this claim, the claim would, in any event, fail on the merits. As discussed in detail below, the Tribunal has found that the FIT Program constitutes government procurement. Consequently, Articles 1108(7)(a) and 1108(8)(b) apply, and as a result an Article 1106(1)(b) claim is excluded.

336. Neither does the Tribunal have jurisdiction to consider the Claimant's claims that the MOU of 12 December 2008 or the subsequent alleged Framework Agreement of 25 September 2009 breached Articles 1102, 1103 and 1105 of the NAFTA. However, as Ontario entered into the GEIA – which was the successor of the MOU and the alleged Framework Agreement – in January 2010 (i.e. after the Claimant's investment), the Tribunal does have jurisdiction over the Claimant's claims in respect of the GEIA. These claims are considered below (§§542 et. seq.).

337. As for North Bruce and Summerhill, which were incorporated later than the first two projects, namely on 6 April 2010, the claims in connection with the GEIA of 21 January 2010 are outside the temporal scope of the Tribunal's jurisdiction, in addition to the measures excluded in the preceding paragraphs.

338. Having so concluded, it is to be noted that while the measures just listed are beyond the reach of the Tribunal's jurisdiction, the circumstances in which they occurred may be considered in so far as they provide background and context to the analysis of the claims over which the Tribunal does have jurisdiction. This is in particular relevant for the Tribunal's analysis of the Claimant's Article 1105(1) claims which are considered below (§§467 et. seq.).

### 4. Attribution Objection

339. As mentioned above (§254), the Respondent impugns acts of the Government of Ontario as well as of the OPA, Hydro One and IESO. The Respondent agrees that acts of the

---

[83] The Claimant has identified these measures as being relevant for its Article 1106(1) claim. See C-PHB §493 ("The domestic content requirements that were imposed by Ontario caused harm to the Investor. The requirements were mandated by the *Green Energy and Green Economy Act* and the Minister's Direction establishing the FIT Program, and were detailed in Exhibit D to the FIT Contract.").

Government of Ontario are attributable to it.[84] However, it disputes the attribution of acts of the OPA, IESO and Hydro One.

340. Before entering into the analysis of attribution, there is an initial question of characterisation. It is Canada's case that its objection goes to the jurisdiction of the Tribunal. This, however, is not the Tribunal's view. While the distinction makes no relevant difference in this case where jurisdiction and merits are joined, on a proper analysis questions of attribution such as those that arise in this case concern the responsibility of a State party for the acts and omissions of others. Whether or not a State party is indeed so responsible is ordinarily a matter concerning the State party's liability, and as such within a tribunal's competence to determine. It does not generally govern the competence of the tribunal to hear the case itself. Further (and in any event) attribution is generally best dealt with at the merits stage. This is subject to a *prima facie pro tem* test being performed in the context of jurisdiction to ascertain that the acts alleged are susceptible of constituting treaty breaches, which test is met here. This was also the approach followed by the tribunals in *Jan de Nul*[85] and *Hamester*.[86] The latter tribunal held:

> "[A]s a practical matter, [attribution] is usually best dealt with at the merits stage, in order to allow for an in-depth analysis of all the parameters of the complex relationship between certain acts and the State."[87]

341. As a further preliminary observation, the Tribunal notes that the Claimant's position in respect of the status of the OPA, Hydro One and IESO is not clear. In its Memorial, the Claimant argued that the OPA was an organ of Canada pursuant to Article 4 of the ILC Articles, and that it was a state enterprise under Article 1503(2) of the NAFTA.[88] It also argued that Hydro One and IESO were "state enterprises" in accordance with the

---

[84] Tr. (31 October 2014) 159:18-22 ("[Canada does] not dispute that the decisions taken by the Government of Ontario are attributable to the Government of Canada. Of course, the actions of sub-national governments are attributable under the NAFTA.").

[85] Exh. RL-057, *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt* (ICSID Case No. ARB/04/13), Award, 6 November 2008 ("*Jan de Nul*").

[86] Exh. RL-055, *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana* (ICSID Case No ARB/07/24), Award, 18 June 2010 ("*Hamester*").

[87] *Hamester* §144.

[88] Mem. §66 ("The OPA is therefore, without doubt, an organ of the Government of Ontario in accordance with principles set out in Article 4 of the ILC Articles on State Responsibility."); §80 ("To the extent that Canada is not responsible for the OPA under ILC Articles 8 and 4, Canada retains plenary responsibility to ensure adequate supervision and control of the OPA under Article 1503(2) of the NAFTA.").

definition of the term in Annex 1505.[89] In its Reply, however, it argued that the OPA's acts were attributable to Canada pursuant to Article 8 (not Article 4[90]) of the ILC Articles, and that the OPA was not a state enterprise under Annex 1505 but under Article 201 of the NAFTA.[91] At the hearing and in its submissions thereafter, the Claimant reiterated its Article 8 ILC argument.[92] However, it also submitted that the OPA "should [...] be properly regarded as an organ of Canada."[93] In these circumstances, rather than focusing on the Parties' arguments, the Tribunal will proceed to examine the facts necessary to determine the status of the OPA, Hydro One and IESO irrespective of whether they have been pleaded in the context of Articles 4, 5 or 8 of the ILC Articles.

### a.  Article 4 of the ILC Articles

342.  Article 4 of the ILC Articles sets out the basic rule that the conduct of a State organ is an act of the State and is thus necessarily attributable to the State:

> "Article 4 - Conduct of organs of a State
>
> 1.The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.
>
> 2.An organ includes any person or entity which has that status in accordance with the internal law of the State."

343.  In its initial submissions, the Claimant took the position that the OPA was an "organ" under Article 4 ILC Articles.[94] The Tribunal cannot agree with this characterization. As will be seen in greater detail below, the OPA, Hydro One and IESO are all corporations[95]

---

[89]  Mem. §92 ("As the IESO is a state enterprise pursuant to the definition in Annex 1505"); §101 ("Hydro One is a state enterprise pursuant to the definition in Annex 1505.").

[90]  Mem. §863 ("The Investor's Memorial detailed how Canada is responsible for the actions of the Ontario Power Authority. Canada has this responsibility because of Article 8 of the ILC Articles of State Responsibility.").

[91]  Reply fn. 217 ("[...] the OPA does not meet the Canadian-specific definition for a state enterprise in Annex 1505 for the purposes of Chapter Fifteen, but the Ontario Power Authority meets the definition of state enterprise for the purposes of the general Article 201 definition of state enterprise which is applicable in NAFTA Chapter Eleven.").

[92]  Tr. (31 October 2014) 120:1-3 ("Just to be clear, the course of conduct of the OPA is attributable to the government as a result of ILC Article 8."); C-PHB §§361(b), 362-366.

[93]  Investor's Submission on the *Bilcon v. Canada* Award dated 14 May 2015 (the "**Claimant's Submission on *Bilcon***") §98.

[94]  Mem. §66.

[95]  Exh. C-0401, Electricity Act, s. 25.1(1), s. 4(1); Exh. R-143.

with independent legal personality. Section 25.3 of the Electricity Restructuring Act, the statute that created the OPA, specifically provides that the OPA is not a Crown agent for any purposes.[96] The position is the same in respect of Hydro One and IESO.[97]

344. There are no Ontario laws which define the organs of the Government of Ontario in the meaning of Article 4(2) of the ILC Articles. The Claimant relies, however, on a so-called "All Agencies List" in support of its contention that the OPA is an organ of the Government. That list does not support Mesa's position. The All Agencies List was drawn up by Ontario's Public Appointments Secretariat to provide information to persons wishing to serve on a government agency or non-classified entity.[98] It describes the OPA, Hydro One, and IESO as "non-classified entities", i.e. as entities that are not "provincial government organization[s]."[99]

345. In the circumstances, the Tribunal sees no basis for holding that the OPA, Hydro One and the IESO are organs of Canada under Article 4 of the ILC Articles.

346. The fact that these entities were characterised as "public bodies" by the World Trade Organization ("**WTO**") Panel[100] and Appellate Body[101] does not lead to a different conclusion. The WTO Panel and Appellate Body considered these entities as "public bodies" within the meaning of Article 1.1(a)(1) of the Agreement on Subsidies and Countervailing Measures (the "**SCM Agreement**"), which is a substantially different context and is thus of little assistance for present purposes. Confronted with the same argument about the characterization of Canada Post as a public body by a WTO Panel, the *UPS* tribunal emphasized the difference in the following terms:

> "[T]he provisions of the GATT considered in that case do not distinguish, as chapters 11 and 15 of NAFTA plainly and carefully do, between organs

---

[96] Exh. C-0401, Electricity Act, s. 25.3.

[97] Exh. C-0401, Electricity Act, s. 6, s. 48(2).

[98] Exhs. R-170, 171.

[99] Exh. R-097.

[100] Exh. CL-001, Canada – Certain Measures Affecting the Renewable Energy Generation Sector, Report of the Panel, WT/DS412/R, 19 December 2012 ("**Panel Report**"), §§7.234, 7.235, 7.239, and fn. 464 (recording that there was no dispute between the parties that the OPA and the IESO are "public bodies" for the purpose of the SCM Agreement).

[101] Exh. CL-002, *Canada – Certain Measures Affecting The Renewable Energy Generation Sector,* WT/DS412/R, *Canada – Measures Relating To The Feed-In Tariff Program,* WT/DS426/AB/R, Reports of the Appellate Body, (6 May 2013) ("**Appellate Body Report**"), §5.124.

of a State of a standard type (like the Canadian Post Office before 1981) and various other forms of State enterprises."[102]

347. Accordingly, nothing in the WTO Panel and Appellate Body's characterization of OPA, IESO and Hydro One as public bodies under the General Agreement on Tariffs and Trade ("**GATT**") and SCM Agreement changes the Tribunal's conclusion with respect to these entities.

### b. Article 5 of the ILC Articles

348. Article 5 of the ILC Articles provides that the acts of entities which are not organs but exercise governmental authority may be attributable to the State if they are carried out in that capacity:

> "Article 5 - Conduct of persons or entities exercising elements of governmental authority
>
> The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance."

349. The Respondent submits that the OPA, Hydro One and IESO are all state enterprises. Therefore, so says Canada, Article 1503(2) of the NAFTA creates a *lex specialis* with respect to the attribution of the acts of these entities, which displaces Article 5 of the ILC Articles.[103] To address this submission, the Tribunal will first determine whether the OPA, Hydro One and IESO are state enterprises ((i) below). It will then examine the Respondent's *lex specialis* argument ((ii) below),[104] and will finally review whether the impugned conduct of the OPA, Hydro One and IESO is attributable to Canada ((iii) below).

### i. Status of OPA, Hydro One and IESO

350. A "state enterprise" is defined in Article 201 of the NAFTA as follows:

---

[102] Exh. RL-075, *United Parcel Service of America, Inc. v. Government of Canada* (UNCITRAL) Award on the Merits, 24 May 2007, §61 ("***UPS***").

[103] C-Mem. §292.

[104] C-PHB §364 ("The provisions of NAFTA Chapter Fifteen create a *lex specialis* that excludes the application of ILC Article 5, as both rules govern the same situation.").

"state enterprise means an enterprise that is owned, or controlled through ownership interests, by a Party"

351. The term is also defined in almost identical terms in Article 1505:

"For purposes of this Chapter:

state enterprise means, except as set out in Annex 1505, an enterprise owned, or controlled through ownership interests, by a Party."

352. The Claimant argues that the OPA, Hydro One and IESO are not state enterprises for the purposes of Article 1505 because they do not meet the specific definition for a state enterprise set forth in Annex 1505. The Tribunal disagrees.

353. By its own terms, Annex 1505 applies only to Article 1503(3)[105] and not to Article 1503(2)[106]:

"Annex 1505: Country-Specific Definitions of State Enterprises

For purposes of Article 1503(3), 'state enterprise':

(a) with respect to Canada, means a Crown corporation within the meaning of the Financial Administration Act (Canada), a Crown corporation within the meaning of any comparable provincial law or equivalent entity that is incorporated under other applicable provincial law; and

[...]"

354. The terms of the Treaty are thus clear: Canada's country-specific definition in Annex 1505 does not apply to Article 1503(2). Rather, the definition of "state enterprise" that governs is the one set out in Article 1505, which is identical to the definition in Article 201. Consequently, for the present purposes, a state enterprise is one which is "owned, or controlled through ownership interests, by a Party."

---

[105] Article 1503(3) provides: "Each Party shall ensure that any state enterprise that it maintains or establishes accords non-discriminatory treatment in the sale of its goods or services to investments in the Party's territory of investors of another Party."

[106] Article 1503(2) provides: "Each Party shall ensure, through regulatory control, administrative supervision or the application of other measures, that any state enterprise that it maintains or establishes acts in a manner that is not inconsistent with the Party's obligations under Chapters Eleven (Investment) and Fourteen (Financial Services) wherever such enterprise exercises any regulatory, administrative or other governmental authority that the Party has delegated to it, such as the power to expropriate, grant licenses, approve commercial transactions or impose quotas, fees or other charges."

355. The Tribunal recalls that the Government of Ontario brought the OPA into existence through the Electricity Restructuring Act, 2004.[107] Under this Act, the OPA was responsible for overall long-term system planning, "activities in support of the goal of ensuring adequate, reliable and secure electricity supply", and the promotion of the diversification of Ontario's electricity supply with a particular emphasis on renewable and clean energy.[108] Operated on a not-for-profit basis, the OPA falls under the "legislative responsibility" of the Ministry of Energy.[109] It receives and executes directives from the Minister of Energy.[110] Further, the Minister appoints the members of the Board of Directors of the OPA who are responsible for managing the OPA's business and affairs.[111] He or she may equally dismiss an individual from the Board.[112] The Minister also has the sole power to approve the business plan of the OPA.[113] In addition, he or she approves the draft by-laws prepared by the OPA.[114] At any time, the Government of Ontario could decide to dissolve and liquidate the OPA. If the OPA is wound up, the remaining property following payment of all debts and liabilities would belong to the Government.[115] All of these elements lead the Tribunal to conclude that the OPA is "owned or controlled" by Canada. Thus, the OPA is a state enterprise under Article 1505 and Article 201 of the NAFTA.

356. As for Hydro One and IESO, as mentioned above, the Claimant agrees that these two entities are "state enterprises" pursuant to the definition of the term in Annex 1505.[116] But for the reasons mentioned above, Article 1505 is relevant and not Annex 1505. The Tribunal concludes that Hydro One and IESO meet the definition under Article 1505. The Ministry of Energy is the sole shareholder of Hydro One and is entitled to acquire, hold and dispose of Hydro One's assets and liabilities.[117] Hydro One falls within the

---

[107] Exh. C-0401, Electricity Act, s.25.1.

[108] Exh. C-0401, Electricity Act, s.25.2(1).

[109] Panel Report, §7.37 (referring to Government of Ontario webpage, "About the Ministry of Energy" available at: http://www.energy.gov.on.ca/en/about/).

[110] Panel Report, §7.37 (referring to Ontario Power Authority webpage, "Directives to OPA from Minister of Energy", available at: http://www.powerauthority.on.ca/about-us/directives-opa-ministerenergy-and-infrastructure).

[111] Exh. C-0401, Electricity Act, Part II.1, s. 25.4(2).

[112] Exh. C-0401, Electricity Act, Part II.1, s. 25.4(8); Exh. R-174, Ontario Power Authority Governance and Structure By-Law, 1 November 2005, s. 3.5.

[113] Exh. C-0401, Electricity Act, Part II.1, s. 25.22(2).

[114] Exh. C-0401, Electricity Act, Part II.1, s. 25.16.

[115] Exh. C-0401, Electricity Act, Part II.1, s. 25.2(3).

[116] Mem. §92 ("As the IESO is a state enterprise pursuant to the definition in Annex 1505"); §101 ("Hydro One is a state enterprise pursuant to the definition in Annex 1505.").

[117] Electricity Act, 1998, s. 49(1) (Investor's Schedule of Exhibits at C-0401).

"legislative responsibility" of Ontario's Ministry of Energy[118] and carries out directives of the Ministry.[119] Similarly, the Ministry of Energy effectively owns and controls IESO, which is a non-share capital corporation.[120] IESO also falls under the "legislative responsibility" of Ontario's Ministry of Energy.[121] It operates under a Board of Directors appointed by the Minister of Energy[122] and its yearly business plan is subject to approval by the Minister.[123] It also submits reports to the Minister.[124]

357.  Having reached the conclusion that the OPA, Hydro One and IESO are all state enterprises, the Tribunal now proceeds to review whether Article 1503(2) of the NAFTA replaces the ordinary rules of attribution found in Article 5 of the ILC Articles or, in other words, whether the former constitutes a *lex specialis* prevailing over the latter.

*ii. Article 1503(2) and Article 5 of the ILC Articles*

358.  The Tribunal first notes that the ILC Articles are residual rules in the sense that they only come into play where no special rules are applicable. This is borne out by Article 55 of the ILC Articles which bears the heading "*lex specialis*" in the following terms:

> "Lex specialis
>
> These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law."

359.  Article 1503(2) of the NAFTA, for its part, reads as follows:

> "Article 1503: State Enterprises
>
> "[...]
>
> 2. Each Party shall ensure, through regulatory control, administrative supervision or the application of other measures, that any state enterprise that it maintains or establishes acts in a manner that is not inconsistent with the Party's obligations under Chapters Eleven (Investment) and Fourteen (Financial Services) wherever such enterprise exercises any

---

[118] Exh. C-0250.
[119] Exh. C-0245.
[120] Exhs. C-0418; C-0228; C-0102.
[121] Exh. C-0250.
[122] Exh. C-0401, Electricity Act, 1998, s. 7(2)(b).
[123] Exh. C-0401, Electricity Act, 1998, s. 19.1(1).
[124] Exh. C-0401, Electricity Act, 1998, s. 22(1).

>regulatory, administrative or other governmental authority that the Party
>has delegated to it, such as the power to expropriate, grant licenses,
>approve commercial transactions or impose quotas, fees or other charges."

360. Article 1503(2) thus addresses situations in which the acts of a state enterprise are impugned. It provides that a NAFTA Party is responsible for the acts of a state enterprise in respect of Chapter 11 (and 14) only in cases where that state enterprise exercises regulatory, administrative or other governmental authority delegated to it by that NAFTA Party.

361. In other words, Chapters 11 and 15 of the NAFTA distinguish between the obligations of a NAFTA Party itself (specified in Chapter 11), and the obligations of a NAFTA Party in respect of its state enterprises (specified in Chapter 15). For the latter, a NAFTA Party must ensure that its enterprises do not act in a manner inconsistent with the obligations imposed on the NAFTA Party under Chapters 11 and 14 of the NAFTA (Article 1503(2)). It must also ensure that its enterprises accord non-discriminatory treatment in the sale of goods or services (Article 1503(3)). Thus, a NAFTA Party is not responsible for every act of its enterprises. Rather, its responsibility is circumscribed by Articles 1503(2) and 1503(3). Furthermore, Article 1116(1) of the NAFTA limits the jurisdiction of a Chapter 11 tribunal to consider claims of a breach of Section A of Chapter 11 or of Article 1503(2).

362. The NAFTA thus establishes a special regime which distinguishes between a NAFTA Party and its enterprises, specifies what control obligations the former has over the latter, and thus organises the NAFTA Party's responsibility for acts of its enterprises. This regime cannot be displaced by the ILC Articles, which, as mentioned above, are residual in nature. Indeed, if the ILC Articles were to apply, then the conduct of a state enterprise discriminating in the sale of its goods or services would be attributable to that NAFTA Party. This would mean that a NAFTA Chapter 11 tribunal would have to consider such conduct, although Article 1116(1) restricts its jurisdiction to claims of breach of Article 1503(2). As a result, the Tribunal concludes that Article 1503(2) constitutes a *lex specialis* that excludes the application of Article 5 of the ILC Articles. The Claimant agrees with this position.[125]

363. The tribunal in *UPS*, after a careful consideration of these provisions, reached the same conclusion:

---

[125] C-PHB §364 ("The provisions of NAFTA Chapter Fifteen create a *lex specialis* that excludes the application of ILC Article 5, as both rules govern the same situation.").

"Chapter 15 provides for a *lex specialis* regime in relation to the attribution of acts of monopolies and state enterprises, to the content of the obligations and to the method of implementation. It follows that the customary international law rules reflected in article 4 of the ILC text do not apply in this case.

[...]

It will be recalled that UPS also contends, as an alternative to the argument based on the rules of customary international law reflected in article 4 of the ILC text, that the proposition reflected in its article 5 apply to make Canada directly responsible for actions of Canada Post.

[...]

We again recall however that the proposition in article 5 of the ILC text (as in other provisions) has – a 'residual character' and does not apply to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of a State's international responsibility are governed by special rules of international law – the *lex specialis* principle (paragraph 55 above). For the reasons which we have just given [....], and in particular the careful structuring and drafting of chapters 11 and 15 [....], we find that this argument also fails, as a general proposition."[126]

364. As a consequence, the responsibility regime arising from Article 1503(2) prevails over the residual rules of Article 5 of the ILC Articles. The acts of the OPA, Hydro One and IESO will accordingly be attributable to Canada if these enterprises were exercising regulatory, administrative or other governmental authority as specified in Article 1503(2) when they carried out the acts in question.

365. Having concluded that the OPA, Hydro One and IESO are state enterprises and that Article 1503(2) of the NAFTA governs attribution, the Tribunal can dispense with reviewing whether their acts are attributable to Canada pursuant to Article 8 of the ILC Articles.

   *iii. Conduct of the OPA, Hydro One and IESO*

366. It follows from the preceding discussion that the Tribunal must now assess whether the impugned acts of the OPA, Hydro One and IESO were carried out in the exercise of regulatory, administrative, or other governmental authority. In the affirmative, these acts would be attributable to Canada.

---

[126] *UPS* §§62-63.

367. The term "governmental authority" is not defined in the NAFTA. In the context of ILC Article 5, the tribunal in *Jan de Nul* held that "governmental authority" meant the use of "prérogatives de puissance publique."[127] As the reference to governmental authority appears in Article 1503(2) as well as in Article 5, it seems appropriate to rely on the meaning so circumscribed. Therefore, to decide whether OPA, Hydro One and IESO exercised governmental authority when performing the acts challenged by Mesa, the Tribunal must assess whether these entities exercised sovereign power, examples of which are provided in Article 1503(2) itself (the power to expropriate, grant licenses, approve commercial transactions or impose quotas, fees or other charges).

368. As mentioned above, the following acts of the OPA have been challenged:

    i.    All versions of the FIT Rules in particular Rule 6.4(a)(i) of Version 1.1, which required projects that became operational after 1 January 2012 to achieve 50% domestic content;

    ii.    The FIT Contract, in particular Section 2.4(b)(iii) and Annex D;

    iii.    The alleged failure to follow the FIT Rules with respect to the ranking and evaluation of applications;

    iv.    The decision taken in August 2010 not to run the ECT;

    v.    The allegedly better treatment offered by the OPA to other FIT applicants, and the OPA's meetings with other FIT applicants which led to benefits not available to the Claimant being granted to these applicants;[128]

    vi.    The release of the FIT Program rankings on 21 December 2010;

    vii.    The OPA's alleged misadministration of the FIT Program;

---

[127] *Jan de Nul* §170; *Hamester* §202 ("[i]t is not enough for an act of a public entity to have been performed in the general fulfilment of some general interest, mission or purpose to qualify as an attributable act.").
[128] Reply §878(b)(iv).

viii.   The OPA's decision on the information to be included in the TAT tables;

ix.   The OPA's decision to offer NextEra a FIT Contract with connection points on the 500 kV Bruce to Longwood Line;

x.   The award of the FIT Contracts on 4 July 2011.

369.   As it held earlier, the Tribunal lacks jurisdiction over items (i) and (ii) (§334). Its review is consequently limited to the acts enumerated in items (iii) to (x).

370.   The Tribunal recalls that section 25.35(1) of the Electricity Act provides that "the Minister may direct the OPA to develop a feed-in-tariff program [...] under such circumstances and conditions, in consideration of such factors and within such period as the Minister may require." Acting under this provision, on 24 September 2009, the Minister of Energy directed the OPA to "develop a feed-in tariff ('FIT') program."[129] That same direction required the OPA to create rules that "[p]roponents will have to comply with."[130] It further specified that it was the Minister's "expectation that the OPA will establish appropriate policies and procedures with respect to the administration of the Programs."[131]

371.   In these circumstances, the Tribunal believes that by preparing the FIT Rules and setting out the ranking and evaluation criteria for the applications to the FIT Program, the OPA was acting in the exercise of delegated governmental authority. Thus, the OPA's acts in ranking and evaluating the FIT Applications are attributable to Canada.

372.   The Tribunal also recalls that the Electricity Act (as amended) empowered the OPA to perform the following tasks:

> "[E]nter into contracts relating to the procurement of electricity supply and capacity in or outside Ontario; [and]
>
> enter into contracts relating to the procurement of electricity supply and capacity using alternative energy sources or renewable energy sources to

---

[129] Exh. C-0264.
[130] Exh. C-0264.
[131] Exh. C-0264.

assist the Government of Ontario in achieving goals in the development and use of alternative or renewable energy technology and resources;" [132]

373. The OPA's authority to enter into contracts is repeated in section 25.32(1)(a) of the Electricity Act (as amended), which reads as follows:

> "25.32 (1) When the OPA considers it advisable, it shall enter into contracts in accordance with procurement processes approved under section 25.31 for the procurement of
>
> (a) electricity supply or capacity, including supply or capacity to be generated using alternative energy sources, renewable energy sources or both." [133]

374. The Tribunal further observes that although the OPA had the power to enter into contracts, the award of FIT Contracts on 4 July 2011 was the result of events that had taken place prior to that date. Indeed, the award of contracts resulted from a combination of the OPA's evaluation and ranking process and the reduction of capacity because of the LTEP and the GEIA.

375. As a result, the Tribunal believes that in carrying out the act listed at items (iii) to (x) above, the OPA was exercising delegated governmental authority.

376. The position is the same when it comes to the controversial acts of Hydro One and IESO. However, for these entities, the Tribunal notes that the only acts challenged are that IESO was part of the "Korean Consortium Working Group" and that, in 2010 and 2011, IESO and Hydro One met with the Claimant's competitors to discuss a connection to a 500 kV transmission line. [134] Mesa has not substantiated its allegations against these entities, nor has it sufficiently explained how the acts of these entities resulted in a breach of Article 1105(1). In any event, it appears that the Claimant no longer pursues claims concerning Hydro One and IESO, at least not in respect of Chapter 15 of the NAFTA. [135]

---

[132] Exh. C-0401, Electricity Act, s.25.2(5).

[133] Exh. C-0401, Electricity Act, s.25.32(1)(a).

[134] Mem. §§234, 578, 633 and 671.

[135] Reply §§874-875 ("Since the full extent of the violations of the NAFTA have taken place by the actions of officials of the *Government of Ontario*, or through measures which occurred through the mandatory direction of such officials by the *Ontario Power Authority*, there is no need to maintain any further Chapter Fifteen claims against the other Ontario entities such as the IESO or Hydro One [...] Canada has full responsibility for these measures taken by officials of the *Government of Ontario* or by the *Ontario Power Authority* under the direction of Ontario (emphasis supplied)").

In these circumstances, the Tribunal will not further review the Claimant's allegations in respect of IESO and Hydro One.

377. The Tribunal concludes, therefore, that the OPA, Hydro One and IESO are state enterprises, and that the OPA's acts identified in §368(iii) to (x) are attributable to Canada, since they were all done in the exercise of regulatory, administrative or other governmental authority. As a consequence, the Tribunal will examine below whether the OPA's conduct in the exercise of this authority was wrongful.

## C. PROCUREMENT EXCEPTION

### 1. The Respondent's Position

378. According to the Respondent, the FIT Program is a procurement process designed by a NAFTA Party and implemented by a state enterprise. The obligations established in Articles 1102, 1103 and 1106(1)(b) of the NAFTA do not apply to Mesa's investment, because the FIT Program constitutes or involves "procurement" under Articles 1108(7)(a) and 1108(8)(b) of the NAFTA. Article 1108 expressly preserves the NAFTA Parties' right to pursue policy objectives through procurement, even where they impose performance requirements or amount to discriminatory treatment.

379. The Respondent notes that Chapter 11 does not define the term "procurement". The term has, however, been considered in *ADF v. U.S.*[136] and *UPS v. Canada,*[137] both of which adopted broad interpretations. The WTO Panel and Appellate Body in *Canada – Renewable Energy*[138] also took an expansive approach. On this basis, the Respondent concludes:

> "[T]he ordinary meaning of the term 'procurement', as it is used in Article 1108, covers all measures constituting or involving the lease or purchase of goods or services for any purpose, regardless of whether the government ultimately paid the cost, and regardless of whether the government retained possession of the end product. Understood in accordance with this plain language interpretation, the FIT Program constitutes procurement for the purposes of Article 1108."[139]

---

[136] *ADF* §§160-174.
[137] *UPS* §§121-136.
[138] Panel Report, §7.131; Appellate Body Report, §5.59.
[139] C-Mem. §314.

380. The Respondent disagrees with the Claimant's invocation of the most favored-nation-clause in Article 1103 and the 2009 Canada-Czech Republic Foreign Investor Promotion and Protection Agreement ("**Canada-Czech Republic FIPA**"). It submits that Article 1103 cannot be used to exclude Article 1108, when the very purpose of Article 1108 is to condition the application of Article 1103. It adds that Mesa has in any event not shown that the requirements of Article 1103 are fulfilled.

381. The Respondent also disagrees with the Claimant's argument that the requirements of GATT Article III and NAFTA Chapter 10 should be imported into Article 1108. None of these requirements apply in this case *inter alia* because:

    i.    Article 1108(7) contains nothing more than the term "procurement", unrestricted in any way and unencumbered by any conditions. In particular, none of the additional elements contained in GATT Article III:8(a) are found in Article 1108(7);

    ii.    The NAFTA Parties expressly "carved-out" all procurement measures in Article 1108 because they wanted to negotiate separate obligations with respect to procurement. In Chapter 10, the NAFTA Parties specified the forms of procurement subject to obligations and the content of these obligations. Chapter 10 in no way modifies the exclusion created in Article 1108 for the purposes of Chapter 11;

    iii.    Article 1001(5) does not contain a general definition of procurement for all of the NAFTA Chapters. The exception found in Article 1108 for purposes of Chapter 11 applies irrespective of obligations which the NAFTA Parties may have undertaken with respect to procurement in Chapter 10. The importation of Article 1001(5) into Article 1108 was also implicitly rejected by the *ADF* and *UPS* tribunals.

382. The Respondent further opposes the Claimant's submission that procurement in Article 1108 requires that the goods or services be procured for the benefit or use of the government. It notes that nothing in the text of Article 1108 requires that procurement be for government use or benefit. It also points out that governments frequently procure on behalf of the people they govern. In addition, if the element of benefit or use were part of the ordinary meaning of procurement, then Canada would not have had to explicitly

mention it in the Government Procurement Agreement on which the Claimant itself relies.

383. Moreover, the Respondent denies that procurement in Article 1108 requires that the government take possession of or title to the goods and services procured. Such a limitation is not in line with the ordinary meaning of the term; and it would render the Article 1108 preclusion inapplicable to the procurement of services, which are not capable of being possessed or owned.

384. Finally, the Respondent opposes the Claimant's submission that the measures impugned by the Claimant are not linked to procurement under the FIT Program. It stresses that all the claims are based on the design and implementation of the FIT Program, and the Claimant's failure to obtain a FIT Contract.

## 2. The Claimant's Position

385. The Claimant submits that the procurement exception in Article 1108 derogates from key principles of the NAFTA and that the "potential for abuse is great."[140] As a consequence, the provision must be interpreted restrictively "in order to meet the interpretative requirements specific to the NAFTA, and the definitive statements within NAFTA itself of its object and purpose."[141] It further argues that, as the party relying upon the exception, the Respondent must establish that the measures in question fit within the meaning of the exception.

386. According to the Claimant, the Tribunal should deny Canada's procurement defense because of the better treatment provided under the Canada-Czech FIPA and the Canada-Slovak Republic Agreement for the Promotion and Protection of Investments (the "**Slovak Treaty**"). While the Slovak Treaty imposes identical national and MFN treatment obligations as the NAFTA, it contains no procurement exception. Thus, an investor under that treaty would receive more favorable treatment from Canada than an investor under the NAFTA, who would be subject to the procurement exception.

---

[140] Mem. §465.
[141] Reply §192.

387. Even if the Tribunal were to consider the Respondent's defense, the latter would in any event fail, so the Claimant submits, because Article 1108 does not apply to provincial governments under Article 1005(1) of the NAFTA.

388. The Claimant points out that Article 1108 does not define "procurement", while Article 1001(5) does. For the Claimant, it is logical that the drafters of the NAFTA presumed that the meaning of "procurement" would be internally consistent within the NAFTA, unless a contrary intention was expressed. Thus, in the absence of a definition in Chapter 11, the one found in Article 1001(5) should be used. What matters under that definition is that the government obtains goods and services for itself, not for others. This understanding conforms to the ordinary meaning of the term "procurement" in international economic law. Mesa also notes that, in its submissions before the tribunal in *UPS*, Canada itself argued that the absence of a definition of "procurement" meant that the Parties intended the term to be given its ordinary meaning throughout the NAFTA, subject to the exclusions in Article 1001(5). The tribunals in *ADF* and *UPS* also relied on Article 1001(5) to understand the context and meaning of the term "procurement" in Article 1108. In any event, Article 1112 provides that, in the event of an inconsistency between Chapter 11 and another Chapter, the provision in the other chapter should prevail. Thus, even if the meaning of "procurement" in Chapter 11 was inconsistent with the one found in Chapter 10, the Chapter 10 meaning must be given preference.[142]

389. Further, by operation of Article 1131(1) and Article 33(3) of the UNCITRAL Rules, the Tribunal should take into account international law as well as applicable usages of trade. In the Claimant's opinion, recourse should thus be made to the meaning of procurement in international economic law, such as in the GATT Article III:8(a) and the WTO Agreement on Government Procurement ("**GPA**"). In Canada's General Notes to Appendix 1 of the GPA, Canada defines procurement as "contractual transactions to acquire property or services for the direct benefit or use of the government". On this basis, the Claimant insists that there is only one meaning of "procurement"; "procurement" simply does not apply to products purchased to be resold to customers.

---

[142] Investor's Response to the 1128 Submissions of the Non-Disputing Parties dated 27 August 2014 ("**Claimant's First Article 1128 Response**") §105.

390. Finally, the Claimant asserts that "the FIT cannot constitute government procurement [...] because the ratepayers paid for all the electricity generated"[143] and that "Ontario designed the program [such that] it could never be a governmental procurement because the government doesn't pay."[144] For the Claimant, the transaction that takes place under a FIT Contract is "akin to a markets based settlement and financial transaction",[145] and not procurement. It notes that while the OPA executes a contract which purports to purchase renewable power from generators, it does not acquire title, possession or control of the electricity produced.

391. Even if Canada could establish that the OPA's activity constitutes procurement, its defense would still fail, because Canada had not established any connection between the disputed measures and the procurement of electricity. In other words, "[t]here is simply no link between the discriminatory treatment in question and the purposes of the 'procurement' of electricity. Indeed, the effect of the discriminatory treatment is to make the supply of renewable generated electricity to Ontario consumers less efficient and more expensive."[146]

### 3. The Non-Disputing Parties' Position

392. Mexico disagrees with the Claimant's contention that the provisions of Article 1103 and the Canada–Czech FIPA can be relied upon to exclude the application of Article 1108 of the NAFTA. It considers that "Article 1103 applies to actual instances of treatment [...] The fact that another treaty theoretically offers different treatment is insufficient to establish a violation of Article 1103."

393. Mexico further states that the ordinary meaning of the term "procurement" in Article 1108 is broad and should not be limited by Article 1001(5). The definition of "procurement" in Article 1001 only applies in the context of Chapter 10 of the NAFTA; it was not intended to have effects in the framework of other chapters such as Chapter 11. Finally, it notes that there are important differences in language between the wording of GATT Article III:8(a) and NAFTA Article 1108.

---

[143] C-PHB §378.
[144] Tr. (26 October 2014) 87:15-22.
[145] Claimant's First Article 1128 Response §98.
[146] Claimant's First Article 1128 Response §111.

394. For the U.S., while the term "procurement" is not defined in the NAFTA, its ordinary meaning "encompasses any and all forms of procurement by a NAFTA Party." This is confirmed by the French and Spanish versions of the NAFTA, which use the generic term for "purchases" in those languages. Further, the United States agrees with the Respondent that Chapter 11 uses the term as a broad "carve-out", whereas Chapter 10 refers to it as a "carve-in".

### 4. Analysis

395. Articles 1108(7)(a) and 1108(8)(b) of the NAFTA provide as follows:

> "7. Articles 1102, 1103 and 1107 do not apply to:
>
> (a) Procurement by a Party or a State enterprise; [...]
>
> 8. The provisions of:
> [...]
> Article 1106(1)(b) [...] do not apply to procurement by a Party or a State enterprise;
> [...]"

396. Accordingly, if the FIT Program constitutes procurement by a Party or a State enterprise, a number of guarantees invoked by Mesa would not apply, specifically Articles 1102 (national treatment), 1103 (most favored nation treatment), and 1106(1)(b) (domestic content).[147]

397. For the reasons discussed above (§§324 et. seq.), the Tribunal considers that it lacks jurisdiction over the domestic content claims. Thus, it will not further analyze these claims and will not consider the Respondent's arguments according to which Article 1108(8)(b) excludes the domestic content claims.

398. The Tribunal does, however, have jurisdiction over the MFN and NT claims. It will therefore consider Canada's position that it cannot entertain these claims as a result of Article 1108(7)(a).

399. The Tribunal will first address the Claimant's argument that the MFN provision (Article 1103), read together with the Canada-Czech FIPA or the Slovak Treaty, precludes the

---

[147] The Claimant's "nexus" argument is addressed below (§459).

application of Article 1108 of the NAFTA ((a) below). It will then review whether the FIT Program constitutes "procurement" ((b) below) by a Party or state enterprise ((c) below).

### a. Whether Article 1103 precludes the application of Article 1108

400. The Claimant submits that because neither the Canada-Czech FIPA nor the Slovak Treaty contains a procurement exemption like the one found in Article 1108(7)(a), Mesa can avoid the application of this exemption by relying on the MFN provision in Article 1103 of the NAFTA, which requires that the Claimant be treated no less favorably than a Czech or Slovak investor. Put differently, relying on Article 1103 and the allegedly more favorable standards of protection in the Canada-Czech FIPA and the Slovak Treaty, the Claimant submits that Article 1108(7)(a) does not apply to Mesa. The Tribunal cannot accept this position.

401. For an MFN clause in a base treaty to allow the importation of a more favorable standard of protection from a third party treaty, the applicability of the MFN clause in the base treaty must first be established. Put differently, one must first be *under* the treaty to claim *through* the treaty.[148] Thus, the Claimant must first establish that the MFN provision of the base treaty applies. Then, relying on that provision, it may be able to import a more favorable standard of protection from a third party treaty. Here, the base treaty is the NAFTA. Thus, the Claimant must first establish that the MFN provision, i.e. Article 1103 of the NAFTA, is applicable. As Article 1108(7)(a) expressly excludes the application of Article 1103 in cases of procurement by a Party or State enterprise, for the Claimant to establish that Article 1103 of the NAFTA applies, it must show that the FIT Program does not constitute procurement.

402. For the reasons set forth below, the Tribunal has come to the conclusion that the FIT Program does constitute procurement. Thus, by virtue of Article 1108(7)(a), the MFN provision enshrined in Article 1103 cannot apply. As a result, the Claimant cannot rely on that provision to import the allegedly more favorable provisions of the Canada-Czech FIPA or of the Slovak Treaty.

---

[148] See Exh. CL-260, *Société Générale In respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad del Este, S. A. v. The Dominican Republic* (UNCITRAL), LCIA Case No. UN 7927, Award on Preliminary Objections to Jurisdiction, 19 September 2008, §41; Exh. CL-262, Vladimir *Berschader and Moïse Berschader v. The Russian Federation*, SCC Case No. 080/2004, Award, 21 April 2006, §188. See also *Metal-Tech Ltd. v. Republic of Uzbekistan* (ICSID Case No. ARB/10/3), Award, 4 October 2013, §145.

403. If one were to follow Mesa's interpretation, an investor would be able to avoid the application of Article 1108(7)(a) by relying on Article 1103, although Article 1108(7)(a) expressly prohibits such use of Article 1103. This result would be contrary to the rule of *effet utile* in treaty interpretation.[149]

### b. The FIT Program constitutes "procurement"

404. Article 1108 excludes the application of non-discrimination standards and performance requirements in the event of "procurement by a Party or a state enterprise". It contains, however, no definition of the term "procurement". Accordingly, it falls on the Tribunal to determine the meaning of this term, as part of the phrase "procurement by a Party or a state enterprise".

405. Mesa suggests that Article 1108(7)(a) must be interpreted restrictively because it is an exception. The Tribunal does not consider that the mere characterization of a treaty term as an "exception" requires an interpretation different from other treaty terms. Indeed, whatever their characterization, all terms of a treaty are subject to the ordinary rules of treaty interpretation. This was also the conclusion of the tribunal in *Mobil v. Canada* which, in the specific context of Article 1108, disavowed any restrictive interpretation:

> "[t]he task of ascertaining the meaning of a reservation, like the task of interpreting any other treaty text, involves understanding the intention of the NAFTA Parties, and it is to be achieved by following the customary rules of interpretation of public international law, as reflected in Articles 31 and 32 of the VCLT."[150]

406. Consequently, the Tribunal will determine the meaning of "procurement" by reference to the principles of treaty interpretation set out above (§§231 et. seq.). It will give the term "procurement" its ordinary meaning, in its context, in light of the object and purpose of the NAFTA.

(i) Ordinary Meaning and Context

---

[149] Exh. RL-111, *Urbaser S.A. and Consorcio de Aguas Bilbao Bizkaia, Bilbao Biskaia Ur Partzuergoa v. The Argentine Republic* (ICSID Case No. ARB/07/26), Decision on Jurisdiction, 19 December 2012, §52 ("Effectiveness of a treaty rule denotes the need to avoid an interpretation which leads to either an impossibility or absurdity or empties the provision of any legal effects.").
[150] *Mobil* §§251, 254.

407. In its ordinary meaning, "procure" (whether or not by a state or a state enterprise) means "to get; to gain; to come into possession of."[151] The French and Spanish texts of the NAFTA use the generic term for "purchases" in Article 1108.[152]

408. Two NAFTA tribunals, *ADF* and *UPS* have considered the meaning of "procurement" in Article 1108(7)(a). In *ADF*, the dispute arose out of the claim of a Canadian steel supplier participating as a sub-contractor in a highway construction project. The governmental entity responsible for the construction, the Virginia Department of Transportation, received federal funding to implement the project. The use of federal funds triggered the application of the Buy America Act, a statute which favors domestic producers participating in government-funded projects. In reaching its conclusion that the procurement exception applied, the tribunal observed that the term "procurement" in Article 1108(7)(a) of the NAFTA was to be understood broadly:

> "In its ordinary or dictionary connotation, 'procurement' refers to the act of obtaining, as by effort, labor or purchase. To procure means to 'get; to gain; to come into possession of'. In the world of commerce and industry, 'procurement' may be seen to refer ordinarily to the activity of obtaining by purchase goods, supplies, services and so forth. Thus, governmental procurement refers to the obtaining by purchase by a governmental agency or entity of title to or possession of, for instance, goods, supplies, materials and machinery."[153]

409. In *UPS*, the Canadian customs service had entered into a contract entitled "Postal Imports Agreement" (the "PIA") with Canada Post. Under the PIA, Canada Post was to render services including the collection of customs duties and excise taxes from the addressees of postal parcels. Canadian Customs paid a fee to Canada Post in consideration for these services. The claimant UPS, a US investor, alleged that it had received less favorable treatment than Canada Post under the PIA. Canada invoked the procurement defense under Article 1108(7)(a) of the NAFTA arguing that the national treatment provision did not apply to the PIA as it was a procurement contract. The tribunal upheld Canada's defense. It noted that under the PIA, Canadian Customs, a

---

[151] Webster's online dictionary: at http://www.merriam-webster.com/dictionary/procure. See also: Webster's New Twentieth Century Dictionary of the English Language, Unabridged 2nd Edition, 1976 p. 1435, cited at *ADF* §161.

[152] Article 1108(7) of the NAFTA ("Les articles 1102, 1103 et 1107 ne s'appliquent pas: a) aux achats effectués par une Partie..."); ("Los Artículos 1102, 1103 y 1107 no se aplican a: (a) las compras realizadas por una Parte..."). Article 2206 of the NAFTA, entitled "Authentic Texts", provides that: "[t]he English, French and Spanish texts of this Agreement are equally authentic."

[153] *ADF* §161.

governmental entity, acquired a service from Canada Post. Relying on *ADF*,[154] it concluded that "the PIA is clearly a procurement contract under which Canada Post performs services for Customs for a fee."[155]

410. All three NAFTA Parties appear to support the broad notion of procurement as advanced by the tribunals in *ADF* and *UPS*.[156]

411. This broad notion is further buttressed by the WTO Panel and Appellate Body in their decisions on whether the FIT program involved government procurement in the context of Article III:8(a) of the GATT. In *Canada-Renewable Energy*, both the Panel and the Appellate Body were *inter alia* called upon to determine whether the domestic content requirements of the FIT Program contravened Article III:8(a) of the GATT.

412. While most of its findings were made in the specific context of Article III:8(a) of the GATT (which, as the Tribunal observes later, is different to Article 1108 in material respects), the Panel nevertheless concluded that the ordinary meaning of procurement was broad:

> "As the parties have explained, the ordinary meaning of the word 'procurement' includes '[t]he action of obtaining something; an acquisition'. Article III:8(a) refers to 'procurement by governmental agencies of products purchased'. The ordinary meanings of the word 'purchase' advanced by the parties include 'to obtain; to gain possession of' and 'to acquire in exchange for payment in money or an equivalent; to buy' […] in our view, to the extent that the ordinary meanings of both words refer to the action of 'obtaining' or 'acquiring' something, they support a conclusion that 'procurement' and 'purchase' should be given the same meaning."[157]

413. On appeal, the Appellate Body rejected the Panel's findings that "purchase" and "procurement" could be equated.[158] Nevertheless, it too observed that "procurement" had a broad meaning, albeit one which was to be understood by reference to the *procedures* of procurement:

---

[154] *UPS* §131.

[155] *UPS* §135. Prof. Cass issued a dissenting opinion in this case. According to him, the PIA could not constitute procurement because (i) it was not regulated in ways comparable to government procurement (there was no formal "agreement" or tender or evaluation process); and (ii) the structure of the PIA was unlike ordinary procurement. As will be seen below, the Tribunal finds that the FIT Program satisfies these requirements as well.

[156] See Submission of the United States of America dated 25 July 2014 ("**U.S. Article 1128 Submission**") §§15-17; and Submission of Mexico Pursuant to NAFTA Article 1128 dated 25 July 2014 ("**Mexico's First Article 1128 Submission**") §§8-10.

[157] Panel Report, §7.131.

[158] Appellate Body Report §5.59.

"The term 'procurement' may refer generally to '[t]he action of obtaining something; acquisition', or it may refer more specifically to 'the action or process of obtaining equipment and supplies'. In a more technical sense, procurement usually refers to *formal procedures used by governments to acquire goods or services.*"

414. Thus, the Appellate Body emphasized that procurement must be achieved through formal government procedures. This formal nature of procurement is also emphasized in the UNCITRAL Model Law on Public Procurement of 2014, which defines procurement as acquisition of goods or services[159] and provides for a formal procurement process including tenders, assessment of qualifications, etc.

415. This notion of procurement – as a "formal" acquisition – is neither confirmed nor contradicted by the context in which the term is used. The context is constituted by the other relevant provisions of the NAFTA as well as by the general objectives of the NAFTA identified in Article 102 of the NAFTA.[160]

416. Several provisions of the NAFTA contain the term "procurement":

- Article 1201(2)(c) sets out the scope and coverage of Chapter 12 (Cross-Border Trade in Services) and is worded similarly to Article 1108(7)(a):

  "Article 1201: Scope and Coverage
  [...]
  2. This Chapter does not apply to:
  [...]
  procurement by a Party or a state enterprise"

- Article 1001 of the NAFTA provides in relevant part:

  "Article 1001: Scope and Coverage

  1. This Chapter applies to measures adopted or maintained by a Party relating to procurement:

  [...]

  5. Procurement includes procurement by such methods as purchase, lease or rental, with or without an option to buy. Procurement does not include:

---

[159] Article 2(j) ("Procurement" or "public procurement" means the acquisition of goods, construction or services by a procuring entity).
[160] *ADF* §147.

(a) non-contractual agreements or any form of government assistance, including cooperative agreements, grants, loans, equity infusions, guarantees, fiscal incentives, and government provision of goods and services to persons or state, provincial and regional governments; and

(b) the acquisition of fiscal agency or depository services, liquidation and management services for regulated financial institutions and sale and distribution services for government debt."

- In Article 1502, the NAFTA Parties undertook obligations with respect to measures adopted or maintained by certain monopolies. Article 1502(4) contains an exception to those obligations for procurements in the following terms:

"Paragraph 3 does not apply to procurement by governmental agencies of goods or services for governmental purposes and not with a view to commercial resale or with a view to use in the production of goods or the provision of services for commercial sale."

417. These provisions provide little guidance on the interpretation of the term "procurement" in Article 1108(7)(a). In its analysis, the Tribunal must look to the specific context in which the term "procurement" has been used and must be "extremely careful not to interpret expressions or concepts used in specific provisions in the light of the use of those or similar expressions in other contexts".[161] The term "procurement" appears in Chapter 3 ("National Treatment and Market Access for Goods"); Chapter 10 ("Government Procurement"); Chapter 12 ("Cross-Border Trade in Services"); and Chapter 15 ("Competition Policy, Monopolies and State Enterprises"). As is evident from the titles of these chapters, each chapter regulates a different area. Some of these chapters have been said to "stand virtually alone"[162] in the NAFTA. Further, in Chapters 11, 12 and 15, the term is used as a "carve-out", precluding the application of substantive provisions, while in Chapter 10 the term is used as a "carve-in", allowing for and regulating the application of substantive provisions. In other words, the term "procurement" is used in different contexts in the NAFTA, serving different functions and for different purposes[163], and to regulate different subject areas. To the Tribunal, this means that the term must

---

[161] Exh. RL-059, *Merrill & Ring Forestry L.P. v. Government of Canada* (UNCITRAL), Award, 31 March 2010, §86.

[162] *ADF* §148 in the context of Chapter 15.

[163] The relevance of this difference is explained in the context of the Tribunal's analysis of the Claimant's arguments on Article 1001(5) of the NAFTA.

be interpreted differently depending on the chapter and the specific context in which it is used. Indeed, if this were not the case, then the term could have been included in Article 201 of the NAFTA, which defines terms for the purposes of the entire Agreement. Yet, Article 201 contains no definition of "procurement." In these circumstances, the Tribunal believes that the other Chapters of NAFTA, aside from Chapter 11, provide only limited context and guidance to understand the meaning of the term in Article 1108(7)(a) of the NAFTA.

(ii)  Object and Purpose

418.  After the ordinary meaning and the context, the Tribunal then turns to object and purpose. The overall objects and purposes of the NAFTA are set out in its Article 102(1), and Article 102(2) provides that: "[t]he Parties shall interpret and apply the provisions of this Agreement in the light of its objectives set out in paragraph 1 and in accordance with applicable rules of international law". These objects and purposes must obviously direct the Tribunal's enquiry, but they operate at a high level of generality, and Article 102(1) itself provides that the objectives of the Treaty are elaborated more specifically through its principles and rules. Hence, when considering the objects and purposes behind the specific term "procurement", the Tribunal must also focus on the objects and purposes of the particular provision in which the term appears. And for this, the Tribunal must consider the text of the provision itself (here Article 1108).[164]

419.  Article 1108 is entitled "Reservations and Exceptions." It excludes certain measures from the substantive protections of Chapter 11. Article 1108(7)(a) excludes the application of non-discrimination provisions (and performance requirements) to investments involving procurement. The Tribunal understands that through the exception carved out by Article 1108(7)(a), the NAFTA Contracting Parties sought to protect their ability to exercise nationality-based preferences in cases of procurement. As noted in *ADF*, the NAFTA Contracting Parties, like many other countries, maintain domestic preference policies when procuring goods and services:

> "The Federal Government of Canada, for instance, provides heavy financial assistance to the provinces for highway construction and many of the provinces receiving this assistance enforce domestic preference regulations in their procurement. In Mexico, too, federal law prescribes preferences for Mexican goods and services in procurement by states wholly or partially

---

[164] See *ADF* §147 ("The object and purpose of the parties to a treaty in agreeing upon any particular paragraph of that treaty are to be found, in the first instance, in the words in fact used by the parties in that paragraph. This is in line with Article 102(1)").

funded by the federal Mexican Government. [...] domestic requirements for Government procurement are in place 'in most, if not all, countries'."[165]

420.  It appears reasonable that a State be free to procure goods or services in a manner that yields maximum benefits for the local economy. Government purchasing of goods and services is an extremely important function, and procurement by way of formal purchasing procedures is frequently utilised as an instrument of policy. To this end, Article 1108(7)(a) allows for preferential treatment of local suppliers, when a Party is engaged in formal purchasing of goods and services.

421.  The Tribunal notes that, in its view, it makes no difference to the analysis above whether one focuses upon the single word "*procurement*" or the phrase "*procurement by a Party or a state enterprise*". The words "*... by a Party or a state enterprise*" identify the entities involved, but do not change the nature of the activity itself – which in this context assumes a State Party or state enterprise in any event.

  (iii) Claimant's Arguments on Interpretation

422.  Having thus set out the contours of the term "procurement" above, the Tribunal now proceeds to examine the Claimant's arguments on the interpretation of the term.

423.  The Claimant argues that the Tribunal should rely on the definition of procurement in Article 1001(5) when interpreting the term procurement in Article 1108(7)(a). It submits that the FIT Program cannot constitute procurement because, through this Program, the government is not purchasing goods for its own use, but for commercial resale. For the reasons set out below, the Tribunal does not share this view.

424.  First, Article 1108(7)(a) only contains the term "procurement", without any limitation or specification. As explained above, "procurement" is commonly understood to refer to a formal acquisition, without a requirement that the acquisition be for the government's own use. The term for procurement in the French and Spanish versions of Article 1108 ("*achats*" and "*compras*" respectively) confirm this broad notion.

425.  Second, Article 1108(7)(a) does not refer to Article 1001(5). If the NAFTA Parties had intended to incorporate the limitations found in Article 1001(5) into Article 1108(7)(a),

---

[165] *ADF* §94.

they could easily have done so. Indeed, other provisions of Article 1108 contain express references to provisions of other chapters of the NAFTA.[166]

426. It is further evident that the limitations of Article 1001(5) should not be read into Article 1108(7)(a) when one considers the purposes and functions of these provisions. Article 1001(5) is a "carve-in" rule, in the sense that it identifies types of procurement to which the regime in Chapter 10 applies. The Chapter 10 regime does not apply to the types of procurement that are specifically excluded by sub-paragraphs (a) and (b) of Article 1001(5) (for instance, non-contractual agreements, the acquisition of fiscal agency or depository services) – albeit these fall within the ordinary scope of "procurement" (and hence the need specifically to exclude them). Hence, Article 1001(5) is "inclusive".

427. By contrast, Article 1108(7)(a) is a "carve-out" rule. Its function is to exclude all procurement activities from the scope of some of the obligations of Chapter 11.

428. In the absence of a reference to Article 1108(7)(a) in Article 1001(5), it does not appear correct to import the limitations of Article 1001(5) into Article 1108(7)(a), given that these provisions serve very different purposes.

429. The Claimant points out that the tribunals in *ADF* and *UPS* referred to Article 1001(5) in their interpretation of Article 1108(7)(a). While this is true, the Tribunal notes that Article 1001(5) itself contains two parts. First, the chapeau provides an inclusive definition of procurement ("procurement includes procurement by such methods as purchase, lease or rental, with or without an option to buy"). Notably, it does not limit the meaning of procurement by requiring that procurement be for governmental use or otherwise. Then, sub-paragraphs (a) and (b) describe the activities that fall outside the scope of Chapter 10's obligations. In determining the ordinary meaning of procurement, the tribunal in *ADF* relied on the chapeau of Article 1001(5) and not on the limitations of sub-paragraphs (a) and (b) of that provision. Neither the *ADF* tribunal nor the *UPS* tribunal imported the sub-paragraphs of Article 1001(5) into Article 1108(7)(a) as a means of limiting the ordinary meaning of "procurement."

---

[166] Article 1108(5) ("Articles 1102 and 1103 do not apply to any measure that is an exception to, or derogation from, the obligations under Article 1703 (Intellectual Property National Treatment) as specifically provided for in that Article.").

430. In any event, despite their reference to Article 1001(5), on the facts, neither the *ADF* nor the *UPS* tribunal found that sole use by the government itself – which is a requirement in Article 1001(5) ("procurement does not include [...] government provision of goods and services to persons") – is an implicit requirement in Article 1108(7)(a). In *ADF* – which the Claimant itself recognises as concerning activity "in the proper nature of procurement"[167] – the procurement related to a highway interchange, which was obviously not for the government's (sole) use. In *UPS*, the services in question were ultimately for the benefit of the persons or companies importing goods by mail rather than for the government.[168] For all these reasons, the Tribunal cannot support the Claimant's arguments on Article 1001(5). The Non-Disputing Parties appear to concur with the Tribunal's conclusions.[169]

431. The Claimant next argues that procurement is a term of art. The Tribunal should therefore refer to the meaning of procurement in international economic law, such as in Article III:8(a) of the GATT and Article I:2 of the GPA to conclude that procurement in Article 1108(7)(a) cannot refer to procurement of products that are not for governmental use. Here too the Tribunal disagrees.

432. Article III:8(a) of the GATT provides as follows:

> "The provisions in this Article shall not apply to laws, regulations or requirements governing the procurement by governmental agencies of products purchased for governmental purposes and not with a view to commercial resale or with a view to use in the production of goods for commercial resale."

433. Accordingly, Article III:8(a) of the GATT contains the term "procurement." However, unlike in Article 1108(7)(a) where the term is unqualified, in Article III:8(a) the term is qualified.[170] As noted above, if the NAFTA Parties had wished to introduce the additional

---

[167] Reply §248.

[168] *UPS* §132.

[169] Mexico's First Article 1128 Submission §8 ("Mexico observes that the ordinary meaning of the term 'procurement' in Article 1108 is broad and should not be limited by Article 1001.5. The description of 'procurement' in [A]rticle 1001.5 is applicable for purposes of Chapter Ten as it is included in the provision that sets out the 'scope and coverage' of [C]hapter Ten. It does not apply to Chapter Eleven."); U.S. First Article1128 Submission §17 ("The United States agrees with Canada that, whereas in Chapter Eleven the term is used as a broad 'carve-out', in Chapter Ten the term is used as a 'carve-in'.").

[170] The Appellate Body noted that Article III:8(a) contains several elements: (i) "laws, regulations or requirements governing the procurement by governmental agencies"; (ii) the procurement of "products"; (iii) "purchased for governmental purposes"; and (iv) products purchased "not for a commercial resale" (Appellate Body Report §§5.57-5.58). None of these elements are present in Article 1108(7)(a) of the

limitations of Article III:8(a) of the GATT into Article 1108(7)(a) of the NAFTA, they could have done so. Indeed, they did do so in Article 1504(2), which replicates the language found in Article III:8(a) of the GATT. But they did not do so here in respect of Article 1108(7)(a), which leads the Tribunal to conclude that Article III:8(a) of the GATT should not be used to interpret Article 1108(7)(a).

434.  Article1:2 of the GPA speaks of procurement in the following terms:

> "This Agreement applies to procurement by any contractual means, including through such methods as purchase or as lease, rental or hire purchase, with or without an option to buy, including any combination of products and services."

435.  The Tribunal notes that in its General Notes to Appendix I of the GPA ("**Canada's Notes**"), Canada defines procurement as "contractual transactions to acquire property or services for the direct benefit or use of the government." If – as the Claimant suggests – the ordinary meaning of "procurement" implied government use, there would have been no reason to specify this in Canada's Notes. The fact that Canada had to specifically limit procurement to government use speaks against the Claimant's arguments that procurement is a term of art implying governmental use.

436.  The understanding that procurement does not ordinarily imply government use was also confirmed by the WTO Panel in the following terms:

> "[A]rgument that 'procurement' implies 'governmental use, benefit, or consumption' does not sit well with the immediate context within which the term 'procurement' is used in Article III:8(a) of the GATT 1994. [...] The notion of governmental use, benefit or consumption is not immediately apparent from the ordinary meanings of these terms."[171]

437.  Further still, if (as the Tribunal has concluded above) the object and purpose of the carve-out in Article 1108(7)(a) is to permit the NAFTA Contracting Parties to purchase goods or services in a manner that yields maximum benefits for the local economy, it would

---

NAFTA. See also Mexico's First Article 1128 Submission §10 ("There are important differences in the language used in GATT Article III:8(a) and NAFTA Article 1108. GATT Article III:8 (a) makes reference to procurement '*by governmental agencies of products purchased for governmental purposes and not with a view to commercial resale or with a view to use in the production of goods for commercial sale*' (*emphasis added*). This language is not present in Article 1108, which only makes reference to '*procurement by a Party or a state enterprise*'.").

[171] Panel Report §7.131.

make no difference at all whether such goods or services, once purchased, are used solely by the Government, or by any other entity.

438. Once again, this is so even if one places special emphasis on the words in Article 1108(7) and (8): "procurement *by a Party or a state enterprise.*"

439. The Claimant further submits that if the meaning of "procurement" in Chapter 11 is inconsistent with the meaning of "procurement" in Chapter 10, then the Chapter 10 meaning should prevail. The Tribunal does not find an inconsistency between the meaning of "procurement" in Article 1108(7)(a) and the chapeau of Article 1001(5). Indeed, for the reasons mentioned above, this Tribunal (like the tribunals in *ADF* and *UPS*) has found that the chapeau of Article 1001(5) informs the meaning of "procurement" in Article 1108(7)(a). In addition, subparagraphs (a) and (b) of Article 1001(5) are not found in Article 1108(7)(a), and therefore, the question of inconsistency cannot arise. What the Claimant is seeking is not a finding of inconsistency between Articles 1001(5) and 1108(7)(a) but rather an importation of the limitations in paragraphs (a) and (b) of Article 1001(5) into Article 1108(7)(a), for which there is no justification, as has already been expounded above.

(iv) Nature of the FIT Program

440. Having thus set the contours of procurement in Article 1108(7)(a), and having refuted the Claimant's related arguments, the Tribunal now proceeds to examine whether the FIT Program constitutes "procurement."

441. The Tribunal recalls that in 2009 the Government of Ontario enacted the GEGEA "to build a green economy." As Ms. Lo (the then Assistant Deputy Minister of the Renewables and Energy Efficiency Division at the Ministry of Energy) testified, the GEGEA sought to address a number of policy objectives, including promoting clean energy, attracting investment, creating jobs in renewable energy, and providing support for aboriginal and rural communities. In line with these objectives, it authorized the Minister of Energy to direct the OPA to establish a FIT Program,[172] which was described as a procurement program:

---

[172] The power to issue directions enabled the Minister of Energy to direct the OPA in various areas including "procurement solicitation" relating to the "procurement of electricity supply", administrative matters and the establishment and administration of the FIT Program.

"(1) The Minister may direct the OPA to develop a feed-in tariff program that is designed to procure energy from renewable energy sources under such circumstances and conditions, in consideration of such factors and within such period as the Minister may require.

[...]

(4) In this section, 'feed-in tariff program' means a program for procurement, including a procurement process, providing standard program rules, standard contracts and standard pricing regarding classes of generation facilities differentiated by energy source or fuel type, generator capacity and the manner by which the generation facility is used, deployed, installed or located."

442. On 24 September 2009, the Minister issued the formal direction to the OPA to establish the FIT Program "to procure energy from a wide range of renewable energy sources." The Program was a "key element" for purposes of meeting the objectives of the GEGEA and it was "critical to Ontario's success in becoming a leading renewable energy jurisdiction." It was to "introduce a simpler method to procure and develop generating capacity from renewable sources of energy", reduce emissions, "enable new green industries through new investment and job creation" and "provide incentives for investment in renewable energy technologies". The direction instructed the OPA to enter into FIT Contracts, prescribed the methodology and process for establishing prices, the duration of FIT Contracts, restrictions on the land on which electricity production facilities could be built, and rules governing reporting and review.

443. As Ms. Lo and Mr. Duffy (Manager of Generation Procurement at the OPA) explained, it was necessary for the Government to step in and to create a specialized procurement process for renewable energy. By doing so, the Government not only attracted investors by somewhat mitigating the commercial risks associated with developing renewable energy, but also ensured that Ontario's renewable energy development would be sufficiently robust to meet its future energy needs.[173]

444. The FIT Program was then put into operation through the FIT Rules, which were the result of numerous consultations with stakeholders.[174] The FIT Rules required generators to enter into FIT Contracts with the OPA. They also specified the form of such contracts.

---

[173] Rejoinder Witness Statement of Susan Lo dated 2 July 2014 ("**Sue Lo WS II**") §19; Witness Statement of Richard Duffy dated 28 February 2014 ("**Duffy WS I**") §5.
[174] Exh. R-169.

445. The OPA's power to enter into such contracts was set out in section 25.35(4) of the amended Electricity Act of 1998, allowing it to conclude "contracts relating to the procurement of electricity supply and capacity using alternative energy sources or renewable energy sources to assist the Government of Ontario in achieving goals in the development and use of alternative or renewable energy technology and resources."[175] When assessing bids and granting FIT Contracts, the OPA was governed by the Ontario Power Authority Procurement Process Regulations.[176]

446. The FIT Contract described the contractual relationship between the OPA and the electricity generators. It included a cover page setting out the essentials of the project, general terms and conditions, annexes addressing various matters relating to each project, and an appendix setting out standard definitions. Essentially, the FIT Contract contained a detailed framework pursuant to which a generator provided renewable energy electricity and, in exchange, received a guaranteed price for 20 years.

447. Consistent with its practice in other procurement programs, the OPA employed a "fairness monitor" to verify the fairness and transparency of the implementation of the FIT Program.[177]

448. On the basis of this description, the Tribunal comes to the conclusion that the FIT Program constitutes "procurement." By way of the FIT Program, the Government of Ontario purchases electricity through the OPA for the use of and for the ultimate benefit of the people of Ontario. The FIT Program bears all the hallmarks of procurement that have been described above. It was introduced to create a green economy and stimulate job creation. It was designed following extensive consultations with stakeholders, and launched by formal announcements of the Government. Applicants to the Program were rigorously screened through prescribed (and publicized) criteria in a competitive, open process to which any interested person could apply.

449. The Tribunal's assessment of the FIT Program as "procurement" is corroborated by the conclusions of the WTO Panel and Appellate Body. The Claimant itself submits that

---

[175] This authority is repeated in Section 25.35(1)(a) of the Act (Exh. C-0401). Section 25.20(3) confirms the OPA's power to enter into "contracts relating to the procurement of electricity."
[176] Exh. C-0401.
[177] Duffy WS I §52.

these conclusions are "highly relevant"[178] and that this Tribunal can rely upon the Panel and Appellate Body's findings of fact about the FIT Program.[179]

450. The Panel – before whom considerable evidence on the FIT Program was placed and which, therefore, reviewed the Program in great detail – reached the same finding as this Tribunal, namely that the FIT Program constitutes "procurement." However, because it also found that the procurement was undertaken "with a view to commercial resale", it held that the FIT Program was not covered by the terms of Article III:8(a).

451. On its part, the Appellate Body did not explicitly comment on whether the FIT Program constituted "procurement" under Article III:8(a) of the GATT, but it too spoke of "procurement" of electricity by Ontario.[180]

452. The Claimant submits that through the FIT Program, the Government does not actually use its ability to procure because "the electricity is not paid for […] by government [but] by consumers" with the OPA acting as a financial conduit, transferring funds to the generators.[181] The Tribunal cannot follow this argument. Under the FIT Rules, the OPA is purchasing electricity.[182] Under the FIT Contract too, the OPA purchases "Electricity and Future Contract Related Products" from the generator.[183] Further, the funds for each OPA purchase of electricity will inevitably be derived from public sources (i.e. consumers). But whether such funds are first collected from consumers and then utilized, or utilized by requiring consumers to pay generators directly, can make no difference.

453. Further still, after a thorough review of the FIT Program, both the Panel and the Appellate Body concluded that the FIT Program involved the purchase of electricity.[184] In fact, the

---

[178] Claimant's Response to First Article1128 Submission §§107, 114.

[179] Reply §208.

[180] Appellate Body Report, §5.79 ("the product being procured is electricity"); See also §5.75 ("The product purchased by the Government of Ontario under the FIT Programme and Contracts, however, is electricity") and §5.84.

[181] C-PHB §381.

[182] Exh. C-0260, s.1.2, FIT Program Rules, v.1.0 ("[a]pplicants must […] enter into a FIT Contract with the OPA pursuant to which the OPA will pay the Supplier for Electricity delivered from its generating facility"); s.6.3(a) ("[t]he OPA's payment obligations under the FIT Contract will be […] to pay for Hourly Delivered Electricity at the Contract Price.").

[183] C-0109, Ontario Power Authority, Feed-in Tariff Contract, Version 1.1 (30 September 2009), Article 3.3.

[184] Panel Report §7.243; Appellate Body Report §§5.124, 5.128, 5.132.

Appellate Body specifically observed that the FIT Program involved the "government purchase of goods" rather than a "transfer of funds."[185]

454. It may be noted that the tribunal in *UPS* dismissed the argument that the fee in question had to be paid in accordance with a specific formula or in a particular manner and concluded that a service had been procured despite the fact that the service was paid by the persons importing goods rather than by the government.[186]

455. Another argument advanced by the Claimant is that the FIT Program cannot constitute procurement because the OPA "does not take any form of possession over electricity supplied by FIT generators, including legal title."[187] Here again, the Tribunal cannot accept this submission. First, unlike other goods, electricity, once generated, must be simultaneously transmitted and consumed. It cannot be stored in a warehouse or elsewhere.[188] The notion of "possession" is not therefore an obvious criterion here. Indeed, in this context, the Tribunal notes that the procurement exception in Article 1108(7)(a) applies to the procurement of both "goods" and "services." If possession were an indispensable characteristic of procurement, this would mean that Article 1108(7)(a) would never apply to the procurement of services, because services are incapable of being possessed. The Claimant's interpretation would therefore render Article 1108(7)(a) unworkable in respect of the procurement of services, a result that would be prohibited by treaty interpretation rules. The Tribunal thus rejects the Claimant's argument that possession is a necessary attribute of procurement in the context of Article 1108(7)(a) of the NAFTA.

456. Finally, both the WTO Panel and Appellate Body observed that Ontario does in fact take a form of possession over the electricity generated. Or, in the words of the Panel:

> "[t]he fact that Hydro One owns and operates 97% of the transmission lines combined with the fact that it distributes electricity to 1.3 million customers, strongly suggests that the Government of Ontario purchases the electricity that is delivered into the grid under the FIT Programme. In this regard, it is also important to recall that while the IESO (another 'agent' of the Government of Ontario) has stated that it does not take any 'title' to the electricity in the Ontario power grid, it nevertheless controls how electricity flows through that grid. Thus, the Government of Ontario not only contracts

---

[185] Appellate Body Report §§5.128 and 5.132.
[186] *UPS* §§132-134.
[187] Reply §209.
[188] Witness Statement of Rick Jennings dated 28 February 2014 ("**Jennings WS I**") §5.

with FIT Programme generators through the OPA to supply electricity into the grid, but it also directs the movement of that electricity to and throughout that grid by means of IESO instructions, and then finally, through the operations of Hydro One, transmits and distributes the delivered electricity to end-user customers. In our view, the combined actions of all three 'public bodies' (but especially Hydro One and the OPA) demonstrate that the Government of Ontario purchases electricity within the meaning of Article 1.1(a)(1)(iii) of the SCM Agreement."[189]

457. On its part, the Appellate Body also held that:

"[t]he Government of Ontario takes possession over electricity and therefore purchases electricity." [190]

458. Thus, even if possession was a necessary requirement of procurement generally (on which the Tribunal expresses no opinion at present), and even if possession was a necessary requirement under Article 1108(7)(a) of NAFTA (which the Tribunal rejects), that requirement would be satisfied in the present case.

459. The final submission put forward by the Claimant is that Canada cannot rely on the procurement exception since it has not demonstrated that there is a "nexus" between the FIT Contract and the measures challenged by the Claimant under Articles 1102 and 1103 of the NAFTA.[191] The Tribunal does not accept this submission. First, the Claimant's view appears to arise from arguments put before the WTO Panel and Appellate Body in the context of Article III:8(a) of the GATT, which, as mentioned earlier, is of limited use in the present analysis. There, the finding of a nexus between the good being procured and the good subject to domestic content was fundamental. The existence of a nexus is irrelevant here, because Article 1108(7)(a) of the NAFTA is broader than Article III:8(a) of the GATT. Once it is established that there has been "procurement" by a Party or state enterprise, Article 1108(7)(a) excludes all claims of NT, MFN and domestic content in connection with such procurement. Second, and in any event, as was already seen above (§254), the claims submitted to this Tribunal principally involve the acts of the Government and the OPA in relation to the FIT Program. In respect of Articles 1102 and 1103 of the NAFTA, the Claimant argues that Canada treated the Claimant and its investments (all of which were in the context of the

---

[189] Panel Report §7.239.

[190] Appellate Body Report §§5.127-5.128.

[191] This argument appears principally in the context of the Claimant's Article 1106 claim (Reply §§204-205, 265), which, for the reasons mentioned above, has been rejected on jurisdictional grounds. As a result, it need not be considered further. However, to the extent the argument also relates to the Articles 1102 and 1103 claims, it is examined here.

FIT Program) less favorably than other investors in like circumstances. Thus, there is a direct nexus between the claims in this arbitration and the FIT Program. As a result, even if a nexus requirement similar to Article III:8(a) of the GATT existed in the context of Article 1108(7)(a) of the NAFTA, it would be satisfied.

460. In sum, the Tribunal concludes that the FIT Program constitutes a "procurement" within the meaning of Article 1108(7)(a).

461. Having reached this conclusion, it remains for the Tribunal to address whether the FIT Program is a procurement program "by a Party or a state enterprise."

### c. The FIT Program is a procurement program "by a Party or a state enterprise"

462. The exception in Article 1108(7)(a) only applies if the procurement is by a "Party" or a "state enterprise." The Claimant argues that the FIT Program is not procurement by a Party or state enterprise because it is a provincial measure and Article 1001(1)(a) of the NAFTA "excludes" procurement by state and local governments. The Tribunal does not share this view. Indeed, the Claimant once again seeks to import into Article 1108(7)(a) limitations not found in that provision. For the reasons elaborated above, this approach is ill-founded. Article 1108(7)(a) does not include or otherwise refer to the limitations found in Article 1001(1)(a), and the Tribunal sees no reason to incorporate such limitations contained in Chapter 10 into Article 1108(7)(a) of Chapter 11.

463. The term "Party" is not defined in the NAFTA. However, as the obligations in Chapter 11 apply to both federal and provincial governments, it is coherent that exceptions to these obligations also apply to federal and provincial governments. Or, in the words of the *ADF* tribunal: "the exclusionary effect of Article 1108(7)(a) and 8(b) operates on both federal and state governmental procurement."[192] Applied to this case, this means that procurement through the FIT Program by the provincial Government of Ontario is to be considered as "procurement by a Party" for the purposes of Article 1108(7)(a) of the NAFTA.

464. Moreover, the Tribunal has already held earlier that the OPA is a state enterprise (§355).

---

[192] *ADF* §170.

465. In summary, the Tribunal holds that the FIT Program constitutes procurement by the Government of Ontario under Article 1108(7)(a) of the NAFTA. The Program is implemented by the Government through the OPA, which is a state enterprise. Consequently, the acts of the Government of Ontario cannot be challenged under Articles 1102 or 1103 of the NAFTA. The claims in respect of these provisions are, therefore, dismissed. As a result of this finding, the Tribunal can dispense with enquiring into the Respondent's Subsidy Defense, which would only have been relevant in the absence of procurement.

466. As it held above, the Tribunal lacks jurisdiction over the domestic content claims (§335). It will thus refrain from discussing whether such claims would be excluded by the operation of Article 1108(8)(b) of the NAFTA, but to mention, for the sake of completeness, that its findings on Article 1108(7)(a) would equally apply to Article 1108(8)(b). Indeed, the Tribunal considers that the term "procurement" has the same meaning in Articles 1108(7)(a) and 1108(8)(b), and notes that none of the Parties (or Non-Disputing Parties) has argued to the contrary. Thus, even if the Tribunal had jurisdiction over the domestic content claims (*quod non*), the latter would in any event not survive on the merits.

### D. ARTICLE 1105(1)

467. It follows from the foregoing analysis that only the Claimant's Article 1105(1) (referred to below as "**Article 1105**") claims remain to be resolved. The Tribunal will start by setting forth the principles governing the interpretation of Article 1105 of the NAFTA (1. below). It will then examine the scope and content of Article 1105 and address the Claimant's argument that Canada is bound to provide it with the allegedly more favorable treatment found in certain of Canada's other investment treaties (2. below). Finally, the Tribunal will determine whether the impugned acts of Canada violate Article 1105 (3. below).

#### 1. Interpretation of Article 1105

##### a. The Claimant's Position

468. The Claimant acknowledges that on 31 July 2001, the NAFTA Free Trade Commission issued the FTC Note, which addressed (*inter alia*) Article 1105. However, it argues that the FTC Note is not the exclusive source of interpretation for Article 1105: "the Tribunal should consider itself at liberty to interpret the meaning of 'fair and equitable treatment'

as contained in NAFTA Article 1105 as an autonomous standard in accordance with all the normal and well-accepted sources of international law – not just customary international law."[193] Further, the Claimant argues that the FTC Note is not a *bona fide* interpretation of Article 1105 and amounts to an amendment of the NAFTA with the result that the FTC Note "has no legal force or effect."[194] Should the Tribunal consider itself bound by the FTC Note, the Claimant stresses that such instrument itself states that it is merely one of the sources of interpretation of the customary international law standard of treatment.[195]

### b. The Respondent's Position

469. By contrast, the Respondent considers that the FTC Note constitutes the only source of interpretation for Article 1105. According to it, had the NAFTA Parties intended that Article 1105 be interpreted in accordance with the customary international law rules of treaty interpretation, they would not have issued the FTC Note. The fact that they did issue the note "leaves no space for the application of the customary international law rules of treaty interpretation."[196]

470. The Respondent further opposes the Claimant's argument that the FTC Note is not binding on the Tribunal. It points to the wording of Article 1131(2), from which it is clear that the Tribunal cannot question the validity of the FTC Note. Moreover, it submits that the FTC Note would bind the Tribunal even in the absence of Article 1131(2), as it merely emphasizes that Article 1105 prescribes the customary international law minimum standard of treatment of aliens, an interpretation that the NAFTA Parties have always given to Article 1105.[197]

471. The Respondent also disputes the Claimant's position that the FTC Note itself requires Article 1105 to be interpreted in accordance with the rules of customary international law on treaty interpretation. If the Claimant's argument were correct, "it would lead to the absurd result that Article 1131(2) would require the Tribunal to apply only the FTC Note and not the customary international law rules of interpretation, only to then have the FTC

---

[193] Reply §596. See also §§543, 553, 572.
[194] Reply §583. See also §572(b).
[195] Reply §594.
[196] Rej. §140.
[197] Rej. §§141-144.

Note require the Tribunal to apply the customary international law rules of interpretation."[198]

472. Finally, the Respondent notes that similar arguments were made by the claimant in the recent *Bilcon* case and that they were all rejected.

### c. Non-Disputing Parties' Position

473. Mexico agrees with Canada's submission that the *Bilcon* tribunal correctly dismissed similar arguments with respect to the FTC Note.[199]

474. The United States also agrees with the conclusions reached in *Bilcon* about the binding nature of the FTC Note. It is equally of the opinion that Chapter 11 tribunals may not turn to sources of international law beyond customary international law when interpreting and applying Article 1105.

### d. Analysis

475. Article 1105(1) of the NAFTA reads as follows:

> "Each Party shall accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security."

476. The FTC Note states in relevant part the following:

> "2. Minimum Standard of Treatment in Accordance with International Law.
>
> 1.Article 1105 prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to investments of investors of another Party.
>
> 2.The concepts of 'fair and equitable treatment' and 'full protection and security' do not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens.

---

[198] Rej. §145.
[199] Second Submission of Mexico Pursuant to NAFTA Article 1128 dated 12 June 2015 ("**Mexico's Second Article 1128 Submission**") §8.

> 3. A determination that there has been a breach of another provision of the NAFTA, or of a separate international agreement, does not establish that there has been a breach of Article 1105." [200]

477. The Claimant contends that the Tribunal is not limited by the FTC Note and may consider sources of law other than customary international law. The Tribunal finds it difficult to follow this view. Indeed, if the NAFTA Parties wished a Chapter 11 tribunal to interpret Article 1105 in accordance with the usual rules of treaty interpretation, there would have been no need for the FTC Note. The fact that the NAFTA Parties issued the FTC Note establishes that the NAFTA Parties intended Chapter 11 tribunals to interpret Article 1105 in the manner prescribed in the FTC Note itself. If one were to follow the Claimant's argument, the FTC Note would be inutile, which cannot be correct.

478. The Claimant further asserts that the FTC Note does not bind the Tribunal. Here too, the Tribunal cannot accept this position. Article 1131 of the NAFTA, which deals with the governing law, provides the contrary in no uncertain terms:

> "2. An interpretation by the Commission of a provision of this Agreement shall be binding on a Tribunal established under this Section."

479. Thus, pursuant to Article 1131(2), an interpretation issued by the Free Trade Commission under the NAFTA, such as the FTC Note, is binding on all Chapter 11 tribunals. It is not for this Tribunal to determine whether – as the Claimant alleges – the FTC Note amounts to an amendment of the NAFTA or not. Rather, faced with an interpretation given by the Contracting States through the FTC, the Tribunal must simply apply it. This approach has been followed by several NAFTA tribunals.[201] For instance, the tribunal in *ADF* observed:

> "Nothing in NAFTA suggests that a Chapter 11 tribunal may determine for itself whether a document submitted to it as an interpretation by the Parties acting through the FTC is in fact an 'amendment' which presumably may be disregarded until ratified by all the Parties under their respective internal law."[202]

---

[200] Exh. RL-063.

[201] See for instance Exh. CL-022, *Methanex Corporation v. United States of America* (UNCITRAL), Final Award of the Tribunal on Jurisdiction and Merits, 3 August 2005, Part IV-Chapter C, §20.

[202] *ADF* §177.

480. More recently, the tribunal in *Bilcon* also held that the FTC Note constituted an "authentic interpretation" of the NAFTA, which it not only had to take into account under Article 31(3) VCLT, but which was binding upon it:

> "Article 31(3)(a) of the Vienna Convention on the Law of Treaties calls on treaty interpreters to take into account 'any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions'. Yet NAFTA Article 1131(2) contains a *lex specialis*, which goes further in providing that '[a]n interpretation by the Commission of a provision of this Agreement shall be binding on a Tribunal established under this Section'. Under the general rule on interpretation set out in the Vienna Convention, a NAFTA tribunal would only need to 'take into account' the subsequent agreement. However, by virtue of NAFTA Article 1131(2), acts of authentic interpretation by the States parties to the Agreement, like the Notes just referred to, are binding and conclusive."[203]

481. The Claimant also argues that the FTC Note itself calls for the Tribunal to apply the customary international law rules of treaty interpretation while interpreting Article 1105. In the Tribunal's opinion, this does not appear correct. The FTC Note does not contain rules for the interpretation of Article 1105. It actually interprets that provision by specifying its meaning according to which the standard of treatment in Article 1105 is identical to the minimum customary international law standard of treatment of aliens.

482. Finally, the Claimant argues that, in determining the content of Article 1105, the Tribunal may refer to the sources of international law enumerated in Article 38 of the Statute of the International Court of Justice (the "**ICJ Statute**"), namely international conventions, international customs, general principles of law, judicial decisions and scholarly writings. Again, the FTC Note, which this Tribunal – like other tribunals before it – considers binding on it, requires the Tribunal to refer to customary international law, and not to other sources of international law. This is clear from the FTC Note itself and from case law in application of the Note.[204] This said, while it cannot refer to other sources of

---

[203] Exh. CL-351, *William Ralph Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton and Bilcon of Delaware, Inc. v. Government of Canada*, PCA Case No. 2009-04, Award on Jurisdiction and Liability, 17 March 2015 ("***Bilcon***"), §430.
[204] Exh. CL-33, *S.D. Myers v. Canada* (NAFTA/UNCITRAL), First Partial Award, 13 November 2000, §259 ("***SD Myers***"); Exh. CL-39, *Pope & Talbot Inc. v. Government of Canada* (UNCITRAL/NAFTA), Award on the Merits of Phase 2, 10 April 2001 ("***Pope & Talbot – Award on the Merits of Phase 2***"), §§110 *et seq.*; *Bilcon* §432.

international law, the Tribunal may certainly be guided by the decisions of other NAFTA Chapter 11 tribunals applying Article 1105 and the FTC Note.[205]

483. Having established that Article 1105 must be interpreted in accordance with the FTC Note, which is binding upon it, the Tribunal will now proceed to determine the scope and content of Article 1105.

## 2. Scope and Content of Article 1105

### a. The Claimant's Position

484. In the Claimant's view, Article 1105 obliges the Respondent to provide investments of foreign investors treatment that accords with the rules and principles established by the four sources of international law as enumerated in Article 38 of the ICJ Statute.[206] It submits that the standard set out in Article 1105 at least includes a requirement that Canada follow customary international law.[207] For Mesa, Article 1105 consists of several components including the duty to act in good faith; fairness and reasonableness; treatment free from arbitrary conduct; transparency; protection against abuse of rights; procedural fairness; legitimate expectations; treatment free from political motivation; and treatment free from discriminatory conduct. Further, the Claimant contends that the "full protection and security" requirement in Article 1105 "requires a host country to exercise reasonable care to protect investments against injury by private parties."[208]

485. The Claimant further submits that the minimum standard of treatment under customary international law has evolved and now converges with the fair and equitable treatment ("**FET**") standard found in modern investment treaties that do not refer to the customary international law standard (to which the Tribunal will refer as "**unqualified FET clauses**"). In effect, the Claimant submits that there are no material differences between the content of Article 1105 and that of unqualified FET provisions in other treaties.

---

[205] *Bilcon* §441 ("According to the FTC Notes, NAFTA tribunals are bound to interpret and apply the standard in accordance with customary international law. In interpreting the international minimum standard, the Tribunal also drew guidance from earlier NAFTA Chapter Eleven decisions.").
[206] Mem. §331.
[207] Mem. §336.
[208] Mem. §413.

486. In response to Canada's objection that the Claimant must establish state practice and *opinio juris* to substantiate the evolution of the minimum standard of treatment under customary international law, the Claimant states that "the content of customary international law can be sourced through international tribunal decisions, and that it is not necessary to specifically prove the elements of state practice and *opinio juris.*"[209]

487. Finally, the Claimant submits that "if a MFN clause in another treaty obliged Canada to provide treatment to investments of foreign investors that would be advantageous or surpassing the quality of that provided to investments under NAFTA Article 1105, then more favorable treatment would need to be provided by Canada [to the Claimant]."[210]

### b. The Respondent's Position

488. For its part, the Respondent refutes the argument that Article 1105 creates an open-ended obligation to be defined by tribunals. It sets an objective standard of treatment, or in Canada's words, it "prescribes no more and no less than the customary international law minimum standard of treatment of aliens."[211] According to the Respondent, the threshold for demonstrating a violation of Article 1105 is high. To breach Article 1105, the impugned state conduct must be "sufficiently egregious and shocking, such as a complete lack of due process, evident discrimination or a manifest lack of reasons."[212]

489. The Respondent rejects the assertion that the autonomous standard of fair and equitable treatment and the international law minimum standard of treatment in Article 1105 have converged. Since the Claimant invokes a rule of customary international law under which the minimum standard equals FET, it has the burden of proving the existence of such a rule. And in this regard, it is for the Claimant to establish state practice and *opinio juris*. It must also prove that the Respondent has breached the customary rule. The Claimant has failed to discharge this burden. In fact, the Claimant has failed to cite a single award interpreting the customary international law minimum standard in a manner supporting its position.

---

[209] Mem. §339.
[210] Reply §540.
[211] R-PHB §65.
[212] R-PHB §66.

490. Finally, the Respondent opposes the use of the MFN provision to import standards found in other treaties. According to it, the FTC Note requires the Tribunal to interpret Article 1105 as providing for the customary international law standard and nothing else. Provisions of other treaties as well as other clauses in the NAFTA, including the MFN clause, are thus irrelevant.[213] In any event, for the Respondent, even if one were to look to its other treaties, the Claimant has not proven that any of those treaties provides for treatment more favorable than the minimum standard of Article 1105.

### c.  The Non-Disputing Parties' Position

491. It is the United States' submission that the FTC Note confirms the NAFTA Parties' express intent to establish the minimum standard of customary international law as the applicable standard for purposes of Article 1105. According to it, "the minimum standard of treatment is an umbrella concept reflecting a set of rules that, over time, has crystallized into customary international law in specific contexts", with the result that Article 1105 "reflects a standard that develops from State practice and *opinio juris*, rather than an autonomous, treaty-based standard."[214]

492. It further submits that the burden is on the Claimant to establish the existence, applicability, and violation of a relevant obligation under customary international law. This burden cannot be discharged by relying on arbitral decisions as these decisions do not constitute evidence of state practice and *opinio juris*.

493. Finally, it notes that a finding of a breach of Article 1105 "must be made in the light of the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their borders."[215]

494. In its submission, Mexico contends that the threshold for a breach of Article 1105 is high. It concurs with the United States and Canada that the burden is on the Claimant to establish an obligation under customary international law based on state practice and *opinio juris*. It is also common ground among Mexico and the other NAFTA Parties that decisions of arbitral tribunals are not themselves a source of customary international law.

---

[213] Rej. §152.
[214] U.S. First Article 1128 Submission §6.
[215] U.S. First Article 1128 Submission §9, citing *SD Myers*.

### d. Analysis

495. The Parties diverge on the content of the customary international law minimum standard of treatment found in Article 1105. Mesa submits that such standard has evolved and now has the same content and meaning as the so-called "autonomous" FET standard of modern BITs, while the Respondent holds the contrary view.

496. An analysis of the content of the customary international law minimum standard of treatment usually starts with a reference to the U.S.-Mexico Claims Commission's decision in *Neer*. There the Claims Commission defined the standard in the following terms:

> "[T]he treatment of an alien, in order to constitute an international delinquency, should amount to an outrage, to bad faith, to willful neglect of duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency."[216]

497. A number of Chapter 11 tribunals have since set out the content of the customary international law minimum standard of treatment in Article 1105. Broadly, two lines of decisions can be discerned: decisions questioning the relevance and applicability of the *Neer* standard, and decisions applying it with a number of important qualifications.

498. Tribunals following the first approach[217] emphasize that *Neer* did not deal with investment protection, but concerned Mexico's alleged failure to carry out an effective investigation of the killing of a US citizen by armed men who were not even alleged to be acting under Mexico's control or direction. According to the *Mondev* tribunal, due to this dissimilarity in circumstances, "there is insufficient cause for assuming that provisions of bilateral investment treaties, and of NAFTA [...] are confined to the *Neer* standard of outrageous treatment [...]."[218] Similarly, for the *ADF* tribunal "there appear[ed] no logical necessity and no concordant state practice to support the view that

---

[216] Exh. CL-141, *L.F.H. Neer and Pauline E. Neer (United States) v. Mexico*, UNRIAA Award, 15 October 1926, Vol. 4, pp. 61-62, §4.

[217] Exh. RL-059, *Merrill & Ring Forestry v. Government of Canada* (UNCITRAL/NAFTA), Award, 31 March 2010, §§197, 204; Exh. CL-034, *Mondev International Ltd. v. United States* (ICSID Case No. ARB(AF)/99/2), Award, 11 October 2002 ("*Mondev*"), §115; *ADF* §181; Exh. CL-121, *Loewen Group, Inc. and Raymond L. Loewen v. United States* (ICSID Case No. ABR(AF)/98/3), Award, 26 June 2003, §132.

[218] *Mondev* §115.

the *Neer* formulation is automatically extendible to the contemporary context of foreign investors and their investments by a host or recipient State."[219] More recently, the *Bilcon* tribunal noted that the NAFTA protection was not restricted to the *Neer* requirement of outrageous conduct:

> "NAFTA awards make it clear that the international minimum standard is not limited to conduct by host states that is outrageous. The contemporary minimum international standard involves a more significant measure of protection."[220]

499.  Tribunals adopting the second approach apply the stringent requirements of *Neer* for purposes of breaches of Article 1105.[221] However, even under this approach, they consider that the principles of customary international law are not understood to be "frozen in amber at the time of the *Neer* decision."[222] They observe that the *Neer* test of severity is easier to satisfy now than it was at the time of the *Neer* decision. Canada itself does not rely on the *Neer* decision; it rather invokes the articulation of the minimum standard as it was set out in *Glamis*,[223] *Cargill*[224] and *Mobil*.[225]

500.  In practice, these two approaches have much in common. Most importantly, they both accept that the minimum standard of treatment is an evolutionary notion,[226] which offers greater protection to investors than that contemplated in the *Neer* decision.

501.  Having considered the Parties' positions and the authorities cited by them, the Tribunal is of the opinion that the decision in *Waste Management II* correctly identifies the content of the customary international law minimum standard of treatment found in Article 1105.

---

[219] *ADF* §181.

[220] *Bilcon* §433.

[221] *Cargill* §284; Exh. CL-138, *Glamis Gold, Ltd. v. United States* (UNCITRAL/NAFTA), Award, 8 June 2009 ("**Glamis**"), §616.

[222] Exh. CL-32, *Pope & Talbot Inc. v. Government of Canada* (UNCITRAL/NAFTA), Award in Respect of Damages, 31 May 2002, §57.

[223] *Glamis* §627.

[224] *Cargill* §286.

[225] *Mobil* §§152-153.

[226] *Mondev* §115 *et. seq.*; *ADF* §179; Exh. CL-091, *Waste Management, Inc. v. United Mexican States* (ICSID No. ARB(AF)00/3), Award, 30 April 2004 ("**Waste Management**"), §98; *Merrill & Ring* §§92-193; *Bilcon* §§435-438. See also Gabrielle Kaufmann-Kohler, Interpretive Powers of the Free Trade Commission, Fifteen Years of NAFTA Chapter 11 Arbitration 175, 184 (2011) ("Essentially, most tribunals have considered that the minimum standard of treatment is an evolutionary notion, which applies as it stands today and not at the time of the *Neer* decision in 1926 – requiring outrageous conduct.").

This decision was cited with approval in the Claimant's submissions.[227] It was also quoted in the recent *Bilcon* decision,[228] with which the Claimant agrees,[229] in the following terms:

> "The formulation of the 'general standard for Article 1105' by the *Waste Management* Tribunal is particularly influential, and a number of other tribunals have applied its formulation of the international minimum standard based on its reading of NAFTA authorities:
>
>> '[T]he minimum standard of treatment of fair and equitable treatment is infringed by conduct attributable to the State and harmful to the claimant if the conduct is arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice, or involves a lack of due process leading to an outcome which offends judicial propriety – as might be the case with a manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process. In applying this standard it is relevant that the treatment is in breach of representations made by the host State which were reasonably relied on by the claimant.
>>
>> Evidently the standard is to some extent a flexible one which must be adapted to the circumstances of each case.'
>
> 443. While no single arbitral formulation can definitively and exhaustively capture the meaning of Article 1105, the Tribunal finds this quote from *Waste Management* to be a particularly apt one. Acts or omissions constituting a breach must be of a serious nature. The *Waste Management* formulation applies intensifying adjectives to certain items—but by no means all of them—in its list of categories of potentially nonconforming conduct. The formulation includes 'grossly' unfair, 'manifest' failure of natural justice and 'complete' lack of transparency.
>
> 444. The list conveys that there is a high threshold for the conduct of a host state to rise to the level of a NAFTA Article 1105 breach, but that there is no requirement in all cases that the challenged conduct reaches the level of shocking or outrageous behaviour. The formulation also recognises the requirement for tribunals to be sensitive to the facts of each case, the potential relevance of reasonably relied-on representations by a host state, and a recognition that injustice in either procedures or outcomes can constitute a breach."[230]

---

[227] Mem. §361.

[228] The decision was also quoted in the cases relied on by the Respondent. See *Mobil* §141; *Cargill* §283.

[229] See Claimant's Submissions on *Bilcon* §§46-50 (setting out the *Bilcon* tribunal's decision on Article 1105 and stating that "[i]n this arbitration, the Investor made similar submissions [...] advocating for the standard ultimately adopted in *Bilcon*.").

[230] *Bilcon* §§442-444.

502. On this basis, the Tribunal considers that the following components can be said to form part of Article 1105: arbitrariness; "gross" unfairness; discrimination; "complete" lack of transparency and candor in an administrative process; lack of due process "leading to an outcome which offends judicial propriety"; and "manifest failure" of natural justice in judicial proceedings.[231] Further, the Tribunal shares the view held by a majority of NAFTA tribunals[232] that the failure to respect an investor's legitimate expectations in and of itself does not constitute a breach of Article 1105, but is an element to take into account when assessing whether other components of the standard are breached.

503. The Tribunal disagrees with the Claimant's submissions that the "autonomous" fair and equitable treatment provisions in other treaties impose additional requirements on Canada beyond those deriving from the minimum standard. As was already discussed above, the FTC Note is clear that the Tribunal must apply the customary international law standard of the international minimum standard of treatment, and nothing else. There is thus no scope for autonomous standards to impose additional requirements on the NAFTA Parties. This was the conclusion in *Bilcon* as well.[233]

504. The threshold for a breach of Article 1105 is also relevant to the Tribunal's analysis. The Claimant does not appear to dispute – and rightly so – that the threshold for Article 1105 is high. Indeed, the three NAFTA Parties concur on this issue[234] and other Chapter 11 tribunals have come to the same conclusion.[235]

---

[231] In a recent case, while interpreting Article 10.5 of the U.S.-Oman Treaty, which is similar to Article 1105 of the NAFTA, the tribunal described the scope and content of the customary international law standard of treatment as "a gross or flagrant disregard for the basic principles of fairness, consistency, even-handedness, due process, or natural justice expected by and of all States under customary international law. Such a standard requires more than that the Claimant point to some inconsistency or inadequacy in Oman's regulation of its internal affairs: a breach of the minimum standard requires a failure, wilful or otherwise egregious, to protect a foreign investor's basic rights and expectations. It will certainly not be the case that every minor misapplication of a State's laws or regulations will meet that high standard." See *Adel A Hamadi Al Tamimi v. Sultanate of Oman* (ICSID Case No. ARB/11/33), Award, 3 November 2015, §390.

[232] See for instance *Waste Management* §96; *Cargill* §296.

[233] *Bilcon* §432 ("In light of the FTC Notes and in the specific context of NAFTA Chapter Eleven in which this Tribunal operates, 'fair and equitable treatment' and 'full protection and security' cannot be regarded as 'autonomous' treaty norms that impose additional requirements above and beyond what the minimum standard requires."). The *Bilcon* tribunal referred to the discussion of the "additive approach" in *Pope & Talbot – Award on the Merits of Phase 2* §110 *et seq*.

[234] U.S. Second Article 1128 Submission §20 ("Accordingly, there is a high threshold for Article 1105 to apply"); Mexico's Second Article 1128 Submission §8 ("[T]he threshold for establishing a breach of the minimum standard of treatment at customary international law is high."); Canada's Observations on the *Bilcon* §15; C-Mem. §§394-402; Rej. §146.

[235] *Bilcon* §441; Exh. CL-194, *International Thunderbird Gaming Corporation v. United Mexican States* (UNCITRAL), Arbitral Award, 26 January 2006 ("***International Thunderbird***"), §§194, 197.

505. Finally, when defining the content of Article 1105 one should further take into consideration that international law requires tribunals to give a good level of deference to the manner in which a state regulates its internal affairs. Or, in the words of the *Bilcon* tribunal:

> "Even when state officials are acting in good faith there will sometimes be not only controversial judgments, but clear-cut mistakes in following procedures, gathering and stating facts and identifying the applicable substantive rules. State authorities are faced with competing demands on their administrative resources and there can be delays or limited time, attention and expertise brought to bear in dealing with issues. The imprudent exercise of discretion or even outright mistakes do not, as a rule, lead to a breach of the international minimum standard."[236]

506. Before the Tribunal proceeds to a review of the acts that allegedly breached Article 1105, it must address the Claimant's argument that "[t]he MFN obligation requires this Tribunal to provide treatment as favorable to the Investor as that provided to other investors who would receive treaty protection for their investments under other investment protection treaties negotiated by Canada."[237] Mesa thus contends that it can avoid the limitations of Article 1105 by relying on the MFN provision in Article 1103(1) of the NAFTA and importing FET clauses from other treaties of Canada. It points to several treaties under which Canada provides foreign investors with a better "autonomous" level of protection[238] and submits that it is entitled to the same protection.[239]

507. The Tribunal rejects the Claimant's submission. Indeed, the Claimant bases its argument on Article 1103 of the NAFTA. As mentioned above, Article 1108(7)(a) excludes the application of Article 1103 in cases of procurement. As the FIT Program constitutes procurement, the Claimant cannot rely on Article 1103 to introduce allegedly more favorable standards of treatment from other treaties.[240]

---

[236] *Bilcon* §§437, 440. See also *SD Myers* §263; *International Thunderbird* §127 (A State "has a wide discretion with respect to how it carries out such policies by regulation and administrative conduct."); Exh. CL-090, *Chemtura Corp. v. Government of Canada* (UNCITRAL), Award, 2 August 2010 ("*Chemtura*"), §153 (recognizing, in the context of a review process evaluating the environmental and public health impacts of a pesticide, that "it is not for the Tribunal to judge the correctness or adequacy of the scientific results").

[237] Reply §541.

[238] Reply §544 relying on treaties entered into between Canada and Armenia, Barbados, Costa Rica, Croatia, Ecuador, Egypt, Lebanon, Philippines, Thailand, Trinidad & Tobago, Ukraine, Uruguay, and Venezuela.

[239] Reply §548.

[240] The *ADF* tribunal appears to have come to the same conclusion. See *ADF* §196 ("Assuming, once more, for purposes of argument merely, that the U.S.-Albania and U.S.-Estonia treaties do provide for better treatment for Albanian and Estonian investors and their investments in the United States, than

### 3.   Canada's Alleged Breaches of Article 1105

508.   In the course of its various submissions, Mesa has argued that numerous acts contravene Article 1105.[241] Indeed, as the Respondent observed, "[t]he Claimant has alleged that virtually each and every aspect of the conduct of Ontario and the OPA in the design and implementation of the FIT Program and the GEIA has violated Canada's obligations under Article 1105."[242]

509.   For the reasons mentioned above, the Tribunal does not have jurisdiction over all of the acts allegedly in breach of Article 1105. Specifically, it lacks jurisdiction over the claim that Canada breached Article 1105 by entering into the MOU;[243] over the Claimant's objections to the specific terms of the MOU;[244] and over Mesa's claims concerning the initial reservation of capacity for the Korean Consortium.[245]

510.   Moreover, some acts which were mentioned in the Claimant's initial submissions did not appear again, at the hearing or in the post-hearing submissions.[246] While the Claimant mentioned these and other acts at some stages of the proceedings, it did not rely on them to raise a specific claim on the ground of Article 1105.[247]

---

the treatment to which the Investor is entitled in the United States under NAFTA Article 1105(1), the Investor still has not thereby shown violation of Article 1103 by the Respondent. For in any event, the Respondent is entitled to the defense provided by NAFTA Article 1108(7)(a) which, as noted earlier in some detail, excludes the application of Article 1103 in a case (like the instant one) involving governmental procurement by a Party.").

[241] See for instance Mem. §§485, 485(d) ("Canada's process for awarding Power Purchase Agreements was unfair, unreasonable and arbitrary toward Mesa"), §§685-686.

[242] C-Mem. §381.

[243] The Tribunal does have jurisdiction over the Claimant's claims in respect of the GEIA for the TTD and Arran projects, these are considered below (§542).

[244] C-PHB §33 ("[u]nder the MOU, the parties were to conduct a feasibility study and if the feasibility study supported the deal going forward, then the parties were to enter a conditional agreement [...] [N]either of these things happened.").

[245] C-PHB §3(c) ("The Korean Consortium did not have to meet any requirements of any kind with respect to its guaranteed priority access to the first 500 MW of transmission access"). The OPA was directed to reserve this capacity on 30 September 2009, which is before the Claimant's investment in November 2009.

[246] See for instance NoA §38-42 where the Claimant complains about "Renewable Energy Approval Changes" and "Waiver of OPA Termination Rights."

[247] For instance, the Claimant submits that "[t]he GEIA also provided the Korean Consortium a higher price for units of wind energy, by way of an Economic Development Adder. This was not available to Mesa despite the fact that both of their products – units of wind energy in Ontario's transmission grid were identical and indistinguishable" (Reply §122). However, it has not raised an Article 1105 claim on this ground. Further, the Claimant submits that "Canada ignored the fundamental legal duty and responsibility of all public servants, who exercise either statutory or discretionary authority, to perform

511. As a result, the Tribunal will focus now on the implementation of the FIT Program by the OPA (a); the GEIA (b); and the allocation of capacity in the Bruce Region (c). Before doing so, the Tribunal wishes to emphasize that, in reaching the conclusion that Canada has not breached Article 1105, the Tribunal has reviewed the entire factual matrix surrounding the Claimant's investment, and every allegation that has been made at various times in these proceedings by the Claimant, not all of which are specifically addressed in this Award.

512. The Tribunal also notes that in various instances the Claimant alleges that Canada's conduct was "unfair", "arbitrary", "unexpected", "non-transparent", "unreasonable", "discriminatory" and contrary to the Claimant's legitimate expectations. On the facts of this case, the Tribunal does not consider it necessary to review whether each of these elements is within the scope of Article 1105. Neither does it appear necessary to set forth a specific test for each element. The following discussion of the evidence will demonstrate that the facts required for a finding of breach of Article 1105 have not been made out and the impugned conduct does not reach the high threshold needed to establish a violation of Article 1105. Thus, even if all of the components identified by the Claimant were to form part of Article 1105 (an issue which the Tribunal does not decide), there would still be no breach of Article 1105.

### a. Implementation of the FIT Program by the OPA

513. For the reasons mentioned above (§§350 et. seq.), the following acts of the OPA are to be considered by the Tribunal:

    i. The OPA's alleged failure to follow the FIT Rules with respect to the ranking and evaluation of FIT applications;

    ii. The OPA's decision not to run the ECT;

    iii. The allegedly better treatment offered by the OPA to other FIT applicants, and the OPA's meetings with other FIT applicants which led to benefits not available to the Claimants being granted to these applicants;

---

their duties fairly, reasonably, and in good faith [...] Ontario's representatives failed to comply with [these duties] when carrying out the renewable energy program" (C-PHB §3(d)), again without articulating a precise Article 1105 claim in this regard.

    iv.    The release of the FIT Program rankings on 21 December 2010;

    v.    The OPA's alleged misadministration of the FIT Program;

    vi.    The OPA's decision on the information to be included in the TAT tables;

    vii.    The OPA's decision to offer NextEra a FIT Contract with connection points on the 500 kV Bruce to Longwood Line; and,

    viii.    The award of the FIT Contracts on 4 July 2011.

514. Each of these acts is considered in greater detail below.

   (i)  Ranking and Evaluation of the Claimant's Launch Period Applications

515. The Claimant alleges that it did not receive a FIT Contract because its TTD and Arran projects were evaluated and ranked in an unfair and arbitrary manner.[248] According to the Claimant, the ranking was done without a careful review of the FIT Rules and the actual applications themselves.[249]

516. The Respondent replies that Mesa's allegations are baseless. It points to the fact that LEI, an independent agency, certified that the OPA had carried out a fair and consistent evaluation of the Launch Period Applications. Moreover, the rankings of the TTD and Arran projects were appropriate given the poor quality of the information supplied by the Claimant.[250]

517. As mentioned above, Claimant made two applications in the Launch Period for its TTD and Arran projects. In each application, the Claimant applied for three criteria points: Major Equipment Control Point, Prior Experience Point and Financial Capacity Point. According to the Claimant, it should have been awarded all three of these points, a position which is opposed by the Respondent. The Tribunal agrees with the Respondent on this issue.

---

[248] Mem. §806.
[249] Reply §29.
[250] Mem. §433.

518. Before reviewing the Claimant's applications, the Tribunal makes three preliminary observations, which it will keep in mind while reviewing the merits of Mesa's claims.

519. First, it is for the Claimant to establish that its applications were incorrectly ranked. This is particularly so in the present case where Mesa, as an applicant in the FIT Program, had the burden of providing the relevant information to the OPA to enable it to evaluate the applications correctly.

520. Second, the Claimant presented Mr. Gary Timm as an independent expert "to [confirm] that the evaluation of Mesa's launch period investments had been improperly scored by the Ontario Power Authority."[251] However, in his expert report, Mr. Timm did not conclude that the Claimant's applications had been improperly ranked. Further, at the hearing, Mr. Timm fairly admitted that he had no comments with respect to the OPA's evaluation of the Major Equipment Control Point,[252] and that he had not concluded that the Claimant should have been awarded the Prior Experience Point[253] or the Financial Capacity Point.[254] The Tribunal finds it significant that the Claimant's own expert has not supported the Claimant's position.

521. Third, the Respondent offered the testimony of Mr. Richard Duffy, the then Manager of Generation Procurement at the OPA and the person responsible for the Launch Period ranking process at the time. Mr. Duffy submitted two witness statements in the arbitration, both of which explained in some detail why the Claimant's applications did not merit any criteria points. Despite the Respondent's insistence, the Claimant chose not to examine Mr. Duffy at the hearing. Further, despite having the opportunity to do so in its submissions, at the hearing, and in its post-hearing brief, the Claimant did not expressly rebut Mr. Duffy's evidence on the shortcomings of the Claimant's applications. His testimony thus remains uncontroverted and the Tribunal sees no reason (nor has any reason been made out) not to rely on it.

522. To be awarded the Major Equipment Control Point, the Claimant would have to show that it had control over a major equipment component.[255] To meet this requirement, the

---

[251] Reply §30.
[252] Tr. (29 October 2014) 114:16-23.
[253] Tr. (29 October 2014) 116:15-117:8.
[254] Tr. (29 October 2014) 115:9-116:14.
[255] Exh. R-003, FIT Rules Version 1.2, Section 13.4(a)(ii).

Claimant submitted a letter from General Electric ("**GE**") that stated that both projects had executed a fixed price contract with GE for the supply wind turbine generators.[256] According to Mr. Duffy's evidence, this was insufficient under the FIT Rules:

> "[T]he Claimant did not specify that the turbines complied or would comply with the domestic content rules of the FIT Program. [...] [E]ach application had to contain within the application materials submitted, all the supporting documentation and required information to support the Claimant's claims. GE makes turbines that are domestic content compliant and turbines that are not. There were no grounds for us to simply assume that the turbines that the Claimant had purchased from GE would meet the requirements of the FIT Program - especially since in other cases and for other proponents, GE had been very specific in committing to meet these requirements in a way that they had not done for the Claimant."[257]

523. The Claimant's applications also contained a statement that its equipment would comply with the FIT Rules. This statement was equally inadequate, as Mr. Duffy convincingly explained:

> "For the Claimant to assert that merely acknowledging that it would comply with the FIT Rules should have been sufficient to obtain this point is, in my view, absurd. This would mean that every applicant that had submitted an application under the FIT Program would have complied with the requirements for this criterion point and if that was sufficient to be awarded this criteria point, there would have been no reason in having the point."[258]

524. At the hearing, Mr. Robertson admitted that the Claimant's application for this criteria point was incomplete:

> "Q. And [the FIT Rules] goes on to indicate that: 'To qualify for the criteria point, it must be demonstrated that the major equipment component will have undergone one of the designated activities set out in the applicable domestic content grid in Exhibit D to the FIT contract.' [As read] Correct?
>
> A. Okay, I read that, yes.
>
> Q. The letter does not indicate that the turbines will undergo the activities specified in Exhibit D of the FIT contract; correct?
>
> A. It does not. This was the letter that GE provided to us, based on their reading of the rules as well.

---

[256] Exh. C-0129, Arran Wind Project FIT Application; Exh. C-0364, Twenty Two Degree Wind Project FIT Application.

[257] Rejoinder Witness Statement of Richard Duffy dated 2 July 2014 ("**Duffy WS II**") §7.

[258] Duffy WS II §6.

> Q. And Mesa did not supply a copy of the contract they had with GE; correct?
>
> A. We did not, no."[259]

525. To be awarded the Prior Experience Point, the Claimant had to show that it "has, or any three full-time employees of [the Claimant] each have, successful experience with planning and developing one or more Similar Facilities."[260] A "Similar Facility" was defined as "an electricity generation facility, other than the Project, that is located anywhere in the world".[261] To qualify as a Similar Facility, a facility needed to meet certain specific criteria.

526. In its applications, the Claimant made general statements about its experience in energy projects. It did not identify any facility which could be regarded as a "Similar Facility". Neither did the Claimant's applications name three full-time employees who had "successful experience with planning and developing one or more Similar Facilities" as required by the FIT Rules.[262]

527. To be awarded the Financial Capacity Point, the Claimant was required to provide audited financial statements and to show that a "Designated Equity Provider" (a person or group of persons holding an interest in the Applicant) had a "Tangible Net Worth" of "$500 or more per kW of proposed Contract Capacity at the end of the most recent fiscal year."[263] The FIT Rules contained detailed definitions of who could be considered a "Designated Equity Provider" and how "Tangible Net Worth" was to be calculated.[264]

528. In its applications, the Claimant did not provide the required audited financial statements.[265] Neither did it describe the calculations used to determine the Tangible

---

[259] Tr. (27 October 2014) 84:16-87:3.

[260] Exh. R-003, FIT Program Rules, v. 1.2, s. 13.4(a)(iii).

[261] Exh. R-003, FIT Program Rules, v. 1.2, s. 13.1(l) ("Similar Facility" is defined as "an electricity generation facility, other than the Project, that is located anywhere in the world, which (i) uses the same Renewable fuel as the Project, and (ii) has a Nameplate Capacity of at least 25% of the proposed Contract Capacity of the Project.").

[262] Duffy WS II §§14-15. See also Tr. (27 October 2014) 12:11-14:3, 37:20-69:23, where Mr. Robertson testified that the Claimant had not fully complied with the FIT Rules in respect of this criteria point, and Reply §107, where the Claimant submits that Mr. Edey and Mr. Ward satisfied the "Similar Facility" requirements, but does not make a similar representation for Mr. Case.

[263] Exh. R-003, FIT Program Rules, v. 1.2, s. 13.4(a)(iv).

[264] Exh. R-003, FIT Program Rules, v. 1.2, s. 13.1(e) and (m).

[265] See the testimony of Mr. Robertson, Tr. (27 October 2014) 69:24-84:15 ("Q. So the FIT Rules required the audited financial statements for 2008, but Mesa was unable to provide those; correct? A.

Net Worth. As Mr. Duffy explained, this failure did not allow the OPA to assess the applicant's Tangible Net Worth:

> "[The Claimant] equated its financial net worth with the alleged value of its turbine agreement with GE. However, there was no information on the aggregate book value of all of Mesa Power Group's assets or liabilities, nor any information on amounts with respect to the components listed in sub-section (c) of the definition of Tangible Net Worth. Without this information, we could not consider that an appropriate summary of the Tangible Net Worth calculation had been provided."[266]

529. The Claimant contends that the Tangible Net Worth could be "derived from the information listed on page 52 of GE's 2008 audited financial statements".[267] In response, Mr. Duffy acknowledges that this is correct, but explains that it was not feasible in practice, which is the reason why the FIT Rules required summaries of the calculations:

> "Of course it is true that a company's 'Tangible Net Worth', as defined in the FIT Rules, can be derived from its financial statements – that would be true of every application that we received in the FIT Program. However, the OPA's role was not to derive anything from the financial statements - if we had to do so for every application, we simply would have been unable to process them all. This is why the onus was on the applicants and that is why the FIT Rules clearly required applicants to attach a summary outlining and describing the calculation used to determine the Tangible Net Worth of Designated Equity."[268]

530. The Respondent has thus furnished reasonable explanations as to why the Claimant's applications were not awarded the three criteria points. In these circumstances, the Tribunal rejects the Claimant's complaint that its TTD and Arran projects were evaluated and ranked in an unfair and arbitrary manner.[269]

(ii) The OPA's decision not to run the ECT

531. The Tribunal has described below (§§616 et. seq.) the circumstances in which and the reasons why the ECT was not carried out in August 2010. The Tribunal refers to that discussion. For the reasons set out there, the Tribunal dismisses the Claimant's

---

The time period between when the rules were released and when we had to submit applications did not provide sufficient time for us to get audited financials.").

[266] Duffy WS II §20.

[267] Reply §110.

[268] Duffy WS II §21.

[269] The Tribunal arrives at this conclusion without referring to the audit conducted by LEI, and therefore does not consider the Claimant's objections to the same.

submission that the OPA's decision not to run the ECT in August 2010 breached Article 1105(1) of the NAFTA.

(iii) The allegedly better treatment offered by the OPA to other FIT applicants and the OPA's meetings with other FIT applicants which led to benefits not available to the Claimants being granted to these applicants

532. The Claimant alleges that the OPA treated other applicants better than itself, and met with these other applicants and granted them benefits which were not available to the Claimant.[270] The Tribunal has addressed the Claimant's objections that particular FIT applicants received better treatment below (§§671 et. seq.).[271] The Tribunal refers to that discussion and for the reasons mentioned there rejects the Claimant's submission.

(iv) The release of the FIT Program rankings on 21 December 2010

533. On 21 December 2010, the OPA published the priority rankings for applications that had not received a FIT Contract in the first round of FIT Contract offers. The Claimant alleges that these rankings were "capricious and arbitrary", but has given no reason to support this allegation.[272] As a result, the Tribunal considers that this complaint is insufficiently pled and without any established foundation. Accordingly it dismisses it.

(v) The OPA's alleged misadministration of the FIT Program

534. The Claimant submits that the OPA's refusal to disclose the scores for the Claimant's TTD and Arran wind projects, as well as the reasons for those scores, constitutes an "arbitrary abuse of authority" and violates "Mesa's right to a fair, good faith and transparent process as protected by Article 1105".[273] It further alleges that the failure of the OPA (and the Ministry of Energy) to meet with the Claimant and explain the ranking also violates Article 1105.[274]

---

[270] Reply §§412(d), 798(d), 878(b)(iv), 878(d)(iv).
[271] Although that section refers to acts of the Ministry, the Tribunal considers that its conclusions equally apply here.
[272] Reply §833(a).
[273] Mem. §§772-782.
[274] Mem. §§783-792.

535. The Tribunal has found above that the OPA's ranking of the Claimant's TTD and Arran projects complied with the FIT Rules. It is thus irrelevant whether the OPA disclosed the details of the rankings to the Claimant, especially in circumstances where the Claimant does not allege to have suffered a loss as a result of the non-disclosure. In any event, the Tribunal notes that it is the OPA's usual practice not to disclose the results of a procurement process.[275] Moreover, the Claimant has not established that the OPA gave access to the information at stake to other applicants. For all these reasons, the Claimant's arguments cannot be accepted.

536. The Claimant also complains that other projects were given higher rankings than its own, although they did not have better qualifications.[276] This argument too can be dismissed for the reasons just mentioned.

   (vi) The OPA's decision on the information to be included in the TAT tables and

   (vii) The OPA's decision to offer NextEra a FIT Contract with connection points on the 500 kV Bruce to Longwood Line

537. The Claimant submits that the OPA's decision to include certain information in the TAT tables concerning connection point capability (specifically the L7S connection point) violated Article 1105.[277] It also contends that the OPA granted special privileges to NextEra by allowing it to connect to the 500 kV Bruce to Longwood Line.[278]

538. The Tribunal recalls that the Claimant bears the burden of establishing a violation of Article 1105(1) of the NAFTA. It further recalls that these arguments were made in the Claimant's Reply and were fully addressed in the Respondent's Rejoinder. Thereafter, the Claimant did not refute the substance of Canada's arguments, be it at the hearing, or in its post-hearing brief. The Respondent's arguments thus stand unrebutted.

539. In respect of the TAT Tables, the Respondent submits that the relevant information was available to all FIT applicants, including the Claimant. In addition, the Claimant could have approached the IESO for more information, if it wished.[279] With regard to the OPA's

---

[275] Witness Statement of Shawn Cronkwright dated 28 February 2014 ("**Cronkwright WS I**") §26.
[276] Mem. §802.
[277] Reply §§765-776.
[278] Reply §§661-674.
[279] Rejoinder Witness Statement of Bob Chow dated 2 July 2014 ("**Chow WS II**") §19.

decision to offer NextEra a FIT Contract with connection points on the 500 kV Bruce to Longwood Line, the Respondent points out that the Claimant's own documents acknowledge that it was not prohibited from connecting to the 500 kV Line.[280] As the Claimant has not submitted any cogent evidence to the contrary, the Tribunal cannot but dismiss the Claimant's arguments on these matters. In any event, the Tribunal notes that the Claimant has not alleged how it incurred any loss on account of these alleged breaches of Article 1105(1) of the NAFTA.

(viii) The award of FIT Contracts on 4 July 2011

540. The OPA awarded the third round of FIT Contracts on 4 July 2011. None of the Claimant's projects received a FIT Contract. The 4 July award of FIT Contracts was largely the result of the reservation of capacity for the Korean Consortium and of the Bruce to Milton line allocation process. For the reasons mentioned in sub-section (b) and (c) below, neither of these events has been held to constitute a breach of Article 1105(1). It follows that the same outcome must prevail in connection with the award of FIT Contracts on 4 July 2011, which was effectively the result of these events. The Claimant's complaint must thus be dismissed.

541. In conclusion, while Mesa has challenged many actions, these acts are essentially steps in the implementation of Ontario policy and the Tribunal finds the policy unobjectionable. And where the challenged acts involve an allegation of collusion or unfair preference, there is simply insufficient evidence to establish the same.[281]

### b.  The GEIA

542. The Claimant contends that through the GEIA, Ontario unjustifiably gave the Korean Consortium preferential treatment at the expense of FIT Applicants including itself, who consequently invested in Ontario "under false pretenses." Specifically, Mesa makes the following submission:

> "The implementation of the GEIA was a breach of NAFTA Article 1105 that directly harmed the Investor. Ontario entered into an agreement that unfairly diminished the prospects for investors that were already participating in the renewable energy program, by blocking off capacity for

---

[280] Rej. §211 relying on Exh. R-181.
[281] These findings equally apply to the Claimant's allegations concerning breaches of Canadian administrative law (Reply §680).

the Korean Consortium that had originally been intended for FIT applicants was unfair, and caused harm to Mesa [sic]. Further, Ontario failed to act with fairness and candor by providing inaccurate and incomplete information about the GEIA to the public when it was signed. Ontario also failed to disclose key aspects of the GEIA which would be necessary for any of its competitors to fairly understand their position in the Ontario renewable energy market in comparison with the Korean Consortium."[282]

543. Accordingly, the Claimant contends that by entering into the GEIA and providing better treatment to the Korean Consortium than to FIT Applicants (i. below);[283] and failing to disclose the GEIA terms (ii. below),[284] Ontario violated Article 1105. It further contends that the delay in running the ECT due to the Consortium[285] also breached the GEIA (iii. below). The Tribunal will examine each of these arguments in turn.

(i) Entering into the GEIA and providing better treatment to the Korean Consortium

(a) The Claimant's Position

544. The Claimant argues that Ontario entered into the GEIA in 2010 although it knew that the FIT Program would be a success and that it would be sufficient to meet Ontario's renewable energy goals. By entering into the GEIA in these circumstances when it was not bound to do so under the terms of the MOU with the Korean Consortium,[286] the Respondent has breached Article 1105.

545. It is the Claimant's further submission that the Respondent breached Article 1105, because it provided "more favorable transmission treatment"[287] to the investments under the GEIA than to those under the FIT Program.[288] It notes that the members of the Korean Consortium are in the same circumstances as the FIT Applicants: a power purchase agreement under the GEIA is like a power purchase agreement under the FIT Program. Power purchase agreements under the GEIA had to meet the very same conditions imposed under the FIT Program concerning minimum domestic content, land

---

[282] C-PHB §473.

[283] Reply §655; Mem. §776; and C-Mem. §§404-408.

[284] Reply §§655-660.

[285] Mem. §§763-775.

[286] C-PHB §298. See also Claimant's Submission on *Bilcon* §99(d) ("creating one competitive renewable energy program and then giving one proponent a significantly better deal to access contracts in that program is fundamentally unfair.").

[287] Mem. §17(d).

[288] Reply §40.

access, documentation, quarterly status reports, and waiver forms.[289] In spite of this likeness, the Government conferred additional benefits on the Korean Consortium under the GEIA to the detriment of applicants under the FIT Program including the Claimant.

546.   The Claimant refutes the Respondent's contention that benefits were conferred on the Korean Consortium in exchange for extra investments in Ontario.[290] For instance, so says Mesa, to be entitled to the Economic Development Adder ("**EDA**"), the Korean Consortium only had to designate a manufacturing partner, without having to actually engage in manufacturing.[291]

547.   On a similar basis, the Claimant disputes the Respondent's submission that the Korean Consortium was needed as an "anchor tenant". For Mesa, "[t]he fact that the [GEIA] was kept a secret until the stakeholders already were preparing their FIT Applications contradicts the suggestion that the Korean consortium was needed as an 'anchor tenant'".[292]

548.   Finally, the Claimant stresses that "[f]rom the very beginning, the Korean Consortium's 'sweetheart deal' was attacked by the press, the Opposition Party, and even the Government's own party. The Cabinet did not want to (and did not) approve this deal, and the entire operation was later criticized by the Auditor General."[293]

   (b) The Respondent's Position

549.   The Respondent submits that "[t]here is nothing manifestly arbitrary, grossly unjust, egregious or shocking about a government entering into an investment agreement in which it accords certain advantages to a particular investor in exchange for certain investment commitments by that investor."[294]

---

[289] Reply §41.
[290] Reply §313.
[291] Reply §313.
[292] C-PHB §70.
[293] C-PHB §6.
[294] C-Mem. §406.

550. It notes that, at the time of the conclusion of the GEIA in January 2010, the OPA had received several applications, but that these were not "good applications", and that the FIT Program was at the risk of becoming a massive failure.[295]

551. Replying to the Claimant's argument that better treatment was provided to the Korean Consortium over FIT Applicants, Canada argues that undertakings with respect to large-scale manufacturing and job creation were imposed on the Korean Consortium through the GEIA, which justified such treatment. The Korean Consortium had agreed to investments valued at CAD$ 7 billion, which distinguished it from FIT Applicants such as the Claimant.

    (c) Analysis

552. The Claimant's submission under this head focuses on the decision by Ontario to enter into the GEIA (which is said to have afforded the Korean Consortium preferential treatment). According to the Claimant, this decision, in and of itself, breached Article 1105.

553. In reviewing this alleged breach, the Tribunal must bear in mind the deference which NAFTA Chapter 11 tribunals owe a state when it comes to assessing how to regulate and manage its affairs. This deference notably applies to the decision to enter into investment agreements.[296] As noted by the *S.D. Myers* tribunal, "[w]hen interpreting and applying the 'minimum standard', a Chapter Eleven tribunal does not have an open-ended mandate to second-guess government decision-making."[297] The tribunal in *Bilcon*, a case which the Claimant has cited with approval, also held that "[t]he imprudent exercise of discretion or even outright mistakes do not, as a rule, lead to a breach of the international minimum standard."[298]

---

[295] Tr. (31 October 2014) 228:25-229:5.

[296] The Claimant agrees with this position. See C-PHB §201 ("a tribunal's role is not to weigh the wisdom of the decision to enter an agreement, but to determine whether a government provided preferential treatment when it did so.").

[297] *SD Myers*, §261.

[298] *Bilcon* §§437, 440. See also *SD Myers* §263; *International Thunderbird* §127 (a State "has a wide discretion with respect to how it carries out such policies by regulation and administrative conduct.")

554. In August 2008, Samsung approached the Government of Ontario for a special deal on renewable energy.[299] The parties subsequently entered into negotiations, which culminated in the signing of the GEIA in January 2010.

555. Under the terms of the GEIA, the Korean Consortium was to develop 2,500 MW of renewable energy in Ontario and, importantly, to attract into the Province facilities for manufacturing wind and solar generation equipment and components.[300] In exchange, the Korean Consortium was guaranteed priority access to 2,500 MW of transmission capacity in Ontario.[301] The capacity was to be allocated in five phases over five years, each of approximately 500 MW.[302] In consideration for its commitments, the Consortium was entitled to a price for its electricity that was higher than that of the FIT producers. This price would be an aggregate of (i) the price payable to renewable energy producers under the FIT Rules plus (ii) an additional EDA calculated in accordance with the terms of the GEIA.

556. It is critical to note, at the outset, that the arrangement encapsulated in the GEIA was not at all comparable with or equivalent to the FIT Program. Contrary to the Claimant's characterization, these were not two competing, interchangeable tracks. Unlike the FIT Program, the GEIA was designed to secure a major "anchor" operator in Ontario, in order to give momentum to its province-wide green energy initiative. But more importantly than this, the GEIA was concerned with local economic development, at a time of economic difficulty. The GEIA entailed a CAD$ 7 billion investment, and the creation of substantial manufacturing facilities over multiple phases; thousands of jobs in the renewable energy sector; and further indirect employment in finance and other service industries, as well as related manufacturing industries. As such, the generation of electricity from renewable sources was only one element of this initiative.

557. Put another way, even if sufficient megawattage was achievable from the FIT participants alone, the other, broader objectives of the GEIA would remain and formed no part of the FIT Program.

---

[299] Tr. (27 October 2014) 251:17-23; Rejoinder Witness Statement of Rick Jennings dated 2 July 2014 ("**Jennings WS II**") §4.
[300] Jennings WS II §4.
[301] Exh. C-0322, GEIA, ss. 3.1 and 3.2.
[302] *Id.*

558. It follows – again contrary to the Claimant's characterization – that the position of the Korean Consortium cannot be compared with the position of FIT Applicants. It was agreeing to a different set of undertakings, on a different scale. And hence, necessarily, the Korean Consortium secured an entitlement to different treatment. It follows that there is no basis to deem this difference in treatment discrimination, or the product of arbitrariness.

559. The fact that other entities (such as Pattern Energy Group LP) could seek to work within the Korean Consortium project, instead of proceeding alone with individual FIT applications, is of no relevance. Any advantage they thereby achieved does not change the fundamental point that the GEIA (of which such entities would form part) was a different project, which would necessarily proceed on different terms.

560. Further, there is no basis to conclude that the GEIA was designed to undermine the FIT Program, and nor would there have been any reason for so doing.

561. The reason for Ontario's entry into the GEIA can be ascertained from the "Backgrounder"[303] which was issued by the Government at the time, and which reads in pertinent part as follows:

> "The agreement stems from opportunities created for developers and investors through Ontario's Green Energy Act, and is expected to be among the first of many major investments to result from the leadership position Ontario has taken in green energy.
>
> [The Korean Consortium] will be an anchor tenant in growing a new, vibrant green economy in Ontario. [...]
>
> The agreement will lead to more than 16,000 green energy jobs over six years and bring $7 billion of renewable generation investment to Ontario. [...]
>
> In addition, the increased renewable energy development and manufacturing activities will support indirect job creation in areas such as finance, consulting and other manufacturing, service and development industries. [...]
>
> These manufacturing facilities will produce wind turbine towers, wind blades, solar inverters and solar assembly in Ontario, creating more than 1,440 manufacturing and related jobs in the renewable energy industry. [...]
>
> The local availability of these manufactured components will also help other renewable energy developers meet the Feed-In Tariff (FIT) domestic content

---

[303] Exh. R-076.

requirements. An additional 700 manufacturing jobs are also anticipated to supply components not manufactured by the Consortium. [...]

The Consortium's renewable energy projects will deliver an estimated 110 million megawatt-hours of emissions-free electricity over the 25-year lifetime of the project. That's enough power to supply the electricity needs of all Ontario homes for nearly three years. Over the lifetime of these contracts, the wind and solar projects will displace 40 Megatonnes of carbon dioxide (CO2, the leading greenhouse gas) compared to what would be emitted by equivalent gas-fired generation. [...]

The 2,500 MW of wind and solar power capacity to be built by the Consortium will triple Ontario's renewable wind and solar energy generation. [...]

The renewable energy projects committed to under this agreement will take advantage of the more than 20 transmission projects announced last fall. The transmission projects will unlock significant opportunities for green energy projects across the province. [...]

All projects under the agreement would be subject to the Consortium entering into required agreements as well as obtaining required licences and approvals. [...]

To ensure value for Ontarians, the consortium and the government have agreed to market rate lease of government lands."

562. The "Backgrounder" effectively followed up on an earlier announcement which Ontario had issued on 15 December 2009 and in which it justified its deal with the Korean Consortium as follows:

"What does this mean for Samsung? [...]

We are in discussions with Samsung which hopes to cultivate a green manufacturing sector in Ontario in light of our recently launched FIT program, which has generated significant interest.

Negotiations are progressing and we're taking the time to ensure we get it right.

The Samsung proposal is about more than just renewable generation, it would help kick-start Ontario's green economy thr[o]u[gh] $7 billion in direct investment, create approximately 16,000 direct and indirect positions and cultivate manufacturing plants as well renewable generation.

[...]

How can the government justify the Samsung when there are so many others willing to develop renewable energy without extra monetary incentives?

Samsung has proposed something no one else has; the construction of manufacturing plants to produce wind turbine and solar components in

Ontario. These manufacturing plants' orders will provide a foundation for the green manufacturing sector in Ontario."[304]

563. Susan Lo, the Assistant Deputy Minister responsible for the implementation of the GEIA at the Ministry of Energy, testified that Ontario entered into the GEIA because the Government was uncertain how much interest the FIT Program would generate and because the Korean Consortium would function as an "anchor tenant":

> "[Ontario] was uncertain of how much interest the FIT Program would generate because of the economic conditions at the time. Entering into a separate framework agreement with the Korean Consortium was seen by Ontario as a prudent means of establishing a foundation for renewable energy generation in the province. The Korean Consortium would provide an 'anchor tenant' for Ontario's renewable energy sector. Thus, even if the FIT Program failed to generate considerable interest, there would still be a significant increase in the amount of renewable electricity being generated for the province."[305]

564. Ms. Lo further testified that the GEIA was expected to develop the manufacturing industry necessary to support FIT applicants:

> "[T]he GEIA ensured the establishment of a green energy manufacturing sector in Ontario [...] the FIT Program contained requirements that developers source goods and services from Ontario in order to stimulate economic development and job growth. However, at the time, there was almost no local manufacturing available to meet these requirements. The manufacturing facilities required by the GEIA would assist the other renewable energy developers in the FIT Program to meet their domestic content requirements."[306]

565. The rationale for the conclusion of the GEIA was thus fourfold. It included (i) a commitment of an anchor tenant (in circumstances where there were concerns as to the ability of the Ontario Government to achieve its renewable energy goals); (ii) the generation in substantial quantities of green electricity; (iii) the attraction of manufacturing plants to Ontario (and in turn the facilitation of domestic content requirements in the FIT Program); and (iv) the creation of jobs (at a time of economic difficulty). These objectives were met – or at least were believed to have been met – by the terms of the GEIA. As will be seen below, the Korean Consortium undertook substantial generation and manufacturing obligations, and its entitlement to transmission

---

[304] Exh. C-0669.
[305] Sue Lo WS I §27.
[306] Sue Lo WS I §28.

capacity was contingent on meeting its commitments to establish and operate manufacturing plants in accordance with the agreed schedule.[307]

566. The Government's decision to enter into the GEIA, in spite of the effect that it would have on the FIT Program applicants, was well-explained by the Government:

> "[The Korean Consortium] has proposed the construction of manufacturing plants to produce both wind turbine and solar components in Ontario. No one else has offered something on this scale. Orders for these products will provide a foundation for the green manufacturing sector in Ontario. This kind of economic development is a key objective of both FIT and the Green Energy Act." [308]

In these circumstances, the Tribunal cannot find that the conclusion of the GEIA was "arbitrary", "grossly unfair" or "unreasonable".

567. The Claimant objects that "[t]he [GEIA] did not require any special investment on the part of the Korean Consortium",[309] calling the consortium's commitments under the GEIA "fictitious". It argues that the GEIA's manufacturing commitments were nothing more than the domestic content requirements of the FIT Program. It further asserts that the "real" obligation of the Korean Consortium under the GEIA was not to create jobs, but merely to identify the jobs which its suppliers would have created, a job growth equally accomplished through the FIT Program's domestic content requirement. Mesa further observes that Ontario did not distinguish between the FIT Program and the Korean Consortium's project when ascertaining the number of jobs created.[310]

568. The Tribunal cannot accept Mesa's arguments. It notes in particular that the Korean Consortium entered into manufacturing partnership agreements with four partners to establish manufacturing plants in Ontario: SMA (solar inverters); Canadian Solar (solar panels); Siemens (wind turbine blades); and CS Wind (turbine towers).[311] In December 2010, i.e. 11 months after the GEIA, Siemens issued a press release stating that it would establish a manufacturing plant in Ontario to help Samsung, a member of the Korean Consortium, to meet its "contractual" commitments:

---

[307] Exh. C-0322, GEIA, ss. 7.4 and 8.1.

[308] Exh. C-0110, Feed-In Tariff Program, Key Messages and Questions & Answers, 6 April 2010.

[309] Reply §37.

[310] C-PHB §187(g).

[311] Sue Lo WS II §8. See also Expert Report of Seabron Adamson dated 27 April 2014 §40 (noting that Samsung has announced four manufacturing partners in Ontario under the GEIA).

"Siemens selects Tillsonburg, Ontario, as new home for Canadian wind turbine blade manufacturing facility

Siemens announced today that it has selected Tillsonburg, Ontario, for its Canadian wind turbine blade manufacturing site. The blade factory will be established in an existing 253,000-square-foot facility, located on 40 acres, that was originally opened in 1975. It's the company's first manufacturing plant for wind turbine components in Canada and represents an investment in excess of $20 million CAD. The manufacturing, service operations and associated back-office activities are expected to create up to 300 jobs. An additional 600 related jobs for the construction and commissioning is expected to be created during the build-out of the wind farms under agreement with Samsung and Pattern.

This new manufacturing facility in Tillsonburg is intended to allow Siemens to help Samsung and Pattern Energy meet their contractual requirements to supply 600 MW of renewable energy to the province of Ontario. The factory is expected to produce all of the wind turbine blades for Siemens projects in the province."[312]

569. Furthermore, the GEIA imposed substantial generation and manufacturing obligations on the Korean Consortium. Pursuant to Articles 8.1, 8.4 and 9.3 of the GEIA, the Government agreed to an approach for calculating the EDA that was based on the Korean Consortium's ability to bring manufacturing plants to Ontario. More importantly, the Korean Consortium had to provide evidence that the manufacturing plants of its partners were established and operational in accordance with the Operational Time Frame set out in Article 8.1 of the GEIA.[313] While the Korean Consortium was guaranteed priority access to 2,500 MW of transmission capacity in Ontario in five phases, such guarantee was conditional upon the Consortium complying with commitments to establish and operate four manufacturing plants in accordance with the schedule set out in the GEIA.[314] Thus, while benefits were given to the Korean Consortium, they were contingent on the Consortium meeting specific conditions (conditions which were different in both nature and scale to those imposed on FIT participants).

570. The GEIA was amended in 2011. Under the terms of the Amended GEIA, to be eligible for the full EDA, the Korean Consortium was required to demonstrate a minimum average of 765 jobs at the plants of its manufacturing partners over a period of at least three years.[315] Additionally, the EDA was subject to reduction in the event that a

---

[312] Exh. C-0594.
[313] Exh. C-0322, GEIA, ss. 8.6 and 9.3.1.
[314] *Id.* ss. 3.1, 3.2, 7.4 and 8.1.
[315] Exh. C-0282, Amended Green Energy Investment Agreement (29 July 2011) ("**Amended GEIA**"), s. 15.

manufacturing plant ceased commercial operation prior to 31 December 2016.[316] Both the GEIA and the amended GEIA thus linked the advantages offered to the Korean Consortium under the GEIA to the creation of jobs and the continued commercial operation of the Consortium's manufacturing plants.

571. In her testimony at the hearing, Ms. Lo confirmed that, as opposed to the FIT Program, the GEIA would result in job growth in the manufacturing sector:

> "Q. And so for purposes of the GEIA and this renewable energy project, at least you were getting the -- the statement, you said you were getting these jobs, you were getting that through the FIT Program, as well; correct?
> A. Well, definitely through the FIT Program we would get jobs and many of them were in construction. They weren't necessarily in the manufacturing sector, and the government was very concerned with building a green tech sector."[317]

572. In the circumstances, the Tribunal does not agree that the generation and manufacturing obligations imposed on the Korean Consortium were "fictitious." In fact, it appears that the Korean Consortium had some success in attracting green energy manufacturing jobs to Ontario.[318]

573. Further, and in any event, whether or not the GEIA actually succeeded in its objectives is not a relevant consideration, as long as the conclusion of the GEIA was pursuant to a *bona fide* policy decision by the Ontario government, at the time.

574. In these circumstances, the Tribunal does not regard the conclusion of the GEIA as inconsistent with Article 1105. The Government provided benefits to the Korean Consortium under the GEIA over and above those provided under the FIT Program, but it did so in the context of a program that was not comparable to the FIT Program. On the contrary, the benefits were in return for specific, time-bound and substantial commitments undertaken by the Korean Consortium, different in scale and nature to those imposed on FIT participants, and designed to achieve policy goals beyond the scope of the FIT Program.

575. It is true that, at the time when the GEIA was signed, the FIT Program was already in place. It is also true that whilst in some quarters concerns were expressed as to the likely

---

[316] Exh. C-0282, Amended GEIA, s. 13.
[317] Tr. (28 October 2014) 49:24-50:9.
[318] Exh. R-192.

success of the FIT Program, others were confident on this.[319] Indeed, in May 2009, the OPA had recognized that there was a "[h]igh level of developer interest and expectation" and "[h]igh level of investor / financial sector interest" in the FIT Program.[320] Equally, however, the Respondent contends that the FIT Applications received at the time of the conclusion of the GEIA in January 2010 were not "good applications" and that (viewed at that time) there was a risk that the FIT Program might be a failure. The Tribunal notes in this regard that in the FIT/MicroFIT announcement of 15 December 2009, the Ministry of Energy acknowledged that it was "seeing a tremendous response to the FIT and microFIT programs".[321] On the other hand, as Richard Duffy, Manager of Generation Procurement at the OPA, testified, additional information had been required from the FIT Applicants (albeit he did not consider that the Program would be a failure).

576. It must also be noted that Jim MacDougall, the Manager of the OPA, admitted that when he learned about the GEIA, he was "not terribly pleased by the competing development opportunities that were running in parallel".[322] He added that in the final months leading up to the GEIA he had realized that the deal with the Korean Consortium would negatively impact FIT Applicants.[323]

577. Further, according to the evidence of Canada's witnesses, Ontario had no obligation under the MOU of December 2008 to enter into the GEIA.[324] It could have chosen not to sign the formal agreement in January 2010. And, on one view, this might have seemed to make sense considering that it was known in 2009 that the GEIA would impact the limited available transmission capacity.[325]

---

[319] See Testimony of Rick Jennings, Tr. (27 October 2014) 270:1-20; Testimony of Sue Lo, Tr. (28 October 2014) 64:4-16 (FIT program was very successful with applications for 10,000 MW).

[320] Exh. R-060, OPA Presentation, "Feed-in Tariff Program Design Update", p.4. [CONFIDENTIAL]

[321] Exh. C-669, FIT/Micro FIT Announcement, p.1.

[322] Tr. (28 October 2014) 275:10-14.

[323] Tr. (28 October 2014) 276:16-20 ("[C]ertainly the existence of the Korean Consortium commitment through the framework agreement created greater pressure on the FIT Program and less capacity availability through the FIT program to offer contracts.").

[324] Tr. (28 October 2014) 59:2-6; Tr. (27 October 2014)199:17-25.

[325] Tr. (28 October 2014) 275:21-276:9 ("So I knew that there would be more demand for FIT contracts than there would be supply of contract capacity. So my professional reaction was this just creates less supply of FIT contracts availability, because a portion of the available grid capacity will necessarily need to be allocated to the Korean Consortium."); Tr. (28 October 2014) 276:10-20 ("But certainly the existence of the Korean Consortium commitment through the framework agreement created greater pressure on the FIT program and less capacity available through the FIT program to offer contracts.").

578. Equally, the actual need for an "anchor tenant" could be questioned. By the time the GEIA was signed in January 2010 (as opposed to its precursor MOU signed in December 2008), it was known that the applications under the FIT Program far exceeded the available capacity. Therefore, it could be argued that no anchor tenant was needed. Moreover, Samsung arguably had no experience with developing wind or solar power and did not then operate renewable energy projects elsewhere. The Claimant also contends that there were procedural irregularities in the GEIA (that it was not approved by the Cabinet,[326] and that Ontario's opposition leader's request to have the deal be examined by the Auditor General before proceeding was ignored[327]).

579. Be that as it may, these are all policy considerations and questions that were for the government of Ontario alone. It is not the Tribunal's role to act as an appellate body in this regard, or second guess or weigh the wisdom of Ontario's decision to enter into the GEIA at the time – even if sufficient renewable energy would possibly have been available through the FIT Program.[328] Rather, it is for the Tribunal to examine whether, as the Claimant alleges, the beneficial treatment was granted to the Korean Consortium arbitrarily, or in any other way that contravened Article 1105. In particular, the Tribunal must determine whether Canada's conclusion of the GEIA lacked a justification, and whether there was a reasonable relationship between the justification supplied and the terms of the GEIA.[329] For the reasons discussed above, the Tribunal comes to the conclusion that such justification and reasonable relationship did exist. It is a different question, on which the Tribunal does not express a view, whether entering into the GEIA was a wise move under the circumstances. As a result, the Tribunal rejects the claim that by entering into the GEIA, Canada breached Article 1105 of the NAFTA.

580. In the same context, the Claimant protests about the detrimental effect which the GEIA produced on FIT Applicants including itself. In particular, it criticizes the reservation of

---

[326] C-PHB §72.

[327] C-PHB §77.

[328] See Exh. RL-065, *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. The Government of Mongolia* (UNCITRAL), Award on Jurisdiction and Liability, 28 April 2011, §316 ("It is not the role of the Tribunal to weigh the wisdom of legislation, but merely to assess whether such legislation breaches the Treaty. Claimants have not succeeded in demonstrating that this was an abusive or irrational decision").

[329] The Claimant agrees, although it adopts a different formulation. See Tr. (26 October 2014) 61:19-62:2 ("And with respect to the protection against arbitrariness, the state breaches its customary international law obligation when it acts arbitrarily for instance, on prejudice or preference rather than on reason or fact. Arbitrariness also occurs when discretionary decisions by governments are based on irrelevant considerations and when relevant considerations are ignored.").

capacity for the Korean Consortium in the Bruce Region.[330] According to the Claimant, the "secret"[331] reservation of capacity for the Korean Consortium was politically motivated[332] and in disregard of the FIT process.[333] Indeed, so it is argued, it effectively undermined the FIT process.[334] Although the OPA had estimated that 1,200 MW of transmission capacity would be available in the Bruce Region because of the Bruce to Milton Line, it turned out that only 750 MW were available to FIT Applicants, as the remainder was set aside for the Korean Consortium.[335]

581. As was mentioned above, in exchange for the commitments of the Korean Consortium, the GEIA granted the Korean Consortium a guarantee of access to priority transmission.[336] The Consortium could reserve this capacity anywhere in Ontario by indicating connection points of its choice.[337] On 30 September 2010, the Consortium indicated provisional connection points in the Bruce Region.[338] As a result, on 17 September 2010, the Minister of Energy directed the OPA to reserve 500 MW of transmission capacity in the Bruce area.[339] The Korean Consortium then formally asked for capacity in the Bruce Region in November of that year. [340]

582. The Claimant first alleges that the reservation of capacity for the Korean Consortium was done in "secret." The record does not substantiate this allegation. As will be seen below (§§596 et. seq.), the Claimant was aware that the Korean Consortium had the right to reserve transmission capacity in Ontario even before its investment in Canada. Although it could not have known then that the Korean Consortium would actually reserve capacity in the Bruce Region, the Claimant should have known that this was a serious possibility. Indeed, the Claimant's expert Seabron Adamson testified that participants in the wind

---

[330] C-PHB §14.

[331] Mem. §767.

[332] Mem. §713.

[333] Mem. §714.

[334] Mem. §763.

[335] Exh. C-0073, Ontario Power Authority, Priority ranking for First Round FIT Contracts, 21 December 2010; Exh. C-0046, Letter from Minister Brad Duguid (Ministry of Energy) to Colin Andersen (OPA), Direction to the OPA, 3 June 2011; Exh. C-0292, Ontario Power Authority, "FIT Contract Offers for the Bruce-Milton Capacity Allocation Process," 4 July 2011.

[336] Exh. C-0322, GEIA, s. 7.3(c).

[337] Exh. C-0119.

[338] Exh. C-0093, Ministry of Energy Presentation, 1 October 2010, at p. 2. Final confirmation of its connection points was provided on 7 January 2011.

[339] Id.

[340] Tr. (31 October 2014) 25:17-26:13.

industry would have been aware that transmission capacity would become available on the Bruce to Milton Line since the time of its proposed development. In the same vein, Bob Chow, Director of Transmission Integration at the OPA, testified that the Bruce Region was a "recipe for success" as the wind regime was the strongest in the province. Further, the fact that the Government was reserving transmission capacity as a priority for the Korean Consortium was officially announced on 21 January 2010, i.e. one and a half years before capacity was allocated in the Bruce Region,[341] and the fact that 500 MW were reserved in the Bruce Region for the Korean Consortium was publicly announced on 17 September 2010, i.e. months before the Bruce to Milton allocation process was developed.[342] Thus, the Tribunal cannot agree that the reservation of capacity for the Korean Consortium was done in "secret."

583. The Claimant next argues that the reservation of capacity for the Korean Consortium was in and of itself incompatible with Article 1105. For reasons it has already mentioned above , the Tribunal cannot accept this argument. While the benefit of priority access to transmission conferred on the Korean Consortium reduced the available capacity in the Bruce Region, this was merely the result of the limited capacity present in Ontario, a fact that was well known to all at the time. To meet its stated goals for renewable energy generation, economic development and job growth, the Government chose to reserve capacity for the Korean Consortium. It did so in the context of a policy initiative that was not comparable to the FIT Program, and in the exercise of its discretion as to how best to achieve its objectives. This was an exercise of discretion which the Tribunal cannot fault under the circumstances, and has no basis to second-guess.

584. An internal document evinces the Government's reasons for the reservation of capacity for the Korean Consortium in spite of the FIT Program, in the following terms:

> "Doesn't the set aside for the Korean consortium undermine the whole intent of the FIT program?
>
> Not at all. The Korean Consortium has proposed something no one else has; the construction of manufacturing plants to produce wind turbine and solar components in Ontario. Orders for these products will provide a foundation for the green manufacturing sector in Ontario. This kind of economic development is a key objective of both FIT and the Green Energy Act."[343]

---

[341] Exh. R-076.
[342] Exh. C-0119.
[343] Exh. C-0110.

585. The Claimant also complains that, in addition to the reservation of transmission capacity, the Korean Consortium was given better governmental assistance; "received better pricing for renewable power sold in PPAs and automatic rights to increase power project size"; was allowed to engage in a "wait-and-see" approach to acquire low ranked FIT projects that were unlikely to get contracts and then convert them into GEIA projects; and received exclusivity as the Ministry agreed that it would not enter into similar transactions with third parties upon terms identical to the GEIA. In the Tribunal's view, assuming that these benefits were effectively granted, they would not rise to the level of a breach of Article 1105. If granted, they may or may not have been the best, or even just a good exercise, of judgment and discretion for purposes of reaching the stated objectives. But even if this were so, the facts in the record do not evidence conduct meeting the stringent requirements of Article 1105.

586. The Claimant further refers to the Korean Consortium's breaches of the GEIA and challenges the Government's choice not to terminate the GEIA as a consequence of those breaches. It claims that this choice resulted in a breach of Article 1105.[344] It is true that the Korean Consortium may not have met the deadlines provided in the 2010 GEIA and that the agreement was amended on two occasions.[345] Under the first amendment, the EDA was reduced in exchange for an extension of the time limits stipulated in the agreement[346] and the time for specifying Phase 2 connection points was eliminated.[347] Under the second amendment, the priority transmission capacity of the Korean Consortium was reduced from 2,500 MW to 1,369 MW.[348] These amendments thus linked the level of the EDA to the creation of jobs and the continued operation of manufacturing plants.

587. While it may be that all the original intentions of the Ministry in entering into the GEIA were not fully met, it remains that the principal contractual obligations of the Korean Consortium were retained. As the Claimant itself recognizes,[349] a government cannot be faulted for being unable to meet each and every one of its stated policy goals, a

---

[344] The Tribunal notes that the Claimant first fully expanded this argument in its post-hearing submission and thus the Respondent had no opportunity to address it.

[345] Exh. C-0282, Amended GEIA; Exh. R-133, Amended and Restated GEIA, s. 3.4 (20 June 2013).

[346] Exh. C-0282, Amended GEIA, s. 15.

[347] Id. at ss. 9, 17, 19-20.

[348] Exh. R-133, s. 3.

[349] C-PHB §250 ("[G]overnments cannot be held to the unreasonably high standard of successfully implementing all policy goals, they must be accountable for the stated policies and the implementation of those policies.").

recognition that is particularly apposite in the context of an Article 1105 assessment. In the circumstances, Mesa's claim that the Government's failure to terminate the GEIA was "grossly unfair" or "inequitable" cannot be sustained.

(ii)  Non-Disclosure of the GEIA Terms

(a)  The Claimant's Position

588.  It is the Claimant's case that the customary international law standard is breached when a party acts without transparency and that "[f]rom the first time Mesa engaged with Ontario's FIT Program in 2009, there was a complete lack of transparency and candor on Ontario's part with respect to its dealings with the Korean Consortium."[350] It points out that the OPA was not informed until the summer of 2009 of the secret deal with the Korean Consortium and the public was only made aware of it on 26 September 2009. The Claimant adds that the public was not told of the MOU of December 2008 nor of the Framework Agreement which was allegedly signed in October 2009 until after the FIT Program was announced.[351]

589.  Mesa also claims that in 2010 the Minister of Economic Development and Trade encouraged it to invest in Canada. However neither the Minister nor her officials advised Mesa that there was another possibility of accessing the Ontario market than the FIT Program. In other words, it was not invited to engage in negotiations with the Ontario Government to invest in renewable energy outside the FIT Program.[352]

590.  To counter the Respondent's invocation of reports published in the Toronto Star, the Claimant contends that these reports "were vague and misleading and did not disclose the main contours of the deal, such as priority transmission access."[353]

591.  To the extent that the GEIA was publicly discussed, the Claimant submits that "the government of Ontario made material misrepresentations at the highest levels as to the content and terms of the GEIA. These representations were fundamentally misleading

---

[350] C-PHB §4.
[351] Reply §74.
[352] Reply §21.
[353] C-PHB §295.

as to the opportunities available to access the renewable energy market in Ontario, as well as to the conditions that access could be obtained."[354]

### (b)   The Respondent's Position

592.   Canada disputes the Claimant's submission that Article 1105 imposes an obligation on the NAFTA Parties to act with complete transparency in all their operations. It states that no authority supports the Claimant's argument that NAFTA Parties must be transparent about their commercial negotiations. Such negotiations, given their nature, must be allowed to be conducted in confidence in order to succeed. [355]

593.   In any event, the Respondent states that the Government publicized its dealings with the Korean Consortium "as much as possible."[356] The Toronto Star article, which was published prior to the Claimant's investment in Canada, discussed the main terms of the forthcoming GEIA, including the manufacturing commitments, the creation of jobs, and the EDA. Further, through its September direction to the OPA requiring the reservation of transmission capacity, the Government publicly disclosed that it was negotiating a province-wide framework agreement for the generation of renewable energy. Therefore, so says Canada, Mesa was fully aware of the fact that the GEIA was being negotiated and of its key terms. As a result, the Claimant's complaints about the secret nature of the deal must be dismissed.

594.   In answer to the Claimant's reliance on statements of the Minister of Economic Development and Trade, the Respondent observes that Mesa merely alleges that the Minister had encouraged it to invest in Ontario. Encouragements of this nature are insufficient to create expectations that could be pertinent for purposes of a breach of Article 1105. Finally, the statements of the Minister are in any event irrelevant, because the Claimant had already made its investment when it spoke with the Minister.

### (c)   Analysis

595.   The Claimant asserts that transparency forms part of the customary international law standard enshrined in Article 1105, which the Respondent disputes. The existence of an

---

[354] Reply §657. See also C-PHB §12(d).
[355] Rej. §154.
[356] Rej. §155.

obligation of transparency under international law and under Article 1105 of the NAFTA in particular is a controversial issue. The Tribunal does not deem it necessary to enter into the merits of this debate in the context of this dispute. For the reasons discussed below, the Tribunal finds that sufficient information about the Ministry's dealings with the Korean Consortium was in the public domain prior to the Claimant's investment in Ontario. Thus, even if an obligation of transparency of the kind suggested by the Claimant existed – an issue on which the Tribunal expresses no opinion – that obligation would be satisfied here.

596. On 24 September 2009, the Ministry of Energy directed the OPA to develop the FIT Program. Two days later, on 26 September, the Toronto Star reported for the first time that Ontario was in negotiations with Samsung for a special deal on renewable energy:[357]

> "Ontario eyes green job bonanza
> [...]
>
> The Ontario government is in advanced negotiations with South Korean industrial and electronics powerhouse Samsung Group about manufacturing wind turbines and other green-energy gear – including solar panels – in the province.
>
> Samsung is considering a multibillion-dollar investment that would stimulate the creation of several hundred direct jobs and, indirectly, potentially thousands more. The province, led by the Ministry of Energy and Infrastructure, has been in talks with Samsung subsidiary Samsung C&T Corp. for the past year, the Star has learned.
>
> Energy Minister George Smitherman confirmed in an interview with the Star that serious discussions are ongoing and proceeding well toward the signing of what he called a 'historic framework agreement.'
>
> 'They're looking to get into the renewable-energy business in a big way, and Ontario seems suited to their ambitions,' said Smitherman.
>
> 'If it comes to fruition, it would see them invest several billions of dollars and have the prospect of creating hundreds and hundreds of jobs in manufacturing at the same time.'
>
> That would be a coup for a province that has suffered a steep decline in manufacturing, particularly in the hard-hit auto sector, and the loss of thousands of jobs.
>
> It also represents an early sign that Ontario's new Green Energy and Economy Act, designed to stimulate the development of renewable-energy projects, is attracting the foreign investment and 'green-collar' jobs promised by Premier Dalton McGuinty.

---

[357] Exh. R-177, Toronto Star, "Ontario eyes green job bonanza".

[…]

Smitherman said Samsung, as a developer, will get the same rate as every other developer taking part in the [FIT] program. But if the company commits to manufacturing its equipment in Ontario, it will get what he called an 'economic adder' on top of the 13.5 cents rate. He wouldn't say how much that benefit might be."

597. On the day on which the news article appeared, the Ministry of Energy and Samsung C&T Corporation issued a joint statement regretting that information about the negotiations had been prematurely released to the public:[358]

"Statement from the Minister of Energy and Infrastructure and Samsung C & T Corporation

Recently information concerning negotiations between Samsung C and T Corporation and the Government of Ontario has prematurely entered the public domain.

Both parties regret that months of extraordinarily cooperative effort have become known even while serious discussions are ongoing.

However, both Samsung C and T Corporation and the Government of Ontario are pleased to confirm that efforts are progressing well toward the signing of a historic framework agreement.

While the contents of the proposed agreement remain commercially sensitive, both parties can confirm that Samsung, one of the world's leading companies, proposes to establish a new renewable energy business in Ontario where the Feed in Tariff was recently launched as part of the Green Energy Act.

The substantial scale of the proposed investment would be a very early sign of success of the Green Energy Act and would lead to the establishment of new manufacturing capacity in Ontario.

Both parties are committed to a more formal public presentation once a framework agreement has been completed."

598. A few days later, on 30 September 2009, the Minister of Energy publicly directed the OPA to reserve capacity for the Korean Consortium as follows:

"The Government is exploring opportunities to further enable new green industries through new investment and job creation and provide incentives for investment in renewable energy technologies.

---

[358] Exh. R-068, News Release, "Statement from the Minister of Energy and Infrastructure and Samsung C&T Corporation", p.2.

[...]

I now further direct the OPA [...] to hold in reserve 240 MW of transmission capacity in Haldimand County and a total of 260 MW of transmission capacity in Essex County and the Municipality of Chatham-Kent jointly for renewable energy generating facilities whose proponents have signed a province-wide framework agreement with the Province."

599. On 31 October 2009, the Korean Consortium's priority access to transmission capacity was addressed in the press in the following terms:[359]

"Samsung's turbine deal in jeopardy

[...]

Smitherman touted it as a 'historic framework agreement' that would see Samsung develop green energy projects and manufacture equipment to support them. In return, the province would reward Samsung with incentives above what other wind and solar developers can get.

[...]

At issue is what some Liberals believe is a sweetheart deal with a foreign firm, which would also get priority access to Ontario grid space."

600. About a week later, on 8 November 2009, the transaction with the Korean Consortium was once again mentioned in the press.[360]

601. Cole Robertson, who was responsible for the day to day operations of Mesa at the time, admitted that Mesa was aware of the press reports about the Ministry's deal with the Korean Consortium:

"Q. [P]ut yourself back into this position at the time, can you just explain: Did you see these reports at the time?

THE WITNESS: Yes, sir, did we see them at the time? We did see them at the time and what was our reaction to them? We were concerned, I think as any prudent developer would be.

[...]

I knew the minute these releases were made, maybe not the minute but within a few hours, that they were made, I was notified and reviewed."[361]

---

[359] Exh. R-178.
[360] Exh. C-0660.
[361] Tr. (27 October 2014) 143:19-146:20.

602. Mr. Robertson also conceded that he did not approach the Ministry for further information on the Toronto Star article or the Ministry's press release:

> "Q. Did you contact the Ministry to confirm whether these stories were accurate, of the GEIA?
> A. The Toronto Star story?
> Q. Yeah, the Toronto Star story or the initial -- the press release of the same day from the Ministry?
> A. [...] no, we did not contact the Ministry of Energy or the Ontario Government about the story, no."

603. Mesa did not even approach the Ministry after the conclusion of the GEIA was publicly disclosed, as the oral evidence of Mr. Robertson showed:

> "Q. Did you contact the Ministry after [the conclusion of the GEIA was made public]?
> A. We did not."[362]

And further:

> "THE WITNESS: On the publications by both the Toronto Star and the OPA or, I believe, it's Ministry -- Minister of Energy release as it relates to this. On those articles we did not contact the government."[363]

604. The Claimant's expert Mr. Adamson accepted that the Claimant could have known about the Ministry's agreement with the Korean Consortium and its key terms as early as September 2009, prior to applying for the FIT Program.[364] He also admitted that the Claimant could have been aware that the Korean Consortium would have priority access to Ontario's grid space before filing its FIT Applications.[365]

605. It is true that the OPA was not made aware of the agreement with the Korean Consortium until the summer of 2009. In fact, Jim MacDougall, the manager of the OPA, testified that the OPA was never informed of nor consulted about the GEIA negotiations and that, when he heard about the agreement, he was "not terribly pleased."[366] Yet, pursuant to Ms. Lo's plausible explanation, the need to consult with the OPA arose only when the GEIA had to be put in operation.[367]

---

[362] Tr. (27 October 2014) 140:24-141:1.

[363] Tr. (27 October 2014) 143:24-141:1.

[364] Tr. (29 October 2014) 211:10-218:7.

[365] Tr. (29 October 2014) 211:10-218:7.

[366] Tr. (28 October 2014) 275:10-14.

[367] Tr. (28 October 2014) 16:11-17:13 ("Q. Okay. Well, in fact the Ministry of Energy did not consult with the OPA [...] regarding the memorandum of understanding with the Korean Consortium, did it? A. I understand that that's the case, but it wouldn't be a normal course of action to consult with the OPA [...]

606. It is equally true that on 13 November 2009, the Ministry asked the Korean Consortium
to postpone publicizing the "various elements of the deal" for a "few weeks":

> "[Y]ou should not be going ahead with any public announcement on this or
> any other piece of the deal until we have resolved the issue of the signing of
> the Framework Agreement. This will simply elicit more questions from the
> media that we are not in a position to answer publicly yet and will put us in
> a difficult position. Once the FA is signed, and the terms are public, you will
> be free to execute the various elements of the deal. Until then, you need to
> put this on hold for the time being – hopefully only a couple of weeks."[368]

607. These facts appear to indicate that the Ministry worked towards two parallel renewable
energy programs – the GEIA and the FIT Program – without fully informing the public
and other stakeholders of one of them, namely the GEIA. Be that as it may, prior to the
Claimant's investment in November 2009, the following information was publicly
available and known to the Claimant: (i) the negotiations with the Korean Consortium
were at an "advanced stage"[369]; (ii) pursuant to those negotiations, the Korean
Consortium would get an "economic adder" or EDA in addition to the regular rate "if [it]
commit[ted] to manufacturing its equipment in Ontario"[370]; (iii) the OPA had been
instructed to hold in reserve transmission capacity for "generating facilities whose
proponents have signed a province-wide framework agreement"[371]; and (iv) the
agreement with the Korean Consortium "would give them priority access to Ontario['s]
grid space".[372]

---

The OPA receives policy direction, and then carries it out, but there wouldn't be any need to consult
with either body. If say they needed to be consulted with, well, that's their opinion, but working in
government for 30 years, they wouldn't be a normal body that one would consult with. Q. Well, frequently
during the implementation of the FIT program the Minister of Energy did consult with the OPA? A. The
FIT program is very different, because it is operationalizing a renewable energy program that was
already created in a higher level policy. So, for instance, the Green Energy and Green Economy Act,
would the Ministry of Energy consult with the OPA [...]? No. Not necessarily, no.").

[368] Exh. C-0683, Email from Jennifer Morris (MOE) to Hagen Lee (Samsung), 13 November 2009. See
also Tr. (27 October 2014) 310:20-311:1; Tr. (28 October 2014) 74:2-6 [CONFIDENTIAL].

[369] Exh. R-177.

[370] Id.

[371] Exh. C-105, George Smitherman's (MOE) Direction of 30 September 2009 to the OPA. The Claimant
argues that the use of the past tense in the Direction ("have signed") misled the public by suggesting
that a province-wide investment agreement had already been signed, which was not the case. However,
the Tribunal believes that this language is sufficiently broad to encompass investment agreements that
had, already been or were about to be concluded in a near future. As is discussed elsewhere, the
Claimant admitted that it did not request additional information about the GEIA from the Ministry, which
it reasonably should have done had there been an ambiguity.

[372] Exh. R-178.

608. On the basis of these facts, the Tribunal cannot conclude that the Ministry's dealings with the Korean Consortium were secret. Even if the details of the agreement between the Ministry and the Korean Consortium were not disclosed, sufficient information about the main terms of the transaction was in the public domain before the Claimant made its investment in Ontario.[373] What is more, the record shows that the Claimant was well aware of this information.[374]

609. On a related aspect, the Claimant alleges that it was not given an opportunity to enter into a similar deal with the Ministry and that it would have done so if it had been given the opportunity.[375] In this context, it stresses that the agreement with the Korean Consortium prohibited Ontario from entering into a similar contract[376] unless the latter agreement was comparable in value and scope to the former.[377]

610. As was just discussed, before investing in Canada, Mesa knew about the Ministry's agreement with the Korean Consortium and could have inquired with the competent officials about a similar investment opportunity in addition to or *in lieu* of its participation in the FIT Program. Mr. Adamson, the Claimant's expert, admitted that Mesa could have approached the Ministry with a proposal for an investment agreement providing for priority transmission.[378] Yet, Mesa did not do so, as Mr. Robertson explained. Despite its knowledge of the Ministry's agreement with the Korean Consortium, Mesa never asked for additional information about the agreement or the possibility of entering into its own investment agreement with the province.[379] As the Claimant did not approach the Ministry with a view to obtaining more information or entering into a GEIA-like agreement, its submission that it was deprived of an opportunity to enter into such an agreement can hardly be sustained.

---

[373] The Claimant has alleged that Mesa decided to invest in Ontario in the summer of 2009. If that were the case, then the Claimant's investment would precede the first Toronto Star Article. However, for the reasons mentioned above (§§324 et. seq.), the Tribunal considers the date of the Claimant's investment to be the date of incorporation of its projects i.e. 17 November 2009 for TTD and Arran.

[374] The Claimant also submits that because Canada's deal with the Korean Consortium was not public, the Korean Consortium "went so far as to require a 'comfort letter' explaining the arrangement and its contours" (C-PHB §30(c)).The Tribunal cannot draw this conclusion on the basis of the evidence supplied by the Claimant. In any event, even if the Tribunal were to accept the Claimant's argument, it would not alter the outcome.

[375] Reply §§296-297; C-PHB §12(a).

[376] See C-PHB §12 ("e. Effectively agreeing in the GEIA to not provide a similar deal to anyone else").

[377] C-PHB §85 citing GEIA, s. 8.7.

[378] Tr. (29 October 2014) 212:22-214:21.

[379] Tr. (27 October 2014) 134:1-15, 142:6-144:21, 146:2-7.

611.  Furthermore, besides Mr. Robertson's statement that Mesa "would have tried", the Claimant has provided no plausible indications that it would actually have approached the Ministry.[380] As it happens, as the Claimant itself acknowledged in its later submissions, the Ministry could not have entertained a request for a GEIA-like agreement, due to the lack of transmission capacity resulting from the success of the FIT Program and the GEIA. Hence, the Ministry rejected all the offers which it received from investors for a GEIA-like agreement.[381] But this is beside the point. What ultimately matters is that the Claimant had knowledge of the existence and key terms of the conclusion of the GEIA before it invested into the FIT Program and that it did not seek another investment opportunity, but proceeded with its investment notwithstanding.

612.  The Tribunal notes that the Claimant also complained of another "secret" deal between Ontario and the Korean Consortium, to which it refers as the "Framework Agreement". Rick Jennings, Assistant Deputy Minister of Energy Supply at the Ministry of Energy gave evidence that no such additional agreement existed; the framework agreement of October 2009 was merely an earlier draft of the GEIA. It was not signed in October as originally planned, but rather in January 2010, at which time it became known as the GEIA.[382] In light of these explanations, which appear credible, the Tribunal will not further address this complaint.

(iii) Delay of the ECT

613.  The Claimant submits that, in addition to removing transmission capacity that could have been awarded to FIT Applicants, the Korean Consortium also delayed the award of the FIT Contracts.[383] It emphasizes that, before the third round of FIT Contracts could be awarded, the OPA had to conduct an ECT. This ECT was not run as scheduled in August 2010 because the Korean Consortium had not finalized the connection points for its

---

[380] C-PHB §§82-83.

[381] *See* Testimony of Rick Jennings, Tr. (27 October 2014) 327:5-337:3 (discussing the Ministry of Energy's rejection of proposals from Recurrent, NTS and NextEra); Exhs. C-710-713. See also Exh. C-714, Letter from Minister Brad Duguid to Anthony Caputo, ATS Automation Systems, Undated (stating that Ontario was not in a position to enter into a "special" deal with competitors of the Korean Consortium, and refusing to enter into a GEIA-like agreement with ATS), and Exh. C-696, Email from Samira Viswanathan (MOE) to Mirrun Zaveri (MOE), 20 December 2010 (stating that Ontario was not in a position to offer other proponents a deal similar to that offered to the Korean Consortium).

[382] Jennings WS II §§9-11. See also Respondent's letter of 28 April 2014.

[383] Reply §123.

projects under the GEIA.[384] For Mesa, this delay prevented the TTD and Arran projects from receiving FIT Contracts.[385]

614. It is true that the ECT was never carried out, a topic further addressed below. It is also true that the third round of FIT Contracts was delayed. However, as will be discussed in greater detail in the context of the allocation of capacity in the Bruce Region, Article 1105 provides no guarantee against regulatory change. This is all the more so in the present case where the FIT Rules expressly state that they may be reviewed and amended, particularly in response to "significant changes in market conditions or other circumstances as required." The Claimant was fully aware of and accepted these provisions when it filed its FIT Applications with the OPA.

615. In any event, the sole fact that the ECT was not carried out when it should have been cannot constitute a breach of Article 1105, especially where the Claimant has not shown that it was prejudiced by the delay.

### c. Allocation of capacity in the Bruce Region

616. The Claimant argues that it reasonably expected the Ministry and the OPA to "fairly administer the FIT Rules without acting in a capricious and abusive manner."[386] However, the Minister's direction of 3 June 2011 (the "**3 June Direction**") led to "arbitrary and unexpected" changes to the FIT Rules.[387] For the Claimant, the 3 June Direction was issued without advance notice[388] and departed significantly from the procedure previously established.[389]

617. For its part, the Respondent denies that the 3 June Direction was an unexpected or arbitrary change of the FIT Program. According to it, the process used to allocate the capacity available in the Bruce Region was not materially different from the one publicly discussed by the OPA ever since the initiation of the FIT Program. In any event, even if the FIT Program did change in a way that ultimately affected the Claimant, Canada submits that this change would not violate Article 1105, because that provision does not

---

[384] Reply §125.
[385] Reply §799(b).
[386] Reply §23.
[387] Mem. §688.
[388] Reply §114.
[389] Mem. §722.

prevent a government from changing its regulatory regime in response to new policies and needs.

618. The Claimant has raised a litany of objections in respect of the allocation of capacity in the Bruce Region. In the discussion below, the Tribunal will start by setting forth its understanding of the allocation process (a), before reviewing the Claimant's objections (b).

619. At the outset, however, the Tribunal wishes to recall that Article 1105 does not provide a guarantee against regulatory change. A State may amend its laws and regulations as it deems appropriate in light of changing circumstances. The absence of protection against changes in the legal regime is particularly relevant here in a situation where the FIT Program had undergone several amendments.[390] In fact, the Claimant itself recognized that "prospective FIT Applicants [had] to navigate a changing landscape of FIT Rules and requirements", and that "Ontario's regulators were continuously updating and modifying the program".[391]

620. Further, as mentioned above, the FIT Rules expressly stipulate that they may be reviewed and amended, particularly in response to "significant changes in market conditions or other circumstances as required."[392] As was already noted, in respect of the ECT delay, the Claimant was fully aware of and accepted these provisions when it submitted its FIT Applications.

(i)   Allocation process

621. The framework of the FIT Program has been outlined earlier in this Award (§§12 et. seq.). As mentioned there, the OPA was to conduct an ECT to determine whether the existing transmission system should be upgraded to accommodate those projects for which no capacity was available, i.e. projects that had failed the TAT.

622. While the ECT was to be carried out only for projects that had failed the TAT, additional capacity on the existing transmission system could have become available following the

---

[390] From the time the program was announced in September 2009 through 2012, the FIT Rules changed 10 times. See Reply fn.109.
[391] Reply §113.
[392] Exh. R-003, FIT Program Rules, v. 1.2 s. 10.1(1).

TAT run as a result of the addition of new transmission facilities or of the cancellation of projects.[393] Therefore, the first step in the ECT was to conduct an individual project assessment ("**IPA**") so as to determine whether a project could be connected to the existing grid.[394] As part of the IPA, the OPA would provide TAT Tables to FIT Applicants to inform them where capacity was available.[395] As a next step of the ECT, FIT Applicants could change their connection point during an allotted time so as to make use of additional capacity in the existing system.[396] Information on how to request a change of connection point was posted on the OPA's FIT website.[397]

623.   As mentioned above (§§31 et. seq.), no FIT Contracts had been awarded to projects in the Bruce Region due to the transmission constraints in the region. These constraints were resolved by the construction of the Bruce to Milton Line in May 2011. The additional capacity created by this line in the Bruce and West of London regions was originally planned to be allocated through an ECT.[398]

624.   However, by mid-2011, much had changed in the Ontario electricity market.[399] First, the number of FIT Applications far exceeded the available capacity. If all the capacity was awarded, the impact on electricity prices would have been significant.[400] The Ministry thus needed to slow down the rate of procurement of renewable energy. Second, the Ministry also needed to address the decreasing demand of electricity because of the effect of the economic recession. Third, through the LTEP, Ontario had introduced a new renewable energy target of 10,700 MW to be met by 2018.[401] Out of this target amount,

---

[393] Exh. C-0034, OPA Presentation, "The Economic Connection Test Process", slide 22-23; Witness Statement of Bob Chow dated 28 February 2014 ("**Chow WS I**") §27.

[394] Exh. C-0034, OPA, "The Economic Connection Test Process", slide 21; Chow WS I §26.

[395] Chow WS I §31.

[396] Chow WS I §28; Exh. C-0034, OPA Presentation, "The Economic Connection Test Process", slides 14 and 30. See also Exh. C-0088, Ontario Power Authority Presentation: "The Economic Connection Test – Approach, Metrics and Process" (19 May 2010).

[397] Chow WS I §29.

[398] Exh. C-0073, Ontario Power Authority, Priority ranking for First Round FIT Contracts (21 December 2010); Chow WS I §25; Cronkwright WS I §15; Sue Lo WS I §46.

[399] Sue Lo WS I §§34-40.

[400] Jennings WS I §§17-18.

[401] Exh. C-0414, Ontario's Long-Term Energy Plan (2010), pp. 3, 4, 8, 11, 13-15, 31, 37, 57-62, s. 7 (noting the success of the FIT Program and the GEGEA, but also noting forecasted impacts on electricity prices and a moderate demand growth forecast and thus setting a target of 10,700 MW for renewably generated electricity, and limiting new transmission projects to 5 identified priority projects).

the 2011 Supply Mix Directive required that 10-15% be met with renewables. Ms. Lo testified about the circumstances that led to the LTEP in the following terms:[402]

> "[T]he number of [FIT] applications was growing at a rate that far exceeded the ability of the physical electricity system [...] to accommodate new renewables projects. If all of the companies which applied for FIT contracts were awarded such contracts, a far greater proportion of Ontario's supply mix would be made up of renewable energy than had been recommended by experts, which in turn, would make the operation of the electricity system difficult to manage.
> [...]
> Moreover, if all of the applications for FIT projects were awarded contracts under the program the impacts on ratepayers would be significant.
> [...]
> The culmination of these supply and demand factors confirmed [that] Ontario would need to slow down the rate of its procurement of renewable energy. Accordingly, the 2010 LTEP introduced a target amount for Ontario to procure a total of 10,700 MW of renewable energy capacity by 2018."

625. These factors had implications on the running of the ECT for the Bruce Region as it was originally contemplated.[403] Indeed, if the Ministry had conducted an ECT along the lines of the FIT Rules, the exercise would likely have resulted in procurement in excess of the 10,700 MW target set in the LTEP.[404] The Ministry therefore intended to eliminate parts of the ECT that would result in excess electricity.[405] At the same time, it also intended to develop a process to allocate capacity on the Bruce to Milton Line that was fair and closely matched the expectations of FIT Applicants.

---

[402] Sue Lo WS I §§36-38. See also Exh. C-444, Email from Sue Lo, Ministry of Energy to JoAnne Butler, Shawn Cronkwright and Michael Lyle (12 May 2011) (evidencing that the Ministry of Energy was looking to control the pace of new procurements due to ratepayer impacts).

[403] Rejoinder Witness Statement of Shawn Cronkwright 2 July 2014 ("**Cronkwright WS II**") §§14-15, 19, 21; Chow WS II §§5-6.

[404] Exh. R-107, Ministry of Energy Presentation, "Bruce-to-Milton Transmission Line - FIT Contract Awards" (12 May 2011), slide 2 (noting that the LTEP target had rendered a province-wide ECT unnecessary); Exh. C-269, Ministry of Energy Presentation, "Bruce-to-Milton Transmission Line FIT Contract Awards" (12 May 2011), slide 2 (noting that there was no need to run the ECT and consider new expansion because of the success of the FIT Program and the LTEP target of 10,700 MW of renewable electricity); Exh. C-439, OPA Draft Memorandum (3 May 2011) (noting that there was no need to run the ECT and consider new expansion because of the success of the FIT Program and the LTEP target of 10,700 MW of renewable electricity).

[405] Cronkwright WS II §§14-15. See also Exh. R-182, Draft Ontario Power Authority Presentation, "Economic Connection Test (ECT) Moving Forward" (1 March 2011) (noting that an objective in the Bruce-to-Milton allocation was to limit the amount of megawatts awarded to keep it in line with the LTEP target); Exh. C-444, Email from Sue Lo, Ministry of Energy to JoAnne Butler, Shawn Cronkwright and Michael Lyle (12 May 2011) (evidencing that a cap was placed on the amount of megawatts to be procured during the Bruce-to-Milton allocation in order to control the volume of megawatts awarded); Exh. C-83, Email from Sue Lo (Ministry of Energy) to Pearl Ing and Sunita Chander (Ministry of Energy) (12 May 2011) (noting the preference of the Government was to set a cap on the amount of megawatts to be procured in order to have certainty).

626. Ultimately, the Ministry decided to adopt a regional ECT process rather than a province-wide test or a special TAT. Under the regional ECT, FIT Applicants in the Bruce and West of London regions would have the opportunity to apply for a change of connection points during a five-day window and to select connection points for which generator paid upgrades would be required.[406] This decision was conveyed to the OPA through the 3 June Direction. On the same day, the OPA released version 1.5 of the FIT Rules implementing this direction.[407]

(ii)  Claimant's objections in respect of the Bruce to Milton allocation process

627. The Tribunal will first review Mesa's objections in respect of the allocation process (i). It will then focus on whether the process was designed to benefit particular FIT Applicants to the detriment of others (ii).

i.    Allocation of capacity in the Bruce Region

628. The Claimant argues that the following acts of the Ministry violated Article 1105: the decision not to allocate capacity on the Bruce to Milton Line through a "full" ECT process (a. below); and the decision to allocate capacity on the Bruce to Milton Line through a "regional" ECT process rather than a special TAT (b. below). It also argues that the process ultimately used to allocate capacity on the Bruce to Milton Line violated Article 1105 (c. below).

a. The decision not to allocate capacity on the Bruce to Milton Line through a "full" ECT

629. The Claimant challenges the Ministry's decision not to run a full ECT.[408] It complains that despite its repeated assurances, the ECT was never conducted.

---

[406] Exh. R-011, Letter (Direction) from Minister Brad Duguid to Colin Andersen, Ontario Power Authority (3 June 2011).

[407] Exh. C-0005, FIT Rules Version 1.5, 3 June 2011.

[408] Mem. §§735-762 ("Part 4, IV(iv) – Failing to conduct and Economic Connection Test as required by the FIT Rules"; "Part 4, IV(v) – Mesa Power expected its projects to participate in the ECT in 2010, and not conducting the ECT deprived Mesa of the opportunity to compete for a FIT Contract"; "Part 4, IV(vi) – The Failure to conduct an ECT prior to the Bruce to Milton capacity allocation process caused Mesa Power to lose contract awards").

630. It is true that the FIT Program originally contemplated an ECT in order to determine whether and where to build up further transmission capacity for the FIT Program. However, as has been noted earlier, much had changed in the Ontario electricity market since the conception of the FIT Program. It is in these changed circumstances as they were identified in a foregoing section that the Ministry decided not to carry out an ECT. This being so, it sought, however, to design a regional ECT-like process that would be as close as possible to the province-wide allocation initially envisaged.[409] The Tribunal does not deem this decision incompatible with the guarantee of Article 1105. Indeed, the Ministry took its decision in light of the prevailing circumstances based on reasonable and rational considerations.

> b. The decision to allocate capacity on the Bruce to Milton Line through a "regional" ECT process rather than a special TAT

631. The Claimant next argues that the Ministry's decision to allocate the Bruce to Milton capacity through a regional ECT process rather than through the special TAT process proposed by the OPA violated Article 1105.[410]

632. From its submissions, it is clear that Mesa would have preferred the Government to adopt the special TAT approach over the regional ECT that eventually prevailed. But as already emphasized on several occasions in this Award, it is not for this Tribunal to second-guess a government's policy choices, or to ascertain whether the policy goals of the government would have been better served by resorting to other means. The Tribunal's task is only to determine whether the Government has breached Article 1105 by following the policy in question.

633. In the present case, the Tribunal can see nothing arbitrary or otherwise in breach of the Article 1105 standard about the Ministry's decision to adopt a regional ECT rather than a special TAT process.

---

[409] *See, e.g.,* Exh. R-182, Draft Ontario Power Authority Presentation, "Economic Connection Test (ECT) Moving Forward" (1 March 2011) (reflecting the various policy considerations and decisions needing to be made, and the extensive discussions that took place, with respect to allocating capacity on the Bruce-to-Milton Line); Exh. C-438, OPA Presentation, Economic Connection Test (ECT) & Program Evolution (21 March 2011) and Exh. R-183, Ontario Ministry of Energy Presentation, "DRAFT KC and Future FIT Accommodation on Near-Term Transmission Projects" (21 March 2011) (both reflecting the various policy considerations and decisions needing to be made, and the extensive discussions that took place, with respect to allocating capacity on the Bruce-to-Milton Line).
[410] Reply §§137-163, 645-654, 682-711.

634. Once capacity became available in the Bruce Region because of the Bruce to Milton Line, the question before the Ministry was how to allocate this capacity. Three options were under consideration: (1) continuing with the ECT as originally designed; or (2) adopting the proposal drawn up by the Ministry; or (3) resorting to a proposal prepared by the OPA.[411] The proposals of the Ministry and of the OPA were similar in most respects.[412]

635. As time progressed, the OPA became concerned about its ability to complete the process which it had proposed.[413] As a result, it proposed a new "special TAT/DAT" process under which contracts would be awarded on the basis of the connection points identified in their original applications. The OPA would re-run the TAT process but only for the Bruce and West of London regions. The process would not involve changes in connection points or generator paid upgrades, and would be fast and straightforward from an implementation perspective.[414] This, however, required amendments to the FIT Rules.[415] As an additional drawback, it did not conform to the expectations of FIT Applicants on how the Bruce to Milton capacity would be awarded.[416]

636. Ultimately, the Ministry found it preferable to respect the expectations of FIT Applicants by allocating the available capacity on the Bruce to Milton Line through a process as close as possible to the ECT process originally provided in the FIT Rules.[417] The Ministry thus chose to adopt a regional ECT process which would include connection point changes and generator paid upgrades. In so doing, the Tribunal is of the opinion that the Ministry did not act in a manner that could be deemed contrary to Article 1105.

c. The process ultimately used to allocate capacity on the Bruce to Milton Line

637. The Claimant also claims that the actual allocation process was "materially different from the ECT process established in the FIT Rules" and violated Article 1105.[418] In particular,

---

[411] Exh. C-0438, OPA Presentation, Economic Connection Test (ECT) & Program Evolution (21 March 2011); Cronkwright WS II §16.

[412] Cronkwright WS I §4.

[413] Exh. C-0439, p. 2; Exh. C-0440; Cronkwright WS II §§17-18.

[414] Chow WS II, §7; Cronkwright WS II §§17-18.

[415] Cronkwright WS II §18.

[416] Cronkwright WS II §20; Chow WS II §6.

[417] Sue Lo WS II §19; Cronkwright WS II §§20-21; Chow WS II §8.

[418] Reply §685.

the Claimant's objections target the following features of the process eventually chosen by the Ministry: the process allowed connection point changes in a wide range of circumstances (1);[419] allowed connection point changes between regions (2);[420] it allowed enabler requested projects to select a connection point (3);[421] it allowed generator paid upgrades (4); it did not include a step to assess the feasibility of expansions to the transmission system (5);[422] it established a cap on the capacity that would be procured (6);[423] and it allowed for a five day connection point change window (7).[424] The Claimant also submits that the 3 June Direction was issued without sufficient advance notice and without consultation (8). Each of these objections is considered in turn.

### 1.   Connection point changes in a wide range of circumstances

638.  The Claimant contends that the FIT Rules only allowed distribution projects to change connection points prior to an ECT.[425] Through the 3 June 2011 Direction, however, this possibility was extended to transmission projects.

639.  It is correct that the FIT Rules expressly provided that distribution connected projects could change their connection points prior to an ECT.[426] However, the FIT Applicants and the OPA did not understand this to exclude transmission projects from the change of connection points. Indeed, in numerous presentations, the OPA conveyed to the FIT Applicants that *all* applicants would be given an opportunity to change their connection points prior to an ECT.[427] As an illustration, the OPA presentation of 23 March 2010 provided so in the following language:

---

[419] Reply §§699-703.

[420] Reply §§704-707.

[421] Reply §§708-711.

[422] Reply §685(b).

[423] Reply §685(a).

[424] Reply §685(c).

[425] Reply §§699-703.

[426] Exh. C-0258, FIT Rules Version 1.1, ss. 5.3(d), 5.5(b), 5.5(d) and 5.6(b).

[427] Exhs. C-0034; C-0088, p. 46 ("An applicant who has not passed the TAT is able to change their connection point to requiring an enabler"). See also Exh. C-0405, Ontario Power Authority website excerpt, "Priority ranking for first-round FIT Contracts posted" (21 December 2010) ("FIT applicants will have the opportunity to request a change of connection point prior to the ECT. Connection point changes could impact the ECT outcome for other applicants requesting a nearby connection point.").

> "After an applicant receives a TAT result, they [sic] may request a change of connection point for their project."[428]

640. Accordingly, the Tribunal cannot accept the Claimant's argument that the 3 June Direction introduced a new process not contemplated in the existing FIT framework by allowing transmission connected projects to change their connection points.

### 2. Connection point changes between regions

641. In this context, the Claimant contends that the 3 June Direction allowed connection point changes from West of London to Bruce, as a result of lobbying efforts by NextEra.[429] According to Mesa, connection point changes should have been allowed from all nearby regions and the fact that changes were limited to the Bruce and West of London region was for NextEra's benefit.[430]

642. The Tribunal cannot accept this line of argument. As was seen above, the FIT Rules always contemplated that applicants could change their connection points[431] without regional limitations.[432] As Mr. Chow testified, it would make no sense electrically to limit changes to one region only:[433]

> "At no time did we ever say [that connection point changes during the ECT were to be limited by region] electrically it would have made no sense whatsoever. If an applicant was close to the border of two regions, it would make no sense to prohibit it from changing its connection point to go one way merely because of a line drawn by the OPA solely for planning purposes."

---

[428] Exh. C-0034.

[429] Mem. §§698, 700 and 722.

[430] C-PHB §336.

[431] Chow WS I §§27, 29; Exh. C-0034.

[432] Chow WS I §30.

[433] Chow WS I §30. See also Tr. (28 October 2014) 151:4-11, 157:11-158:23, 160:1-161:8 (Susan Lo testifying that it would not make sense to limit where a FIT applicant could select a connection point and that connection point changes were always contemplated as part of the ECT); Tr. (28 October 2014) 252:25-255:17, 289:7-11 (Jim MacDougall testifying that the ECT always contemplated connection point changes and that this was the expectation of FIT applicants); Tr. (28 October 2014) 302:22 – 303:11, 307:17-309:1-9 (Bob Chow testifying that the ECT always contemplated connection point changes and this was never limited to within regions; limiting within regions would not make sense from an electrical point of view); Tr. (28 October 2014) 43:14-18, 79:22-80:4, 85:17-21 (Shaun Cronkwright testifying that the Bruce and West of London regions were similar electrically, and that connection point changes were envisioned as part of the original ECT).

643. In support of its argument, the Claimant refers to an OPA presentation dated 19 May 2010, which, so it says, provides that connection point changes would only be "allowed within a region, not between regions."[434] The presentation makes no such statement.[435] In fact, the word "region" does not even appear in the presentation.

644. The Claimant also relies on the word "region" as it appears in section 5.1(b) and 5.4(a) of the FIT Rules.[436] However, as Mr. Chow testified, those provisions relate to the OPA's division of the province of Ontario into separate regions for planning and communication purposes. They do not contemplate the division of the province into electrical regions for the purposes of an ECT.[437]

645. Finally, the Claimant has in any event not established how it was prejudiced by the 3 June Direction limiting connection point changes to projects in the Bruce and West of London regions. Indeed, if projects located outside these two regions had been permitted to connect to these two regions, then the Claimant's projects would have faced even greater competition.

### 3. Connection point changes for enabler requested projects

646. The next objection raised by the Claimant is that the 3 June Direction allowed a proponent who previously asked to be "enabler requested"[438] to choose a specific connection point, which was not provided in the FIT Rules.[439]

647. This objection is not well-founded either. While the FIT Rules did not expressly provide for connection point changes for enabler requested projects, there was nothing in the FIT Rules that prohibited them.[440] As Jim MacDougall, manager of the FIT Program at the OPA from July 2009 to June 2011 stated in his oral testimony, "if it is not prohibited

---

[434] Mem. §700.

[435] Exh. C-0138, OPA Presentation, "The Economic Connection Test – Approach, Metrics and Process". See slides 39, 46, 48, and 97 which refer to the option to change connection points but never limiting such change to a transmission region.

[436] Reply §704.

[437] Chow WS II §§12-13.

[438] In their applications, applicants could either indicate a specific connection point, or indicate that they were "enabler requested" i.e. that the applicants would pool together with other nearby projects to form an "enabler" facility that would itself connect to the grid. See Chow WS I §23; Exh. R-002, FIT Program Overview, v. 1.1, pp. 18-19.

[439] Mem. §722.

[440] Mr. Chow's testimony was to the same effect. See Chow WS I §27; Chow WS II §11.

then people can do it."[441] Further, as Canada pointed out, not every aspect of the FIT Program was detailed in the Rules. For instance, the method of carrying out the ECT itself was not prescribed in the Rules.[442] Moreover, the OPA's presentations highlighted the possibility for all projects to change their connection points. This was reiterated in the TAT priority rankings of 21 December 2010, which indicated that all projects listed there would be able to change their connection points without distinguishing between enabler requested projects and others.

### 4.   Generator paid upgrades

648.   The Claimant also asserts that allowing generator paid upgrades as part of the allocation of capacity on the Bruce to Milton Line violated Canada's obligations under NAFTA.[443] The Tribunal notes that generator paid upgrades had always been part of the ECT process.[444] Hence, the 3 June Direction introduced nothing new in this respect. The Claimant's objection must accordingly be dismissed.

### 5.   Feasibility of expansion to the transmission system

649.   The Claimant sees another violation of Article 1105 in the fact that, unlike an ECT, the Bruce to Milton allocation "did not include a phase for proposing and assessing new expansions to the transmission system to accommodate additional FIT projects."[445] It has, however, provided no factual basis or legal arguments in support of this claim. It follows that the Tribunal cannot but dismiss this objection as insufficiently pled.

650.   For the sake of completeness, the Tribunal nevertheless notes that the purpose of the second phase of the ECT was to identify any transmission construction projects that

---

[441] Tr. (28 October 2014) 301:16-22 ("[T]here was no explicit restriction on how connection point changes could be permitted or prohibited or limited. But, in general, with the FIT rules and the FIT contract, if its – if it is not prohibited, then people can do it.").

[442] Exh. C-0258, FIT Program Rules, v. 1.1, s. 5.4 (describing the original FIT Program framework, without providing any details for the running of the ECT).

[443] Reply §§150, 774-775.

[444] Exh. C-0088, Ontario Power Authority Presentation, "The Economic Connection Test – Approach, Metrics and Process" (19 May 2010), p. 72; Exh. C-0444, Email from Sue Lo (12 May 2011), p. 2 (stating that including generator paid upgrades in the Bruce-to-Milton allocation would be consistent with the ECT process as it had always been described); Chow WS I §27 (generator paid upgrades were always part of the ECT); Tr. (29 October 2014) 86:3-8 (Shawn Cronkwright testifying that generator paid upgrades were contemplated as part of the original ECT).

[445] Reply §685(b).

would be worthwhile from an economic perspective.[446] The LTEP had already identified the transmission projects which the Government considered to be economically suitable.[447] None of these projects were located in the Bruce Region. Indeed, once the Bruce to Milton Line would be in operation, no other transmission project would be economically justified in the region - a fact that was known.[448] As a result, the second phase of the ECT would have been unnecessary.

6.   Cap on the amount of capacity

651.   The Claimant also challenges the Government's decision to place a cap on the amount of electricity to be procured from the Bruce Region. It contends that the cap was contrary to the expectations of FIT Applicants to whom the Ministry had promised that all available capacity would be awarded.[449]

652.   The Tribunal has already explained the changed circumstances which gave rise to the LTEP and the 2011 Supply Mix Directive. These texts required Ontario to procure no more than 10,700 MW of renewable energy capacity by 2018. This target was based on the planned transmission expansion, the overall demand for electricity, and the ability to integrate renewables into the system.[450]

653.   On this basis, on 17 February 2011, the Ministry directed the OPA to plan for a generating capacity of renewable energy amounting to 10,700 MW. Further, in the 3 June Direction, the Government directed the OPA to reserve 750 MW of transmission capacity in the Bruce Region. The figure of 750 MW was based *inter alia* on the renewable energy target laid down in the LTEP, which itself reflected the province's needs in terms of supply and demand of renewable energy.

654.   The Claimant also challenges the fact that Ontario only awarded 300 MW of capacity in the West of London region, although 550 MW capacity was available there. For Mesa, if more capacity had been awarded in West of London, "some high-ranked projects that

---

[446] Chow WS I §35.
[447] Sue Lo WS I, §§37-40; Chow WS I §37.
[448] Chow WS I §47 and Sue Lo WS I §40; Exh.C-0414, Ontario's Long-Term Energy Plan, p. 31.
[449] C-PHB §§172, 338.
[450] Sue Lo WS I §§34-36.

displaced Bruce region projects would not have switched regions." The Claimant, however, has furnished the Tribunal with no evidence in support of this allegation.

655.   Therefore, and in all the circumstances, the Tribunal cannot accept the Claimant's submission that the Ministry's decision to cap the amount of electricity to be procured from the Bruce Region was in breach of Article 1105.

### 7.   Five day connection point change window

656.   Mesa further objects that the connection point change window adopted by the 3 June Direction was a "sudden, significant, and arbitrary"[451] departure from the established FIT process, a departure that violated Article 1105.[452] For the following reasons, the Tribunal has a different assessment of the facts at issue.

657.   First, in respect of the connection point change window process itself, the FIT Rules specifically provided that projects would have the opportunity to change their connection point prior to an ECT. This was also the understanding of the FIT Applicants at the time, including the Claimant. In a press release of 23 December 2010, the Claimant acknowledged that it expected that the transmission capacity on the Bruce to Milton Line would be made available to "all wind projects in the western region of Ontario."[453] In other words, Mesa was itself aware that the Bruce to Milton capacity would be available to applicants outside the Bruce Region through a process that would allow applicants to change their connection points. Hence, the Tribunal cannot agree with the Claimant that Ontario's decision to allocate the Bruce to Milton Line capacity through a regional ECT-like process was "arbitrary and unfair."[454]

658.   Second, in respect to the length of the window to change connection points, the Tribunal recalls that, under the original FIT framework, the ECT was to be conducted in August 2010. This process would have involved a period of three weeks for FIT Applicants to

---

[451] Reply §645.

[452] Reply §§645-654, 682-711.

[453] Exh. R-100 ("All wind projects in the Western region of Ontario are now being considered for ranking because 1,200 MW of additional capacity that will be made available by the Bruce to Milton transmission line will be allocated during the next step, AWA's Wind Energy Projects Rank High on Canadian Priority List which is the Economic Connection Test (ECT)").

[454] Reply §§137-163, 645-654, 682-711.

change their connection points. Applicants thus were preparing for this opportunity at least since August 2010.

659. However, for the reasons mentioned above (§§621 et. seq.), the Government decided not to conduct an ECT. Applicants nevertheless had an expectation that the Government would permit them to change their connection points prior to allocating capacity on the Bruce to Milton Line. The Canadian Wind Energy Association ("**CanWEA**") for instance wrote to the Minister of Energy expressing this expectation in the following terms:

> "CanWEA is writing to express the view of a majority of our members that the Government of Ontario and the Ontario Power Authority (OPA) should follow through with the established Feed In Tariff (FIT) process by immediately opening the window for point of interconnection changes to enable the next round of FIT contracts to be issued in June of this year.
>
> As you know, developers were told by the OPA on numerous occasions that the opportunity would exist to change their point of interconnections before the running of the Economic Connection Test (ECT) and the awarding of contracts. We are asking that the OPA follow the process and provide this opportunity."[455]

660. CanWEA further advised the Government that, because the necessary background work had been done, a short window for connection changes would be sufficient:

> "Over the past several months, our members have collectively invested significant time and money to prepare their respective interconnection strategies. Once the updated Transmission Availability Tables are made available our members can be ready to act quickly and respond within the window of time communicated to our members by the OPA. For these reasons, a majority of our members believe the window only needs to be open for a short period of time."[456]

661. In line with CanWEA's representation, the 3 June Direction provided for a short period of five days to change connection points. The Government's decision to limit the connection point change window appears thus in conformity with the needs of the industry. While the Claimant submits that the CANWEA letter is "unavailing",[457] CANWEA does represent the interests of several FIT applicants.

---

[455] Exh. R-113, Letter from Robert Hornung, President of CanWEA to the Brad Duguid, Minister of Energy (27 May 2011).

[456] *Id.*

[457] C-PHB §165.

662. In fact, while the Claimant objected to the connection point change itself,[458] it did not object to the five-day window at the time. On 2 June 2011, Brian Case, the Director of the TTD and Arran projects, learned about the five-day connection point window through an email message received from an industry colleague:

> "Connection point change – which the gov't was contemplating not moving forward with two weeks ago, has made a comeback. The window shall be open for 5 business days beginning next week or the week after as opposed to the 30 days originally outlined."[459]

663. There is no indication on record that Mr. Case reacted negatively to this information.

664. In reality, it is not surprising that Mesa did not protest against the shortness of the window at the time. Indeed, a short window reduced the potential for projects outside the Bruce Region to connect into the region. Hence, rather than being detrimental, if anything this change was beneficial to Mesa's project.

665. In the circumstances, the Tribunal is of the view that, by allowing a five-day connection point change window, the Government did not breach Article 1105.

### 8.   Advance Notice and Prior Consultation

666. Finally, Mesa contends that the 3 June Direction was issued with "inadequate" advance notice and without prior consultation, which was "arbitrary and capricious" and "contrary to expectations",[460] thereby breaching Article 1105.[461] If the Ministry had followed OPA's practice of consulting with FIT Applicants, so says the Claimant, "there may not have been a rule change."[462] On its part, the Respondent counters that the lack of consultation did not cause any harm to Mesa.

---

[458] Exh. R-114, Letter from Charles Edey, Leader Resources, to Brad Duguid, Minister of Energy (30 May 2011).

[459] Exh. R-186, E-mail from Hari Suthan Subramaniam (GE, Corporate) to Rembrandt Niessen (GE Power & Water), Brian Case (GE Power & Water), Marc A. Rousseau (GE Power & Water), Benjamin Kennedy (GE Power & Water), Simon Olivier (GE Infra, Energy) and Mandar Pandit (GE Power & Water) (3 June 2011). See also Exh. R-184, where on 26 May 2011, Chuck Edey of Leader Resources (an outside consultant who submitted the TTD and Arran FIT applications) wrote to Mr. Robertson, indicating that an "announcement [was] imminent" with respect to a change window.

[460] C-PHB §487.

[461] C-PHB §311.

[462] C-PHB §486.

667. It is true that the 3 June Direction was issued on a Friday. It notified FIT Applicants that the connection point change window would open for five days from the following Monday, i.e. 6 June. The Respondent's witness, Mr. MacDougall admitted that this was inadequate[463] and Ms. Lo explained that the Ministry was in a hurry to award contracts because of political considerations.[464]

668. Be that as it may, the Tribunal recalls that FIT Applicants were expecting a connection point change window since at least August 2010. The Respondent's witness Ms. Lo accepted that the connection point change could have been anticipated.[465] Moreover, although the decision to allocate capacity in the manner specified in the 3 June Direction appears to have been taken nearly three weeks earlier on 12 May 2011,[466] subsequent correspondence between the Ministry and the OPA shows that discussions on the connection point change window were still ongoing on 20 May 2011.[467] On 27 May 2011, i.e. just one week before the 3 June Direction, CanWEA informed the Ministry that its members were expecting a connection point amendment window.[468] 39 applicants actually changed their connection points during the window.[469] Furthermore, it is not the Claimant's case that it was unable to change its own connection points because of the short notice. In other words, the Claimant does not allege that it was prejudiced by the short notice.

669. As a consequence, the Tribunal finds that the acts complained of here do not rise to the level required for a breach of Article 1105.

670. In conclusion, the Tribunal dismisses the Claimant's various objections in respect of the process adopted by the Ministry to allocate capacity on the Bruce to Milton Line. The Tribunal will now proceed to examine whether the Ministry developed this process in the interest of particular FIT Applicants.

---

[463] See the testimony of Jim MacDougall (Tr. (28 October 2014) 238:18-20 [CONFIDENTIAL]).

[464] Tr. (28 October 2014) 164-165, 185-186.

[465] Tr. (28 October 2014) 164-167.

[466] Testimony of Shawn Cronkwright, Tr. (29 October 2014) 65:5-66:11 (the decision to change connection points was made on 12 May 2011); C-604, Email from Sue Lo (MEI) to JoAnne Butler, 12 May 2011. See also Rej. §195 ("It is undisputed that [on 12 May 2011], the decision was taken to go with the modified ECT process following a meeting between the Minister's Office and the Premier's Office.").

[467] Exh. R-112 (correspondence between Ms. Lo at the Ministry and Mr. Cronkwright at the OPA).

[468] Exh. R-113, Letter from Robert Hornung, President of CanWEA, to Brad Duguid, Minister of Energy.

[469] Tr. (31 October 2014) 256:21-25.

ii.  Benefit to particular FIT Applicants

671. The Claimant submits that because of "irrelevant considerations arising from electioneering, politicization, or favoritism", other applicants to the FIT Program including NextEra Energy and International Power Canada received better treatment than Mesa,[470] thereby depriving the Claimant of a FIT Contract which otherwise it would have been awarded.[471] For the Claimant, on the basis of advance information, its competitors caused the Ministry to modify the FIT framework in their favor and to Mesa's detriment. The information at issue was not available generally; in supplying it to certain of its competitors, the Claimant submits that the Respondent acted "profoundly unfairly."[472] It summarizes its objections as follows:

> "The Ministry had access to confidential rankings of FIT applicants to see how contracts would be given and how changes would affect applicants. With Ontario knowing this information, one applicant, NextEra, was given access to high level government officials and succeeded in lobbying for a FIT rule change while at the same time receiving prior knowledge of the change. Perhaps most disturbingly, as was revealed at the hearing, blatant protection was afforded to International Power Canada, a Canadian company whose executive leadership at the time was a well-known political backer of the Ontario Liberal government. The result was a capriciously misapplied process contaminated by selective and improper investor protection, a lack of minimal due process, and a complete lack of transparency and candor. This culminated in a significant rule change that was decided without any consultation with stakeholders, and literally was given a weekend's advance notice."[473]

672. The Tribunal has already reviewed the circumstances in which the 3 June Direction was issued. It has found that the direction was based on rational considerations responding to the situation prevailing at the time in Ontario. The Tribunal cannot discern in this factual matrix the "patent abuse of governmental and regulatory authority" alleged by the Claimant. The 3 June Direction may have favored a few applicants, but that was the outcome of the rational policy adopted by the Government, a policy and an outcome that the Tribunal does not fault.

673. The Tribunal has carefully reviewed the evidence presented by the Claimant in support of its allegations that the 3 June Direction and the accompanying changes in the FIT

---

[470] Reply §24.
[471] Mem. §916.
[472] Reply §58; Claimant's Submission on *Bilcon* §99(f).
[473] C-PHB §§15-17.

Rules "systematically benefited" NextEra, and were "specifically designed with NextEra in mind".[474] It comes to the conclusion that the Claimant has not been able to establish its case, which relies largely on conjecture. In the following paragraph, the Tribunal will address the most relevant evidence cited by Mesa in support of its case and explain why such evidence does not substantiate the Claimant's allegations.

674. The Claimant first points to a "dry run" which the OPA conducted, in the course of deciding which of the three proposals to follow for allocating capacity on the Bruce to Milton Line.[475] As this test showed that only one NextEra project would receive a FIT Contract under this approach, so argues the Claimant, the Ministry chose a different approach, i.e. the regional ECT eventually followed, to ensure that specific proponents, including NextEra, would be favored.[476]

675. It is correct that the OPA conducted a dry run to determine the capacity that would be awarded as part of the Bruce to Milton allocation if the preferred approach were that of a special TAT. The reason why the Government eventually chose the regional ECT has already been explained above. The choice was dictated by the fact that the special TAT required an amendment of the FIT Rules and would have been contrary to the expectations of the FIT Applicants.

676. The Claimant has not established that the decision not to follow the special TAT process was motivated by an intention to benefit NextEra. The Claimant has not established either that the results of the dry run were known to NextEra. Nor are there indications on record allowing the Tribunal to reasonably infer that NextEra exerted influence on Ministry officials to induce them to adopt a specific process. Indeed, it appears that the results of the dry run were shared only with certain Ministry officials, and not with any of the individuals who allegedly influenced Ministry officials.[477]

677. In support its arguments, the Claimant also refers to several alleged meetings between Ministry representatives and NextEra, explaining particularly that NextEra had advance notice of the Ministry's decision to alter the process for allocating capacity on the Bruce

---

[474] See, for example, Mem. §§688, 697, 719, and 721.
[475] Reply §§152-155.
[476] Reply §§156-163, 645-654, 682-711.
[477] Exh. C-0448; Bruce Scenario Analysis, Table of Results (13 April 2011); Cronkwright WS II §19.

to Milton Line and of the 3 June Direction.[478] Specifically, it cites a meeting held on 11 May 2011 between NextEra's Senior Vice President Al Wiley and Andrew Mitchell, Director of Policy at the Ministry of Energy. It alleges that after that meeting a decision was taken to amend the capacity allocation process on the Bruce to Milton Line in a manner that would favor NextEra.[479] It is correct that on the day following the meeting with NextEra, the Ministry appears to have decided to adopt the regional ECT approach instead of the special TAT process. However, as mentioned earlier, subsequent correspondence between the Ministry and the OPA shows that discussions on the connection point change window were still ongoing on 20 May 2011.[480]

678. The fact that NextEra representatives met with Ministry officials does not in and of itself lead to the conclusion that the Ministry's decision and the 3 June Direction were the product of that meeting. As several witnesses confirmed, officials from the Ministry and the OPA regularly met with numerous FIT Applicants throughout the relevant period.[481] Indeed, the email relied upon by the Claimant in support of its argument merely demonstrates that no decision had been made yet on the connection point change window.[482] While the Claimant has certainly proven that meetings were held between NextEra and the Ministry, it has not established that the content of these meetings differed in any relevant manner from the many meetings which the Ministry conducted in the normal course with investors in the FIT Program.

679. The Claimant also submits that because NextEra made significant changes to its connection points within the five-day window, the Tribunal should assume that it had prior knowledge of the 3 June Direction. As was established earlier, the FIT Applicants were expecting a connection point change since at least August 2010. They knew their FIT provincial priority ranking as well as the connection points of every project since 21 December 2010.[483] Thus, applicants had all the information needed to determine

---

[478] Mem. §§721, 725, and 726.

[479] Reply §§781, 147, 318.

[480] Exh. R-112 (correspondence between Ms. Lo at the Ministry and Mr. Cronkwright at the OPA).

[481] Sue Lo WS I §§53-54; Chow WS I §§49-59; MacDougall WS I §§30-49. See also WS Lo I §53 ("if someone requested a meeting, it was part of my job to meet with them").

[482] See PHB fn. 412 relying on an email exchange between Ministry of Energy and NextEra (Exh. C-0090) and stating that the facts contained therein were not notified to other FIT applicants. However, that exchange merely notes the discussions at the Ministry at the time "a decision has not been made yet on whether or not to open the POI [point of interconnection] amendment window, and whether, if so, to do so province-wide or just for Bruce-to-Milton and West of London."

[483] Exh. C-0405, Ontario Power Authority website excerpt, "Priority ranking for first-round FIT Contracts posted", (21 December 2010).

whether to change their connection point[484] and do the necessary preparatory work. In November 2010, Ortech, a consulting firm in Ontario, advised FIT Applicants that the connection point change window would be limited and that projects in need of assistance on such change should initiate the process early.[485] Moreover, in the absence of any convincing evidence, the Tribunal cannot simply assume that NextEra had advance notice of the 3 June Direction because it changed its connection points during the five-day change window.

680. The Claimant has made several other unsupported allegations. For instance, it submits that the 3 June Direction was intended to favor NextEra because "around the time of the June 3, 2011 rule changes", NextEra made "the maximum donation amount permitted under Ontario law" to the governing Liberal Party.[486] It also argues that NextEra "gained assistance through the Ontario Premier's office" and that "the Minister of Energy's Office took explicit steps to ensure the process was being executed to the benefit of NextEra", citing to an irrelevant meeting note. None of these allegations is supported by cogent evidence. In the circumstances, the facts so alleged have simply not been established.

681. The Tribunal notes that Mesa also claims that the Respondent breached the full protection and security component of Article 1105. It pleads that "the obligation of full protection and security, which is an integral part of NAFTA 1105, requires Canada to exercise due diligence that the treatment of the investor by the OPA does not undermine the protection of a stable, transparent, non-arbitrary regulatory framework."[487] The facts invoked for this claim are the same as those considered above. As a result, the Tribunal cannot but dismiss this claim as well.

682. On the basis of the foregoing analysis, the Tribunal comes to the conclusion that Canada's conduct has not breached Article 1105. While reaching this conclusion, the Tribunal nevertheless notes that at least some criticism may be levelled at Ontario's decision to run two renewable energy programs in parallel without clearly articulating the relationship of the two and without spelling out their interaction in the event of shifts in demand and supply and other changes in the energy market. In the event, this choice and the manner in which it was implemented created certain problems, and might well

---

[484] Chow WS I §§29-33.
[485] Exh. R-098, Ortech Newsletter "Heads Up For Ontario ECT Projects" (November 2010).
[486] Reply §778.
[487] Mem. §80.

have been handled differently. But judged in all the circumstances, this is not criticism that reaches the threshold of a violation of Canada's international obligations.

## VI.   COSTS

### A.  BACKGROUND

683. As mentioned above (§§189-190), the Parties filed cost submissions on 3 March 2015 (**"Claimant's Costs Submission"**, **"Respondent's Costs Submission"**) and replies on 26 March 2015 (**"Claimant's Reply on Costs"** and **"Respondent's Reply on Costs"**).

### B.  POSITIONS OF THE PARTIES

#### 1.  The Claimant's Position

684. The Claimant submits that "Canada's conduct has caused unjustifiable inefficiencies in these proceedings resulting in longer delays and increased workloads for both the Investor and the Tribunal. In these instances, costs should be assessed against Canada to address actions that imposed unnecessary burden on the Tribunal and the Investor."[488] The Claimant therefore requests the Tribunal to order the Respondent to bear the costs of this arbitration, as well its costs of legal representation and assistance, which together amount to US$ 9,306,156.02.

685. The Claimant further submits that even if it were not to prevail on any claim, it should still be awarded the costs it has incurred on account of "Canada's conduct and vexatious argumentation".[489] In particular it points to Canada's failure to produce documents in a timely manner and to the "meritless" subsidy defense advanced by Canada. It quantifies these costs as 30% of its overall legal fees, i.e. US$ 2,791,847.

686. Finally, the Claimant submits that there are several reasons why, even if it is eventually unsuccessful, it should still not have to bear Canada's arbitration or representation costs. It stresses that several aspects of its claim were novel and that there was no unreasonable or wasteful conduct on its part.

---

[488] Claimant's Reply on Costs §4.
[489] Claimant's Submission on Costs §57.

### 2. The Respondent's Position

687. The Respondent contends that Mesa's claims were speculative, unreasonable and based on a "meritless interpretation of the NAFTA".[490] For these reasons and to provide reparation to Canada and dissuade similarly frivolous and meritless claims, the Respondent should be granted all of its costs in this arbitration.

688. The Respondent also submits that the Claimant pursued the arbitration in an "inefficient and needlessly complex way that [...] wasted time and money".[491] In particular, it points out that the Claimant "(1) failed to respect NAFTA's 6-month cooling-off period, (2) engaged in unauthorized and excessively burdensome fishing expeditions for documents, (3) ignored the Tribunal's rulings and procedures on confidentiality, (4) filed unnecessary and duplicative procedural requests, (5) consistently disrespected the Tribunal's rules on the number of submissions permitted on procedural requests, (6) sought to prejudice Canada with untimely, last-minute submissions of exhibits, (7) failed to clarify whether it was continuing to pursue certain claims based on measures of the [OPA], (8) presented circular arguments on the nature of the FIT Program that led to unnecessary disputes, and (9) conducted unnecessary cross-examinations on irrelevant issues at the hearing."[492]

689. For all of these reasons, the Tribunal should award the Respondent all of its costs in this arbitration. These include its arbitration costs and its costs for legal representation and assistance, the latter of which amount to CAD 6,109,001.95.

### C. ANALYSIS

690. The Tribunal will first detail the arbitration costs and the costs incurred by the Parties (1). It will then set out the applicable legal framework (2) and determine the apportionment of costs (3).

---

[490] Respondent's Submission on Costs §9.
[491] *Id.* §10.
[492] *Id.*

### 1. Costs

691. The Claimant has made advances towards costs in the amount of CAD 1,116,000 and the Respondent in the amount of CAD 1,116,000, which gives a total advance of CAD 2,232,000 (equivalent to EUR 1,551,343.80 as converted to Euros upon receipt by the PCA).

692. The rates for time spent by the Tribunal and Secretary on this case were set in §23.1 of PO 1 (USD 550 per hour for the Arbitrators and USD 280 per hour for the Secretary, all exclusive of VAT). Computed at these rates, and as converted to Euros for payment by the PCA, the fees of the members of the Tribunal amount to: The Honorable Charles N. Brower EUR 317,369.32; Toby Landau, QC EUR 221,758.57; and Prof. Gabrielle Kaufmann-Kohler EUR 508,153.14. The fees of the Secretary of the Tribunal amount to EUR 211,899.78. Accordingly, the total fees accrued for the Tribunal and the Secretary (which are hereby fixed pursuant to Article 39 of the UNCITRAL Rules) amount to EUR 1,259,180.81. Compared to the time actually spent, these fees were reduced in order not to exceed the advance available after the last call. The PCA will shortly provide the Parties with a final statement of account.

693. The PCA has charged fees in the amount of EUR 37,455 for the administration of the case and its registry services. Other costs amount to EUR 254,707.99.

694. The total costs of the proceedings are thus EUR 1,551,343.80.

695. The Claimant's costs for legal representation and assistance amount to US$ 8,518,585.47[493] while the Respondent's costs amount to CAD 6,109,001.95. Considering the complexity of these proceedings, both these amounts appear reasonable.[494]

---

[493] This is the total amount of costs claimed by the Claimant (US$ 9,306,156.02) less the "fees paid to the Tribunal" (US$ 787,570.55).

[494] The Claimant agrees that the Respondent's costs for legal representation and assistance are reasonable. See Claimant's Reply on Costs §11 ("The number of hours of legal work provided by both parties is relatively similar and reasonable given the complexity of these proceedings. Similarly, the costs for expert witnesses are similar and reasonable in the circumstances".).

### 2.   Applicable Legal Framework

696.   Article 1135(1) of the NAFTA provides that a NAFTA Chapter 11 tribunal may award costs in accordance with the applicable arbitration rules. As mentioned above, the 1976 UNCITRAL Rules apply in the present proceeding.

697.   Article 38 of these Rules provides that the Tribunal shall fix the costs of arbitration in its award. It also provides a list of items that may be claimed which include the fees and expenses of the Tribunal and the reasonable costs for legal representation and assistance of the successful party.

698.   Article 40 of the UNCITRAL Rules contains rules for the allocation of costs:

> "1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

> 2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable."

### 3.   Allocation of Costs

(a) Arbitration Costs

699.   Article 40(1) of the UNCITRAL Rules provides that the unsuccessful party shall "in principle" bear all of the costs of the arbitration. The Claimant too agrees that, in general, costs should follow the outcome of the case.[495]

---

[495] Claimant's Reply on Costs §3.

700. The Respondent has prevailed in the present proceedings and the Tribunal sees no reason to depart from the general rule set in Article 40(1) of the UNCITRAL Rules. Indeed, it finds it fair and appropriate that the Claimant bear the entire costs of the arbitration, i.e. EUR 1,551,343.80.

(b) Costs of Legal Representation and Assistance

701. Unlike the position on arbitration costs, the UNCITRAL Rules do not contain a presumption for awarding costs of legal representation and other party costs to the successful party. Rather, they provide that in apportioning these costs, the arbitral tribunal should consider "the circumstances of the case". Doing so, NAFTA tribunals have taken several factors into account including an overall view of the case, the novelty of the case, and the parties' conduct throughout the case.[496]

702. Here, each Party complains of the conduct of the other which, so each says, led to an increase in costs. Each of them also provides explanations to justify its own conduct complained of by the other.

703. The Tribunal recalls that the Claimant advanced a large number of procedural requests in the course of this arbitration. While it was its right to do so, many of these requests unnecessarily burdened the arbitral process and were decided against the Claimant.[497] Further, many "confidential" and "restricted access" designations applied by the Claimant and contested by the Respondent were later voluntarily withdrawn.[498] The Claimant also filed proceedings under Section 1782 of the U.S. Federal Rules of Civil Procedure in various U.S. courts before the constitution of the Tribunal (but after the filing of its Notice of Arbitration). It also sought to make additional Section 1782 requests

---

[496] See, for instance, *Pope & Talbot Inc. v. Government of Canada* (UNCITRAL), Award in Respect of Costs, 26 November 2002, §17 (Investor's Reply Statement of Costs Schedule of Documents at Tab-01); *S.D. Myers v. Government of Canada* (UNCITRAL), Final Award (concerning the apportionment of the costs between the Disputing Parties), 30 December 2002, §49 (Investor's Statement of Costs Schedule of Documents at Tab-01); *Azinian* §§125-126.

[497] See, for instance PO 4 in which the Tribunal rejected the Claimant's request to amend the procedural calendar on the basis that the Claimant had failed to make our any compelling reason to revisit the calendar that had been previously adopted; PO 6, PO 11 in which other procedural requests made by the Claimant were rejected.

[498] The Respondent contends that it challenged 458 confidentiality designations made by the Claimant, of which 210 designations were voluntarily withdrawn by the Claimant (Respondent's Statement of Costs §18). The Claimant has not denied this submission.

while the arbitration was ongoing. All of this created a number of procedural difficulties that might have been avoided.

704. At the same time, it is true that the matters in controversy were genuinely complex and that Mesa's claims raised in part difficult factual and legal issues, the outcome of which was uncertain. In other words, this was a legitimate dispute.

705. Taking all of these aspects into account, the Tribunal is of the view that the Claimant should bear all of its own costs, and 30% of Canada's costs in an amount of CAD 1,832,701.

## VII.  DECISION

706. For the reasons set forth above, the Tribunal:

    i.    Decides that it has jurisdiction over the claims brought in the present proceedings, excluding the claims for breaches that occurred prior to the Claimant's investment in Canada;

    ii.    Decides that these claims are admissible;

    iii.    Decides that, by reason of Articles 1108(7)(a) and 1108(8)(b) of the NAFTA, the Claimant's claims under Articles 1102, 1103 and 1104 of the NAFTA must be dismissed;

    iv.    Decides that the Respondent has not acted in breach of Article 1105 of NAFTA;

    v.    Fixes the costs of the arbitration at EUR 1,551,343.80;

    vi.    Decides that the Claimant shall bear 100% of the arbitration costs fixed in the preceding paragraph and thus orders the Claimant to pay CAD 1,116,000 to the Respondent within 30 days of notification of this award;

    vii.    Decides that the Claimant shall bear 30% of the Respondent's costs and thus orders the Claimant to pay CAD 1,832,701 to the Respondent within 30 days of notification of this award;

viii.    All other claims are dismissed.

All these decisions are unanimous, except for those set forth in subparagraphs (iii) and (iv), which are made by majority.

Seat of the Arbitration: Miami, Florida, U.S.A

Date: 24  march  2016

The Arbitral Tribunal

_____
The Hon. Charles N. Brower
Subject to the attached Concurring and
Dissenting Opinion

_____
Toby Landau Q.C.

_____
Prof. Gabrielle Kaufmann-Kohler