**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**MESA POWER GROUP, LLC,**

    **Petitioner,**

        **v.**

**GOVERNMENT OF CANADA,**

    **Respondent.**

**Civil Action No. 16-1101 (JDB)**

---

## MEMORANDUM OPINION

This is a dispute over enforcement of an arbitration award. Mesa Power Group, LLC ("Mesa"), an energy company, believes that the government of Canada violated the North American Free Trade Agreement in how it awarded various renewable energy contracts in Ontario. An arbitration panel disagreed. Mesa now petitions this Court to vacate that award; Canada counter-petitions for enforcement of the award. Given a federal court's narrow power to review the substance of arbitration awards, the Court will deny Mesa's petition to vacate and grant Canada's counter-petition to enforce the award. Canada also argues that Mesa's petition is frivolous and in bad faith, and therefore requests that this Court award it attorney's fees. The Court will deny that request.

## BACKGROUND

In 2009, the government of the Canadian province of Ontario launched a program designed to encourage renewable energy, known as the Feed-in-Tariff (FIT) program. Mesa Power Grp., LLC v. Gov't of Canada, Case No. 2012-17, Final Award, ¶ 13 (Perm. Ct. Arb., March 24, 2016), Ex. 1 to Resp.'s Br. [ECF No. 22-2] (hereinafter "Award"). Mesa is an energy company that made significant investment in the production of renewable energy in the region with the hope of being

awarded a contract through the FIT program. Pet.'s Br. [ECF No. 1-1] at 5. After Ontario announced the FIT program, it entered into a separate contract, outside of the FIT program, to provide renewable energy to the same electrical grid. Award ¶¶ 38–39. This contract, the Green Energy Investment Agreement (GEIA) was with two Korean companies known as the Korean Consortium. Id.

Mesa believes that when Ontario announced the FIT program, it pledged to award all of the electric grid capacity through FIT, and that Ontario's decision to enter the GEIA reneged on this pledge. Pet.'s Br. at 5–6. Mesa also believes that the GEIA contained fewer requirements of investors than the FIT program did. Id. Mesa contends that these unfair practices amount to a violation of NAFTA, which, broadly speaking, requires signatory nations to treat investors fairly. Id. at 6–9.

Mesa asserted these claims through arbitration, as provided for in NAFTA Article 1116, in October of 2011. Award ¶ 207; North American Free Trade Agreement, Can.-Mex.-U.S., art. 1116, Dec. 17, 1992, 32 I.L.M. 605, 640 (1993) ("NAFTA"). Specifically, Mesa argued that Canada violated several articles of NAFTA Chapter 11. See Award ¶ 208. First and foremost, Mesa claimed that Canada violated Article 1105(1)'s requirement that signatory nations treat investors from another signatory nation "in accordance with international law, including fair and equitable treatment." NAFTA Art. 1105(1); Award ¶ 208. Mesa also claimed that Canada improperly imposed domestic content requirements in violation of Article 1106, and that Canada treated other investors more favorably in violation of Articles 1102 and 1103. Award ¶ 208.

NAFTA provides that arbitration proceedings are governed by NAFTA itself and the 1976 rules of the United Nations Commission on International Trade Law (UNCITRAL Rules). See NAFTA Art. 1120(2). A tribunal of three arbitrators was duly constituted pursuant to these rules.

It reviewed extensive briefing, received factual and expert evidence, and held an oral hearing on October 26–31, 2014. Award ¶¶ 43–180 (evidence), ¶ 181 (oral hearing). The tribunal also received post-hearing briefs, id. ¶ 186, and briefs from the governments of the United States and Mexico, id. ¶¶ 192–204.

On March 24, 2016, the tribunal issued its award. It determined that the FIT program was "procurement" by a government (namely, Canada) as defined by Article 1108, and therefore the requirements of Articles 1102, 1103, and 1106 did not apply. Id. ¶ 465 ("The Tribunal holds that the FIT program constitutes procurement by the Government of Ontario . . . ."); see also id. ¶¶ 403–466 (providing analysis); ¶ 335 (regarding Mesa's claim under Article 1106). The tribunal therefore did not consider Mesa's claims under those articles. It did consider Mesa's Article 1105 claim, however, and ultimately determined that Canada did not violate that provision. Id. ¶ 682. It also determined that Canada did not enter into the GEIA agreement in secret, or after promising to award all of the grid capacity through FIT. Id. ¶ 582. The tribunal in fact found that Mesa was aware that the Korean Consortium had the right to reserve a certain amount of the grid capacity before Mesa made any investments in the region. Id. The tribunal, after finding for Canada on all claims, awarded the costs and fees of arbitration to Canada. Specifically, it ordered payment of CAD 1,116,000 for the cost of arbitration, and CAD 1,832,701, representing 30% of Canada's costs of engaging in arbitration. Id. ¶ 706.

One arbitrator, Judge Charles N. Brower, concurred in part and dissented in part. Award (Brower, J., concurring in part and dissenting in part), Ex. 2 to Pet.'s Br. [ECF No. 1-3]. With respect to Article 1105, he agreed that the tribunal stated the proper standard, but would have applied it differently. Id. ¶ 3. Specifically, he would have found that Canada violated Article 1105 by treating the Korean Consortium more favorably than the applicants to the FIT program, and by

awarding some of the grid capacity through GEIA rather than the FIT program.  Id. ¶¶ 4–24.  In particular, Brower would have held that Canada's decision-making regarding the Korean Consortium crossed over from the realm of reasonable policy choices into unfair treatment in violation of Article 1105.  Id. ¶ 17.  Brower also would have held that the FIT program is not "procurement" as defined by Article 1108.  Id. ¶¶ 25–34.

Mesa now asks this court to vacate the award pursuant to § 10 of the Federal Arbitration Act (FAA), 9 U.S.C. § 10.  Specifically, Mesa contends that vacatur is proper because the arbitrators "exceeded their powers" as defined by § 10(a)(4) and were "guilty of misconduct . . . or . . . misbehavior by which the rights of [Mesa were] prejudiced" as defined by § 10(a)(3).  It also argues that the tribunal acted "in manifest disregard of the law," which the D.C. Circuit has recognized as a valid ground for vacating an arbitral award.  See LaPrade v. Kidder, Peabody & Co., Inc., 246 F.3d 702, 706 (D.C. Cir. 2001) (internal quotation marks omitted).  Mesa identifies two of the tribunal's actions that it believes violate these provisions.  First, Mesa asserts that the tribunal's interpretation of the term "procurement" in Article 1108 was such a departure from the text of NAFTA that it justifies vacatur.  Second, Mesa contends that the tribunal improperly granted "deference" to Canada's decision-making regarding the FIT program and entering the GEIA contract such that the proceedings were inappropriately biased, justifying vacatur.

The Court reviewed full briefing from the parties and held an oral argument on June 1, 2017.

## CHOICE OF LAW

There is a preliminary issue regarding the controlling choice of law.  Canada asserts that the precedent of the Eleventh Circuit, rather than the D.C. Circuit, controls, because the seat of this arbitration was Miami, Florida.  If Eleventh Circuit decisions control, then the legal standard

is much more favorable to Canada: under Eleventh Circuit precedent the grounds for vacating an award enumerated in § 10 of the FAA are not applicable to a foreign arbitral award (like this one), nor is the additional grounds of "manifest disregard of the law" available. See Resp.'s Br. [ECF No. 22] at 14–15 (citing Indus. Risk Ins. v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434 (11th Cir. 1998)).

Canada's argument relies on Article V(1)(e) of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which, as the name suggests, governs enforcement of arbitral awards issued in foreign proceedings, and is incorporated in the Federal Arbitration Act. See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958 ("Convention"), 21 U.S.T. 2517, codified at 9 U.S.C. §§ 201–08. Article V(1)(e) of the Convention states that a court may vacate an award if it "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." "The phrase 'under the law of which' in Article V(1)(e) . . . refers to the procedural law governing the arbitration, not the substantive law governing the Agreement." Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 727 (D.C. Cir. 2012). Thus, because the parties agree that the seat of the arbitration was in Florida—which is within the Eleventh Circuit—Canada argues that the procedural law of the Eleventh Circuit controls.

But this position contradicts the weight of the decisions that have considered similar issues. Neither party has provided the Court with any cases discussing which circuit's precedent governs confirmation (or vacatur) of an arbitral award when the arbitration took place in one circuit and the case is filed in a different circuit. However, there is extensive case law and legal commentary regarding which circuit's precedent applies when a federal question case is transferred from one circuit to another: the law of the transferee court (here, the D.C. Circuit) rather than the transferor

court (here, the Eleventh Circuit) governs.  This is true in the context of transfers for the parties' convenience under 28 U.S.C. § 1404, transfers to obtain proper venue under § 1406, and transfers for multi-district litigation under § 1407.  See Lafferty v. St. Riel, 495 F.3d 72, 83 (3d Cir. 2007) (transfer under § 1406); Hartline v. Sheet Metal Workers' Nat. Pension Fund, 286 F.3d 598, 599 (D.C. Cir. 2002) (per curiam) (transfer under § 1404); In re Korean Air Lines Disaster, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (transfer under § 1407); see generally Charles A. Wright & Arthur R. Miller, 15 Fed. Prac. & Proc. § 3846 (4th ed.) (citing, inter alia, cases from the First, Second, Ninth and Eleventh Circuits reaching similar conclusions); see also Int'l Union of Painters & Allied Trades, Local Unions No. 970 & 1144, AFL-CIO v. NLRB, 309 F.3d 1, 6 (D.C. Cir. 2002) ("To the extent that [plaintiff] asks us to create special circuit law depending on the geographic origins of a case, it asks us . . . to abandon the federal circuits' normal task of trying to determine federal law as correctly as possible.").

        This rule—that the transferee court's interpretation of federal law controls—makes sense given the nature of federal law.  While there are "differences between different states' laws," there is "unitary federal law" and "each [federal court] has an obligation to engage independently in reasoned analysis" interpreting that law.  In re Korean Air Lines Disaster, 829 F.2d at 1175–76. When a federal court interprets federal law, "[b]inding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit." Id. at 1176; see also Richard L. Marcus, Conflict Among Circuits and Transfers within the Federal Judicial System, 93 YALE L.J. 677, 721 (1984)).  This is in contrast to when a federal court sits in diversity jurisdiction, where there are reasons based on comity and federalism for the substantive law of the transferor jurisdiction—that is, the state law of the transferor jurisdiction—to apply.

See <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 637–42 (1964).[1]  But when a court has federal question jurisdiction, these rationales do not apply.  <u>See</u> <u>In re Korean Air Lines Disaster</u>, 829 F.2d at 1176. The only exception to this general rule—one that is not applicable here—is if the transferor court already decided an issue (based on its own interpretation of the law) and thus the "law of the case" governs that issue even in the transferee court.  <u>See</u> <u>Hill v. Henderson</u>, 195 F.3d 671, 678 (D.C. Cir. 1999).

Here, the case was not transferred under §§ 1404, 1406, or 1407—indeed, it was not transferred at all.  Rather, the arbitration took place within the Eleventh Circuit but the petition was filed in this Circuit.  Still, the same reasoning likely applies: there is one federal law, and this Court has an obligation to interpret the law "as correctly as possible."  That might be why, during oral argument, counsel for the respondent could not identify a single case in which a district court applied an interpretation of federal law from another circuit that contradicted the precedent of the circuit where the district court was located.  Interpreting the law "as correctly as possible" requires interpreting the law within the bounds of controlling precedent—which in this district, means D.C. Circuit and Supreme Court precedent.

However, the Court need not actually decide this issue.  Even under D.C. Circuit precedent—which is more favorable to Mesa and which Mesa believes should apply—Mesa's arguments still fail.  Thus, the Court will assume, without deciding, that D.C. Circuit law, specifically its interpretation of federal law, controls.

---

[1] Neither of the parties have argued that the state law of Florida controls.

## LEGAL STANDARD

Mesa asks this Court to vacate the award pursuant to § 10 of the FAA. <u>See</u> 9 U.S.C. § 10. Canada, on the other hand, seeks enforcement of the award pursuant to the Convention. <u>See</u> 9 U.S.C. § 207.

The Convention is codified as part of the FAA, and is "a carefully crafted framework for the enforcement of international arbitral awards." <u>TermoRio S.A. E.S.P. v. Electranta S.P.</u>, 487 F.3d 928, 935 (D.C. Cir. 2007). It "mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made" versus "(2) in other states where recognition and enforcement are sought." <u>Id.</u> (internal quotation marks omitted) (quoting <u>Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.</u>, 126 F.3d 15, 23 (2d Cir. 1997)). When a party seeks to set aside an award in "the state in which, or under the law of which, the award was made," that court is "free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds of relief." <u>Id.</u> (internal quotation marks omitted) (quoting <u>Yusuf Ahmed Alghanim & Sons</u>, 126 F.3d at 23). Here, the arbitration award was issued in the United States, and thus U.S. law—namely the FAA and its "full panoply of express and implied grounds of relief"—applies. <u>Id.</u> at 935–37; <u>see also</u> <u>First Inv. Corp. of Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.</u>, 703 F.3d 742, 748 (5th Cir. 2012) (holding that dismissal on basis of lack of personal jurisdiction as matter of constitutional due process was appropriate); <u>Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account</u>, 618 F.3d 277, 292 (3d Cir. 2010) ("[B]ecause the arbitration took place in Philadelphia, and the enforcement action was also brought in Philadelphia, we may apply United States law, including the domestic FAA and its vacatur standards.").

Under the FAA, a "court shall confirm the [foreign arbitral] award unless it finds one of the grounds for refusal or deferral of recognition or enforcement" that are enumerated in the Convention or the FAA. See 9 U.S.C. § 207; TermoRio, 487 F.3d at 935. The FAA and the Convention therefore "'reflect[] an emphatic federal policy in favor of arbitral dispute resolution.'" Marmet Health Care Center, Inc. v. Brown, 565 U.S. 530, 533 (2012) (per curiam) (quoting KPMG LLP v. Cocchi, 565 U.S. 18, 25 (2011)). This emphatic federal policy is equally true in enforcing foreign arbitration awards. See TermoRio, 487 F.3d 933–34 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)); see also Newco Ltd. v. Gov't of Belize, 650 F. App'x 14, 16 (D.C. Cir. 2016) (nonprecedential).

Thus, "courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2068 (2013) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942 (1995)). This "limited judicial review" is necessary to "'maintain[] arbitration's essential virtue of resolving disputes straightaway.'" Id. (quoting Hall St. Assocs., LLC v. Mattel, Inc., 552 U.S. 576, 588 (2008)). Section 10 of the FAA "provide[s] the FAA's exclusive grounds" for vacating an award. Hall St., 552 U.S. at 584.

The grounds for vacatur "codified in § 10(a) restate the longstanding rule that, '[i]f [an arbitration] award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court . . . will not set [the award] aside for error, either in law or fact.'" Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 693–94 (2010) (Ginsburg, J., dissenting) (alterations in original) (quoting Burchell v. Marsh, 58 U.S. 344, 349 (1855)); see also E. Associated Coal Corp. v. United Mine Workers of Am., 531 U.S. 57, 62 (2000) ("'[A]s long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious

error does not suffice to overturn his decision.'" (quoting <u>United Paperworkers Int'l Union v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987)).  Mesa invokes two of those grounds: § 10(a)(3) and (a)(4). Section 10(a)(3) permits vacatur "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3).  Section 10(a)(4) permits vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  Id. § 10(a)(4).

Mesa also argues that the award may be vacated on the grounds that it is in manifest disregard of the law.  In 2001, the D.C. Circuit explained that "[i]n addition to the limited statutory grounds on which an arbitration award may be vacated, 'arbitration awards can be vacated [only] if they are in manifest disregard of the law.'"  <u>LaPrade</u>, 246 F.3d at 706 (alterations in original) (quoting <u>Cole v. Burns Int'l Sec. Servs.</u>, 105 F.3d 1465, 1486 (D.C. Cir. 1997)).  A tribunal is in manifest disregard of the law if "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."  <u>Id.</u> (internal quotation marks omitted).  In 2008, however, the Supreme Court held that §§ 10 and 11 "provide the FAA's exclusive grounds for expedited vacatur and modification."  <u>Hall St.</u>, 552 U.S. at 584.  Since then, the circuits have taken different approaches to whether "manifest disregard of the law" is simply another way of expressing the grounds in § 10(a) and thus survives, or does not.  <u>See, e.g.</u>, <u>Coffee Beanery, Ltd. v. WW, LLC</u>, 300 F. App'x 415, 419 (6th Cir. 2008) (nonprecedential) ("In light of the Supreme Court's hesitation to reject the 'manifest disregard' doctrine in all circumstances, we believe it would be imprudent to cease employing such a universally recognized principle.")  The D.C.

Circuit has not decided the issue, but has assumed without deciding that "manifest disregard of the law" survives as a separate ground for vacatur. See Affinity Fin. Corp. v. AARP Fin., Inc., 468 F. App'x 4, 5 (D.C. Cir. 2012) (nonprecedential); Regnery Pub., Inc. v. Miniter, 368 F. App'x 148, 149 (D.C. Cir. 2010) (nonprecedential). This Court takes the same approach, and assumes without deciding that "manifest disregard of the law" is a valid ground for vacatur under the FAA.

When analyzing these grounds for vacatur, "[i]t is not enough for petitioners to show that the panel committed an error—or even a serious error." Stolt-Nielsen, 559 U.S. at 671 (citing E. Associated Coal, 531 U.S. at 62). Rather, under § 10(a)(4) "'[i]t is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable.'" Id. (second and third alteration in original) (quoting Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (per curiam)). In other words, "[o]nly if 'the arbitrator act[s] outside the scope of his contractually delegated authority'—issuing an award that 'simply reflect[s] [his] own notions of [economic] justice' rather than 'draw[ing] its essence from the contract'—may a court overturn his determination." Oxford Health Plans LLC, 133 S. Ct. at 2068 (first alteration added) (quoting E. Associated Coal, 531 U.S. at 62). Thus, "the sole question" is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." Id.

The scope of review under § 10(a)(3) is similarly narrow. See Howard Univ. v. Metro. Campus Police Officer's Union, 512 F.3d 716, 721–22 (D.C. Cir. 2008). Section 10(a)(3) is focused on whether the tribunal refused to hear material evidence, or otherwise employed an improper procedure. See 9 U.S.C. § 10(a)(3); see also Gulf Coast Indus. Workers Union v. Exxon Co., USA, 70 F.3d 847, 850 (5th Cir. 1995) (vacating award where the arbitrator refused to consider key evidence); Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc., 607 F.2d 649,

653 (5th Cir. 1979) (vacating award based on arbitrator's ex parte communications with a party).

But because "'an arbitrator need not follow all of the niceties'" of the federal rules of evidence, a court's inquiry is limited to whether the tribunal "'grant[ed] the parties a fundamentally fair hearing.'" Howard Univ., 512 F.3d at 721 (quoting Lessin v. Merril Lynch, Pierce, Fenner & Smith, Inc., 481 F.3d 813, 816 (D.C. Cir. 2007)). Hence, a court "'may vacate an award only if the panel's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings.'" Id. (quoting Lessin, 481 F.3d at 818). With this narrow scope of review in mind, the Court turns to the issues at hand.

## ANALYSIS

Mesa identifies two alleged errors in the tribunal's analysis that show that the tribunal exceeded its powers, prejudiced Canada's rights, and acted in manifest disregard of the law. These are, first, the tribunal's interpretation of "procurement" as used in Article 1108 of NAFTA, and second, the tribunal's deference to the government of Ontario's decisionmaking discretion in implementing its renewable energy policy.

### I.     The Tribunal's Interpretation of "Procurement"

Section 1108 of NAFTA states that "Articles 1102, 1103, and 1107 do not apply to: (a) Procurement by a Party or a State enterprise" and that "Article 1106(1)(b) . . . [does] not apply to procurement by a party or a State enterprise." NAFTA Art. 1108(7), (8)(b). In the arbitration, Mesa argued that because individual consumers purchase electricity through the grid, neither FIT nor GEIA involve procurement by a state enterprise. The tribunal, however, disagreed. It explained that because the government enters into contracts with energy generators to supply the electrical grid with power, that constitutes government procurement, even if the end consumers are individuals who ultimately purchase the electricity from the grid. See Award ¶¶ 443–448.

Thus, because the FIT program and the contracts through the GEIA were "procurement" by the Government of Ontario, then Articles 1102, 1103, and 1106 did not apply. In making this determination, the tribunal noted that

> it makes no difference . . . whether one focuses upon the single word 'procurement' or the phrase 'procurement by a Party or a state enterprise' [in Article 1108]. The words '. . . by a party or a state enterprise' identify the entities involved, but do not change the nature of the activity itself—which in this context assumes a State Party or state enterprise in any event."

Id. ¶ 421 (second alteration in original).

The Supreme Court explained in Oxford Health Plans v. Sutter that "[s]o long as the arbitrator was 'arguably construing' the contract . . . a court may not correct his mistakes under § 10(a)(4)." Oxford Health Plans, 133 S. Ct. at 2070 (quoting E. Associated Coal, 531 U.S. at 62). Here, the tribunal comprehensively examined the text itself and the parties' arguments regarding the text before ultimately concluding that the FIT program constituted "procurement" under Article 1108.

The tribunal fully considered the primary argument that Mesa advances in this litigation: that the word "procurement" in Chapter 10 of NAFTA excludes this type of contracting, and therefore the word should be interpreted analogously in Chapter 11, which includes Article 1108. Award ¶¶ 378–84. Article 1001(5)(a), in Chapter 10, states that "procurement does not include . . . government provision of goods and services to persons." This definition, Mesa argued then and persists in arguing now, extends to Article 1108, and excludes Ontario's contracts to supply renewable energy to the electrical grid, which will eventually be purchased by consumers. But the tribunal rejected this argument after examining the role and structure of Chapter 10 versus Chapter 11 versus other chapters of the treaty. See Award ¶ 417, 423–430.

It also compared the text of Article 1108 to other uses of the word "procurement" in NAFTA and other international trade agreements. See id. ¶¶ 395–403. It considered and differentiated the numerous previous arbitral awards that Mesa referenced, as well as the ordinary meaning of the word in other contexts and the dictionary meaning. Id. ¶¶ 404–417. The tribunal also discussed whether other adjudicatory bodies had considered the purchase of energy to be "procurement" by a government. See id. ¶¶ 449–461. It then looked at the broader purpose of Article 1108 within the structure of NAFTA. Id. ¶¶ 418–439. As part of that analysis, the tribunal noted that the context of Article 1108 makes it clear that "procurement" refers to procurement by a state, whether or not the text of Article 1108(7) or (8) include that specific language. Id. ¶ 421.

There can be no serious debate that the tribunal was interpreting the text of NAFTA to reach its conclusion, and that it did so exhaustively. The tribunal employed all of the standard interpretative tools that a court or arbitration panel would normally use when interpreting a text. The dissenting opinion proves as much: there, Brower explains how he would have used the same interpretative tools but analyzed them differently. See, e.g., Award (Brower, J., concurring in part and dissenting in part) ¶ 29 (explaining how he would have distinguished the precedent that the majority relied on). The fact that the tribunal noted that some words were superfluous in context does not transform the tribunal's thorough analysis from a text-based interpretation into something else. The tribunal might have been wrong, but "[t]he potential for those mistakes is the price of agreeing to arbitration." Oxford Health Plans, 133 S. Ct. at 2070.

Mesa argues that the panel's disregard of the words "Party or state enterprise" crosses the line from a mere mistake, which is not grounds for vacatur, into abandoning the text entirely and thus exceeding the tribunal's authority. Federal courts can vacate arbitration awards where the tribunal's decision "disregard[s] or modif[ies] unambiguous contract provisions" and thus exceeds

its authority.  See Mo. River Servs., Inc. v. Omaha Tribe of Neb., 267 F.3d 848, 855 (8th Cir. 2001) (internal quotation marks omitted); Hoteles Condado Beach v. Union De Tronquistas Local 901, 763 F.2d 34, 41 (1st Cir. 1985) (quoting the same); see also PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd., 659 F. Supp. 2d 631, 639 (E.D. Pa. 2009) (similar).  But here the tribunal did not disregard or modify an unambiguous provision of the treaty.  Indeed, it interpreted relevant text to determine that the FIT program constituted "procurement by a Party or state enterprise," i.e., by the government of Ontario.  The fact that it did so while explaining that some words in that article were redundant in the specific context does not mean it disregarded or modified the text of the treaty.  Because "[i]t is the arbitrator's construction [of the contract] which was bargained for" and "the arbitrator[s'] decision concerns construction of the contract," this Court therefore has "no business overruling [the tribunal]."  Oxford Health Plans, 133 S. Ct. at 2071 (internal quotation marks omitted).  Accordingly, the panel did not exceed its authority as defined by 9 U.S.C. § 10(a)(4).

Mesa contends that the tribunal's analysis of Article 1108 was a refusal to interpret the text at all, and thus was "misbehavior" under § 10(a)(3) and was in manifest disregard of the law.  See Pet.'s Br. [ECF No. 1-1] at 26–27 (citing Hoteles Condado Beach, 763 F.2d at 41); Pet.'s Opp'n & Rep. [ECF No. 30] at 34–38.  But as explained above, the tribunal did undoubtedly interpret the text of the treaty.  And it did so after exhaustively reviewing the evidence that Mesa presented.  Mesa simply disagrees with the interpretation that the tribunal adopted.  Hence, Mesa has not shown that the tribunal's interpretation of the word "procurement" provides a basis for vacating the award under § 10(a)(3), (a)(4), or "manifest disregard of the law."

## II.     The Tribunal's "Deference" to Canada

Article 1105(1) of NAFTA states: "Each Party shall accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security."  NAFTA Art. 1105(1).  The tribunal explained that "the following components can be said to form part of Article 1105: arbitrariness; gross unfairness; discrimination; complete lack of transparency and candor in an administrative process; lack of due process leading to an outcome which offends judicial propriety; and manifest failure of natural justice in judicial proceedings."   Award ¶ 502 (internal quotation marks omitted).  It further explained that "when defining the content of Article 1105, one should further take into consideration that international law requires tribunals to give a good level of deference to the manner in which a state regulates its internal affairs."  Id. ¶ 505.  Quoting another arbitral award, the tribunal noted that states will sometimes make "controversial judgments" and "clear-cut mistakes" because "[s]tate authorities are faced with competing demands on their administrative resources" but "the imprudent exercise of discretion or even outright mistakes do not, as a rule, lead to a breach" of Article 1105.  Id. (internal quotation marks omitted).

Mesa urges that giving the government "a good deal of deference" in determining whether the government's actions were arbitrary or unfair is itself so unfair as to prejudice the proceedings, exceed the tribunal's authority, and demonstrate manifest disregard for the law.  Mesa contends that this deference changed the standard of proof in this proceeding, which rendered the proceeding fundamentally unfair and violated the "equality of the parties" that is guaranteed by the rules governing this arbitration contained in Article 1115 of NAFTA and UNCITRAL Rule 15(1).

Mesa's arguments are unpersuasive.  The tribunal did not grant Canada deference on its legal arguments or on its factual assertions as that term is usually used in U.S. law.  Instead, the

tribunal closely—indeed exhaustively—analyzed whether Canada acted fairly. The tribunal walked through all of Canada's actions that Mesa claimed violated Article 1105. See Award ¶¶ 513–51 (summarizing the parties' positions on the facts in dispute); id. ¶¶ 552–682 (making factual findings and analyzing whether Canada's actions violated Article 1105). It examined the facts and made de novo factual findings on the contested issues, including whether Canada imposed similar requirements on the Korean Consortium as it did on the FIT applicants, and whether Canada misled FIT applicants about what percentage of the grid capacity would be allocated through FIT. See, e.g., Award ¶ 569–72 (finding significant requirements imposed on Korean Consortium); id. ¶ 585 (finding Korean Consortium was not offered additional government assistance); id. ¶ 582 (finding reservation of grid capacity for Korean Consortium was not done in secret).

Thus, the tribunal's "deference" merely amounted to an acknowledgment that a government is entitled to make policy choices that are not perfectly rational. The tribunal explained that although Canada could have behaved differently with respect to FIT and the GEIA, those "are all policy considerations and questions that were for the government of Ontario alone." Id. ¶ 579. The tribunal continued:

> It is not the Tribunal's role to . . . weigh the wisdom of Ontario's decision to enter into the GEIA at the time . . . . Rather, it is for the Tribunal to examine whether . . . the beneficial treatment was granted to the Korean Consortium arbitrarily, or in any other way that contravened Article 1105. In particular, the Tribunal must determine whether Canada's conclusion of the GEIA lacked a justification, and whether there was a reasonable relationship between the justification supplied and the terms of the GEIA.

Id. When read in the context of the full award, the tribunal's statement quoted above, and its statement that it would give a "good level of deference to the manner in which [Canada] regulates its internal affairs" in paragraph 505, merely amount to the relatively mundane observation that an imperfect policy choice by a government actor is not necessarily unfair or inequitable within the meaning of Article 1105.

The parties' continued dispute about the legal validity of that point shows that their disagreement is over whether the law was correctly applied, not over whether the tribunal exceeded its power or disregarded the law entirely. Mesa presents numerous arbitral awards that conclude that an arbitration panel has an obligation to examine the facts before it, while also acknowledging that a government has some room to make policy decisions, which is described as "deference." See Pet.'s Opp'n & Rep. at 25–28; Not. of Supp. Auth. [ECF No. 32]. One of these arbitral awards that Mesa cites explains a tribunal's obligation when examining a country's conduct as follows:

> Given that the Claimant invokes [Article 1105(1)] . . . the Tribunal must determine whether the Respondent's conduct [violated that article]. . . . This determination is best done, not in the abstract, but in the context of the facts of this particular case, taking into account the indirect evidence of the content of the customary international law minimum standard of treatment as evidence in the decisions of other NAFTA tribunals.

Windstream Award, Ex. A to Not. of Supp. Auth. [ECF No. 32-1] ¶ 358. Mesa argues that this statement rejects any concept of deference, and shows that the tribunal here acted outside of its authority.

But contrary to Mesa's assertions, that analysis is exactly what this tribunal engaged in. The tribunal did review the facts and reach factual determinations on contested issues. Furthermore, the tribunal itself acknowledged several of these same prior arbitral awards that Mesa relies on in its briefs to this Court, and concluded those awards were in accordance with the deference standard it employed. See Award ¶ 505 n.36.

Judge Brower's dissent also demonstrates that the issue here is simply over whether the tribunal applied the law correctly. He acknowledges that a government has some room to make policy decisions without running afoul of Article 1105. See Award (Brower, J., concurring in part and dissenting in part) ¶ 17 ("There is an acceptable range of potential change that the Province could lawfully effect."). He then disagrees on whether the government acted within that reasonable

policymaking authority, or crossed the line into unfair conduct prohibited by Article 1105. Id. But nothing in Brower's dissent indicates that he believes that the tribunal acted so far outside of the bounds of its authority that it cannot be said to be interpreting the text, or that it prejudiced the rights of a party, or acted in manifest disregard of the law.

Ultimately, there is nothing in either the tribunal's award or the dissent to indicate that the tribunal engaged in "misbehavior by which the rights" of Mesa "were prejudiced" under § 10(a)(3) or that it "exceeded its powers" under § 10(a)(4). Mesa argues that consent to arbitration was premised on the arbitrators' following the rules of arbitration—which require "equal treatment" and due process for both parties, as defined by NAFTA Article 1115 and UNCITRAL Rule 15(1). Mesa of course is correct that the agreement to arbitrate is premised on the arbitrator's following the agreed-upon rules, and that by doing otherwise a tribunal might exceed its powers or misbehave in a manner that causes prejudice. See Stolt-Nielsen, 559 U.S. at 670–71; Oxford Health Plans, 133 S. Ct. at 2068. And applying an incorrect standard of proof—such as "beyond a reasonable doubt" when "preponderance of the evidence" is appropriate—is one way in which an arbitrator might stray from the agreed-upon rules of arbitration. See Sq. Plus Operating Corp. v. Local Union No. 917, 90 Civ. 1713 (LJF), 1992 WL 116610, at *2 (S.D.N.Y. May 15, 1992) (vacating arbitration award where arbitrator required proof beyond a reasonable doubt rather than applying preponderance of the evidence standard); In re A.H. Robins, Co., Inc., 221 B.R. 169, 175 (E.D. Va. 1998) (vacating award where arbitrator improperly "relieved [a party] of her burden of proving causation"). But there is nothing here to show that the tribunal treated the parties unequally or changed the standard of proof. The tribunal interpreted the text of Article 1105, which requires "fair and equitable treatment," in accordance with "international law" to include a traditional norm that a government's action is not unfair or inequitable if it had a justification, and if "there was a reasonable relationship between the justification supplied" and the action taken. Award ¶ 579.

This is an interpretation of the text of the treaty based, as explained above, on analysis of the text, context, and structure of the treaty, other relevant treaties, and relevant precedent from similar arbitration awards. Whether or not that interpretation was correct, it surely was not an abdication of the tribunal's duty to interpret the contract, nor was it "misbehavior." And it did not change any standard of proof: the tribunal did not presume that Canada's factual assertions were correct or defer to Canada's legal interpretations of what Article 1105 requires. Rather, the tribunal merely acknowledged that a government can make poor or mistaken decisions without violating Article 1105's prohibition on inequitable treatment. The tribunal thus simply reached a legal conclusion that Mesa does not agree with.

Similarly, the tribunal did not "[know] of a governing legal principle yet refuse[] to apply it" or ignore law that "was well defined, explicit, and clearly applicable to the case." LaPrade, 246 F.3d at 706. The tribunal stated the governing legal rule by quoting Article 1105, and interpreted it by drawing on past arbitral awards to give meaning to the vague standard of "fair and equitable treatment." Moreover, even if the tribunal stated the wrong standard, Mesa has certainly not demonstrated that there is a different interpretation of "fair and equitable treatment" that is well-defined, explicit, and clearly applicable here. At best, there is conflicting authority on how deference plays into the standard under Article 1105, as demonstrated by the numerous arbitral awards submitted by the parties that employ deference to a government's decisionmaking slightly differently.[2] See, e.g., Resp.'s Br. [ECF No. 22] at 30–33 (collecting cases). Thus, this award cannot be vacated on the ground of manifest disregard of the law.

---

[2] In its briefing, Canada compares this "deference" under international law to a federal court's deference to an administrative agency under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). While there appear to be some similarities between Chevron deference and the type of deference the tribunal employed here—namely, the principle of according governments room to weigh competing policy values and make choices, even if imperfect ones—the deference that the tribunal employed seems to be a different type. The tribunal did not accept Canada's interpretation of the law (whether Article 1105 or any other law) in lieu of its own, which is a core

### III.   Canada's Request for Attorney's Fees

Canada argues that a court has inherent authority to award attorney's fees when the "'losing party's actions were frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'"  See Resp.'s Br. at 40–41 (quoting Unite Here Local 23 v. I.L. Creations of Md., Inc., 148 F. Supp. 3d 12, 23 (D.D.C. 2015)).  Mesa responds that the Court only has the power to award fees against a party who acts in bad faith.  See Pet.'s Opp'n & Rep. at 39 (citing United States v. Wallace, 964 F.2d 1214, 1219 (D.C. Cir. 1992)).

Regardless of what exact power the Court has, Mesa's appeal is not frivolous and does not indicate subjective or objective bad faith.  Although Mesa's petition will be denied, seeking vacatur alone is not an indication of bad faith—rather, it is simply an exercise of the losing party's rights.  Cf. Getma Int'l v. Republic of Guinea, 142 F. Supp. 3d 110, 114–15 (D.D.C. 2015) (employing bargained-for review mechanisms is within the parties' rights); NAFTA Art. 1136 (contemplating enforcement or vacatur proceedings when parties do not voluntarily comply with arbitration awards).  Mesa has identified two grounds for vacatur that are explicitly enumerated in the FAA, and one that is arguably implied and has been recognized by this Circuit previously.  While Mesa's arguments that these three grounds justify vacating the award are not meritorious, they are not so lacking in merit to be described as frivolous or as evidence of bad faith.  Thus, Canada's request for fees and costs incurred in this civil action will be denied.

### CONCLUSION

The Court will deny Mesa Power Group's petition to vacate the award, and will grant the Government of Canada's counter-petition to confirm the award.  Canada's request for attorney's fees will be denied.  A separate order will be issued on this date.

---

tenant of Chevron.  See generally Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 512–14 (discussing Chevron deference and statutory interpretation).

_____/s/_____
                                                              JOHN D. BATES
                                                     United States District Judge

Dated: June 15, 2017